## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JILL E. SOUTHWORTH, as TRUSTEE )
of the JILL SOUTHWORTH )
REVOCABLE TRUST, et al., )
                                )

      **Plaintiff,**          )

**v.**                             )    **Case Number _____**

                                )

HARTFORD INVESTMENT )    **Demand for Jury Trial**
FINANCIAL SERVICES, LLC, )
                                )

      **Defendant.**      )
_____/

## COMPLAINT

Plaintiff Jill E. Southworth, as Trustee of the Jill Southworth Revocable Trust ("Plaintiff"), brings this action on behalf of and for the benefit of: the Hartford Capital Appreciation Fund; the Hartford Dividend & Growth Fund; the Hartford Income Fund; the Hartford Midcap Fund; the Hartford Short Duration Fund; and the Hartford Total Return Bond Fund (collectively, "the Hartford Funds"), and sues Hartford Investment Financial Services, LLC ("Defendant" or "HIFSCO"), an indirect wholly owned subsidiary of Hartford Financial Services Group, Inc. ("HIG"), a company having shares listed on the New York Stock Exchange.

## OVERVIEW

The Plaintiff seeks to rescind the investment management agreements and distribution plans between Defendant and the Hartford Funds and to recover the total fees charged by Defendant thereunder or, alternatively, to recover any improper compensation received by Defendant in breach of its statutory fiduciary duty under Section 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b) (hereinafter "Section 36(b)" or "§ 36(b)").  The conduct complained of herein is continuing in nature, and Plaintiff seeks

recovery from the earliest possible period allowed by the applicable statute of limitations through the date of final judgment after trial.  Plaintiff alleges:

## I.      JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

2.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 87, as the Defendant inhabits or transacts business in this district, a substantial part of the events or omissions that give rise to Plaintiff's claims occurred in this district, and Defendant may be found in this district.

3.      No pre-suit demand on the Board of Directors of the Hartford Mutual Funds, Inc., the Board overseeing the Hartford Funds, is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under § 36(b) of the ICA.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).

4.      All conditions precedent have been performed, or have been satisfied or waived.

## II.     NATURE OF THE ACTION

5.      This action is a derivative action brought by the Plaintiff, for the benefit of and on behalf of the Hartford Funds, pursuant to ICA § 36(b).

6.      The Hartford Mutual Funds, Inc. (hereinafter "HMF") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq.* comprised of various mutual funds, including the Hartford Funds, each of which is a separate investment portfolio or mutual fund.

7.      The Plaintiff, who owns shares of each of the Hartford Funds described herein, alleges that the investment management fees charged to each of the Hartford Funds by HIFSCO, the Funds' investment manager, breach HIFSCO's fiduciary duty to the Funds with respect to

such compensation in violation of § 36(b) as demonstrated by, *inter alia*: (a) the nature and quality of services provided to the Hartford Funds and their shareholders in exchange for the investment management fees, including the fact that Defendant subcontracts out the critical mass of management services at a fraction of the actual investment management fees charged to the Funds; (b) the failure of the Hartford Funds' Board of Directors to exercise the requisite level of care and conscientiousness in approving the investment management agreements; (c) the failure of Defendant to provide the Hartford Funds' Board of Directors with all information reasonably necessary to evaluate the terms of the investment management agreements with respect to each of the Funds; (d) the level of the fees as compared to those charged by Defendant or its affiliates to institutional accounts, including non-mutual fund customers; (e) the fees other mutual fund advisers charge for similar services to similar mutual funds; (f) the failure of Defendant to adequately pass economies-of-scale savings on to the Funds and their shareholders, and the retention of those economies-of-scale savings by Defendant; and (g) Defendant's costs and high profitability associated with providing investment management services to the Hartford Funds.

8.    The Plaintiff further alleges that HIFSCO received Rule 12b-1 Distribution Fees ("12b-1 fees") from the Funds and breached its fiduciary duty to the Funds with respect to such compensation, as demonstrated by, *inter alia*: (a)  the fact the 12b-1 fees have produced few, if any, benefits (in the form of economies-of-scale benefits, or otherwise) for the Hartford Funds but, rather, have been used by Defendant to generate additional investment management fee revenue for itself; (b) the nature and quality of the services provided in exchange for the 12b-1 fees; and (c) Defendant's failure to provide the Hartford Funds' Board of Directors with all information reasonably necessary to evaluate the Rule 12b-1 Distribution Plans and 12b-1 fees paid pursuant thereto.

9.     The allegations in this Complaint are predicated on publicly available information, including information contained in the public filings with the Securities and Exchange Commission of Hartford Mutual Funds, Inc., and on information and belief after a reasonable investigation.

## III.   PARTIES

10.    Plaintiff Jill E. Southworth owns shares in each of the Hartford Funds as Trustee of the Jill Southworth Revocable Trust.

11.    Defendant HIFSCO is the investment manager for each of the Hartford Funds. Defendant HIFSCO is registered as an investment adviser under the Investment Advisers Act of 1940 ("the Investment Advisers Act").  HMF, on behalf of each of the Funds, has entered into an Investment Management Agreement with HIFSCO.  The Investment Management Agreement provides that HIFSCO, subject to the supervision and approval of HMF's Board of Directors, shall (a) provide investment advice and recommendations to each fund, (b) supervise continuously the investment program of each fund and determine what securities should be bought and sold by each fund, (c) arrange for the purchase and sale of investments for each fund, and (d) provide economic and statistical data and/or other information as HIFSCO shall deem appropriate or as shall be requested by the Board of Directors.  Since 1997, HIFSCO has continuously been the primary investment adviser to the Hartford Funds and/or their predecessors pursuant to an Investment Management Agreement.  *See* Composite Exhibit 1, comprised of the March 3, 1997 Investment Management Agreement, as amended, in pertinent part on December 31, 1997; October 31, 2002; and November 1, 2008; as well as the November 1, 2009 Investment Management Agreement.  *See also* Composite Exhibit 2, comprised of the February 6, 2008 Expense Limitation Agreement, as amended and restated on November 1, 2008; November 1, 2009; and May 28, 2010.   HIFSCO is an affiliate of  Hartford Financial

Services Group, Inc. ("HIG") (together with its subsidiaries, the "Hartford" or "Company"),[1] an insurance and financial services company having shares listed on the New York Stock Exchange.[2]  HIG, through its wholly-owned subsidiaries, provides a variety of investment management, administrative, and operational services for a large number of investment companies or mutual funds (the "Hartford Funds Complex") and managed accounts, including HIG's indirect wholly owned subsidiary HIFSCO.

12.    Defendant HIFSCO is also a registered broker-dealer and serves as the Hartford Funds' principal underwriter and distributor.  HIFSCO receives distribution, or "12b-1" fees, from each of the Hartford Funds pursuant to Rule 12b-1 Distribution Plans adopted by HMF on behalf of the Funds.  *See* Exhibit 3, the August 3, 2006 HMF Amended and Restated Distribution Plan.

13.    Defendant, as the underwriter, distributor, adviser, and control person of the Harford Funds received compensation from the funds for providing investment management and other services to them.  As such, Defendant owes fiduciary and other duties to the Plaintiff and all shareholders of each of the funds.

## IV.    THE PURPOSE OF SECTION 36(b)

14.    Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation.  Congress recognized as early as 1935 that because "a typical [mutual] fund is organized by its investment advisor which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the

---

[1] Plaintiffs refer to HIG, together with its subsidiaries and/or affiliates that perform a variety of investment management, administrative, and operational services to mutual funds and managed accounts, collectively as "Hartford" or the "Company" which is also how Hartford refers to itself in its public filings.

[2] The New York Stock Exchange ticker symbol for Hartford Financial Services Group, Inc. is HIG.

advisor." S. Rep. No. 91-184, p. 5 (1969). Therefore, "the forces of arm's-length bargaining do

not work in the mutual fund industry in the same manner as they do in other sectors of the

American economy." *Id*. As a result in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected . . .
> when investment companies are organized, operated [and] managed . . . in the
> interest of . . . investment advisers . . . rather than in the interest of [shareholders] .
> . . or when the investment companies . . . are not subjected to adequate
> independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994). Accordingly, the ICA was designed to regulate and

curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Associates

L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536

(1984)), and to create standards of care applicable to investment advisers and their affiliates,

such as Defendant.

15. The Hartford Funds Complex, like almost all other mutual fund complexes,

operates under a single structure consisting of a group of related investment companies (the

mutual funds themselves) that are owned by their shareholders and governed by a Board of

Directors. However, the mutual funds themselves are basically corporate shells in that they have

few or no employees. Instead, the mutual funds contract for all of the services they need –

including distribution of their securities, custodianship of their assets, auditing, servicing

shareholder accounts, portfolio management, and day-to-day administration – all of which are

provided by or arranged for by Defendant and its affiliates. For this very reason, "the

relationship between investment advisers and mutual funds is fraught with potential conflicts of

interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and "potentially incestuous." *Gartenberg

v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

16. Each of the services provided by Hartford through its various affiliates is the

subject of separate contracts, each of which gives rise to a separate fee paid by the Funds. *See*

*e.g.,* Exhibit 4: the February 8, 2007 Master Custodian Contract; Composite Exhibit 5: the February 1, 2006 Transfer Agency and Service Agreement, as amended on November 1, 2006; December 15, 2006; November 1, 2007; November 1, 2008; November 1, 2009; and November 1, 2009; Composite Exhibit 6: the Transfer Agency Fee Waiver Agreement, dated February 6, 2008; October 2, 2009; and May 28, 2010; Composite Exhibit 7: the July 22, 1996 Principal Underwriting Agreement, as amended effective July 22, 1997, and as assigned effective November 1, 1998; Composite Exhibit 8: the January 3, 2000 Fund Accounting Agreement, as amended on July 23, 2001; October 31, 2002; August 25, 2003; September 27, 2005; May 31, 2007; November 30, 2007; January 1, 2008; March 1, 2008; October 31, 2008; and May 28, 2010; and Exhibit 9: the May 3, 2004 Share Purchase Agreement.

17.    Plaintiff does not complain of the myriad other fees charged by Hartford to the Hartford Funds, other than the investment management and 12b-1 fees charged by HIFSCO.

18.    Under the terms of the Investment Management Agreement, Defendant HIFSCO provides two categories of services: investment management services and administrative services.   *See* Composite Exhibit 1.[3]   Various other services which investment managers typically provide – Custodian, Transfer Agency and Service, Underwriting, and Accounting – are not provided by HIFSCO.  Instead, the Funds contract directly with other entities.  *See supra* Exhibit 4-9.  To the extent they are included in the Management Agreement, on information and belief, the administrative type services included are a very small percentage of the expenses incurred under the agreement as transfer agency costs are typically by far the largest component of administrative costs but are provided to the Hartford Funds pursuant to a separate contract with Hartford Administrative Services Company ("HASCO"), a wholly owned subsidiary of

---

[3] Although the Investment Management Agreement purports to include administrative services, it bears noting that the Funds' Annual Reports include a separate line item for administrative services fees paid by the Funds.

HIG.  *See supra* Exhibit 6.  HASCO's services include communications with each Hartford Fund's shareholders as well as the preparation and distribution of reports, proxies, notices, confirmation of transactions, prospectuses, and tax information.  In the aggregate, various miscellaneous administrative items aside from the transfer agency cost do not account for more than three basis points of the average mutual fund's advisory fee.  *See* John P. Freeman, Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 Okla. L. Rev. 83, 113 (2008), attached as Exhibit 10.

19.     As discussed below, the fees charged to each of the Hartford Funds by HIFSCO for the investment management services breach HIFSCO's fiduciary duty to the Funds with respect to such compensation, especially in light of the fact that HIFSCO has delegated virtually all of its duties to subcontractors at a fraction of HIFSCO's fee, and when compared to the fees charged by Hartford to institutional accounts that bargain at arm's length.  Likewise, the 12b-1 fees charged to the Hartford Funds breach HIFSCO's fiduciary duty to the Funds with respect to such compensation because those fees inure few, if any, benefits to the Funds and their shareholders but, rather, serve as a means by which Defendant can extract additional management compensation and because those fees were not approved in accordance with applicable statutory and/or regulatory requirements.

20.     Defendant's, or its affiliates', purpose in starting, maintaining, and servicing mutual funds is to make a profit on the management, administrative, and shareholder services sold to the Funds for fee income to the service-providers.

21.     When Hartford starts a new mutual fund, it not only contracts to provide all the services the funds need but also nominates and elects the members of the fund's Board

(including all "independent" Board members[4]), which consists of the same people that serve on the boards of all of the funds in the Hartford Funds Complex.

22.     The Hartford Funds are governed by a Board of Directors.[5]   These same individuals, including all independent board members, simultaneously serve on the Boards and oversee approximately 88 portfolios consisting of 93 mutual funds in the Hartford Funds Complex.

23.     The Board members are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component, as well as retirement benefits.  For the fiscal year ending October 31, 2009, according to publicly available information, the Board members for the funds in the Hartford Funds Complex received total compensation in the following amounts:

| | |
|---|---|
| Lynn S. Birdsong | $190,000 |
| Dr. Robert M. Gavin | $266,500 |
| Duane E. Hill | $170,000 |
| Sandra S. Jaffee | $164,500 |
| William P. Johnston | $196,500 |
| Phillip O. Peterson | $196,500 |
| Lemma W. Senbet | $159,000 |
| Lowndes A. Smith[6] | $189,000 |

24.     While mutual fund boards are supposed to be the "watchdogs" for the shareholders of the funds, two noteworthy industry insiders have commented on the general failure of mutual fund boards to fulfill their responsibilities under the ICA.

---

[4] "Independent" board members are those who are not "interested persons" as defined under the 1940 Act.  *See* 15 U.S.C. § 80a-2(a).

[5] Plaintiff uses the terms "trustee" and "director" interchangeably, as is conventional under the ICA.  *See* 15 U.S.C. § 80a-2(a)(12).

[6] Lowndes A. Smith is an "interested" director by virtue of his prior position as a Hartford executive.

25.     Jack Bogle, founder of the Vanguard Group, made the following comment:

Well, fund directors are, or at least to a very major extent, sort of a bad joke. They've watched industry fees go up year after year, they've added 12b-1 fees. I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser. It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

26.     Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the

following comment, which was quoted by a United States District Court:

I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money. The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management — whether management was good, bad, or indifferent. Not negotiate for fee reductions and so on. A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans. I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp.2d 373, 383 (S.D.N.Y. 2002)(citation omitted).

27.     Mr. Buffet has also stated, in his letter to shareholders in the 2002 Berkshire

Hathaway, Inc. annual report:

[A] monkey will type out a Shakespeare play before an "independent" mutual-fund director will suggest that his fund look at other managers, even if the incumbent manager has persistently delivered substandard performance. When they are handling their own money . . . directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others . . . Investment company directors have failed as well in negotiating management fees . . . If you or I were empowered, I can assure you that we could easily negotiate materially lower management fees with the incumbent managers of most mutual funds. And, believe me, if directors were promised a portion of any fee savings they realized, the skies would be filled with falling fees. Under the current system, though, reductions mean nothing to "independent" directors while meaning everything to managers. So guess who wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably. (They've succeeded, however, in taking care of themselves; their fees from serving on multiple boards of a single "family" of funds often run well into six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

28.     These statements exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."

29.     In the late 1960s, it became clear to Congress that investment advisers to mutual funds were gouging those funds with unreasonable and excessive fees, particularly by not taking economies of scale into account when setting fees to charge investors.  As a result, § 36(b) was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

30.     Section 36(b) also created a judicial remedy for breach of such fiduciary duty by authorizing litigation against investment advisers, their affiliates, and certain others by the Securities and Exchange Commission ("SEC" or the "Commission") or by a security holder on behalf of the investment company with respect to payments made to such entities or persons by the investment company or by its security holders.  Section 36(b) states, in pertinent part:

> Sec. 36(b).  For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in the respect of such compensation or payments paid by such registered investment company or the security holders thereof to such investment adviser or person.  With respect to any such action, the following provisions shall apply:
>
> (1)  It shall not be necessary to prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
>
> (2)  In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other

arrangements providing for such compensation payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company shall be given such consideration by the court as is deemed appropriate under all the circumstances.  15 U.S.C. Sec. 80a-35(b).

***********

31.     Congress enacted § 36(b) to provide shareholders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes.   1970 U.S.C.C.A.N. at 4898.  Congress chose not to rely simply on a fund's directors to prevent excessive fees and other abuses.  Rather, Congress intended security holder legal actions under § 36(b) to act as independent checks on an adviser's fulfillment of its fiduciary duties.

32.     Furthermore, while on a shareholder-by-shareholder basis, the fees charged and received by Defendant may appear to be very small, they cause a dramatic decrease in Plaintiff's investment returns over time.  Arthur Levitt, past Chairman of the SEC, was critical of what he called the "tyranny of compounding high costs:"

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., *Inaugural Address: Costs Paid with Other People's Money, Address at Fordham University School of Law* (Nov. 3, 2000), 6 Fordham J. Corp. & Fin. L. 261, 259, 267 (2001).

33.     For example, assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000.  If returns on investments in their account over the next 35 years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, their account balance would grow to $227,000 at retirement, even if there were no further contributions to their account.  However, if fees and expenses being withheld are 1.5 percent,

their account balance would grow to only $163,000 at retirement.  The 1 percent difference in fees and expenses reduces their account balance at retirement by a shocking ***28 percent***.



*See* Department of Labor Publication "A Look at 401(k) Plan Fees," available at *http://www.dol.gov/ebsa/publications/401k_employee.html.*

34.   Section 36(b) itself does not set forth a list of factors to be considered in determining whether an investment adviser, such as HIFSCO, has breached its fiduciary duty with respect to its receipt of compensation for services paid by a mutual fund such as any of the Hartford Funds.  "Fiduciary duty" is a well-established legal concept that entails duties of good faith, loyalty, and due care.  A fiduciary must act primarily in the best interests of the client.  *See* Restatement of Trusts (Third) § 170.  A breach of fiduciary duty occurs "when a fiduciary permits an unreasonable or excessive fee to be levied on the fund,"  1969 Hearings at 189, or "when compensation to the adviser for his services is excessive, in view of the services rendered – where the fund pays what is an unfair fee under the circumstances.  *Id.* at 190.  In the case of fees that involve a conflict of interest, such as here, this standard requires both fair dealing and a

fair price.  Thus, under general fiduciary law, a fee that is not the result of a fair process, or that

is not reasonable, is a breach of fiduciary duty.

35.     In *Pepper v. Litton*, 308 U.S. 295 (1939), former SEC Chairman Justice Douglas

further explained the fiduciary duty standard, as he opined that fiduciaries'

> dealings with the corporation are subjected to rigorous scrutiny and where any of
> their contracts or engagements with the corporation is challenged the burden is on
> the [fiduciary] not only to prove the good faith of the transaction but also to show
> its inherent fairness from the viewpoint of the corporation and those interested
> therein.  *The essence of the test is whether or not under all the circumstances the
> transaction carries the earmarks of an arm's length bargain.  If it does not, equity
> will set it aside* . . . He who is in such a fiduciary position cannot serve himself
> first and his cestuis second . . . He cannot use his power for his personal
> advantage and to the detriment of the stockholders and creditors no matter how
> absolute in terms that power may be and no matter how meticulous he is to satisfy
> technical requirements.  For that power is at all times subject to the equitable
> limitation that it may not be exercised for the aggrandizement, preference, or
> advantage of the fiduciary to the exclusion or detriment of the cestuis.  Where
> there is a violation of those principles, equity will undo the wrong or intervene to
> prevent its consummation.

*Pepper*, 308 U.S. at 306-311 (emphasis added).  In *Jones*, the United States Supreme Court held

the formulation of the concept of fiduciary duty stated in *Pepper* "expresses the meaning of the

phrase 'fiduciary duty' in § 36(b) . . . ."  130 S.Ct. at 1427.     Thus, by adopting *Pepper,* the

Supreme Court adopted a fiduciary duty standard for § 36(b) that requires both good faith in the

negotiation process *and* a fair outcome.

36.     The Delaware Supreme Court has admonished independent directors to bargain

hard in order to insure that the best possible bargain is struck on their corporation's behalf:

> The power to say no is a significant power.  It is the duty of the directors serving
> on [an independent committee] to approve **only** a transaction that is in the best
> interests of the public shareholders, to **say no to any transaction that is not fair
> to those shareholders and is not the best transaction available**.

*Kahn v. Lynch Commc'ns, Inc.*, 638 A.2d 1110, 1119 (Del. 1994) (emphasis supplied) (brackets in original), *quoting In re First Boston, Inc. S'holder Litig.,* Civ. A. No. 10338, 1990 WL 78836, at *15-*16 (Del. Ch. June 7, 1990).

## V.     FACTORS GENERALLY RELEVANT TO A SECTION 36(b) CLAIM

37.     The Supreme Court also made clear that "a court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance." *Id.* at 1429.   In the context of § 36(b) litigation, courts have historically considered, *inter alia*, the following factors:

- the nature and quality of services being paid for by the fund and its investors;

- whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

- what fees are charged by the adviser to its other non-mutual fund customers, if any;

- what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- the costs of providing those services and the profitability of providing the services.

38.     With respect to comparative fee information, the Supreme Court has cautioned courts "not [to] rely too heavily on comparisons with fees charged to mutual funds by other advisers." *Jones,* 130 S.Ct. at 1429.   The Court explained that such comparisons "are problematic because [the fees charged to other similar funds], like those challenged, may not be the product of negotiations conducted at arm's length." *Id.*

39.     As set forth below, an examination of these factors demonstrates that the fees charged to the Hartford Funds and their investors breach HIFSCO's fiduciary duty to the Funds with respect to such compensation.

### A.     NATURE AND QUALITY OF SERVICES

#### 1.     INVESTMENT MANAGEMENT SERVICES

40.     For investment management services, each of the Hartford Funds pays HIFSCO a fee based on a fixed percentage of the Fund's assets.  *See infra* ¶ 47.   The investment management fees are not based on the services actually rendered or HIFSCO's actual costs in providing services to the Hartford Funds.

41.     Pursuant to the terms of the Investment Management Agreement between HIFSCO and the Funds, the duties of HIFSCO, as the investment adviser to the Hartford Funds, are to manage the portfolio of securities, to research securities, and to make the purchase, sale and hold decisions for each of the portfolios. *See infra* ¶ 44.

42.     Rather than directly providing these investment management services, HIFSCO subcontracts with others to provide the services at a fraction of HIFSCO's fee collected from each Hartford Fund.

43.     Since 1997, HIFSCO has sub-contracted its investment management duties to either Wellington Management Company, LLP ("Wellington"), pursuant to an Investment Sub-Advisory Agreement, and/or to Hartford Investment Management Company ("HIMCO"), pursuant to an Investment Services Agreement, and subsequently an Investment Sub-Advisory Agreement. *See* Composite Exhibit 11: the March 3, 1997 Investment Subadvisory Agreement with Wellington, as amended in pertinent part on December 29, 1997; October 31, 2002; January 1, 2008; January 1, 2009; February 5, 2009; as well as the October 1, 2009 Investment Sub-Advisory Agreement; and Composite Exhibit 12: the March 3, 1997 Investment Services

Agreement with HIMCO, as well as the October 1, 2009 Investment Sub-Advisory Agreement with HIMCO.

44.     HIFSCO has the responsibility, subject to oversight by the Hartford Funds' Board of Directors, to oversee the sub-advisers and recommend hiring, termination, and replacement of the sub-advisers.  According to HMF's most recent Statement of Additional Information ("SAI"), HIFSCO specifically will: (a) set the applicable Fund's overall investment strategies; (b) evaluate, select, and recommend sub-advisers to manage all or a part of the applicable Fund's assets; (c) allocate and, when appropriate, reallocate the applicable Fund's assets among multiple sub-advisers; (d) monitor and evaluate the investment performance of sub-advisers; and (e) implement procedures reasonably designed to ensure that the sub-advisers comply with the applicable Fund's investment objective, policies, and restrictions.  In other words, HIFSCO makes a one-time, initial determination regarding investment objectives and selects sub-advisers.  Other than HIFSCO's initial involvement, it provides minimal services to the funds and it charges its sub-advisers with providing the substantive investment advisory services to the funds.

45.     Wellington is a sub-adviser to the Hartford Capital Appreciation Fund, the Hartford Dividend and Growth Fund, and the Hartford Mid-Cap Fund and provides the day-to-day investment management for each of these Funds.  Indeed, according to the sub-advisory agreement, it is Wellington that is charged with "evaluat[ing] and implement[ing] an investment program appropriate for each Portfolio" and "will make all determinations with respect to the investment of the assets for the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same."

46.     HIMCO is a sub-adviser to the Hartford Income Fund, the Hartford Short Duration Fund, and the Hartford Total Return Bond Fund and provides the day-to-day

investment management for each of these Funds.  HIMCO is a wholly-owned subsidiary of HIG.

Similar to Wellington, under the HIMCO Investment Services Agreement, "HIMCO shall

evaluate and implement an investment program appropriate for each Portfolio" and "will make

all determinations with respect to the investment of the assets for the Portfolios and the purchase

or sale of portfolio securities, and shall take such steps as may be necessary to implement the

same."

      47.    HIFSCO's fee schedule varies for each of the Hartford Funds.  HIFSCO then

subcontracts with Wellington and/or HIMCO at a fraction of HIFSCO's fee.  Virtually all of the

portfolio management and investment management services required by the mutual funds are

performed by Wellington and/or HIMCO pursuant to the Investment Services and/or Sub-

Advisory Agreements and there is little, if any, work left to be done by HIFSCO.  Despite the

fact that the sub-advisers provided the bulk of the investment advisory services to the Funds, in

fiscal year 2009 alone, HIFSCO collected nearly $140 million in investment management fees

from the Hartford Funds, *see infra* ¶ 108, paying the sub-advisers just a fraction of that fee:

**HARTFORD FUNDS FEE BREAKDOWN PURSUANT TO HMF'S SAI DATED
MARCH 1, 2010, AS AMENDED AND RESTATED MAY 28, 2010**
**("M" refers to "Million" and "B" refers to "Billion")**

| HARTFORD FUND | INVESTMENT SERVICES/ SUB-ADVISORY AGREEMENT | HIFSCO FEE SCHEDULE (annual rate based on average daily net assets) | SUB-ADVISER FEE SCHEDULE (based on average daily net assets) |
|---|---|---|---|
| Hartford Capital Appreciation | Wellington | First $500M – 0.8000%; Next $500M – 0.7000%; Next $4B – 0.6500%; Next $5B – 0.6475%; Amt. over $10B – 0.6450% | All Assets – 0.2500% |
| Hartford Dividend & Growth | Wellington | First $500M – 0.7500%; Next $500M – 0.6500%; Next $4B – 0.6000%; Next $5B – 0.5975%; Amt. over $10B – 0.5950% | First $50M – 0.3250%; Next $100M – 0.2500%; Next $350M – 0.2000%; Amt. over $500M – 0.1500% |
| Hartford Income | HIMCO | First $500M – 0.5500%; Next $4.5B – 0.5000%; Next $5B – 0.4800%; Amt. over $10B – 0.4700% | All Assets – At Cost |
| Hartford Midcap | Wellington | First $500M – 0.8500%; Next $500M – 0.7500%; Next $4B – 0.7000%; Next $5B – 0.6975%; Amt. over $10B – 0.6950% | First $50M – 0.4000%; Next $100M – 0.3000%; Next $350M – 0.2500%; Amt. over $500M – 0.2333% |
| Hartford Short Duration | HIMCO | First $500M – 0.4500%; Next $4.5B – 0.4000%; Next $5B – 0.3800%; Amt. over $10B – 0.3700% | All Assets – At Cost |
| Hartford Total Return Bond | HIMCO | First $500M – 0.5500%; Next $500M – 0.5250%; Next $4B – 0.5000%; Next $5B – 0.4800%; Amt. over $10B – 0.4700% | All Assets – At Cost |

48.    While Wellington's fees are a fraction of HIFSCO's fee, Wellington still makes a profit.  Moreover, assuming *arguendo* that HIMCO's "at cost" fee demonstrates the actual cost of performing services, HIFSCO's fee of 3 to 3.5 times the "cost" is grossly disproportionate to the services it actually provides to the Funds.  In 2009 alone, HIFSCO was paid a total of

$139,635,062 in investment management fees from the Funds at issue in this Complaint. *See infra* ¶ 108. Of that sum, HIFSCO paid Wellington and HIMCO $44,328,200 for sub-advisory services, retaining $95,306,862 for itself despite providing minimal additional advisory services to the Funds. *See id.*

### 2. 12b-1 DISTRIBUTION SERVICES

49. Plaintiff and the other shareholders of the Hartford Funds also pay Rule 12b-1 distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendant adopted with respect to the Hartford Funds pursuant to Rule 12b-1, 17 C.F.R. § 270.12b-1 ("Distribution Plans"). The 12b-1 fees are paid to Defendant HIFSCO. The 12b-1 fees are based on a percentage of the net assets of each of the Funds. Defendant purportedly collects these fees in order to grow or stabilize the assets of the Hartford Funds so that the Hartford Funds can benefit from economies of scale through reductions in other fees, such as management and administrative fees.

50. Prior to 1980, the use of fund assets (which are owned by the shareholders) to sell new fund shares was prohibited. The SEC had historically been reluctant to allow fund advisers to charge their shareholders for selling shares to others because:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

51. After intense lobbying by the mutual fund industry, the Commission agreed to consider modifying its objections to allow current fund shareholders to pay distribution expenses. In early comment letters and in proxy statements proposing adoption of plans of

distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

52.     Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in fees and other expenses, the Commission tentatively approved Rule 12b-1, 17 C.F.R. § 270.12b-1.  However, numerous conditions were attached to the use of fund assets to pay distribution expenses.  For example, the Commission wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan."  *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).  Unfortunately, that is precisely what Defendant has done: extracted additional compensation for its retail management services by causing the Plaintiff and other shareholders to pay Defendant's marketing expenses to acquire new shareholders so that these new shareholders could pay additional investment management fees to Defendant.  Under this regime, Defendant has fashioned yet another way to increase its financial benefit while leaving Plaintiff and other shareholders to bear the financial burden.

53.     Furthermore, the 12b-1 fees are based on the net asset value of the Hartford Funds and not on the distribution activity, if any, by Defendant, such as number of shares sold.  Consequently, in addition to failing to benefit the Plaintiff and other shareholders, the Distribution Plans have extracted additional compensation for management services to Defendant, a breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.  For example, any portion of the fees paid to Defendant that are derived from market increases in the net asset value of the fund, rather than any distribution activity by Defendant, constitutes a breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

54.     For the fiscal year ended October 31, 2009, the Hartford Funds paid the Defendant $77,865,153 in 12b-1 fees.

55.     Rule 12b-1 Distribution fees have served only Defendant, just as the SEC feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  As such, the 12b-1 fees are entirely a waste of fund assets.

56.     Plaintiff, on behalf of the Hartford Funds, is entitled to recover the 12b-1 fees received (and continuing to be received) by HIFSCO in breach of its fiduciary duty to the Funds with respect to such compensation.

**B.      LEVEL OF CARE AND CONSCIENTIOUSNESS OF THE FUNDS' DIRECTORS IN APPROVING THE INVESTMENT MANAGEMENT AGREEMENTS AND RULE 12b-1 DISTRIBUTION PLANS**

57.     In *Jones*, the Supreme Court adopted a fiduciary duty standard for § 36(b) that requires *both* a fair outcome *and* good faith in the negotiation process.  *See supra* ¶ 35.  As discussed below, Defendant failed to provide the Funds' directors with all necessary information, and the directors did not (and, indeed, could not) act with sufficient care and conscientiousness in reviewing and approving the management and 12b-1 fees.  As a result, the fee-setting process lacked the requisite integrity and good faith in violation of § 36(b).

58.     Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

59.     The Hartford Board has a separate and distinct fiduciary duty to each Hartford Fund, to enter into serious and substantive negotiations with respect to all fees charged by Hartford Management.   *See* Am. Bar. Ass'n, Fund Director's Guidebook (2d ed. 2003) at 10 ("Although there are areas of common interest among fund, the directors must exercise their specific board responsibilities on a fund-by-fund basis.").     Correspondingly, Hartford Management has a reciprocal fiduciary duty to each mutual fund under its management, including the Hartford Funds, to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond with fees that would be charged in an arm's length negotiation.

## 1.     INVESTMENT MANAGEMENT AGREEMENTS

60.     Congress has fortified fund directors' oversight responsibilities by adopting § 15(c) of the ICA, requiring directors to be adequately informed of the terms of any investment management contracts.

61.     ICA § 15(c) requires investment advisers to furnish documents and other information in order for fund directors to make informed and independent decisions when evaluating investment advisory contracts; that section also gives directors the authority to demand such information from advisers.   *See* 15 U.S.C. § 80a-15(c).

62.     The Hartford Disclosure Materials indicate that the Board of Directors for HMF is composed of nine persons (the "Hartford Directors"), who meet and make decisions for the Hartford Funds.   This same group of directors oversees and makes decisions for all approximately 90 funds in the Hartford Funds Complex.

63.     No public information is disclosed on the length of the meetings of these boards of directors.   The issues that would need to be covered in these board meetings include the numerous corporate governance, portfolio management, portfolio pricing, audit and accounting

issues that a mutual fund board must review annually under applicable statutes, rules and regulations in overseeing or governing a particular mutual fund, and would also include the annual renewals of the investment management agreements and the Rule 12b-1 Distribution Fee arrangements.

64.    The Hartford Directors are well compensated for their services with a fee that consists of an annual retainer component and a meeting fee component as well as retirement benefits. *See supra* ¶ 23. As a result of the compensation they receive, board membership in the Hartford Funds Complex is a lucrative part-time job for the Fund Directors. Further, the Directors' continuation in the role of an Independent Director from year to year is at least partially dependent on the continued good will and support of the Defendant HIFSCO.

65.    The independent or "non-interested" directors are supposed to be "watchdogs" for the funds' shareholders, but the same directors are charged with the oversight of all of the more than 90 mutual funds in the Hartford Funds Complex. Regardless of the dedication, sophistication, and the individual educational and business qualifications of the independent members of the Board of Directors of the Hartford Funds, many of whom are otherwise fully employed in demanding positions of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the directors were to look at each fund individually.

66.    The Board does not hold separate meetings for each mutual fund. Instead, upon information and belief, the Board's practice has been to consider all funds at one time.

67.    Because the Board considers all the funds simultaneously, Defendant's much greater revenue and higher profitability attributable to larger funds, such as the Hartford Capital Appreciation Fund, can be masked or overlooked. In this type of aggregated analysis, total revenues received from investment management fees for all funds or many funds in the

aggregate may be viewed by the Defendant or the Hartford Directors as compensating HIFSCO for lower revenue and/or lower profitability of the small mutual funds within the Hartford Funds Complex.  This analysis prevents the Board from carefully reviewing the fairness of investment management fees of individual funds.

68.     Furthermore, even if statutorily "non-interested," the directors are in all practical respects dominated and unduly influenced by Defendant in reviewing the fees paid by the Funds and their shareholders.  In particular, upon information and belief, Defendant does not provide the directors with sufficient information to fulfill their obligations, a factor demonstrating that the fee setting process lacked good faith and integrity, in violation of ICA § 36(b).

69.     A truly independent board of directors would not have tolerated the investment management fees charged by Defendant or the conduct of the service providers if they had obtained adequate information regarding, among other things: the sub-advisory fees Defendant paid for the Hartford Funds and the services received by the Funds from Defendant for the additional "premium" Defendant charges on top of the sub-advisory fees; the management fees charged and services provided by competitors with similar fund structures; the management fees charged and services provided to pension funds and other institutional clients of Defendant or its affiliates; the economies of scale enjoyed or fallout benefits received by Defendant; and the profitability of the Funds to Defendant (and how to evaluate the profitability data in light of economies of scale).  In fact, Hartford has been the subject of SEC Cease and Desist proceedings regarding HIFSCO's Financial Arrangements with Broker-Dealers for Shelf Space and HIFSCO's failure to disclose the uses of Fund assets to the Board, resulting in financial settlement.  *See* Exhibit 13.

70.     On information and belief, the directors rarely, if ever, question any information or recommendations provided by Defendant, including, for example, misleading representations

by HIFSCO that it is difficult to anticipate whether and to what extent that economies of scale may be realized by HIFSCO as fund assets grow over time.  The evidence needed to establish the truth of these allegations is believed to be exclusively in the control of Defendant and is not in Plaintiff's possession at this time.

71.    The foregoing assures that the directors do not understand Defendant's true cost structure and, in particular, the economies of scale it enjoyed in providing investment management services to the Funds.

## 2.    12b-1 DISTRIBUTION PLANS

72.    In addition to their annual review of the Investment Management Agreements, the Directors must also review the 12b-1 Plans on an annual basis.  In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued."  17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders."  17 C.F.R. § 270.12b-l(e).

73.    The Hartford Funds' 12b-1 Plans have not been adopted in accordance with these requirements.  In particular, the Board could not have found that the 12b-1 Plans in general or the 12b-1 Fees in particular benefit the Funds or their shareholders by generating savings from economies of scale in excess of the cost of the plan. In fact, despite the dramatic growth in total assets held by the Funds, both the management fee and total 12b-l fees received by Defendant have grown over time, thus depriving the Funds of the benefit of these economies of scale.

74.    A recent report written by Dr. Lori Walsh, financial economist at the S.E.C., studied "whether shareholders do, in fact, reap the benefits of 12b-1 plans."  It states:

Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee. In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire amount of the fee. This study confirms these results using a more recent dataset . . .

In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth. This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans. . .

12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund. Although it is hypothetically possible for most types of funds to generate sufficient scale economies to offset the 12b-1 fee, it is not an efficient use of shareholder assets. . . Fund advisers use shareholder money to pay for asset growth from which the adviser is the primary beneficiary through the collection of higher fees.

Lori Walsh, The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns (2004) at 4, 18, Exhibit 14.  Thus, a financial economist at the S.E.C. confirms that, consistent with overwhelming empirical evidence drawn from numerous scholarly studies, shareholders reap no benefits from 12b-1 plans and 12b-1 fees are "not an efficient use of shareholder assets."

75.     Despite the fact that Plaintiff and the other shareholders of the Hartford Funds have enjoyed no benefits from the Distribution Plans (even though they contributed to the growth of fund assets by paying 12b-1 fees), and despite the fact that the Distribution Plans have allowed Defendant to extract additional unreasonable and excessive compensation from Plaintiff and the other shareholders of the Funds, the Hartford Funds' Directors nevertheless have continued to approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1 and ICA §§ 12 and 36(b).

76.     A truly independent board would not have tolerated the 12b-1 fees charged by Defendant if it had obtained adequate information regarding the Distribution Plans and the

benefit (or lack thereof) to the shareholders of the plans (such as whether the Distribution Plans should have been implemented and whether they should have been continued).

77.     Based on the foregoing, the Hartford Funds Board did not (and, indeed, was unable to) act conscientiously and fulfill its fiduciary duty when it approved fees.   In contravention of its duty to provide to the Board all information necessary to evaluate terms of the Investment Management Agreements and Distribution Plans, Defendant did not furnish such necessary information to the Board for purposes of its review of the Funds' investment management agreements and 12b-1 Plans.  *See* 15 U.S.C. § 80a-15(c); 17 C.F.R. § 270.12b-1(d). Thus, the Board was unable to conduct informed arm's-length negotiations when approving the fees charged to the Funds.

78.     The Supreme Court has instructed that where, as here, "the board's process was deficient [and/] or the adviser withheld important information, the court must take a more rigorous look at the outcome."  *Jones*, 120 S. Ct. at 1430.  As described herein, the deficient fee-setting process resulted in fees that constitute a breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

### C.     COMPARATIVE FEE STRUCTURES CHARGED TO NON-MUTUAL FUND CUSTOMERS AND OTHER MUTUAL FUND COMPLEXES FOR SIMILAR INVESTMENT MANAGEMENT SERVICES

79.     An analysis of the investment management fees charged by Defendant's competitors to mutual funds comparable to the Hartford Funds, as well as an analysis of the management fees charged by Hartford to third-party institutional clients, including non-mutual fund customers, demonstrates that HIFSCO has charged the Hartford Funds investment management fees that violate HIFSCO's fiduciary duty with respect to the receipt of compensation.

### 1. FEES CHARGED TO OTHER MUTUAL FUND COMPLEXES FOR SIMILAR INVESTMENT MANAGEMENT SERVICES

80.     Other investment advisers who offer services to funds similar to the Hartford Funds charge substantially less than Defendant.  On information and belief, the services provided by these other advisers are the same or substantially similar management services that Defendant provides to shareholders of the Hartford Funds.

81.     For example, Wellington, the sub-adviser to the Hartford Capital Appreciation Fund, the Hartford Dividend & Growth Fund, and the Hartford Midcap Fund, has also been engaged by Vanguard to provide sub-advisory services to a number of the Vanguard mutual funds.  While Vanguard provides services to the Vanguard funds at cost, the investment management services for its actively managed funds are provided by external managers, such as Wellington, who subcontract with Vanguard for a negotiated fee and earn a reasonable profit for its services.

82.     Among others, Wellington provides management services to the Vanguard Windsor Fund, which is classified as a large cap value fund, and to the Vanguard Capital Value Fund and the Vanguard Dividend Growth Fund, both of which are classified as large cap blend funds.  Shareholders of these Vanguard Funds pay significantly lower investment management fees than the Hartford Dividend & Growth Fund and the Hartford Capital Appreciation Fund, which are classified as large cap value and large cap blend funds, respectively.   The following table contains a side-by-side comparison of the management fee schedules for the Hartford Funds, including the fees that Wellington charges for providing sub-advisory services to the Hartford Funds, with the fee schedules charged to comparable Vanguard funds:

| HARTFORD FUND | HIFSCO FEE SCHEDULE (annual rate based on average daily net assets) | WELLINGTON FEE FOR PROVIDING SUB-ADVISORY SERVICES TO HARTFORD FUNDS | VANGUARD FUND (of comparable investment classification) | FEE SCHEDULE FOR VANGUARD FUNDS[7] (based on average daily net assets) |
|---|---|---|---|---|
| Hartford Dividend & Growth (Large Cap Value) | First $500M – 0.7500%; Next $500M – 0.6500%; Next $4B – 0.6000%; Next $5B – 0.5975%; Amt. over $10B – 0.5950% | First $50M – 0.3250%; Next $100M – 0.2500%; Next $350M – 0.2000%; Amt. over $500M – 0.1500% | Vanguard Windsor Fund (Large Cap Value) | First $17.5B – 0.125%; Amt. on add'l assets – 0.100% |
| Hartford Capital Appreciation (Large Cap Blend) | First $500M – 0.8000%; Next $500M – 0.7000%; Next $4B – 0.6500%; Next $5B – 0.6475%; Amt. over $10B – 0.6450% | All Assets – 0.2500% | Vanguard Capital Value Fund (Large Cap Blend) | First $1B –0.225%; Next $1B – 0.175%; Amt. on add'l assets – 0.150% |
|  |  |  | Vanguard Dividend Growth Fund (Large Cap Blend) | First $100M – 0.150%; Next $300M – 0.125%; Next $500M – 0.100%; Next $1B – 0.075%; Amt. on add'l assets – 0.050% |

83.    Had the Vanguard investment management fee schedules been applicable to the Hartford Dividend & Growth Fund and the Hartford Capital Appreciation Fund, those Funds would have saved approximately $17 million and $71 million, respectively, in 2009 alone.

---

[7] The fee schedules set forth for the Vanguard funds are the rates reported in 2004 – the most recent year that the Vanguard funds' publicly filed documents included the advisory fee schedules charged by the funds' external sub-advisers, such as Wellington.  It is unlikely that the fees would have changed in any material way since that time.

2.     FEES CHARGED BY HARTFORD TO INSTITUTIONAL
CLIENTS FOR SIMILAR INVESTMENT MANAGEMENT
SERVICES

84.     Defendant and/or its affiliated entities also provide investment management
services to third-party institutional, or separately managed, accounts.

85.     In *Jones*, the Supreme Court indicated that a court should give comparisons
between management fees charged to an adviser's mutual funds and management fees charged to
its independent clients "the weight that they merit in light of the similarities and differences
between the services." 130 S. Ct. at 1428.

86.     Here, the services that Hartford provides to the institutional accounts are
substantially similar, if not identical, to the investment management services Defendant provides
to the Funds. Indeed, the Hartford Funds *pay separately* pursuant to *separate agreements* for
services that are not provided to non-mutual fund clients.[8] As a result, the comparison of the
investment management fees HIFSCO charges to the Funds to the fees charged by Hartford to
the institutional accounts is entitled to considerable weight.

87.     Although the investment management services provided to the Funds are virtually
identical to services provided to the institutional accounts, and therefore are directly comparable,
the fees charged to the Funds are materially higher than the fees charged to the institutional
accounts.

88.     While a "manager may encounter different levels of fixed and variable research
costs depending on the type of the portfolio, . . . the fundamental management process is
essentially the same for large and small portfolios, as well as for pension funds and mutual funds.
The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a

---

[8] For example, the Hartford Funds have entered into a separate Fund Accounting Agreement pursuant to which they pay fees to Hartford Life Insurance Co. for accounting services. *See* Exhibit 8. Similarly, the Funds pay Hartford Administrative Services Company separately for administrative and transfer agency services. *See* Exhibit 5.

reason for portfolio management costs being higher or lower." *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610, at 627-28 (2001) (the "Freeman & Brown Study"), attached as Exhibit 15.  Indeed, "a mutual fund, as an entity, actually is an institutional investor.   When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." *Id.* at 629 n.93.  Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." *Id.* at 671-72.

89.     The shareholders of the Hartford Funds are plagued by discriminatory over-charging by Defendants.

90.     For example, HIMCO, an affiliate of HIFSCO and sub-adviser to 3 of the Hartford Funds at issue here, provides investment management services to employee benefit plans and/or mutual funds unaffiliated with Hartford, such as the State Board of Administration of Florida, the State of Connecticut, and Montgomery Street Income Securities, Inc.

91.     Although the investment management services that HIMCO provides these institutional accounts are the same as the investment management services that Hartford provides the Funds, the Funds, to whom HIFSCO owes a fiduciary duty, pay investment management fees that are significantly higher than those paid by the institutional clients, who bargain at arm's-length over fees.

> a.     For the fiscal year ending December 31, 2009, HIMCO charged Montgomery Street Income Securities, Inc., a closed end mutual fund, a total annual investment management fee of approximately 0.25% of the average net assets managed.

b.      HIMCO provides investment management services to a fixed income account for the State of Connecticut.   In exchange for these investment management services, the State of Connecticut pays approximately 9 to 11 basis points.[9]  In fiscal year 2009, HIMCO received a fee of approximately $444,000 for advising an approximately $ 407 million account.   Meanwhile, in 2009, the Hartford Total Return Bond Fund, with average assets under management of $1.6 billion, paid approximately $8 million for virtually identical management services.   Similarly, the Hartford Income Fund, with average assets of $227 million, and the Hartford Short Duration Fund, with average assets of $211 million, paid approximately $1.1 million and $928,000, respectively, for the same investment management services that the State of Connecticut received at a fraction of the price.

c.      HIMCO also manages an approximately $2 billion fixed income account for the State Board of Administration of Florida.  For fiscal years 2007-2008 and 2008-2009, the State Board of Administration of Florida paid 8 basis points and 10 basis points, respectively, to the investment advisers of its fixed income accounts.[10]

92.      In 2009, the Hartford Short Duration, the Hartford Income, and the Hartford Total Return Funds—all of which are fixed income funds—paid investment management fees to HIFSCO that were as much as 4.5 to 5.5 times *higher* in basis points than what HIMCO charges institutional clients to provide investment management services to fixed income accounts.  *See*

---

[9] These figures are derived from reported fiscal year end assets managed by HIMCO and total fees paid to HIMCO by fiscal year.

[10] Although the precise fee charged by HIMCO is not reported, it is unlikely that the fees HIMCO charges would deviate materially from the reported aggregate fee, particularly given that the fee is in line with what HIMCO charges the State of Connecticut.

*supra* ¶ 47.  For example, had the Hartford Total Return Bond Fund been subject to the favorable rates charged to the State of Connecticut for investment management services, it could have saved over $6 million in 2009.

93.      That Defendant and its affiliates charge third parties far lower fees than they are charging the Hartford Funds, to whom they owe a fiduciary duty, for the *same* services demonstrates that the investment management fees charged constitute a breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

> **D.    WHETHER ECONOMIES OF SCALE WERE PASSED TO THE FUNDS AND THEIR INVESTORS OR KEPT BY THE INVESTMENT ADVISER WITH RESPECT TO INVESTMENT MANAGEMENT SERVICES**

94.      The size of the compensation received by the adviser should be evaluated in context with the economies of scale realized by a fund.  Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase long with portfolio size.  A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion.  (Size may impair performance, but it imposes little logistical challenge.)

Swensen, *Unconventional Success:  A Fundamental Approach to Personal Investment* 238. Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit."  *Id.*  Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size."  *Id.*  According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering."  John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005).

95.   As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year.  A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of ***thirty-seven million, five hundred thousand dollars ($37,500,000) per year.***

96.   As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale.  In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.  In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale.  Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

97.   The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.  *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31, attached as Exhibit 16; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9, attached as Exhibit 17.

98.     In addition, the most significant academic research undertaken since the Wharton School study in the 1960s, has proven that economies of scale are not being passed along to mutual fund shareholders – in violation of Defendant's duty to do so under § 36(b) and Rule 12b-1.   *See* Freeman & Brown Study at 661. The Freeman & Brown Study noted:   "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase.   Fund industry investment managers are prone to cite economies of scale as justification for business combinations."  *Id*. at 620.

99.     Economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients.  *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)).

100.     In the case of the Hartford Funds, as assets under management have grown, so have the management and distribution fees paid to Defendant grown dramatically, despite the economies of scale realized by Defendant.   Although significant economies of scale exist for the Hartford Funds, they largely have been appropriated for the benefit of Defendant.   The economies of scale benefits that have been captured and misappropriated by Defendant can and do generate huge unreasonable and excessive, undeserved profits for HIFSCO in breach of its fiduciary duty to the Funds with respect to such compensation.  These benefits can be shared with the mutual funds and their shareholders by reducing the management fees and other costs charged to the funds by Defendant.  However, in the case of the Hartford Funds, no meaningful savings have been shared with the Funds.

101.    For instance, HIFSCO has negotiated a breakpoint schedule with Wellington on at least two of its funds by which Wellington grants fee reductions at several levels prior to $500 million in assets under management.  *See supra* ¶ 47.  On the other hand, the breakpoint schedule that HIFSCO charges to the Funds does not even start until $500 million. *Id.* As a result, HIFSCO fails to share with the mutual fund shareholders the benefits of economies of scale realized from the Wellington Sub-Advisory Agreement and generally fails to meaningfully share economies of scale with the mutual fund shareholders regarding the fees HIFSCO collects from the mutual funds.

102.    By subcontracting with Wellington and/or HIMCO to provide sub-advisory and/or investment services at a fraction of HIFSCO's fee, HIFSCO receives fees that are disproportionate to the services it renders.   HIFSCO's receipt of these fees is particularly egregious given that the cost of the "oversight" function it performs for the Funds should not increase as Fund assets increase, resulting in enormous economies-of-scale benefits that HIFSCO retains for itself but that should be shared with the Funds and their shareholders.

103.    Given that the fees paid to Defendant are unfair, unreasonable, and excessive, especially when compared to the rates charged by the sub-advisers, by competitors or to institutional clients, the excess profits resulting from these economies of scale belong to the Plaintiff and the other shareholders of the Funds.  Nevertheless, the economies of scale enjoyed by Defendant with respect to the Hartford Funds have not been adequately shared with the Funds, as required by § 36(b) and Rule 12b-1, in breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

### E.     COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT SERVICES

104.    "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See* the "Freeman & Brown Study" at 661.  The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.  However, on information and belief, Defendant's reporting of its revenue and costs is intended to, and does, obfuscate Defendant's true profitability.   For instance, on information and belief, Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations.

105.    Following discovery of this information, Defendant's true profitability can be determined on either an incremental basis or a full-cost basis.  Defendant's incremental costs of providing management services to Plaintiff are believed to be nominal while the additional fees received by Defendant are unreasonable and hugely excessive given that the nature, quality, and level of the services remain the same in breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.  On information and belief, a review of Defendant's full costs of providing management services will also demonstrate the enormous profitability to Defendant of managing the Hartford Funds.

106.    The table in Paragraph 47 shows the investment management fee schedule that HIFSCO charges to each of the Funds as compared to the fee schedule that HIFSCO pays its sub-advisers to whom HIFSCO delegates the core of the investment management duties.

107.    While fees of less than 1% may seem inconsequential, these percentages translate into substantial fees when applied to Fund assets in the hundreds of millions, or even billions, of dollars.

108.    Indeed, HIFSCO has collected investment management fees of over $900 thousand per year for its smallest funds (while paying the sub-adviser only $318 thousand)  to nearly $100 Million per year for the largest funds (while paying the sub-adviser only $35 million):

**2009 HARTFORD FUNDS HIFSCO FEES RETAINED AFTER PAYMENT TO SUB-ADVISERS WELLINGTON & HIMCO PURSUANT TO HMF'S SAI DATED MARCH 1, 2010, AS AMENDED AND RESTATED MAY 28, 2010**
**("M" refers to "Million" and "B" refers to "Billion")**

| FUND | INVESTMENT SERVICES/ SUB-ADVISORY AGREEMENT | NET PAID HIFSCO (in dollars) | NET PAID SUB-ADVISER (in dollars) | DIFFERENCE (in dollars) | PERCENT RETAINED BY HIFSCO |
|---|---|---|---|---|---|
| Hartford Capital Appreciation | Wellington | 92,960,091 | 35,368,120 | 57,591,971 | 61.95 |
| Hartford Dividend & Growth | Wellington | 21,160,936 | 5,477,074 | 15,683,862 | 74.12 |
| Hartford Income | HIMCO | 1,099,919 | 374,258 | 725,661 | 65.97 |
| Hartford Midcap | Wellington | 15,405,213 | 4,723,649 | 10,681,564 | 69.34 |
| Hartford Short Duration | HIMCO | 928,096 | 317,835 | 610,261 | 65.75 |
| Hartford Total Return Bond | HIMCO | 8,080,807 | 2,318,549 | 5,762,258 | 71.31 |

109.    "[F]und managers … routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders." John P. Freeman, Stewart L. Brown & Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 Okla. L. Rev. 83, 113 (2003), Exhibit 10, *supra*.  Indeed, "overall fee levels

for sub-advised funds are substantially higher than for funds managed in-house." *Id.* at 118.  As demonstrated above, HIFSCO is no different, padding the bill by over $90 million dollars in fiscal year 2009 alone, for providing few, if any, additional services to the Hartford Funds.

110.    Despite delegating all or substantially all of its investment management duties to sub-advisers and performing little, if any additional work, *see supra* ¶ 108, HIFSCO retains between 61% and 75% of these investment management fees, resulting in exorbitant profits.

111.    Put another way, the true cost of investment management services should represent 25% to 39% of HIFSCO's fee to the Hartford Funds, which correlates to the fees charged by Wellington and/or HIMCO.[11]

112.    Indeed, the Hartford Funds' disclosures characterize the HIMCO fees charged as "at cost."  Assuming *arguendo* that HIMCO's sub-advisory services truly are provided "at cost" and do not include any markup or built-in profit, HIMCO's cost to provide advisory services to the Hartford Income, Hartford Short Duration Bond, and Hartford Total Return Bond Funds in 2009 were *at most* approximately 16.5 basis points, 15.1 basis points, and 14.3 basis points, respectively.  For performing little, if any, additional services to the funds, HIFSCO nevertheless charged the Hartford Income and Hartford Short Duration Funds a fee that is nearly 3 times, and in the case of the Hartford Total Return Bond Fund a fee that is almost 3.5 times, HIMCO's costs.

113.    This subcontracting arrangement led to fees that were disproportionate to services actually rendered and enormous profits to HIFSCO for little or no work.

---

[11] In fact, as an external, for-profit sub-adviser, the fees charged by Wellington to HIFSCO include Wellington's costs *plus* a reasonable profit.

114.    These markups could not be the product of negotiations conducted at arm's length and constitute a breach of HIFSCO's fiduciary duty to the Funds with respect to the receipt of compensation.

<u>**COUNT I**</u>

**AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b) DERIVATIVELY
ON BEHALF OF THE HARTFORD FUNDS
<u>(INVESTMENT MANAGEMENT FEES)</u>**

115.    The Plaintiff repeats and realleges each and every allegation contained prior to Count I as if fully set forth herein.

116.    The fees charged by Defendant for providing management services to the Funds breach HIFSCO's fiduciary duty to the Funds with respect to such compensation.

117.    This Count is brought by Plaintiff derivatively on behalf of the Hartford Funds against the Defendant for breach of its fiduciary duties with respect to the receipt of compensation as defined by § 36(b).

118.    The Defendant in this Count had a fiduciary duty to the Hartford Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to such Defendant.

119.    As alleged above, the fees received by Defendant breach HIFSCO's fiduciary duty to the Funds with respect to such compensation.

120.    By reason of the conduct described above, Defendant violated § 36(b) of the ICA. As a direct, proximate and foreseeable result of Defendant's breaches of fiduciary duties in its role as investment adviser to the Hartford Funds and their investors, the Hartford Funds and their shareholders have sustained many millions of dollars in damages.

121.    In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of the Plaintiff, and other shareholders of the Funds ahead of its own interests,

Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiff in violation of § 36(b).

122.    The Plaintiff seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the Funds.

123.    Alternatively, the Plaintiff seeks rescission of the contracts and restitution of all fees paid pursuant thereto. *See* 15 U.S.C. §80a-46(a-b) of the ICA.  When a violation of the ICA has occurred, a court may order that the Investment Management Agreements between the Defendant and the Hartford Funds on behalf of the Hartford Funds be rescinded, thereby requiring restitution of all investment management fees paid to it by the Hartford Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

124.    The Plaintiff respectfully requests a trial by jury for all issues above so triable.

## COUNT II

**AGAINST DEFENDANT HIFSCO PURSUANT TO
ICA § 36(b) DERIVATIVELY
ON BEHALF OF THE HARTFORD FUNDS
(Unreasonable and Excessive Rule 12b-1 Distribution Fees
and Extraction of Additional Compensation for Investment Management Services)**

125.    The Plaintiff repeats and realleges each and every allegation contained prior to Count I as if fully set forth herein.

126.    The 12b-1 fees charged and received by Defendant were designed to, and did, extract additional compensation for Defendant's management services in violation of Defendant's fiduciary duty under ICA § 36(b).  Even to the extent that the 12b-1 fees (as opposed to market forces or appreciation) contributed to the growth in assets of the Hartford

Funds, the resulting economies of scale benefited only Defendant, and not the Hartford Funds or their shareholders, such as the Plaintiff.

127.     In failing to pass along economies-of-scale benefits from the 12b-1 fees, and in continuing to assess 12b-1 fees pursuant to the Distribution Plans despite the fact that no benefits inured to the Hartford Funds or their shareholders, Defendant has violated, and continues to violate, the ICA and has breached and continues to breach its statutory fiduciary duty to Plaintiff and the Funds in violation of § 36(b), both as a result of a negotiation process that lacked good faith and integrity and/or with respect to the substantive amounts of the fees.

128.     Plaintiff seeks, pursuant to ICA § 36(b)(3), the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, the "amount of compensation or payments received from" the Hartford Funds.

129.     Alternatively, the Plaintiff seeks rescission of the Rule 12b-1 Distribution Plans and restitution of all fees paid pursuant thereto.  *See* 15 U.S.C. § 80a-46(a-b) of the ICA.  When a violation of the ICA has occurred, a court may order that the contracts between the Defendant and the Hartford Funds on behalf of the Hartford Funds be rescinded, thereby requiring restitution of all 12b-1 fees paid to it by the Hartford Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

130.     The Plaintiff respectfully requests a trial by jury for all issues above so triable.

**WHEREFORE**, Plaintiff demands judgment as follows:

(1)     An order declaring that Defendant has violated and continues to violate ICA §§ 12, 36(b) and Rule 12b-1 through the receipt of fees from the Hartford Funds that breach Defendant's fiduciary duty with respect to the reception of compensation.

(2)     An order preliminarily and permanently enjoining Defendant from further violations of the Investment Company Act.

(3)     An order awarding compensatory damages on behalf of the Hartford Funds against Defendant, including repayment of all unlawful fees paid to it by the Hartford Funds or their security holders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law. Plaintiff reserves the right to seek punitive damages where applicable.

(4)     An order rescinding the several investment management agreements and Rule 12b-1 Distribution Plans between the Defendant and the Hartford Funds, pursuant to 15 U.S.C. § 80a-46(b), including restitution of all investment management fees and 12b-1 fees paid to it by the Hartford Funds from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

(5)     Such other and further relief as may be just and proper under the circumstances.

Dated:  October 14, 2010

Respectfully submitted,

**ROSENTHAL, MONHAIT & GODDESS, P.A.**

By:_____/s/ *Carmella P. Keener*_____
        Carmella P. Keener (Del. Bar No. 2810)
        919 N. Market Street
        Suite 1401, Citizens Bank Center
        P.O. Box 1070
        Wilmington, DE 19899-1070
        (302) 656-4433
        ckeener@rmgglaw.com

**JOHNSON, POPE, BOKOR,**
**RUPPEL & BURNS, LLP**
> Guy M. Burns, FBN 0160901
> guyb@jpfirm.com
> Jonathan S. Coleman, FBN 0797480
> jonathanc@jpfirm.com
> Aleksas A. Barauskas, FBN 68175
> aleksasb@jpfirm.com
> 403 E Madison Street, Suite 400
> Tampa, FL  33602
> Phone:  (813) 225-2500
> Fax:  (813) 223-7118

**KELLER ROHRBACK, LLP**
> Michael D. Woerner, Esq.
> mwoerner@KellerRohrback.com
> Tana Lin, Esq.
> tlin@KellerRohrback.com
> 1201 Third Ave., Ste. 3200
> Seattle, WA  98101-3052

**RICHARDSON, PATRICK, WESTBROOK**
**& BRICKMAN, LLC**
> Michael Brickman, Esq.
> mbrickman@rpwb.com
> James C. Bradley, Esq.
> jbradley@rpwb.com
> Nina H. Fields, Esq.
> nfields@rpwb.com
> 174 E. Bay St.
> Charleston, SC  29401

**THE NYGAARD LAW FIRM**
> Diane A. Nygaard, Esq.
> diane@nygaardlaw.com
> 11050 Roe Avenue, Suite 212
> Leawood, KS  66211
> Phone:  (913) 469-5544
> Fax: (913) 469-1561

136522v.11