# EXHIBIT 1

INVESTMENT MANAGEMENT AGREEMENT WITH
HARTFORD INVESTMENT FINANCIAL SERVICES COMPANY

<PAGE>

INVESTMENT MANAGEMENT AGREEMENT


    This Agreement is made by and between Hartford Investment Financial
Services Company, a Delaware corporation ( "HIFSCO") and ITT Hartford Mutual
Funds, Inc., a Maryland corporation (the "Company") whereby HIFSCO will act as
investment manager to each series of the Company as listed on Attachment A (each
a  "Portfolio" and together the "Portfolios") and any future series as agreed to
between HIFSCO and the Company.

    WHEREAS, the Company and HIFSCO wish to enter into an agreement setting
forth the services to be performed by HIFSCO for each Portfolio of the Company
and the terms and conditions under which such services will be performed.

    NOW, THEREFORE, in consideration of the promises and the mutual agreements
herein contained, the parties hereto agree as follows:

    1.  GENERAL PROVISION.

        The Company hereby employs HIFSCO and HIFSCO hereby undertakes to act
        as the investment manager of the Company and to each Portfolio and to
        perform for the Company such other duties and functions as are
        hereinafter set forth and such other duties as may be necessary or
        appropriate in connection with its services as investment manager.
        HIFSCO shall, in all matters, give to the Company  and its Board of
        Directors the benefit of its best judgment, effort, advice and
        recommendations and shall, at all times conform to, and use its best
        efforts to enable the Company to conform to (i) the provisions of the
        Investment Company Act of 1940 (the "Investment Company Act") and any
        rules or regulations thereunder, (ii) any other applicable provisions
        of state or federal law; (iii) the provisions of the Articles of
        Incorporation and By-Laws of the Company as amended from time to time;
        (iv) policies and determinations of the Board of Directors of the
        Company; (v) the fundamental policies and investment restrictions of
        the Company and Portfolios  as reflected in the Company's registration
        statement under the Investment Company Act or as such policies may,
        from time to time, be amended by the Company's shareholders, and (vi)
        the Prospectus and Statement of Additional Information of the Company
        in effect from time to time.  The appropriate officers and employees
        of HIFSCO shall be available upon reasonable notice for consultation
        with any of the Directors and officers of the Company with respect to
        any matters dealing with the business and affairs of the Company
        including the valuation of any of each Portfolios' securities which
        are either not registered for public sale or not being traded on any
        securities market.

    2.  INVESTMENT MANAGEMENT SERVICES

        (a)  HIFSCO shall, subject to the direction and control by the
             Company's Board of Directors, (i) regularly provide investment
             advice and recommendations to each

<PAGE>

             Portfolio with respect to its
             investments, investment policies and the purchase and sale of
             securities; (ii) supervise continuously the investment program of
             each Portfolio and the composition of its portfolio securities
             and determine what securities shall be purchased or sold by each
             Portfolio; and (iii) arrange, subject to the provisions of
             paragraph 5 hereof, for the purchase of securities and other

investments for each Portfolio and the sale of securities and other investments held in each Portfolio.

    (b)   HIFSCO shall provide such economic and statistical data relating to each Portfolio and such information concerning important economic, political and other developments as HIFSCO shall deem appropriate or as shall be requested by the Company's Board of Directors.

3.    ADMINISTRATIVE SERVICES.

    In addition to the performance of investment advisory services HIFSCO shall perform  the following services in connection with the management of the Company:

    (a)   assist in the supervision of all aspects of the Company's operation, including the coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder servicing agents ( if any), accountants, attorneys and other parties performing services or operational functions for the Company;

    (b) ·provide the Company with the services of persons, who may be HIFSCO's officers or employees, competent to serve as officers of the Company and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company; and

    (c)   provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement.

4.    SUB-ADVISERS AND SUB-CONTRACTORS.

    HIFSCO, upon approval of the Board of Directors and shareholders where appropriate, may engage one or more investment advisers which are either registered as such or specifically exempt from registration under the Investment Advisers Act of 1940, to act as sub-advisers to provide, with respect to existing and future Portfolios of the Company, some or all of the services set forth in Sections 2 and 5 of this Agreement.  In addition, HIFSCO may subcontract for any of the administrative services listed in Section 3.

5.    BROKERAGE TRANSACTIONS.

2

&lt;PAGE&gt;

    When placing orders for the purchase or sale of a Portfolio's securities, HIFSCO or any subadviser approved in accordance with Section 4 of this Agreement, shall use its best efforts to obtain the best net security price available for a Portfolio.  Subject to and in accordance with any directions which the Board of Directors may issue from time to time, HIFSCO or the subadviser, if applicable,  may also be authorized to effect individual securities transactions at commission rates in excess of the minimum commission rates available, if HIFSCO or the subadviser, if applicable, determines in good faith that such amount of commission is reasonable in relation to the value of the brokerage or research services provided by such broker or dealer, viewed in terms of either that particular transaction or

a Portfolio and other advisory clients. The execution of such transactions shall not be deemed to represent an unlawful act or breach of any duty created by this Agreement or otherwise. HIFSCO or the subadviser will promptly communicate to the Board of Directors such information relating to portfolio transactions as the Board may reasonably request.

6. EXPENSES.

Expenses to be paid by the Company, include, but are not limited to (i) interest and taxes; (ii) brokerage commissions; (iii) premium for fidelity and other insurance coverage requisite to the Company's operations; (iv) the fees and expenses of its non-interested directors; (v) legal, audit and fund accounting expenses; (vi) custodian and transfer agent fees and expenses; (vii) expenses incident to the redemption of its shares; (viii) fees and expenses related to the registration under federal and state securities laws of shares of the Company for public sale; (ix) expenses of printing and mailing prospectuses, reports, notices and proxy material to shareholders of the Company; (x) all other expenses incidental to holding meetings of the Company's shareholders; and (xi) such extraordinary non-recurring expenses as may arise, including litigation affecting the Company and any obligation which the Company may have to indemnify its officers and Directors with respect thereto. Any officer or employee of HIFSCO or of any entity controlling, controlled by or under common control with HIFSCO, who may also serve as officers, directors or employees of the Company shall not receive any compensation from the Company for their services.

7. COMPENSATION OF HIFSCO.

As compensation for the services rendered by HIFSCO, each Portfolio shall pay to HIFSCO as promptly as possible after the last day of each month during the term of this Agreement, a fee accrued daily and paid monthly, based upon the following annual rates and upon the calculated daily net asset value of the Portfolio:

MONEY MARKET FUND.

| Net Asset Value | Annual Rate |
| --------------- | ----------- |

3

<PAGE>

| Net Asset Value | Annual Rate |
| --------------- | ----------- |
| First $500,000,000 | 0.50% |
| Next $500,000,000 | 0.45% |
| Amount Over $1 Billion | 0.40% |

THE BOND INCOME STRATEGY FUND.

| Net Asset Value | Annual Rate |
| --------------- | ----------- |
| First $500,000,000 | 0.65% |
| Next $500,000,000 | 0.55% |
| Amount Over $1 Billion | 0.50% |

SMALL COMPANY FUND AND INTERNATIONAL OPPORTUNITIES FUND.

| Net Asset Value | Annual Rate |
| --------------- | ----------- |
| First $500,000,000 | 0.85% |
| Next $500,000,000 | 0.75% |

CAPITAL APPRECIATION FUND AND STOCK FUND.

| Net Asset Value | Annual Rate |
| --- | --- |
| First $500,000,000 | 0.80% |
| Next $500,000,000 | 0.70% |
| Amount Over $1 Billion | 0.65% |

DIVIDEND AND GROWTH FUND AND ADVISERS FUND.

| Net Asset Value | Annual Rate |
| --- | --- |
| First $500,000,000 | 0.75% |
| Next $500,000,000 | 0.65% |
| Amount Over $1 Billion | 0.60% |

HIFSCO, or an affiliate of HIFSCO, may agree to subsidize any of the
Portfolios to any level that HIFSCO, or any such affiliate, may specify.
Any such undertaking may be modified or discontinued at any time.

If it is necessary to calculate the fee for a period of time which is less
than a month, then the fee shall be (i) calculated at the annual rates
provided above but prorated for the number of days elapsed in the month in
question as a percentage of the total number of days in such month, (ii)
based upon the average of the Portfolio's daily net asset value for the
period in question, and (iii) paid within a reasonable time after the close
of such period.

4

<PAGE>

8. LIABILITY OF HIFSCO.

HIFSCO shall not be liable for any loss or losses sustained by reason
of any investment including the purchase, holding or sale of any
security, or with respect to the administration of the Company, as
long as HIFSCO shall have acted in good faith and with due care;
provided, however, that no provision in this Agreement shall be deemed
to protect HIFSCO against any liability to the Company or its
shareholders by reason of its willful misfeasance, bad faith or gross
negligence in the performance of its duties or by reason of its
reckless disregard of its obligations and duties under this Agreement.

9.   DURATION OF AGREEMENT.

(a)   This Agreement shall be effective on March 3, 1997 and shall
continue in effect through July 22, 1998. This Agreement, unless
sooner terminated in accordance with 9(b) below, shall continue
in effect from year to year thereafter provided that its
continuance is specifically approved at least annually (1) by a
vote of a majority of the members of the Board of Directors of
the Company or by a vote of a majority of the outstanding voting
securities of each Portfolio, and (2) in either event, by the
vote of a majority of the members of the Company's Board of
Directors who are not parties to this Agreement or interested
persons of any such party, cast in person at a meeting called for
the purpose of voting on this Agreement.

(b)   This Agreement (1) may be terminated at any time without the
payment of any penalty either by a vote of a majority of the
members of the Board of Directors of the Company or by a vote of
a majority of the Portfolio's outstanding voting securities, on

sixty days' prior written notice to HIFSCO, (2) shall immediately terminate in the event of its assignment and (3) may be terminated by HIFSCO on sixty days' prior written notice to the Portfolio, but such termination will not be effective until the Portfolio shall have contracted with one or more persons to serve as a successor investment adviser for the Portfolio and such person(s) shall have assumed such position.

(c)   As used in this Agreement, the terms "assignment", "interested person" and "vote of majority of the Company's outstanding voting securities" shall have the meanings set forth for such terms in the 1940 Act, as amended.

5

<PAGE>

(d)   Any notice under this Agreement shall be given in writing, addressed and delivered, or mailed postpaid, to the other party to this Agreement to whom such notice is to be given at such party's current address.

10.   OTHER ACTIVITIES.

Nothing in this Agreement shall limit or restrict the right of any director, officer, or employee of HIFSCO to engage in any other business or to devote his or her time and attention in part to the management or other aspects of any other business, whether of a similar nature or a dissimilar nature, nor to limit or restrict the right of HIFSCO to engage in any other business or to render services of any kind to any other corporation, firm individual or association.

11.   ADDITIONAL SERIES.

The amendment of this Agreement for the sole purpose of adding one or more Portfolios shall not be deemed an amendment affecting an already existing Portfolio and requiring the approval of shareholders of that Portfolio.

12.   INVALID PROVISIONS.

If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby.

13.   GOVERNING LAW.

To the extent that federal securities laws do not apply, this Agreement and all performance hereunder shall be governed by the laws of the State of Connecticut which apply to contracts made and to be performed in the State of Connecticut.

6

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the 3rd day of March, 1997.

HARTFORD INVESTMENT FINANCIAL
SERVICES COMPANY

```
<DOCUMENT>
<TYPE>EX-99.D.II
<SEQUENCE>4
<FILENAME>b45788h1exv99wdwii.txt
<DESCRIPTION>AMEND. #1 TO INVESTMENT MGMT. AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT 99.d(ii)

AMENDMENT NUMBER 1 TO
INVESTMENT MANAGEMENT AGREEMENT

Pursuant to the Investment Management Agreement between Hartford
Investment Financial Services Company ("HIFSCO") and The Hartford Mutual Funds,
Inc. (formally known as ITT Hartford Mutual Funds, Inc.) dated March 3, 1997
(the "Agreement"), The Hartford MidCap Fund is hereby included as an additional
Portfolio. All provisions in the Agreement shall apply to the management of The
Hartford MidCap Fund except as follows:

1. HIFSCO shall be paid a fee accrued daily and paid monthly, based upon
the following annual rates and upon the calculated daily net asset value of the
Fund:

```
<TABLE>
```

| Net Asset Value | Annual Rate |
| --------------- | ----------- |
| <S> | <C> |
| First $500,000,000 | 0.85% |
| Next $500,000,000 | 0.75% |
| Amount Over $1 Billion | 0.70% |

```
</TABLE>
```

2. The effective date for this amendment shall be December 31, 1997. The
initial term of the amended Agreement with respect to the Fund shall be for a
two-year period subject to continuance or termination as specified in Sections
9(a) and 9(b) of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this amendment to be
executed on the 31st day of December, 1997.

HARTFORD INVESTMENT FINANCIAL SERVICES COMPANY

/s/ Joseph H. Gareau
-----------------------------------------------
By:    Joseph H. Gareau
Title: President


THE HARTFORD MUTUAL FUNDS, INC.
on behalf of:

The Hartford MidCap Fund
/s/ Andrew W. Kohnke
-----------------------------------------------
By:    Andrew W. Kohnke
Title: Vice President

```
</TEXT>
</DOCUMENT>
```

```
<DOCUMENT>
<TYPE>EX-99.D.VIII
<SEQUENCE>10
<FILENAME>b45788h1exv99wdwviii.txt
<DESCRIPTION>AMENDMENT #7 TO INVESTMENT MGMT. AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT 99.d(viii)

## AMENDMENT NUMBER 7 TO
## INVESTMENT MANAGEMENT AGREEMENT

Pursuant to the Investment Management Agreement between Hartford Investment Financial Services, LLC (formerly known as Hartford Investment Financial Services Company) ("HIFSCO") and The Hartford Mutual Funds, Inc. (formerly known as ITT Hartford Mutual Funds, Inc.) dated March 3, 1997, as amended (the "Agreement"), The Hartford Income Fund, The Hartford Inflation Plus Fund, The Hartford Short Duration Fund, The Hartford Tax-Free California Fund and The Hartford Tax-Free New York Fund are hereby included in the definition of Portfolio. All provisions in the Agreement shall apply to the management of The Hartford Income Fund, The Hartford Inflation Plus Fund, The Hartford Short Duration Fund, The Hartford Tax-Free California Fund and The Hartford Tax-Free New York Fund except as stated below.

The advisory fee for the five new portfolios shall be accrued daily and paid monthly, based upon the following annual rates and upon the calculated daily net asset value of the Fund:

The Hartford Income Fund and The Hartford Inflation Plus Fund

```
<TABLE>
<CAPTION>
```

| Net Asset Value | Annual Rate |
| --------------- | ----------- |
| <S> | <C> |
| First $500 million | 0.60% |
| Amount over $500 million | 0.55% |

```
</TABLE>
```

The Hartford Short Duration Fund, The Hartford Tax-Free California Fund and The Hartford Tax-Free New York Fund

```
<TABLE>
<CAPTION>
```

| Net Asset Value | Annual Rate |
| --------------- | ----------- |
| <S> | <C> |
| First $500 million | 0.55% |
| Amount over $500 million | 0.50% |

```
</TABLE>
```

This amended Agreement is effective for a period of two years from the date hereof and shall continue in effect thereafter in accordance with the provisions of Section 9 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this amendment to be executed on the 31st day of October, 2002.

| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC | THE HARTFORD MUTUAL FUNDS, INC. on behalf of: |
| --- | --- |
| By: /s/ David M. Znamierowski | The Hartford Income Fund |
| ----------------------------------- | The Hartford Inflation Plus Fund |
| David M. Znamierowski | The Hartford Short Duration Fund |
| Senior Vice President, Investments | The Hartford Tax-Free California Fund |

```
By: /s/ David M. Znamierowski
    --------------------------------
    David M. Znamierowski
    President
```

```
</TEXT>
</DOCUMENT>
```

<div align="right">**EXHIBIT D.(XXV)**</div>

## AMENDMENT NUMBER 24 TO
## INVESTMENT MANAGEMENT AGREEMENT

Effective November 1, 2008

Pursuant to the Investment Management Agreement between Hartford Investment Financial Services, LLC (formerly known as Hartford Investment Financial Services Company) ("HIFSCO") and The Hartford Mutual Funds, Inc. (formerly known as ITT Hartford Mutual Funds, Inc.) dated March 3, 1997, as amended (the "Agreement"), is hereby further amended as follows:

In Section 7 of the Agreement, the fee schedule for the Portfolios is restated as follows:

### Advisers Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.690% |
| On next $500 million | 0.625% |
| On next $4 billion | 0.575% |
| On next $5 billion | 0.5725% |
| Over $10 billion | 0.570% |

### Balanced Allocation Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| Over next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Balanced Income Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $250 million | 0.725% |
| On next $250 million | 0.700% |
| On next $500 million | 0.675% |
| On next $4 billion | 0.650% |
| On next $5 billion | 0.6475% |
| Over $10 billion | 0.645% |

### Capital Appreciation Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.80% |
| On next $500 million | 0.70% |
| On next $4 billion | 0.65% |
| On next $5 billion | 0.6475% |
| Over $10 billion | 0.645% |

HMF, Inc.

### Capital Appreciation II Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $250 million | 1.00% |
| On next $250 million | 0.95% |
| On next $500 million | 0.90% |
| On next $4 billion | 0.85% |
| On next $5 billion | 0.8475% |
| Over $10 billion | 0.845% |

### Checks and Balances Fund

| Net Asset Value | Annual Rate |
|---|---|
| - | None |

### Conservative Allocation Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Disciplined Equity Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.75% |
| On next $500 million | 0.675% |
| On next $4 billion | 0.625% |
| On next $5 billion | 0.6225% |
| Over $10 billion | 0.62% |

### Diversified International Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 1.00% |
| On next $500 million | 0.95% |
| Next $4 billion | 0.90% |
| Next $5 billion | 0.8975% |
| Over $10 billion | 0.895% |

### Dividend and Growth Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.75% |
| On next $500 million | 0.65% |
| On next $4 billion | 0.60% |
| On next $5 billion | 0.5975% |
| Over $10 billion | 0.595% |

HMF, Inc.

### Equity Growth Allocation Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Equity Income Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.75% |
| On next $500 million | 0.70% |
| On next $4 billion | 0.65% |
| On next $5 billion | 0.6475% |
| Over $10 billion | 0.645% |

### Floating Rate Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.65% |
| On next $4.5 billion | 0.60% |
| On next $5 billion | 0.58% |
| Over $10 billion | 0.57% |

### Fundamental Growth Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.85% |
| On next $500 million | 0.80% |
| On next $4 billion | 0.75% |
| On next $5 billion | 0.7475% |
| Over $10 billion | 0.745% |

### Global Communications Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.90% |
| On next $500 million | 0.85% |
| On next $4 billion | 0.80% |
| On next $5 billion | 0.7975% |
| Over $10 billion | 0.795% |

### Global Enhanced Dividend Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 1.00% |
| On next $500 million | 0.95% |
| On next $4 billion | 0.90% |
| On next $5 billion | 0.88% |
| Over $10 billion | 0.87% |

HMF, Inc.

### Global Equity Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.95% |
| On next $500 million | 0.90% |
| On next $4 billion | 0.85% |
| On next $5 billion | 0.8475% |
| Over $10 billion | 0.845% |

### Global Financial Services Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.90% |
| On next $500 million | 0.85% |
| On next $4 billion | 0.80% |
| On next $5 billion | 0.7975% |
| Over $10 billion | 0.795% |

### Global Growth Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.85% |
| On next $500 million | 0.75% |
| On next $4 billion | 0.70% |
| On next $5 billion | 0.6975% |
| Over $10 billion | 0.695% |

### Global Health Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.90% |
| On next $500 million | 0.85% |
| On next $4 billion | 0.80% |
| On next $5 billion | 0.7975% |
| Over $10 billion | 0.795% |

### Global Technology Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.90% |
| On next $500 million | 0.85% |
| On next $4 billion | 0.80% |
| On next $5 billion | 0.7975% |
| Over $10 billion | 0.795% |

### Growth Allocation Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.08% |
| Over $10 billion | 0.07% |

HMF, Inc.

### High Yield Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.70% |
| On next $500 million | 0.65% |
| On next $4 billion | 0.60% |
| On next $5 billion | 0.58% |
| Over $10 billion | 0.57% |

### High Yield Municipal Bond Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.55% |
| On next $500 million | 0.50% |
| On next $4 billion | 0.475% |
| On next $5 billion | 0.455% |
| Over $10 billion | 0.445% |

### Income Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.55% |
| On next $4.5 billion | 0.50% |
| On next $5 billion | 0.48% |
| Over $10 billion | 0.47% |

### Income Allocation Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Inflation Plus Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.55% |
| On next $4.5 billion | 0.50% |
| On next $5 billion | 0.48% |
| Over $10 billion | 0.47% |

### International Growth Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.90% |
| On next $500 million | 0.85% |
| On next $4 billion | 0.80% |
| On next $5 billion | 0.7975% |
| Over $10 billion | 0.795% |

HMF, Inc.

### International Opportunities Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.85% |
| On next $500 million | 0.75% |
| On next $4 billion | 0.70% |
| On next $5 billion | 0.6975% |
| Over $10 billion | 0.695% |

### International Small Company Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.90% |
| On next $500 million | 0.85% |
| On next $4 billion | 0.80% |
| On next $5 billion | 0.7975% |
| Over $10 billion | 0.795% |

### LargeCap Growth Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.65% |
| On next $500 million | 0.60% |
| On next $4 billion | 0.55% |
| On next $5 billion | 0.53% |
| Over $10 billion | 0.52% |

### MidCap Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.85% |
| On next $500 million | 0.75% |
| On next $4 billion | 0.70% |
| On next $5 billion | 0.6975% |
| Over $10 billion | 0.695% |

### MidCap Growth Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.75% |
| On next $500 million | 0.70% |
| On next $4 billion | 0.65% |
| On next $5 billion | 0.63% |
| Over $10 billion | 0.62% |

### MidCap Value Fund

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.80% |
| On next $500 million | 0.725% |
| On next $4 billion | 0.675% |
| On next $5 billion | 0.6725% |
| Over $10 billion | 0.67% |

HMF, Inc.

### Money Market Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $1 billion | 0.45% |
| On next $4 billion | 0.40% |
| On next $5 billion | 0.38% |
| Over $10 billion | 0.37% |

### Retirement Income Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| Next $4.5 billion | 0.10% |
| Next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Select MidCap Value Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.75% |
| On next $500 million | 0.70% |
| On next $4 billion | 0.65% |
| On next $5 billion | 0.63% |
| Over $10 billion | 0.62% |

### Select SmallCap Value Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 1.00% |
| On next $500 million | 0.95% |
| On next $4 billion | 0.90% |
| On next $5 billion | 0.8975% |
| Over $10 billion | 0.895% |

### Short Duration Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.45% |
| On next $4.5 billion | 0.40% |
| On next $5 billion | 0.38% |
| Over $10 billion | 0.37% |

### Small Company Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $250 million | 0.85% |
| On next $250 million | 0.80% |
| On next $500 million | 0.75% |
| On next $500 million | 0.70% |
| On next $3.5 billion | 0.65% |
| On next $5 billion | 0.63% |
| Over $10 billion | 0.62% |

HMF, Inc.

**Stock Fund**

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.75% |
| On next $500 million | 0.70% |
| On next $4 billion | 0.65% |
| On next $5 billion | 0.6475% |
| Over $10 billion | 0.645% |

**Strategic Income Fund**

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.55% |
| On next $500 million | 0.50% |
| On next $4 billion | 0.475% |
| On next $5 billion | 0.455% |
| Over $10 billion | 0.445% |

**Target Retirement 2010 Fund**

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

**Target Retirement 2015 Fund**

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

**Target Retirement 2020 Fund**

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

**Target Retirement 2025 Fund**

| Net Asset Value | Annual Rate |
|---|---|
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

HMF, Inc.

### Target Retirement 2030 Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Target Retirement 2035 Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Target Retirement 2040 Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Target Retirement 2045 Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Target Retirement 2050 Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.15% |
| On next $4.5 billion | 0.10% |
| On next $5 billion | 0.080% |
| Over $10 billion | 0.070% |

### Tax-Free California Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.500% |
| On next $4.5 billion | 0.450% |
| On next $5 billion | 0.430% |
| Over $10 billion | 0.420% |

HMF, Inc.

## Tax-Free New York Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.50% |
| On next $4.5 billion | 0.45% |
| On next $5 billion | 0.43% |
| Over $10 billion | 0.42% |

## Total Return Bond Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.55% |
| On next $500 million | 0.525% |
| On next $4 billion | 0.50% |
| On next $5 billion | 0.48% |
| Over $10 billion | 0.47% |

## Value Fund

| Net Asset Value | Annual Rate |
| --- | --- |
| On first $500 million | 0.80% |
| On next $500 million | 0.70% |
| On next $4 billion | 0.65% |
| On next $5 billion | 0.6475% |
| Over $10 billion | 0.645% |

HARTFORD INVESTMENT FINANCIAL
SERVICES, LLC

THE HARTFORD MUTUAL FUNDS, INC.


By:/s/Robert Arena
    Robert Arena
    Manager, Senior Vice President/
    Business Line Principal

By:/s/Robert Arena
    Robert Arena
    Vice President

HMF, Inc.

**Exhibit 99.Bd.(i)**

### EXHIBIT D.(I)

### INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made by and between Hartford Investment Financial Services, LLC a Delaware limited liability company (the "Adviser"), and The Hartford Mutual Funds, Inc. a corporation organized under the laws of the State of Maryland (the "Company"), on its own behalf and on behalf of each of its series listed on Schedule A hereto, as it may be amended from time to time (each, a "Portfolio" and, collectively, the "Portfolios").

WHEREAS, the Adviser has agreed to furnish investment advisory services to the Company, an open-end management investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act") and each Portfolio; and

WHEREAS, the Company and the Adviser wish to enter into this Agreement setting forth the investment advisory services to be performed by the Adviser for the Company and each Portfolio, and the terms and conditions under which such services will be performed; and

WHEREAS, this Agreement has been approved in accordance with the provisions of the 1940 Act, and HIFSCO is willing to furnish such services upon the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the promises and the mutual agreements herein contained, the parties hereto agree as follows:

1.      General Provision

The Company hereby employs the Adviser and the Adviser hereby undertakes to act as the investment manager of the Company and to each Portfolio and to perform for the Company such other duties and functions as are hereinafter set forth and such other duties as may be necessary or appropriate in connection with its services as investment manager.  The Adviser shall, in all matters, give to the Company and its Board of Directors the benefit of its best judgment, effort, advice and recommendations and shall at all times conform to, and use its best efforts to enable the Company to conform to (i) the provisions of the 1940 Act and any rules or regulations thereunder, (ii) any other applicable provisions of state or federal law; (iii) the provisions of the Articles of Incorporation and By-Laws of the Company as amended from time to time; (iv) the policies and determinations of the Board of Directors of the Company; (v) the fundamental policies and investment restrictions of the Company and Portfolios as reflected in the Company's registration statement under the 1940 Act or as such policies may, from time to time, be amended by the Company's shareholders, and (vi) the Prospectus and Statement of Additional Information of the Company in effect from time to time. The appropriate officers and employees of the Adviser shall be available upon reasonable notice for consultation with any of the Directors and officers of the Company with respect to any matters dealing with the business and affairs of the Company including the valuation of any of each Portfolios' securities that are either not registered for public sale or not being traded on any securities market.

1

2.   Investment Management Services

(a)       Subject to the direction and control by the Company's Board of Directors, the Adviser shall, or shall cause an affiliate to: (i) regularly provide investment advice and recommendations to each Portfolio with respect to its investments, investment policies and the purchase and sale of securities; (ii) supervise continuously the investment program of each Portfolio and the composition and performance of its portfolio securities and determine what securities shall be purchased or sold by each Portfolio; and (iii) arrange, subject to the provisions of Section 4 hereof, for the purchase of securities and other investments for each Portfolio and the sale of securities and other investments held in each Portfolio.

(b)       The Adviser shall provide, or shall cause an affiliate to provide, such economic and statistical data relating to each Portfolio and such information concerning important economic, political and other developments as the Adviser shall deem appropriate or as shall be requested by the Company's Board of Directors.

3.   Administrative Services

In addition to the performance of investment advisory services, the Adviser shall perform, or shall cause an affiliate to perform, the following services in connection with the management of the Company:

(a)       assist in the supervision of all aspects of the Company's operation, including the coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder servicing agents (if any), accountants, attorneys and other parties performing services or operational functions for the Company;

(b)       provide the Company with the services of persons, who may be the Adviser's officers or employees, competent to serve as officers of the Company and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company; and

(c)       provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement.

(d)       provide such other services as the parties hereto may agree upon from time to time.

4.   Sub-Advisers and Sub-Contractors

The Adviser, upon approval of the Board of Directors, may engage one or more investment advisers that are registered as such under the Investment Advisers Act of 1940, as amended, to act as sub-adviser with respect to existing and future Portfolios of the Company. Such sub-adviser or sub-advisers shall assume such responsibilities and obligations of the Adviser pursuant to this Investment Management Agreement as shall be delegated to the sub-adviser or sub-advisers, and the Adviser will supervise and oversee the activities of any such sub-adviser or sub-advisers. In addition, the Adviser may subcontract for any of the administrative services set forth in Section 3 above.

2

5.        Brokerage Transactions

When placing orders for the purchase or sale of a Portfolio's securities, the Adviser or any sub-adviser appointed by the Adviser shall use its best efforts to obtain the best net security price available for a Portfolio. Subject to and in accordance with any directions that the Board of Directors may issue from time to time the Adviser or the sub-adviser, if applicable, may also be authorized to effect individual securities transactions at commission rates in excess of the minimum commission rates available, if the Adviser or the sub-adviser, if applicable, determines in good faith that such amount of commission is reasonable in relation to the value of the brokerage or research services provided by such broker or dealer, viewed in terms of either that particular transaction or the Adviser's or the sub-adviser's overall responsibilities with respect to a Portfolio and other advisory clients.  The execution of such transactions shall not be deemed to represent an unlawful act or breach of any duty created by this Agreement or otherwise.  The Adviser or the sub-adviser will promptly communicate to the Board of Directors such information relating to portfolio transactions as the Board may reasonably request.

6.        Expenses

Expenses to be paid by the Company, include, but are not limited to (i) interest and taxes; (ii) brokerage commissions; (iii) premiums for fidelity and other insurance coverage requisite to the Company's operations; (iv) the fees and expenses of its non-interested directors; (v) legal, audit and fund accounting expenses; (vi) custodian and transfer agent fees and expenses; (vii) expenses incident to the redemption of its shares; (viii) fees and expenses related to the registration under federal and state securities laws of shares of the Company for public sale; (ix) expenses of printing and mailing prospectuses, reports, notices and proxy material to shareholders of the Company; (x) all other expenses incidental to holding meetings of the Company's shareholders; and (xi) such extraordinary non-recurring expenses as may arise, including litigation affecting the Company and any obligation which the Company may have to indemnify its officers and Directors with respect thereto.  Any officer or employee of the Adviser or of any entity controlling, controlled by or under common control with the Adviser, who may also serve as officers, directors or employees of the Company shall not receive any compensation from the Company for their services.

7.        Compensation of the Adviser

As compensation for the services rendered by the Adviser, each Portfolio shall pay to the Adviser as promptly as possible after the last day of each month during the term of this Agreement, a fee accrued daily and paid monthly, as set forth in Schedule B to this Agreement, as it may be amended from time to time:

The Adviser, or an affiliate of the Adviser, may agree to subsidize any of the Portfolios to any level that the Adviser, or any such affiliate, may specify. Any such undertaking may be modified or discontinued at any time except to the extent the Adviser explicitly agrees to maintain such undertaking for a specified period.

If it is necessary to calculate the fee for a period of time that is less than a month, then the fee shall be (i) calculated at the annual rates provided in Schedule B but prorated for the number of days elapsed in the month in question as a percentage of the total number of days in such month, (ii) based upon the average of the Portfolio's daily net asset value for the period in question, and (iii) paid within a reasonable time after the close of such period.

3

8.      Liability of the Adviser

(a)      The Adviser shall not be liable for any loss or losses sustained by reason of any investment including the purchase, holding or sale of any security, or with respect to the administration of the Company, as long as the Adviser shall have acted in good faith and with due care; provided, however, that no provision in this Agreement shall be deemed to protect the Adviser against any liability to the Company or its shareholders by reason of its willful misfeasance, bad faith or gross negligence (or, alternatively, in respect of any Portfolio for which the sub-adviser at the time of such loss is Hartford Investment Management Company, its negligence) in the performance of its duties or by reason of its reckless disregard of its obligations and duties under this Agreement.

(b)      The rights of exculpation and indemnification are not to be construed so as to provide for exculpation or indemnification provided under 8(a) of any person for any liability (including liability under U.S. federal securities laws that, under certain circumstances, impose liability even on persons that act in good faith) to the extent (but only to the extent) that exculpation or indemnification would be in violation of applicable law, but will be construed so as to effectuate the applicable provisions of this section to the maximum extent permitted by applicable law.

9.      Duration of Agreement

(a)      This Agreement shall be effective on November 1, 2009.  This Agreement, unless sooner terminated in accordance with 9(b) below, shall continue in effect from year to year thereafter provided that its continuance is specifically approved at least annually (1) by a vote of a majority of the members of the Board of Directors of the Company or by a vote of a majority of the outstanding voting securities of each Portfolio, and (2) in either event, by the vote of a majority of the members of the Company's Board of Directors who are not parties to this Agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on this Agreement.

(b)      This Agreement (1) may be terminated at any time without the payment of any penalty either by a vote of a majority of the members of the Board of Directors of the Company or by a vote of a majority of the Portfolio's outstanding voting securities, on sixty days' prior written notice to the Adviser; (2) shall immediately terminate in the event of its assignment and (3) may be terminated by the Adviser on sixty days' prior written notice to the Portfolio, but such termination will not be effective until the Portfolio shall have contracted with one or more persons to serve as a successor investment adviser for the Portfolio and such person(s) shall have assumed such position.

(c)      As used in this Agreement, the terms "assignment", "interested person" and "vote of majority of the Company's outstanding voting securities" shall have the meanings set forth for such terms in the 1940 Act, as amended.

(d)      Any notice under this Agreement shall be given in writing, addressed and delivered, or mailed postpaid, to the other party to this Agreement to whom such notice is to be given at such party's current address.

4

10.    Other Activities

Nothing in this Agreement shall limit or restrict the right of any director, officer, or employee of the Adviser to engage in any other business or to devote his or her time and attention in part to the management or other aspects of any other business, whether of a similar nature or a dissimilar nature, nor to limit or restrict the right of the Adviser to engage in any other business or to render services of any kind to any other corporation, firm individual or association.

11.    Additional Series

The amendment of Schedule A to this Agreement for the sole purpose of adding one or more Portfolios shall not be deemed an amendment of this Agreement or an amendment affecting an already existing Portfolio and requiring the approval of shareholders of that Portfolio.

12.    Invalid Provisions

If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby.

13.    Governing Law

To the extent that federal securities laws do not apply, this Agreement and all performance hereunder shall be governed by the laws of the State of Connecticut, which apply to contracts made and to be performed in the State of Connecticut.

14.    Amendments

No provision of this Agreement may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought, and no amendment of this Agreement will be effective until approved in a manner consistent with the 1940 Act and rules and regulations under the 1940 Act and any applicable Securities and Exchange Commission exemptive order from such rules and regulations. Any such instrument signed by a Portfolio must be (a) approved by the vote of a majority of the Directors who are not parties to this Agreement or "interested persons" of any party to this Agreement, cast in person at a meeting called for the purpose of voting on such approval, and (b) by the vote of a majority of the Directors of the Company, or by the vote of a majority of the outstanding voting securities of the Portfolio. The amendment of Schedule A and/or Schedule B to this Agreement for the sole purpose of (i) adding or deleting one or more Portfolios or (ii) making other non-material changes to the information included in the Schedule shall not be deemed an amendment of this Agreement.

15.    Entire Agreement

This Agreement, including the schedules hereto, constitutes the entire understanding between the parties pertaining to the subject matter hereof and supersedes any prior agreement between the parties on this subject matter.

[The remainder of this page left intentionally blank.]

5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the 1st day of November, 2009.

Hartford Investment Financial Services, LLC


/s/Robert Arena
By: Robert Arena
Title: President


The Hartford Mutual Funds, Inc.
on behalf of each of its series listed on Attachment A


/s/Robert Arena
By: Robert Arena
Title: President

6

Schedule A

**List of Portfolios**

HARTFORD MUTUAL FUNDS, INC.
ON BEHALF OF:

        The Hartford Advisers Fund
        The Hartford Balanced Allocation Fund
        The Hartford Balanced Income Fund
        The Hartford Capital Appreciation Fund
        The Hartford Capital Appreciation II Fund
        The Hartford Checks and Balances Fund
        The Hartford Conservative Allocation Fund
        The Hartford Disciplined Equity Fund
        The Hartford Diversified International Fund
        The Hartford Dividend and Growth Fund
        The Hartford Equity Growth Allocation Fund
        The Hartford Equity Income Fund
        The Hartford Floating Rate Fund
        The Hartford Fundamental Growth Fund
        The Hartford Global Enhanced Dividend Fund
        The Hartford Global Equity Fund
        The Hartford Global Growth Fund
        The Hartford Global Health Fund
        The Hartford Growth Allocation Fund
        The Hartford High Yield Fund
        The Hartford High Yield Municipal Bond Fund
        The Hartford Income Fund
        The Hartford Inflation Plus Fund
        The Hartford International Growth Fund
        The Hartford International Opportunities Fund
        The Hartford International Small Company Fund
        The Hartford MidCap Fund
        The Hartford MidCap Growth Fund
        The Hartford MidCap Value Fund
        The Hartford Money Market Fund
        The Hartford Select MidCap Value Fund
        The Hartford Select SmallCap Value Fund
        The Hartford Short Duration Fund
        The Hartford Small Company Fund
        The Hartford Strategic Income Fund
        The Hartford Target Retirement 2010 Fund
        The Hartford Target Retirement 2015 Fund
        The Hartford Target Retirement 2020 Fund
        The Hartford Target Retirement 2025 Fund
        The Hartford Target Retirement 2030 Fund
        The Hartford Target Retirement 2035 Fund

1

The Hartford Target Retirement 2040 Fund
The Hartford Target Retirement 2045 Fund
The Hartford Target Retirement 2050 Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund

2

**Schedule B**

**Fees**

As compensation for the services rendered by the Adviser, each Portfolio shall pay to the Adviser as promptly as possible after the last day of each month during the term of this Agreement, a fee accrued daily and paid monthly based upon the following annual rates calculated based on the average daily net asset value of the applicable Portfolio:

**Advisers Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.6900% |
| Next $500 million | 0.6250% |
| Next $4 billion | 0.5750% |
| Next $5 billion | 0.5725% |
| Amount Over $10 billion | 0.5700% |

**Balanced Income Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $250 million | 0.7250% |
| Next $250 million | 0.7000% |
| Next $500 million | 0.6750% |
| Next $4 billion | 0.6500% |
| Next $5 billion | 0.6475% |
| Amount Over $10 billion | 0.6450% |

**Capital Appreciation Fund and Value Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.8000% |
| Next $500 million | 0.7000% |
| Next $4 billion | 0.6500% |
| Next $5 billion | 0.6475% |
| Amount Over $10 billion | 0.6450% |

**Capital Appreciation II Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $250 million | 1.0000% |
| Next $250 million | 0.9500% |
| Next $500 million | 0.9000% |
| Next $4 billion | 0.8500% |
| Next $5 billion | 0.8475% |
| Amount Over $10 billion | 0.8450% |

1

**Checks and Balances Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| | None |

**Disciplined Equity Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.7500% |
| Next $500 million | 0.6750% |
| Next $4 million | 0.6250% |
| Next $5 million | 0.6225% |
| Amount Over $10 billion | 0.6200% |

**Diversified International Fund and Select SmallCap Value Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 1.0000% |
| Next $500 million | 0.9500% |
| Next $4 billion | 0.9000% |
| Next $5 billion | 0.8975% |
| Amount Over $10 billion | 0.8950% |

**Dividend and Growth Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.7500% |
| Next $500 million | 0.6500% |
| Next $4 billion | 0.6000% |
| Next $5 billion | 0.5975% |
| Amount Over $10 billion | 0.5950% |

**Equity Income Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.7500% |
| Next $500 million | 0.7000% |
| Next $4 billion | 0.6500% |
| Next $5 billion | 0.6475% |
| Amount Over $10 billion | 0.6450% |

2

## Floating Rate Fund

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.6500% |
| Next $4.5 billion | 0.6000% |
| Next $5 billion | 0.5800% |
| Amount Over $10 billion | 0.5700% |

## Fundamental Growth Fund

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.8500% |
| Next $500 million | 0.8000% |
| Next $4 billion | 0.7500% |
| Next $5 billion | 0.7475% |
| Amount Over $10 billion | 0.7450% |

## Global Enhanced Dividend Fund

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 1.0000% |
| Next $500 million | 0.9500% |
| Next $4 billion | 0.9000% |
| Next $5 billion | 0.8800% |
| Amount Over $10 billion | 0.8700% |

## Global Equity Fund

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.9500% |
| Next $500 million | 0.9000% |
| Next $4 billion | 0.8500% |
| Next $5 billion | 0.8475% |
| Amount Over $10 billion | 0.8450% |

## Global Growth Fund, International Opportunities Fund and MidCap Fund

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.8500% |
| Next $500 million | 0.7500% |
| Next $4 billion | 0.7000% |
| Next $5 billion | 0.6975% |
| Amount Over $10 billion | 0.6950% |

3

**Global Health Fund, International Growth Fund and International Small Company Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.9000% |
| Next $500 million | 0.8500% |
| Next $4 billion | 0.8000% |
| Next $5 billion | 0.7975% |
| Amount Over $10 billion | 0.7950% |

**High Yield Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.7000% |
| Next $500 million | 0.6500% |
| Next $4 billion | 0.6000% |
| Next $5 billion | 0.5800% |
| Amount Over $10 billion | 0.5700% |

**High Yield Municipal Bond Fund and Strategic Income Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.5500% |
| Next $500 million | 0.5000% |
| Next $4 billion | 0.4750% |
| Next $5 billion | 0.4550% |
| Amount Over $10 billion | 0.4450% |

**Income Fund and Inflation Plus Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.5500% |
| Next $4.5 billion | 0.5000% |
| Next $5 billion | 0.4800% |
| Amount Over $10 billion | 0.4700% |

**MidCap Growth Fund and Select MidCap Value Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.7500% |
| Next $500 million | 0.7000% |
| Next $4 billion | 0.6500% |
| Next $5 billion | 0.6300% |
| Amount Over $10 billion | 0.6200% |

4

**MidCap Value Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.8000% |
| Next $500 million | 0.7250% |
| Next $4 billion | 0.6750% |
| Next $5 billion | 0.6725% |
| Amount Over $10 billion | 0.6700% |

**Money Market Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $1 billion | 0.4500% |
| Next $4 billion | 0.4000% |
| Next $5 billion | 0.3800% |
| Amount Over $10 billion | 0.3700% |

**Short Duration Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.4500% |
| Next $4.5 billion | 0.4000% |
| Next $5 billion | 0.3800% |
| Amount Over $10 billion | 0.3700% |

**Small Company Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $250 million | 0.8500% |
| Next $250 million | 0.8000% |
| Next $500 million | 0.7500% |
| Next $500 million | 0.7000% |
| Next $3.5 billion | 0.6500% |
| Next $5 billion | 0.6300% |
| Amount Over $10 billion | 0.6200% |

**Total Return Bond Fund**

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.5500% |
| Next $500 million | 0.5250% |
| Next $4 billion | 0.5000% |
| Next $5 billion | 0.4800% |
| Amount Over $10 billion | 0.4700% |

**Balanced Allocation Fund, Conservative Allocation Fund, Equity Growth Allocation Fund, Growth Allocation Fund, Target Retirement 2010 Fund, Target Retirement 2015 Fund, Target Retirement 2020 Fund, Target**

Retirement 2025 Fund, Target Retirement 2030 Fund, Target Retirement 2035 Fund, Target Retirement 2040 Fund, Target Retirement 2045 Fund and Target Retirement 2050 Fund

| Average Daily Net Assets | Annual Rate |
|---|---|
| First $500 million | 0.1500% |
| Next $4.5 billion | 0.1000% |
| Next $5 billion | 0.0800% |
| Amount Over $10 billion | 0.0700% |

6

# EXHIBIT 2

```
<DOCUMENT>
<TYPE>EX-99.(H)(XVIII)
<SEQUENCE>10
<FILENAME>b68643a1exv99wxhyxxviiiy.txt
<DESCRIPTION>EXPENSE LIMITATION AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT H.XVIII

EXPENSE LIMITATION AGREEMENT

THIS AGREEMENT, dated as of February 6, 2008, between The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (each a "Company" and collectively, the "Companies") on behalf of each series of the Companies (each a "Fund" and collectively, the "Funds") and Hartford Investment Financial Services, LLC (the "Adviser").

WHEREAS, the Adviser has been appointed the investment adviser of each of the Funds pursuant to an Investment Management Agreement between each Company, on behalf of the Funds, and the Adviser; and

WHEREAS, each Company and the Adviser desire to enter into the arrangements described herein relating to certain expenses of the Funds;

NOW, THEREFORE, each Company and the Adviser hereby agree as follows:

1. For the period commencing November 1, 2007 through February 28, 2009, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions, acquired fund fees and expenses and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule A.

2. The reimbursement described in Section 1 above is not subject to recoupment by the Adviser.

3. The Adviser understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Companies on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

4. This Agreement shall renew automatically for one-year terms unless the Adviser provides written notice of termination prior to the start of such term.

```
<PAGE>
```

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.


Name: /s/ Tamara L. Fagely
      ----------------------------------
      Tamara L. Fagely
Title: Vice President, Treasurer and
       Controller


THE HARTFORD MUTUAL FUNDS II, INC.


Name: /s/ Tamara L. Fagely

      Tamara L. Fagely
Title: Vice President, Treasurer and
       Controller


HARTFORD INVESTMENT FINANCIAL SERVICES, LLP


Name: /s/ Robert Arena
      ---------------------------------
      Robert Arena
Title: Manager, Senior Vice President
       /Business Line Principal


                              2


<PAGE>


                         SCHEDULE A

<TABLE>
<CAPTION>

                                        TOTAL NET ANNUAL OPERATING
                                              EXPENSE LIMIT
                                        (AS A PERCENT OF AVERAGE DAILY
               FUND                           NET ASSETS)
               ----                     -------------------------------
<S>                                     <C>
The Hartford Advisers Fund                   Class A:  1.18%
                                             Class R3: 1.43%
                                             Class R4: 1.13%
                                             Class R5: 0.83%

The Hartford Balanced Allocation Fund        Class A:  1.40%
                                             Class B:  2.15%
                                             Class C:  2.15%
         '                                   Class I:  1.15%
                                             Class R3: 1.78%
                                             Class R4: 1.48%
                                             Class R5: 1.18%

The Hartford Balanced Income Fund            Class A:  1.25%
                                             Class B:  2.00%
                                             Class C:  2.00%
                                             Class Y:  0.90%

The Hartford Capital Appreciation Fund       Class A:  1.29%
                                             Class I:  1.04%
                                             Class R3: 1.54%
                                             Class R4: 1.24%
                                             Class R5: 0.94%

The Hartford Capital Appreciation II Fund    Class A:  1.60%
                                             Class B:  2.35%
                                             Class C:  2.35%
                                             Class I:  1.35%
                                             Class R3: 1.85%
                                             Class R4: 1.55%
                                             Class R5: 1.25%
                                             Class Y:  1.25%

The Hartford Checks and Balances Fund        Class A:  1.15%
                                             Class B:  1.90%
                                             Class C:  1.90%

```
The Hartford Conservative Allocation Fund          Class A:  1.35%
                                                   Class B:  2.10%
                                                   Class C:  2.10%
                                                   Class I:  1.10%
                                                   Class R3: 1.78%
                                                   Class R4: 1.48%
                                                   Class R5: 1.18%

The Hartford Disciplined Equity Fund               Class A:  1.40%
                                                   Class B:  2.15%
                                                   Class C:  2.15%
                                                   Class R3: 1.65%
                                                   Class R4: 1.35%
                                                   Class R5: 1.05%
                                                   Class Y:  1.00%

The Hartford Dividend and Growth Fund              Class A:  1.25%
                                                   Class I:  1.00%
</TABLE>
```

3

```
<PAGE>

<TABLE>
<S>                                           <C>
                                                   Class R3: 1.50%
                                                   Class R4: 1.20%
                                                   Class R5: 0.90%

The Hartford Equity Growth Allocation Fund         Class A:  1.60%
                                                   Class B:  2.35%
                                                   Class C:  2.35%
                                                   Class I:  1.35%
                                                   Class R3: 1.85%
                                                   Class R4: 1.55%
                                                   Class R5: 1.25%

The Hartford Equity Income Fund                    Class A:  1.25%
                                                   Class B:  2.00%
                                                   Class C:  2.00%
                                                   Class I:  1.00%
                                                   Class R3: 1.60%
                                                   Class R4: 1.30%
                                                   Class R5: 1.00%
                                                   Class Y:  0.90%

The Hartford Fundamental Growth Fund               Class A:  1.45%
                                                   Class B:  2.20%
                                                   Class C:  2.20%
                                                   Class Y:  1.05%

The Hartford Global Communications Fund            Class A:  1.60%
                                                   Class B:  2.35%
                                                   Class C:  2.35%
                                                   Class Y:  1.20%

The Hartford Global Equity Fund                    Class A:  1.65%
                                                   Class B:  2.40%
                                                   Class C:  2.40%
                                                   Class I:  1.40%
                                                   Class R3: 1.90%
                                                   Class R4: 1.65%
```

```
                                                    Class Y:   1.30%

The Hartford Global Financial Services Fund         Class A:   1.60%
                                                    Class B:   2.35%
                                                    Class C:   2.35%
                                                    Class Y:   1.20%

The Hartford Global Growth Fund                     Class A:   1.48%
                                                    Class B:   2.23%
                                                    Class C:   2.23%
                                                    Class R3:  1.73%
                                                    Class R4:  1.43%
                                                    Class R5:  1.13%
                                                    Class Y:   1.13%

The Hartford Global Health Fund                     Class A:   1.60%
                                                    Class B:   2.35%
                                                    Class C:   2.35%
                                                    Class I:   1.35%
                                                    Class R3:  1.85%
                                                    Class R4:  1.55%
                                                    Class R5:  1.25%
                                                    Class Y:   1.20%

The Hartford Global Technology Fund                 Class A:   1.60%
                                                    Class B:   2.35%
</TABLE>
```

4

```
<PAGE>

<TABLE>
<S>                                    <C>
                                                    Class C:   2.35%
                                                    Class Y:   1.20%

The Hartford Growth Fund                            Class A:   1.30%
                                                    Class B:   2.05%
                                                    Class C:   2.05%
                                                    Class I:   1.05%
                                                    Class L:   1.42%
                                                    Class R3:  1.55%
                                                    Class R4:  1.25%
                                                    Class R5:  0.95%
                                                    Class Y:   0.95%

The Hartford Growth Allocation Fund                 Class A:   1.50%
                                                    Class B:   2.25%
                                                    Class C:   2.25%
                                                    Class I:   1.25%
                                                    Class R3:  1.81%
                                                    Class R4:  1.51%
                                                    Class R5:  1.21%

The Hartford Growth Opportunities Fund              Class A:   1.36%
                                                    Class B:   2.11%
                                                    Class C:   2.11%
                                                    Class I:   1.11%
                                                    Class L:   1.45%
                                                    Class R3:  1.61%
                                                    Class R4:  1.31%
                                                    Class R5:  1.01%
                                                    Class Y:   1.01%
```

```
The Hartford High Yield Fund                      Class A:  1.15%
                                                  Class B:  1.90%
                                                  Class C:  1.90%
                                                  Class I:  0.90%
                                                  Class R3: 1.40%
                                                  Class R4: 1.10%
                                                  Class R5: 0.90%
                                                  Class Y:  0.90%

The Hartford High Yield Municipal Bond Fund       Class A:  1.00%
                                                  Class B:  1.75%
                                                  Class C:  1.75%
                                                  Class I:  0.75%

The Hartford Income Fund                          Class A:  0.95%
                                                  Class B:  1.70%
                                                  Class C:  1.70%
                                                  Class Y:  0.70%

The Hartford Income Allocation Fund               Class A:  1.20%
                                                  Class B:  1.95%
                                                  Class C:  1.95%
                                                  Class I:  0.95%
                                                  Class R3: 1.59%
                                                  Class R4: 1.29%
                                                  Class R5: 0.99%

The Hartford Inflation Plus Fund                  Class A:  0.85%
                                                  Class B:  1.60%
                                                  Class C:  1.60%
                                                  Class I:  0.60%
                                                  Class R3: 1.25%
</TABLE>
```

5

<PAGE>

```
<TABLE>
<S>                                      <C>
                                                  Class R4: 1.00%
                                                  Class R5: 0.76%
                                                  Class Y:  0.60%

The Hartford International Growth Fund             Class A:  1.60%
                                                  Class B:  2.35%
                                                  Class C:  2.35%
                                                  Class I:  1.35%
                                                  Class R3: 1.85%
                                                  Class R4: 1.55%
                                                  Class R5: 1.25%
                                                  Class Y:  1.20%

The Hartford International Opportunities Fund      Class A:  1.57%
                                                  Class B:  2.32%
                                                  Class C:  2.32%
                                                  Class R3: 1.82%
                                                  Class R4: 1.52%
                                                  Class R5: 1.22%
                                                  Class Y:  1.22%

The Hartford International Small Company Fund      Class A:  1.60%
                                                  Class B:  2.35%
                                                  Class C:  2.35%
```

|                                           |           |       |
|-------------------------------------------|-----------|-------|
|                                           | Class Y:  | 1.20% |
| The Hartford LargeCap Growth Fund         | Class A:  | 1.25% |
|                                           | Class B:  | 2.00% |
|                                           | Class C:  | 2.00% |
|                                           | Class Y:  | 0.85% |
| The Hartford MidCap Fund                  | Class A:  | 1.37% |
| The Hartford MidCap Growth Fund           | Class A:  | 1.35% |
|                                           | Class B:  | 2.10% |
|                                           | Class C:  | 2.10% |
|                                           | Class Y:  | 0.95% |
| The Hartford MidCap Value Fund            | Class A:  | 1.40% |
|                                           | Class B:  | 2.15% |
|                                           | Class C:  | 2.15% |
|                                           | Class Y:  | 1.00% |
| The Hartford Money Market Fund            | Class A:  | 0.90% |
|                                           | Class B:  | 1.65% |
|                                           | Class C:  | 1.65% |
|                                           | Class R3: | 1.15% |
|                                           | Class R4: | 0.85% |
|                                           | Class R5: | 0.65% |
|                                           | Class Y:  | 0.65% |
| The Hartford Retirement Income Fund       | Class A:  | 1.20% |
|                                           | Class B:  | 1.95% |
|                                           | Class C:  | 1.95% |
|                                           | Class R3: | 1.60% |
|                                           | Class R4: | 1.30% |
|                                           | Class R5: | 1.00% |
|                                           | Class Y:  | 0.85% |
| The Hartford Select MidCap Value Fund     | Class A:  | 1.30% |
|                                           | Class B:  | 2.05% |
|                                           | Class C:  | 2.05% |
|                                           | Class Y:  | 0.90% |
| The Hartford Select SmallCap Value Fund   | Class A:  | 1.60% |

</TABLE>

6

<PAGE>

<TABLE>
<S>                                            <C>

|                                           |           |       |
|-------------------------------------------|-----------|-------|
|                                           | Class B:  | 2.35% |
|                                           | Class C:  | 2.35% |
|                                           | Class Y:  | 1.20% |
| The Hartford Short Duration Fund          | Class A:  | 0.90% |
|                                           | Class B:  | 1.65% |
|                                           | Class C:  | 1.65% |
|                                           | Class Y:  | 0.65% |
| The Hartford Small Company Fund           | Class A:  | 1.40% |
|                                           | Class B:  | 2.15% |
|                                           | Class C:  | 2.15% |
|                                           | Class I:  | 1.15% |
|                                           | Class R3: | 1.65% |
|                                           | Class R4: | 1.35% |

|                                            |               |       |
|--------------------------------------------|---------------|-------|
|                                            | Class Y:      | 1.00% |
| The Hartford SmallCap Growth Fund          | Class A:      | 1.40% |
|                                            | Class B:      | 2.15% |
|                                            | Class C:      | 2.15% |
|                                            | Class I:      | 1.15% |
|                                            | Class L:      | 1.25% |
|                                            | Class R3:     | 1.65% |
|                                            | Class R4:     | 1.35% |
|                                            | Class R5:     | 1.05% |
|                                            | Class Y:      | 1.05% |
| The Hartford Stock Fund                    | Class A:      | 1.25% |
|                                            | Class R3:     | 1.50% |
|                                            | Class R4:     | 1.20% |
|                                            | Class R5:     | 0.90% |
| The Hartford Strategic Income Fund         | Class A:      | 1.15% |
|                                            | Class B:      | 1.90% |
|                                            | Class C:      | 1.90% |
|                                            | Class I:      | 0.90% |
| The Hartford Target Retirement 2010 Fund   | Class A:      | 1.25% |
|                                            | Class B:      | 2.00% |
|                                            | Class C:      | 2.00% |
|                                            | Class R3:     | 1.65% |
|                                            | Class R4:     | 1.35% |
|                                            | Class R5:     | 1.05% |
|                                            | Class Y:      | 0.90% |
| The Hartford Target Retirement 2020 Fund   | Class A:      | 1.30% |
|                                            | Class B:      | 2.05% |
|                                            | Class C:      | 2.05% |
|                                            | Class R3:     | 1.70% |
|                                            | Class R4:     | 1.40% |
|                                            | Class R5:     | 1.10% |
|                                            | Class Y:      | 0.95% |
| The Hartford Target Retirement 2030 Fund   | Class A:      | 1.35% |
|                                            | Class B:      | 2.10% |
|                                            | Class C:      | 2.10% |
|                                            | Class R3:     | 1.75% |
|                                            | Class R4:     | 1.45% |
|                                            | Class R5:     | 1.15% |
|                                            | Class Y:      | 1.00% |
| The Hartford Tax-Free California Fund       | Class A:      | 0.85% |
|                                            | Class B:      | 1.60% |

</TABLE>

7

<PAGE>

<TABLE>
<S>                                         <C>

|                                            |               |       |
|--------------------------------------------|---------------|-------|
|                                            | Class C:      | 1.60% |
|                                            | Class Y:      | 0.75% |
| The Hartford Tax-Free Minnesota Fund       | Class A:      | 0.85% |
|                                            | Class B:      | 1.60% |
|                                            | Class C:      | 1.60% |
|                                            | Class L:      | 0.90% |

|                                        |     |          |       |
|----------------------------------------|-----|----------|-------|
|                                        |     | Class B: | 1.60% |
|                                        |     | Class C: | 1.60% |
|                                        |     | Class I: | 0.60% |
|                                        |     | Class L: | 0.80% |
|                                        |     | Class Y: | 0.60% |
| The Hartford Tax-Free New York Fund    | [1] | Class A: | 0.85% |
|                                        |     | Class B: | 1.60% |
|                                        |     | Class C: | 1.60% |
|                                        |     | Class Y: | 0.75% |
| The Hartford Value Fund                |     | Class A: | 1.40% |
|                                        |     | Class B: | 2.15% |
|                                        |     | Class C: | 2.15% |
|                                        |     | Class I: | 1.15% |
|                                        |     | Class R3:| 1.65% |
|                                        |     | Class R4:| 1.35% |
|                                        |     | Class R5:| 1.05% |
|                                        |     | Class Y: | 1.00% |
| The Hartford Value Opportunities Fund  |     | Class A: | 1.40% |
|                                        |     | Class B: | 2.15% |
|                                        |     | Class C: | 2.15% |
|                                        |     | Class I: | 1.15% |
|                                        |     | Class L: | 1.45% |
|                                        |     | Class R3:| 1.65% |
|                                        |     | Class R4:| 1.35% |
|                                        |     | Class R5:| 1.05% |
|                                        |     | Class Y: | 1.05% |

</TABLE>

8

</TEXT>
</DOCUMENT>

**Exh H.(XXI)**

### AMENDED AND RESTATED

### EXPENSE LIMITATION AGREEMENT

**THIS AMENDED AND RESTATED EXPENSE LIMITATION AGREEMENT,** dated as of November 1, 2008, between The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (each a "Company" and collectively, the "Companies") on behalf of each series of the Companies (each a "Fund" and collectively, the "Funds") and Hartford Investment Financial Services, LLC (the "Adviser").

**WHEREAS,** the Adviser has been appointed the investment adviser of each of the Funds pursuant to an Investment Management Agreement between each Company, on behalf of the Funds, and the Adviser; and

**WHEREAS,** each Company and the Adviser desire to enter into the arrangements described herein relating to certain expenses of the Funds;

**NOW, THEREFORE,** each Company and the Adviser hereby agree as follows:

1. For the period commencing November 1, 2008 through February 28, 2010, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions, acquired fund fees and expenses and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule A.

2. For the period commencing November 1, 2008 through February 28, 2010, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule B.

3. The reimbursements described in Section 1 and Section 2 above are not subject to recoupment by the Adviser.

4. The Adviser understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Companies on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

5. This Agreement shall renew automatically for one-year terms unless the Adviser provides written notice of termination prior to the start of such term.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.


Name: /s/Tamara L. Fagely
       Tamara L. Fagely
Title:  Vice President, Treasurer and Controller


THE HARTFORD MUTUAL FUNDS II, INC.


Name:  /s/Tamara L. Fagely
       Tamara L. Fagely
Title:  Vice President, Treasurer and Controller


HARTFORD INVESTMENT FINANCIAL SERVICES, LLC

Name: /s/Robert Arena
       Robert Arena
Title:  Manager, Senior Vice President /Business Line Principal


2

## SCHEDULE A

| Fund | Total Net Annual Operating Expense Limit (as a percent of average daily net assets) | |
|------|---------|---------|
| The Hartford Advisers Fund | Class A: | 1.18% |
| | Class R3: | 1.43% |
| | Class R4: | 1.13% |
| | Class R5: | 0.83% |
| The Hartford Balanced Income Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class Y: | 0.90% |
| The Hartford Capital Appreciation Fund | Class A: | 1.29% |
| | Class I: | 1.04% |
| | Class R3: | 1.54% |
| | Class R4: | 1.24% |
| | Class R5: | 0.94% |
| The Hartford Capital Appreciation II Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.25% |
| The Hartford Disciplined Equity Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 0.95% |
| The Hartford Dividend and Growth Fund | Class A: | 1.25% |
| | Class I: | 1.00% |
| | Class R3: | 1.50% |
| | Class R4: | 1.20% |
| | Class R5: | 0.90% |
| The Hartford Diversified International Fund | Class A: | 1.65% |
| | Class B: | 2.40% |
| | Class C: | 2.40% |
| | Class I: | 1.40% |
| | Class R3: | 1.90% |
| | Class R4: | 1.65% |
| | Class R5: | 1.40% |
| | Class Y: | 1.30% |
| The Hartford Equity Income Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class I: | 1.00% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 0.90% |

|  | | |
|---|---|---|
| | Class A: | 1.45% |
| | Class B: | 2.20% |
| | Class C: | 2.20% |
| | Class Y: | 1.05% |
| The Hartford Global Communications Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class Y: | 1.20% |
| The Hartford Global Enhanced Dividend Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.60% |
| | Class R5: | 1.35% |
| | Class Y: | 1.25% |
| The Hartford Global Equity Fund | Class A: | 1.65% |
| | Class B: | 2.40% |
| | Class C: | 2.40% |
| | Class I: | 1.40% |
| | Class R3: | 1.90% |
| | Class R4: | 1.65% |
| | Class R5: | 1.40% |
| | Class Y: | 1.30% |
| The Hartford Global Financial Services Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class Y: | 1.20% |
| The Hartford Global Growth Fund | Class A: | 1.48% |
| | Class B: | 2.23% |
| | Class C: | 2.23% |
| | Class R3: | 1.73% |
| | Class R4: | 1.43% |
| | Class R5: | 1.13% |
| | Class Y: | 1.13% |
| The Hartford Global Health Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.20% |
| The Hartford Global Technology Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class Y: | 1.20% |
| The Hartford Growth Fund | Class A: | 1.30% |
| | Class B: | 2.05% |
| | Class C: | 2.05% |
| | Class I: | 1.05% |
| | Class L: | 1.42% |
| | Class R3: | 1.55% |
| | Class R4: | 1.25% |
| | Class R5: | 0.95% |
| | Class Y: | 0.95% |

The Hartford Growth Opportunities Fund

| | |
|---|---|
| Class A: | 1.36% |
| Class B: | 2.11% |
| Class C: | 2.11% |
| Class I: | 1.11% |
| Class L: | 1.45% |
| Class R3: | 1.61% |
| Class R4: | 1.31% |
| Class R5: | 1.01% |
| Class Y: | 0.80% |

The Hartford High Yield Fund

| | |
|---|---|
| Class A: | 1.15% |
| Class B: | 1.90% |
| Class C: | 1.90% |
| Class I: | 0.90% |
| Class R3: | 1.40% |
| Class R4: | 1.10% |
| Class R5: | 0.90% |
| Class Y: | 0.90% |

The Hartford High Yield Municipal Bond Fund

| | |
|---|---|
| Class A: | 1.00% |
| Class B: | 1.75% |
| Class C: | 1.75% |
| Class I: | 0.75% |

The Hartford Income Fund

| | |
|---|---|
| Class A: | 0.95% |
| Class B: | 1.70% |
| Class C: | 1.70% |
| Class Y: | 0.70% |

The Hartford Inflation Plus Fund

| | |
|---|---|
| Class A: | 0.85% |
| Class B: | 1.60% |
| Class C: | 1.60% |
| Class I: | 0.60% |
| Class R3: | 1.25% |
| Class R4: | 1.00% |
| Class R5: | 0.76% |
| Class Y: | 0.60% |

The Hartford International Growth Fund

| | |
|---|---|
| Class A: | 1.60% |
| Class B: | 2.35% |
| Class C: | 2.35% |
| Class I: | 1.35% |
| Class R3: | 1.85% |
| Class R4: | 1.55% |
| Class R5: | 1.25% |
| Class Y: | 1.20% |

The Hartford International Opportunities Fund

| | |
|---|---|
| Class A: | 1.57% |
| Class B: | 2.32% |
| Class C: | 2.32% |
| Class I: | 1.32% |
| Class R3: | 1.82% |
| Class R4: | 1.52% |
| Class R5: | 1.22% |
| Class Y: | 1.22% |

The Hartford International Small Company Fund

| | |
|---|---|
| Class A: | 1.60% |
| Class B: | 2.35% |
| Class C: | 2.35% |
| Class I: | 1.35% |
| Class Y: | 1.20% |

| | | |
|---|---|---|
| The Hartford LargeCap Growth Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class Y: | 0.85% |
| The Hartford MidCap Fund | Class A: | 1.37% |
| | Class I: | 1.12% |
| The Hartford MidCap Growth Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class Y: | 0.95% |
| The Hartford MidCap Value Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class Y: | 0.95% |
| The Hartford Money Market Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class R3: | 1.15% |
| | Class R4: | 0.85% |
| | Class R5: | 0.65% |
| | Class Y: | 0.65% |
| The Hartford Select MidCap Value Fund | Class A: | 1.30% |
| | Class B: | 2.05% |
| | Class C: | 2.05% |
| | Class Y: | 0.90% |
| The Hartford Select SmallCap Value Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class Y: | 1.20% |
| The Hartford Short Duration Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class Y: | 0.65% |
| The Hartford Small Company Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.00% |
| The Hartford SmallCap Growth Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class L: | 1.25% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.05% |
| The Hartford Stock Fund | Class A: | 1.25% |
| | Class I: | 1.00% |
| | Class R3: | 1.50% |
| | Class R4: | 1.20% |
| | Class R5: | 0.90% |

| | | |
|---|---|---|
| The Hartford Strategic Income Fund | Class A: | 1.75% |
| | Class B: | 1.90% |
| | Class C: | 1.90% |
| | Class Y: | 0.90% |
| | Class I: | 0.90% |
| The Hartford Tax-Free California Fund | Class A | 0.85% |
| | Class B: | 1.60% |
| | Class C: | 1.60% |
| | Class Y: | 0.75% |
| The Hartford Tax-Free Minnesota Fund | Class A: | 0.85% |
| | Class B: | 1.60% |
| | Class C: | 1.60% |
| | Class L: | 0.90% |
| The Hartford Tax-Free National Fund | Class A: | 0.85% |
| | Class B: | 1.60% |
| | Class C: | 1.60% |
| | Class I: | 0.60% |
| | Class L: | 0.80% |
| | Class Y: | 0.60% |
| The Hartford Tax-Free New York Fund | Class A: | 0.85% |
| | Class B: | 1.60% |
| | Class C: | 1.60% |
| | Class Y: | 0.75% |
| The Hartford Value Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.00% |
| The Hartford Value Opportunities Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class I: | 1.10% |
| | Class L: | 1.40% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 1.00% |

| The Hartford Balanced Allocation Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.78% |
| | Class R4: | 1.48% |
| | Class R5: | 1.18% |
| The Hartford Checks and Balances Fund | Class A: | 1.15% |
| | Class B: | 1.90% |
| | Class C: | 1.90% |
| | Class I: | 0.90% |
| | Class R3: | 1.45% |
| | Class R4: | 1.15% |
| | Class R5: | 0.95% |
| The Hartford Conservative Allocation Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class I: | 1.10% |
| | Class R3 | 1.78% |
| | Class R4: | 1.48% |
| | Class R5: | 1.18% |
| The Hartford Equity Growth Allocation Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| The Hartford Growth Allocation Fund | Class A: | 1.50% |
| | Class B: | 2.25% |
| | Class C: | 2.25% |
| | Class I: | 1.25% |
| | Class R3: | 1.81% |
| | Class R4: | 1.51% |
| | Class R5: | 1.21% |
| The Hartford Income Allocation Fund | Class A: | 1.20% |
| | Class B: | 1.95% |
| | Class C: | 1.95% |
| | Class I: | 0.95% |
| | Class R3: | 1.59% |
| | Class R4: | 1.29% |
| | Class R5: | 0.99% |
| The Hartford Retirement Income Fund | Class A: | 1.20% |
| | Class B: | 1.95% |
| | Class C: | 1.95% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 0.85% |
| The Hartford Target Retirement 2010 Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class R3: | 1.30% |
| | Class R4: | 1.00% |

8

| | |
|---|---|
| The Hartford Target Retirement 2015 Fund | Class R3: 1.30% |
| | Class R4: 1.00% |
| | Class R5: 0.80% |
| The Hartford Target Retirement 2020 Fund | Class A:  1.05% |
| | Class B:  1.80% |
| | Class C:  1.80% |
| | Class R3: 1.35% |
| | Class R4: 1.05% |
| | Class R5: 0.85% |
| | Class Y:  0.85% |
| The Hartford Target Retirement 2025 Fund | Class R3: 1.35% |
| | Class R4: 1.05% |
| | Class R5: 0.85% |
| The Hartford Target Retirement 2030 Fund | Class A:  1.05% |
| | Class B:  1.80% |
| | Class C:  1.80% |
| | Class R3: 1.35% |
| | Class R4: 1.05% |
| | Class R5: 0.85% |
| | Class Y:  0.85% |
| The Hartford Target Retirement 2035 Fund | Class R3: 1.35% |
| | Class R4: 1.05% |
| | Class R5: 0.85% |
| The Hartford Target Retirement 2040 Fund | Class R3: 1.35% |
| | Class R4: 1.05% |
| | Class R5: 0.85% |
| The Hartford Target Retirement 2045 Fund | Class R3: 1.40% |
| | Class R4: 1.10% |
| | Class R5: 0.90% |
| The Hartford Target Retirement 2050 Fund | Class R3: 1.40% |
| | Class R4: 1.10% |
| | Class R5: 0.90% |

9

## EXHIBIT H.(XXI)

## AMENDED AND RESTATED

## EXPENSE LIMITATION AGREEMENT

**THIS AMENDED AND RESTATED EXPENSE LIMITATION AGREEMENT,** dated as of November 1, 2009, between The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (each a "Company" and collectively, the "Companies") on behalf of each series of the Companies (each a "Fund" and collectively, the "Funds") and Hartford Investment Financial Services, LLC (the "Adviser").

**WHEREAS,** the Adviser has been appointed the investment adviser of each of the Funds pursuant to an Investment Management Agreement between each Company, on behalf of the Funds, and the Adviser; and

**WHEREAS,** each Company and the Adviser desire to enter into the arrangements described herein relating to certain expenses of the Funds;

**NOW, THEREFORE,** each Company and the Adviser hereby agree as follows:

1.          For the period commencing November 1, 2009 through February 28, 2011, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions, acquired fund fees and expenses and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule A.

2.          For the period commencing November 1, 2009 through February 28, 2011, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule B.

3.          The reimbursements described in Section 1 and Section 2 above are not subject to recoupment by the Adviser.

4.          The Adviser understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Companies on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

5.          This Agreement shall renew automatically for one-year terms unless the Adviser provides written notice of termination prior to the start of such term.

6.	This Agreement may be amended or modified by mutual consent of the Adviser and the Board of Directors of the respective Company at any time prior to the expiration date of the Agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.

Name:	/s/Tamara L. Fagely
	Tamara L. Fagely
Title:	Vice President, Treasurer and Controller

THE HARTFORD MUTUAL FUNDS II, INC.

Name:	/s/Tamara L. Fagely
	Tamara L. Fagely
Title:	Vice President, Treasurer and Controller

HARTFORD INVESTMENT FINANCIAL SERVICES, LLC

Name:	/s/Robert Arena
	Robert Arena
Title:	President

2

## SCHEDULE A

| Fund | Total Net Annual Operating Expense Limit (as a percent of average daily net assets) | |
|---|---|---|
| The Hartford Advisers Fund | Class A: | 1.18% |
| | Class R3: | 1.43% |
| | Class R4: | 1.13% |
| | Class R5: | 0.83% |
| The Hartford Balanced Income Fund (1) | Class A: | 0.75% |
| | Class B: | 1.50% |
| | Class C: | 1.50% |
| | Class Y: | 0.40% |
| The Hartford Capital Appreciation Fund | Class A: | 1.29% |
| | Class I: | 1.04% |
| | Class R3: | 1.54% |
| | Class R4: | 1.24% |
| | Class R5: | 0.94% |
| The Hartford Capital Appreciation II Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.25% |
| The Hartford Disciplined Equity Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 0.95% |
| The Hartford Diversified International Fund | Class A: | 1.65% |
| | Class B: | 2.40% |
| | Class C: | 2.40% |
| | Class I: | 1.40% |
| | Class R3: | 1.90% |
| | Class R4: | 1.65% |
| | Class R5: | 1.40% |
| | Class Y: | 1.30% |
| The Hartford Dividend and Growth Fund | Class A: | 1.25% |
| | Class I: | 1.00% |
| | Class R3: | 1.50% |
| | Class R4: | 1.20% |
| | Class R5: | 0.90% |

| The Hartford Equity Income Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class I: | 1.00% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 0.90% |
| The Hartford Floating Rate Fund | Class A: | 100% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class I: | 0.75% |
| | Class R3: | 1.25% |
| | Class R4: | 1.00% |
| | Class R5: | 0.85% |
| | Class Y: | 0.75% |
| The Hartford Fundamental Growth Fund | Class A: | 1.45% |
| | Class B: | 2.20% |
| | Class C: | 2.20% |
| | Class Y: | 1.05% |
| The Hartford Global Enhanced Dividend Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.60% |
| | Class R5: | 1.35% |
| | Class Y: | 1.25% |
| The Hartford Global Equity Fund | Class A: | 1.75% |
| | Class B: | 2.50% |
| | Class C: | 2.50% |
| | Class I: | 1.50% |
| | Class R3: | 2.00% |
| | Class R4: | 1.75% |
| | Class R5: | 1.50% |
| | Class Y: | 1.40% |
| The Hartford Global Growth Fund | Class A: | 1.48% |
| | Class B: | 2.23% |
| | Class C: | 2.23% |
| | Class R3: | 1.73% |
| | Class R4: | 1.43% |
| | Class R5: | 1.13% |
| | Class Y: | 1.13% |
| The Hartford Global Health Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.20% |

4

| The Hartford Growth Fund | Class A: | 1.30% |
|---|---|---|
| | Class B: | 2.05% |
| | Class C: | 2.05% |
| | Class I: | 1.05% |
| | Class L: | 1.42% |
| | Class R3: | 1.55% |
| | Class R4: | 1.25% |
| | Class R5: | 0.95% |
| | Class Y: | 0.95% |
| The Hartford Growth Opportunities Fund | Class A: | 1.36% |
| | Class B: | 2.11% |
| | Class C: | 2.11% |
| | Class I: | 1.11% |
| | Class L: | 1.45% |
| | Class R3: | 1.61% |
| | Class R4: | 1.31% |
| | Class R5: | 1.01% |
| | Class Y: | 0.80% |
| The Hartford High Yield Fund | Class A: | 1.20% |
| | Class B: | 1.95% |
| | Class C: | 1.95% |
| | Class I: | 0.95% |
| | Class R3: | 1.45% |
| | Class R4: | 1.15% |
| | Class R5: | 0.95% |
| | Class Y: | 0.95% |
| The Hartford High Yield Municipal Bond Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class I: | 0.75% |
| The Hartford Income Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class Y: | 0.75% |
| The Hartford Inflation Plus Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class I: | 0.65% |
| | Class L: | 0.90%(2) |
| | Class R3: | 1.25% |
| | Class R4: | 1.00% |
| | Class R5: | 0.81% |
| | Class Y: | 0.65% |
| The Hartford International Growth Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.20% |

5

| The Hartford International Opportunities Fund | Class A: | 1.57% |
| | Class B: | 2.32% |
| | Class C: | 2.32% |
| | Class I: | 1.32% |
| | Class R3: | 1.82% |
| | Class R4: | 1.52% |
| | Class R5: | 1.22% |
| | Class Y: | 1.22% |
| The Hartford International Small Company Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class Y: | 1.20% |
| The Hartford MidCap Fund | Class A: | 1.37% |
| | Class I: | 1.12% |
| | Class R3: | 1.67% |
| | Class R4: | 1.37% |
| | Class R5: | 1.07% |
| The Hartford MidCap Growth Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class Y: | 0.95% |
| The Hartford MidCap Value Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class Y: | 0.95% |
| The Hartford Money Market Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class R3: | 1.15% |
| | Class R4: | 0.85% |
| | Class R5: | 0.65% |
| | Class Y: | 0.65% |
| The Hartford Select MidCap Value Fund | Class A: | 1.30% |
| | Class B: | 2.05% |
| | Class C: | 2.05% |
| | Class Y: | 0.90% |
| The Hartford Select SmallCap Value Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class Y: | 1.20% |
| The Hartford Short Duration Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class Y: | 0.65% |
| The Hartford Small Company Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.00% |

6

| | | |
|---|---|---|
| The Hartford SmallCap Growth Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class L: | 1.25% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.05% |
| The Hartford Strategic Income Fund | Class A: | 1.15% |
| | Class B: | 1.90% |
| | Class C: | 1.90% |
| | Class Y: | 0.90% |
| | Class I: | 0.90% |
| The Hartford Tax-Free National Fund | Class A: | 0.85% |
| | Class B: | 1.60% |
| | Class C: | 1.60% |
| | Class I: | 0.60% |
| | Class L: | 0.80% |
| | Class Y: | 0.60% |
| The Hartford Total Return Bond Fund | Class A: | 100% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class I: | 0.75% |
| | Class R3: | 1.25% |
| | Class R4: | 1.00% |
| | Class R5: | 0.85% |
| | Class Y: | 0.75% |
| The Hartford Value Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.00% |
| The Hartford Value Opportunities Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class I: | 1.10% |
| | Class L: | 1.40% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 1.00% |

(1) For The Hartford Balanced Income Fund, effective October 1, 2009, the Adviser has contractually agreed to waive 0.50% of its management fees, until October 31, 2010. While such waiver is in effect, the Adviser has contracually agreed to reimburse expenses (exclusive of taxes, interest expenses, brokerage commissions, acquired fund fees and expenses and extraordinary expenses) to the extent necessary to maintain total annual operating expenses for Class A,B,C and Y shares as reflected above for The Hartford Balanced Income Fund.

(2) Effective November 11, 2009 for Class L Shares of The Hartford Inflation Plus Fund

**SCHEDULE B**

| | | |
|---|---|---|
| The Hartford Balanced Allocation Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.78% |
| | Class R4: | 1.48% |
| | Class R5: | 1.18% |
| The Hartford Checks and Balances Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class I: | 1.00% |
| | Class R3: | 1.55% |
| | Class R4: | 1.25% |
| | Class R5: | 1.05% |
| The Hartford Conservative Allocation Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class I: | 1.10% |
| | Class R3: | 1.78% |
| | Class R4: | 1.48% |
| | Class R5: | 1.18% |
| The Hartford Equity Growth Allocation Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| The Hartford Growth Allocation Fund | Class A: | 1.50% |
| | Class B: | 2.25% |
| | Class C: | 2.25% |
| | Class I: | 1.25% |
| | Class R3: | 1.81% |
| | Class R4: | 1.51% |
| | Class R5: | 1.21% |
| The Hartford Target Retirement 2010 Fund | Class A: | 1.00% |
| | Class R3: | 1.30% |
| | Class R4: | 1.00% |
| | Class R5: | 0.80% |
| | Class Y: | 0.80% |
| The Hartford Target Retirement 2015 Fund | Class R3: | 1.30% |
| | Class R4: | 1.00% |
| | Class R5: | 0.80% |
| The Hartford Target Retirement 2020 Fund | Class A: | 1.05% |
| | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |
| | Class Y: | 0.85% |
| The Hartford Target Retirement 2025 Fund | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |

8

| | |
|---|---|
| The Hartford Target Retirement 2030 Fund | Class A:   1.05% |
| | Class R3:   1.35% |
| | Class R4:   1.05% |
| | Class R5:   0.85% |
| | Class Y:   0.85% |
| The Hartford Target Retirement 2035 Fund | Class R3:   1.35% |
| | Class R4:   1.05% |
| | Class R5:   0.85% |
| The Hartford Target Retirement 2040 Fund | Class R3:   1.35% |
| | Class R4:   1.05% |
| | Class R5:   0.85% |
| The Hartford Target Retirement 2045 Fund | Class R3:   1.40% |
| | Class R4:   1.10% |
| | Class R5:   0.90% |
| The Hartford Target Retirement 2050 Fund | Class R3:   1.40% |
| | Class R4:   1.10% |
| | Class R5:   0.90% |

Exhibit 99.B.h.(xxiv)

## AMENDED AND RESTATED

## EXPENSE LIMITATION AGREEMENT

THIS AMENDED AND RESTATED EXPENSE LIMITATION AGREEMENT, dated as of May 28, 2010, between The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (each a "Company" and collectively, the "Companies") on behalf of each series of the Companies (each a "Fund" and collectively, the "Funds") and Hartford Investment Financial Services, LLC (the "Adviser").

WHEREAS, the Adviser has been appointed the investment adviser of each of the Funds pursuant to an Investment Management Agreement between each Company, on behalf of the Funds, and the Adviser; and

WHEREAS, each Company and the Adviser desire to enter into the arrangements described herein relating to certain expenses of the Funds;

NOW, THEREFORE, each Company and the Adviser hereby agree as follows:

1.      For the period commencing November 1, 2009 through February 28, 2011, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions, acquired fund fees and expenses and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule A.

2.      For the period commencing November 1, 2009 through February 28, 2011, the Adviser hereby agrees to reimburse Fund expenses, exclusive of taxes, interest expense, brokerage commissions and extraordinary expenses, to the extent necessary to maintain the net annual operating expenses specified for the class of shares of each Fund listed on Schedule B.

3.      The reimbursements described in Section 1 and Section 2 above are not subject to recoupment by the Adviser.

4.      The Adviser understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Companies on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

5.      This Agreement shall renew automatically for one-year terms unless the Adviser provides written notice of termination prior to the start of such term.

6.      This Agreement may be amended or modified by mutual consent of the Adviser and the Board of Directors of the respective Company at any time prior to the expiration date of the Agreement.

IN **WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.

Name:  /s/Tamara L. Fagely  _____

Tamara L. Fagely

Title:   Vice President, Treasurer and Controller


THE HARTFORD MUTUAL FUNDS II, INC.

Name:  /s/Tamara L. Fagely  _____

Tamara L. Fagely

Title:   Vice President, Treasurer and Controller


HARTFORD INVESTMENT FINANCIAL SERVICES, LLC

Name:   /s/Robert Arena  _____

Robert Arena

Title:   President

2

SCHEDULE A

| Fund | | Total Net Annual Operating Expense Limit (as a percent of average daily net assets) |
|---|---|---|
| The Hartford Advisers Fund | Class A: 1.18% | |
| | Class R3: 1.43% | |
| | Class R4: 1.13% | |
| | Class R5: 0.83% | |
| The Hartford Balanced Income Fund(1) | Class A: 0.75% | |
| | Class B: 1.50% | |
| | Class C: 1.50% | |
| | Class Y: 0.40% | |
| The Hartford Capital Appreciation Fund | Class A: 1.29% | |
| | Class I: 1.04% | |
| | Class R3: 1.54% | |
| | Class R4: 1.24% | |
| | Class R5: 0.94% | |
| The Hartford Capital Appreciation II Fund | Class A: 1.60% | |
| | Class B: 2.35% | |
| | Class C: 2.35% | |
| | Class I: 1.35% | |
| | Class R3: 1.85% | |
| | Class R4: 1.55% | |
| | Class R5: 1.25% | |
| | Class Y: 1.25% | |
| The Hartford Disciplined Equity Fund | Class A: 1.35% | |
| | Class B: 2.10% | |
| | Class C: 2.10% | |
| | Class R3: 1.60% | |
| | Class R4: 1.30% | |
| | Class R5: 1.00% | |
| | Class Y: 0.95% | |
| The Hartford Diversified International Fund | Class A: 1.65% | |
| | Class B: 2.40% | |
| | Class C: 2.40% | |
| | Class I: 1.40% | |
| | Class R3: 1.90% | |
| | Class R4: 1.65% | |
| | Class R5: 1.40% | |
| | Class Y: 1.30% | |
| The Hartford Dividend and Growth Fund | Class A: 1.25% | |
| | Class I: 1.00% | |
| | Class R3: 1.50% | |
| | Class R4: 1.20% | |
| | Class R5: 0.90% | |

3

| | | |
|---|---|---|
| The Hartford Equity Income Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class I: | 1.00% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 0.90% |
| The Hartford Floating Rate Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class I: | 0.75% |
| | Class R3: | 1.25% |
| | Class R4: | 1.00% |
| | Class R5: | 0.85% |
| | Class Y: | 0.75% |
| The Hartford Fundamental Growth Fund | Class A: | 1.45% |
| | Class B: | 2.20% |
| | Class C: | 2.20% |
| | Class Y: | 1.05% |
| The Hartford Global All-Asset Fund | Class A: | 1.450% |
| | Class C: | 2.20% |
| | Class I: | 1.20% |
| | Class R3: | 1.75% |
| | Class R4: | 1.45% |
| | Class R5: | 1.15% |
| | Class Y: | 1.10% |
| The Hartford Global Enhanced Dividend Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.60% |
| | Class R5: | 1.35% |
| | Class Y: | 1.25% |
| The Hartford Global Growth Fund | Class A: | 1.48% |
| | Class B: | 2.23% |
| | Class C: | 2.23% |
| | Class R3: | 1.73% |
| | Class R4: | 1.43% |
| | Class R5: | 1.13% |
| | Class Y: | 1.13% |
| The Hartford Global Health Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.20% |

4

| The Hartford Global Real Asset Fund | Class A: | 1.450% |
|---|---|---|
| | Class C: | 2.20% |
| | Class I: | 1.20% |
| | Class R3: | 1.75% |
| | Class R4: | 1.45% |
| | Class R5: | 1.15% |
| | Class Y: | 1.10% |
| The Hartford Global Research Fund | Class A: | 1.50% |
| | Class B: | 2.25% |
| | Class C: | 2.25% |
| | Class I: | 1.25% |
| | Class R3: | 1.75% |
| | Class R4: | 1.50% |
| | Class R5: | 1.25% |
| | Class Y: | 1.15% |
| The Hartford Growth Fund | Class A: | 1.30% |
| | Class B: | 2.05% |
| | Class C: | 2.05% |
| | Class I: | 1.05% |
| | Class L: | 1.42% |
| | Class R3: | 1.55% |
| | Class R4: | 1.25% |
| | Class R5: | 0.95% |
| | Class Y: | 0.95% |
| The Hartford Growth Opportunities Fund | Class A: | 1.36% |
| | Class B: | 2.11% |
| | Class C: | 2.11% |
| | Class I: | 1.11% |
| | Class L: | 1.45% |
| | Class R3: | 1.61% |
| | Class R4: | 1.31% |
| | Class R5: | 1.01% |
| | Class Y: | 0.80% |
| The Hartford High Yield Fund | Class A: | 1.20% |
| | Class B: | 1.95% |
| | Class C: | 1.95% |
| | Class I: | 0.95% |
| | Class R3: | 1.45% |
| | Class R4: | 1.15% |
| | Class R5: | 0.95% |
| | Class Y: | 0.95% |
| The Hartford High Yield Municipal Bond Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class I: | 0.75% |
| The Hartford Income Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class Y: | 0.75% |

5

| The Hartford Inflation Plus Fund | Class A: | 0.90% |
|---|---|---|
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class I: | 0.65% |
| | Class L: | 0.90% |
| | Class R3: | 1.25% |
| | Class R4: | 1.00% |
| | Class R5: | 0.81% |
| | Class Y: | 0.65% |
| The Hartford International Growth Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| | Class Y: | 1.20% |
| The Hartford International Opportunities Fund | Class A: | 1.57% |
| | Class B: | 2.32% |
| | Class C: | 2.32% |
| | Class I: | 1.32% |
| | Class R3: | 1.82% |
| | Class R4: | 1.52% |
| | Class R5: | 1.22% |
| | Class Y: | 1.22% |
| The Hartford International Small Company Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class Y: | 1.20% |
| The Hartford International Value Fund | Class A: | 1.40% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.70% |
| | Class R4: | 1.40% |
| | Class R5: | 1.10% |
| | Class Y: | 1.05% |
| The Hartford MidCap Fund | Class A: | 1.37% |
| | Class I: | 1.12% |
| | Class R3: | 1.67% |
| | Class R4: | 1.37% |
| | Class R5: | 1.07% |
| The Hartford MidCap Value Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class Y: | 0.95% |
| The Hartford Money Market Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class R3: | 1.15% |
| | Class R4: | 0.85% |
| | Class R5: | 0.65% |
| | Class Y: | 0.65% |

6

| The Hartford Select SmallCap Value Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class Y: | 1.20% |
| The Hartford Short Duration Fund | Class A: | 0.90% |
| | Class B: | 1.65% |
| | Class C: | 1.65% |
| | Class Y: | 0.65% |
| The Hartford Small Company Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.00% |
| The Hartford SmallCap Growth Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class L: | 1.25% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.05% |
| The Hartford Small/Mid Cap Equity Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class Y: | 0.95% |
| The Hartford Strategic Income Fund | Class A: | 1.15% |
| | Class B: | 1.90% |
| | Class C: | 1.90% |
| | Class Y: | 0.90% |
| | Class I: | 0.90% |
| The Hartford Tax-Free National Fund | Class A: | 0.85% |
| | Class B: | 1.60% |
| | Class C: | 1.60% |
| | Class I: | 0.60% |
| | Class L: | 0.80% |
| | Class Y: | 0.60% |
| The Hartford Total Return Bond Fund | Class A: | 1.00% |
| | Class B: | 1.75% |
| | Class C: | 1.75% |
| | Class I: | 0.75% |
| | Class R3: | 1.25% |
| | Class R4: | 1.00% |
| | Class R5: | 0.85% |
| | Class Y: | 0.75% |

7

| The Hartford Value Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.65% |
| | Class R4: | 1.35% |
| | Class R5: | 1.05% |
| | Class Y: | 1.00% |
| The Hartford Value Opportunities Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class I: | 1.10% |
| | Class L: | 1.40% |
| | Class R3: | 1.60% |
| | Class R4: | 1.30% |
| | Class R5: | 1.00% |
| | Class Y: | 1.00% |

(1) For The Hartford Balanced Income Fund, effective October 1, 2009, the Adviser has contractually agreed to waive 0.50% of its management fees, until October 31, 2010.  While such waiver is in effect, the Adviser has contracually agreed to reimburse expenses (exclusive of taxes, interest expenses, brokerage commissions, acquired fund fees and expenses and extraordinary expenses) to the extent necessary to maintain total annual operating expenses for Class A,B,C and Y shares as reflected above for The Hartford Balanced Income Fund.

8

## SCHEDULE B

| | | |
|---|---|---|
| The Hartford Balanced Allocation Fund | Class A: | 1.40% |
| | Class B: | 2.15% |
| | Class C: | 2.15% |
| | Class I: | 1.15% |
| | Class R3: | 1.78% |
| | Class R4: | 1.48% |
| | Class R5: | 1.18% |
| The Hartford Checks and Balances Fund | Class A: | 1.25% |
| | Class B: | 2.00% |
| | Class C: | 2.00% |
| | Class I: | 1.00% |
| | Class R3: | 1.55% |
| | Class R4: | 1.25% |
| | Class R5: | 1.05% |
| The Hartford Conservative Allocation Fund | Class A: | 1.35% |
| | Class B: | 2.10% |
| | Class C: | 2.10% |
| | Class I: | 1.10% |
| | Class R3: | 1.78% |
| | Class R4: | 1.48% |
| | Class R5: | 1.18% |
| The Hartford Equity Growth Allocation Fund | Class A: | 1.60% |
| | Class B: | 2.35% |
| | Class C: | 2.35% |
| | Class I: | 1.35% |
| | Class R3: | 1.85% |
| | Class R4: | 1.55% |
| | Class R5: | 1.25% |
| The Hartford Growth Allocation Fund | Class A: | 1.50% |
| | Class B: | 2.25% |
| | Class C: | 2.25% |
| | Class I: | 1.25% |
| | Class R3: | 1.81% |
| | Class R4: | 1.51% |
| | Class R5: | 1.21% |
| The Hartford Target Retirement 2010 Fund | Class A: | 1.00% |
| | Class R3: | 1.30% |
| | Class R4: | 1.00% |
| | Class R5: | 0.80% |
| | Class Y: | 0.80% |
| The Hartford Target Retirement 2015 Fund | Class R3: | 1.30% |
| | Class R4: | 1.00% |
| | Class R5: | 0.80% |
| The Hartford Target Retirement 2020 Fund | Class A: | 1.05% |
| | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |
| | Class Y: | 0.85% |
| The Hartford Target Retirement 2025 Fund | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |

9

| | | |
|---|---|---|
| The Hartford Target Retirement 2030 Fund | Class A: | 1.05% |
| | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |
| | Class Y: | 0.85% |
| The Hartford Target Retirement 2035 Fund | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |
| The Hartford Target Retirement 2040 Fund | Class R3: | 1.35% |
| | Class R4: | 1.05% |
| | Class R5: | 0.85% |
| The Hartford Target Retirement 2045 Fund | Class R3: | 1.40% |
| | Class R4: | 1.10% |
| | Class R5: | 0.90% |
| The Hartford Target Retirement 2050 Fund | Class R3: | 1.40% |
| | Class R4: | 1.10% |
| | Class R5: | 0.90% |

# EXHIBIT 3

&lt;TYPE&gt;EX-99.(M)
&lt;SEQUENCE&gt;14
&lt;FILENAME&gt;b68643a1exv99wxmy.txt
&lt;DESCRIPTION&gt;AMENDED AND RESTATED RULE 12B-1 DISTRIBUTION PLAN
&lt;TEXT&gt;
&lt;PAGE&gt;

Exhibit M

THE HARTFORD MUTUAL FUNDS, INC.

AMENDED AND RESTATED

DISTRIBUTION PLAN

CLASS A, B, C, R3, R4 AND R5 SHARES

ARTICLE I. THE PLAN

This Amended and Restated Distribution Plan (the "Plan") sets forth the terms
and conditions on which The Hartford Mutual Funds, Inc. (the "Company"), on
behalf of each series of the Company (each a "Fund" and together the "Funds")
will pay certain amounts to Hartford Investment Financial Services, LLC (the
"Distributor") in connection with the provision by the Distributor, of certain
services to the Funds, as set forth herein. Certain of such payments by a Fund
may, under Rule 12b-1 (the "Rule") under the Investment Company Act of 1940, as
amended (the "Act"), be deemed to constitute the financing of distribution by a
Fund. This Plan describes all material aspects of such financing as contemplated
by the Rule and shall be administered and interpreted, and implemented and
continued, in a manner consistent with the Rule. The Fund and each Class of
those Funds that currently have adopted this Plan, and the effective dates of
such adoption, are as follows:

&lt;TABLE&gt;
&lt;CAPTION&gt;

| SERIES | CLASS | EFFECTIVE DATE |
|--------|-------|----------------|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; |
| The Hartford Advisers Fund | A | July 22, 1996 |
| The Hartford Advisers Fund | B | July 22, 1996 |
| The Hartford Advisers Fund | C | July 31, 1998 |
| The Hartford Balanced Allocation Fund | A | May 19, 2004 |
| The Hartford Balanced Allocation Fund | B | May 19, 2004 |
| The Hartford Balanced Allocation Fund | C | May 19, 2004 |
| The Hartford Balanced Income Fund | A | May 10, 2006 |
| The Hartford Balanced Income Fund | B | May 10, 2006 |
| The Hartford Balanced Income Fund | C | May 10, 2006 |
| The Hartford Capital Appreciation Fund | A | July 22, 1996 |
| The Hartford Capital Appreciation Fund | B | July 22, 1996 |
| The Hartford Capital Appreciation Fund | C | July 31, 1998 |
| The Hartford Capital Appreciation Fund | R3 | August 2, 2006 |
| The Hartford Capital Appreciation Fund | R4 | August 2, 2006 |
| The Hartford Capital Appreciation Fund | R5 | August 2, 2006 |
| The Hartford Capital Appreciation II Fund | A | April 29, 2005 |
| The Hartford Capital Appreciation II Fund | B | April 29, 2005 |
| The Hartford Capital Appreciation II Fund | C | April 29, 2005 |
| The Hartford Capital Appreciation II Fund | R3 | August 2, 2006 |
| The Hartford Capital Appreciation II Fund | R4 | August 2, 2006 |
| The Hartford Capital Appreciation II Fund | R5 | August 2, 2006 |
| The Hartford Checks and Balances Fund | A | May 31, 2007 |

```
The Hartford Checks and Balances Fund                             C      May 31, 2007

The Hartford Conservative Allocation Fund                         A      May 19, 2004
The Hartford Conservative Allocation Fund                         B      May 19, 2004
The Hartford Conservative Allocation Fund                         C      May 19, 2004
</TABLE>
```

<PAGE>

```
<TABLE>
<CAPTION>
                         SERIES                          CLASS     EFFECTIVE DATE
--------------------------------------------------------  -----    ------------------
<S>                                                       <C>      <C>
The Hartford Disciplined Equity Fund                      A        April 30, 1998
The Hartford Disciplined Equity Fund                      B        April 30, 1998
The Hartford Disciplined Equity Fund                      C        July 31, 1998
The Hartford Disciplined Equity Fund                      R3       August 2, 2006
The Hartford Disciplined Equity Fund                      R4       August 2, 2006
The Hartford Disciplined Equity Fund                      R5       August 2, 2006

The Hartford Dividend and Growth Fund                     A        July 22, 1996
The Hartford Dividend and Growth Fund                     B        July 22, 1996
The Hartford Dividend and Growth Fund                     C        July 31, 1998
The Hartford Dividend and Growth Fund                     R3       August 2, 2006
The Hartford Dividend and Growth Fund                     R4       August 2, 2006
The Hartford Dividend and Growth Fund                     R5       August 2, 2006

The Hartford Equity Growth Allocation Fund,               A        May 19, 2004
(formerly The Hartford Aggressive Growth Allocation Fund)
The Hartford Equity Growth Allocation Fund,               B        May 19, 2004
(formerly The Hartford Aggressive Growth Allocation Fund)
The Hartford Equity Growth Allocation Fund,               C        May 19, 2004
(formerly The Hartford Aggressive Growth Allocation Fund)

The Hartford Equity Income Fund                           A        August 28, 2003
The Hartford Equity Income Fund                           B        August 28, 2003
The Hartford Equity Income Fund                           C        August 28, 2003
The Hartford Equity Income Fund                           R3       August 2, 2006
The Hartford Equity Income Fund                           R4       August 2, 2006
The Hartford Equity Income Fund                           R5       August 2, 2006

The Hartford Floating Rate Fund                           A        April 29, 2005
The Hartford Floating Rate Fund                           B        April 29, 2005
The Hartford Floating Rate Fund                           C        April 29, 2005

The Hartford Fundamental Growth Fund,                     A        April 30, 2001
(formerly The Hartford Focus Fund)
The Hartford Fundamental Growth Fund,                     B        April 30, 2001
formerly The Hartford Focus Fund)
The Hartford Fundamental Growth Fund,                     C        April 30, 2001
(formerly The Hartford Focus Fund)

The Hartford Global Communications Fund                   A        October 30, 2000
The Hartford Global Communications Fund                   B        October 30, 2000
The Hartford Global Communications Fund                   C        October 30, 2000

The Hartford Global Enhanced Dividend Fund                A        November 30, 2007
The Hartford Global Enhanced Dividend Fund                B        November 30, 2007
The Hartford Global Enhanced Dividend Fund                C        November 30, 2007
The Hartford Global Enhanced Dividend Fund                R3       November 30, 2007
The Hartford Global Enhanced Dividend Fund                R4       November 30, 2007
The Hartford Global Enhanced Dividend Fund                R5       November 30, 2007
</TABLE>
```

```
<TABLE>
<CAPTION>
                                                 SERIES              CLASS     EFFECTIVE DATE
-----------------------------------------------------------       -----     ------------------
<S>                                                               <C>       <C>
The Hartford Global Equity Fund                                     A       March 1, 2008
The Hartford Global Equity Fund                                     B       March 1, 2008
The Hartford Global Equity Fund                                     C       March 1, 2008
The Hartford Global Equity Fund                                     R3      March 1, 2008
The Hartford Global Equity Fund                                     R4      March 1, 2008
The Hartford Global Equity Fund                                     R5      March 1, 2008

The Hartford Global Financial Services Fund                         A       October 30, 2000
The Hartford Global Financial Services Fund                         B       October 30, 2000
The Hartford Global Financial Services Fund                         C       October 30, 2000

The Hartford Global Growth Fund,                                    A       September 30, 1998
(formerly The Hartford Global Leaders Fund)
The Hartford Global Growth Fund,                                    B       September 30, 1998
(formerly The Hartford Global Leaders Fund)
The Hartford Global Growth Fund,                                    C       September 30, 1998
(formerly The Hartford Global Leaders Fund)
The Hartford Global Growth Fund,                                    R3      August 2, 2006
(formerly The Hartford Global Leaders Fund)
The Hartford Global Growth Fund,                                    R4      August 2, 2006
(formerly The Hartford Global Leaders Fund)
The Hartford Global Growth Fund,                                    R5      August 2, 2006
(formerly The Hartford Global Leaders Fund)

The Hartford Global Health Fund                                     A       April 27, 2000
The Hartford Global Health Fund                                     B       April 27, 2000
The Hartford Global Health Fund                                     C       April 27, 2000
The Hartford Global Health Fund                                     R3      August 2, 2006
The Hartford Global Health Fund                                     R4      August 2, 2006
The Hartford Global Health Fund                                     R5      August 2, 2006

The Hartford Global Technology Fund                                 A       April 27, 2000
The Hartford Global Technology Fund                                 B       April 27, 2000
The Hartford Global Technology Fund                                 C       April 27, 2000

The Hartford Growth Allocation Fund                                 A       May 19, 2004
The Hartford Growth Allocation Fund                                 B       May 19, 2004
The Hartford Growth Allocation Fund                                 C       May 19, 2004

The Hartford High Yield Fund                                        A       September 30, 1998
The Hartford High Yield Fund                                        B       September 30, 1998
The Hartford High Yield Fund                                        C       September 30, 1998

The Hartford High Yield Municipal Bond Fund                         A       May 31, 2007
The Hartford High Yield Municipal Bond Fund                         B       May 31, 2007
The Hartford High Yield Municipal Bond Fund                         C       May 31, 2007

The Hartford Income Fund                                            A       October 31, 2002
The Hartford Income Fund                                            B       October 31, 2002
The Hartford Income Fund                                            C       October 31, 2002
</TABLE>

<PAGE>

<TABLE>
<CAPTION>
                                                 SERIES              CLASS     EFFECTIVE DATE
-----------------------------------------------------------       -----     ------------------
<S>                                                               <C>       <C>
```

| The Hartford Income Allocation Fund | B | May 19, 2004 |
|---|---|---|
| The Hartford Income Allocation Fund | C | May 19, 2004 |
| | | |
| The Hartford Inflation Plus Fund | A | October 31, 2002 |
| The Hartford Inflation Plus Fund | B | October 31, 2002 |
| The Hartford Inflation Plus Fund | C | October 31, 2002 |
| | | |
| The Hartford International Growth Fund, (formerly The Hartford International Capital Appreciation Fund) | A | April 30, 2001 |
| The Hartford International Growth Fund, (formerly The Hartford International Capital Appreciation Fund) | B | April 30, 2001 |
| The Hartford International Growth Fund, (formerly The Hartford International Capital Appreciation Fund) | C | April 30, 2001 |
| The Hartford International Growth Fund, (formerly The Hartford International Capital Appreciation Fund) | R3 | August 2, 2006 |
| The Hartford International Growth Fund, (formerly The Hartford International Capital Appreciation Fund) | R4 | August 2, 2006 |
| The Hartford International Growth Fund, (formerly The Hartford International Capital Appreciation Fund) | R5 | August 2, 2006 |
| | | |
| The Hartford International Opportunities Fund | A | July 22, 1996 |
| The Hartford International Opportunities Fund | B | July 22, 1996 |
| The Hartford International Opportunities Fund | C | July 31, 1998 |
| The Hartford International Opportunities Fund | R3 | August 2, 2006 |
| The Hartford International Opportunities Fund | R4 | August 2, 2006 |
| The Hartford International Opportunities Fund | R5 | August 2, 2006 |
| | | |
| The Hartford International Small Company Fund | A | April 30, 2001 |
| The Hartford International Small Company Fund | B | April 30, 2001 |
| The Hartford International Small Company Fund | C | April 30, 2001 |
| | | |
| The Hartford LargeCap Growth Fund | A | November 30, 2006 |
| The Hartford LargeCap Growth Fund | B | November 30, 2006 |
| The Hartford LargeCap Growth Fund | C | November 30, 2006 |
| | | |
| The Hartford MidCap Fund | A | July 22, 1996 |
| The Hartford MidCap Fund | B | July 22, 1996 |
| The Hartford MidCap Fund | C | July 31, 1998 |
| | | |
| The Hartford MidCap Growth Fund, (formerly The Hartford Select MidCap Growth Fund) | A | February 8, 2006 |
| The Hartford MidCap Growth Fund, (formerly The Hartford Select MidCap Growth Fund) | B | February 8, 2006 |
| The Hartford MidCap Growth Fund, (formerly The Hartford Select MidCap Growth Fund) | C | February 8, 2006 |
| | | |
| The Hartford MidCap Value Fund | A | April 30, 2001 |
| The Hartford MidCap Value Fund | B | April 30, 2001 |
| The Hartford MidCap Value Fund | C | April 30, 2001 |

  </TABLE>

<PAGE>

<TABLE>
<CAPTION>

| SERIES | CLASS | EFFECTIVE DATE |
|---|---|---|
| <S> | <C> | <C> |
| The Hartford Money Market Fund | A | July 22, 1996 |
| The Hartford Money Market Fund | B | July 22, 1996 |
| The Hartford Money Market Fund | C | July 31, 1998 |
| | | |
| The Hartford Retirement Income Fund | A | September 30, 2005 |
| The Hartford Retirement Income Fund | B | September 30, 2005 |
| The Hartford Retirement Income Fund | C | September 30, 2005 |

| The Hartford Retirement Income Fund | R4 | August 2, 2006 |
| The Hartford Retirement Income Fund | R5 | August 2, 2006 |
| The Hartford Select MidCap Value Fund | A | April 29, 2005 |
| The Hartford Select MidCap Value Fund | B | April 29, 2005 |
| The Hartford Select MidCap Value Fund | C | April 29, 2005 |
| The Hartford Select SmallCap Value Fund | A | February 8, 2006 |
| The Hartford Select SmallCap Value Fund | B | February 8, 2006 |
| The Hartford Select SmallCap Value Fund | C | February 8, 2006 |
| The Hartford Short Duration Fund | A | October 31, 2002 |
| The Hartford Short Duration Fund | B | October 31, 2002 |
| The Hartford Short Duration Fund | C | October 31, 2002 |
| The Hartford Small Company Fund | A | July 22, 1996 |
| The Hartford Small Company Fund | B | July 22, 1996 |
| The Hartford Small Company Fund | C | July 31, 1998 |
| The Hartford Small Company Fund | R3 | August 2, 2006 |
| The Hartford Small Company Fund | R4 | August 2, 2006 |
| The Hartford Small Company Fund | R5 | August 2, 2006 |
| The Hartford Stock Fund | A | July 22, 1996 |
| The Hartford Stock Fund | B | July 22, 1996 |
| The Hartford Stock Fund | C | July 31, 1998 |
| The Hartford Strategic Income Fund | A | May 31, 2007 |
| The Hartford Strategic Income Fund | B | May 31, 2007 |
| The Hartford Strategic Income Fund | C | May 31, 2007 |
| The Hartford Target Retirement 2010 Fund | A | September 30, 2005 |
| The Hartford Target Retirement 2010 Fund | B | September 30, 2005 |
| The Hartford Target Retirement 2010 Fund | C | September 30, 2005 |
| The Hartford Target Retirement 2010 Fund | R3 | August 2, 2006 |
| The Hartford Target Retirement 2010 Fund | R4 | August 2, 2006 |
| The Hartford Target Retirement 2010 Fund | R5 | August 2, 2006 |
| The Hartford Target Retirement 2020 Fund | A | September 30, 2005 |
| The Hartford Target Retirement 2020 Fund | B | September 30, 2005 |
| The Hartford Target Retirement 2020 Fund | C | September 30, 2005 |
| The Hartford Target Retirement 2020 Fund | R3 | May 10, 2006 |
| The Hartford Target Retirement 2020 Fund | R4 | May 10, 2006 |
| The Hartford Target Retirement 2020 Fund | R5 | May 10, 2006 |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| SERIES | CLASS | EFFECTIVE DATE |
|--------|-------|----------------|
| <S> | <C> | <C> |
| The Hartford Target Retirement 2030 Fund | A | September 30, 2005 |
| The Hartford Target Retirement 2030 Fund | B | September 30, 2005 |
| The Hartford Target Retirement 2030 Fund | C | September 30, 2005 |
| The Hartford Target Retirement 2030 Fund | R3 | August 2, 2006 |
| The Hartford Target Retirement 2030 Fund | R4 | August 2, 2006 |
| The Hartford Target Retirement 2030 Fund | R5 | August 2, 2006 |
| The Hartford Tax-Free California Fund | A | October 31, 2002 |
| The Hartford Tax-Free California Fund | B | October 31, 2002 |
| The Hartford Tax-Free California Fund | C | October 31, 2002 |
| The Hartford Tax-Free New York Fund | A | October 31, 2002 |
| The Hartford Tax-Free New York Fund | B | October 31, 2002 |

```
The Hartford Total Return Bond Fund                           A        July 22, 1996
The Hartford Total Return Bond Fund                           B        July 22, 1996
The Hartford Total Return Bond Fund                           C        July 31, 1999
The Hartford Total Return Bond Fund                           R3       August 2, 2006
The Hartford Total Return Bond Fund                           R4       August 2, 2006
The Hartford Total Return Bond Fund                           R5       August 2, 2006

The Hartford Value Fund                                       A        April 30, 2001
The Hartford Value Fund                                       B        April 30, 2001
The Hartford Value Fund                                       C        April 30, 2001
The Hartford Value Fund                                       R3       August 2, 2006
The Hartford Value Fund                                       R4       August 2, 2006
The Hartford Value Fund                                       R5       August 2, 2006
</TABLE>
```

### ARTICLE II. DISTRIBUTION AND SERVICE EXPENSES

Each Fund shall pay to the Distributor a fee in the amount specified in Article III hereof. Such fee may be spent by the Distributor on any activities or expenses primarily intended to result in the sale of the applicable Class of shares of the Funds, including, but not limited to the payment of Distribution Expenses (as defined below) and Service Expenses (as defined below). Distribution Expenses include, but are not limited to, (a) payment of initial and ongoing commissions and other payments to brokers, dealers, financial institutions or others who sell each Fund's shares; (b) compensation to employees of the Distributor; (c) compensation to and expenses, including overhead such as communications and telephone, training, supplies, photocopying and similar types of expenses, of the Distributor incurred in the printing and mailing or other dissemination of all prospectuses and statements of additional information; (d) the costs of preparation, printing and mailing of reports used for sales literature and related expenses, advertisements and other distribution-related expenses (including personnel of the Distributor).

"Service Expenses" shall mean fees for activities covered by the definition of "service fee" contained in Article III, Section 26(b) of the Rules of Fair Practice of the National Association of Securities Dealers, Inc., which provides that service fees shall mean payments by an investment company for personal service and/or the maintenance of shareholder accounts.

### ARTICLE III. MAXIMUM EXPENDITURES

### CLASS A SHARES

<PAGE>

The expenditures to be made by each Fund pursuant to this Plan, and the basis upon which such expenditures will be made, shall be determined by each Fund, and in no event shall such expenditures exceed 0.35% of the average daily net asset value of the Class A shares of any Fund (determined in accordance with each Fund's prospectus as from time to time in effect) on an annual basis to cover Distribution Expenses and Service Expenses. Up to 0.25% may be used to cover Service Expenses. All such expenditures shall be calculated and accrued daily and paid monthly or at such other intervals as the Board of Directors shall determine.

### CLASS B AND C SHARES

The expenditures to be made by each Fund pursuant to this Plan, and the basis upon which such expenditures will be made, shall be determined by each Fund, and in no event shall such expenditures exceed 1.00% of the average daily net asset value of the Class B shares or Class C shares, as applicable, of any Fund (determined in accordance with each Fund's prospectus as from time to time in effect) on an annual basis to cover Distribution Expenses and Service Expenses. Up to 0.25% may be used to cover Service Expenses. All such expenditures shall

the Board of Directors shall determine.

## CLASS R3, R4 and R5 SHARES

The expenditures to be made by each Fund pursuant to this Plan, and the basis upon which such expenditures will be made, shall be determined by each Fund, and in no event shall such expenditures exceed 1.00% of the average daily net asset value of the Class R3 shares or Class R4 shares or Class R5 shares, as applicable, of any Fund (determined in accordance with each Fund's prospectus as from time to time in effect) on an annual basis to cover Distribution Expenses and Service Expenses. Up to 0.25% may be used to cover Service Expenses. All such expenditures shall be calculated and accrued daily and paid monthly or at such other intervals as the Board of Directors shall determine.

## ARTICLE IV. EXPENSES BORNE BY THE FUNDS

Notwithstanding any other provision of this Plan, the Company, each Fund and its administrator, may bear the respective expenses to be borne by them under any administrative services agreement, as from time to time in effect under the Company's current prospectus. Except as otherwise contemplated by this Plan, the Company, and each Fund shall not, directly or indirectly, engage in financing any activity which is primarily intended to or should reasonably result in the sale of shares of any Fund.

It is recognized that the costs of distributing Fund's shares may exceed the sum of all sales charges collected on sales of Fund shares. In view of this, if and to the extent that any investment management and administration fees paid by a fund might be considered as indirectly financing any activity which is primarily intended to result in the sale of the Fund's shares, the payment by that Fund of such fees hereby is authorized under this Plan.

## ARTICLE V. APPROVAL BY BOARD OF DIRECTORS, SHAREHOLDERS

This Plan shall not be effective with respect to any class of shares of a Fund unless: (a) this Plan has been approved by the vote of the majority of the outstanding voting shares of such class, if this Plan is adopted for such class after any public offering of the shares of such class or the sale of shares of such class to persons who are not affiliated persons of the Company, affiliated persons of such person, a promoter of the Company, or affiliated persons of such promoters; and (b) this Plan, together with any related agreements, has been approved for such class, by votes cast in person at a meeting called for the purpose of voting on this Plan and any such related agreements, of a majority of both (i) the Directors of the Company and (ii) those directors who are not "interested persons" of the Company and have no direct or indirect financial interest in the operation of this Plan or any agreements related to it (the "Independent Directors").

## ARTICLE VI. CONTINUANCE

This Plan and any related agreement shall continue in effect with respect to each Fund from year to year provided such continuance is specifically approved at least annually in the manner provided for in Article

<PAGE>

V, clause (b).

## ARTICLE VII. INFORMATION

The Distributor shall provide the Board of Directors and the Board of Directors, and, in particular, the Independent Directors, shall review, in the exercise of their fiduciary duties, at least quarterly, a written report of the amounts expended with respect to the Class A, B, C, R3, R4 and R5 shares of each Fund by the Distributor under this Plan and the Principal Underwriting Agreement and the purposes for which such expenditures were made.

ARTICLE VIII. TERMINATION

This Plan may be terminated with respect to any class of shares of a Fund (a) at any time by vote of a majority of the Independent Directors, or a majority of the applicable Fund's outstanding voting Class A, B, C, R3, R4 or R5 shares, as applicable, or (b) by the Distributor on 60 days' notice in writing to the applicable Fund(s).

Termination or discontinuance of the Plan with respect to one Fund shall not affect the continued effectiveness of this Plan with respect to the shares or classes of any other Fund.

ARTICLE IX. AGREEMENTS

Each agreement with any person relating to implementation of this Plan shall be in writing, and each agreement related to this Plan shall provide:

(a) That, with respect to each Fund, such agreement may be terminated at any time, without payment of any penalty, by vote of a majority of the Independent Directors or by vote of a majority of the Fund's then outstanding voting Class A, B, C, R3, R4 or R5 shares, as applicable.

(b) That such agreement shall terminate automatically in the event of its assignment.

ARTICLE X. AMENDMENTS

This Plan may not be amended to increase materially the maximum amount of the fees payable by any Fund hereunder without the approval of a majority of the outstanding voting Class A, B, C, R3, R4 or R5 shares, as applicable, of the applicable Fund. No material amendment to the Plan shall, in any event, be effective unless it is approved by the Board of Directors in the same manner as is provided for in Article V.

ARTICLE XI. PRESERVATION OF DOCUMENTS

The Company shall preserve copies of this Plan (including any amendments thereto) and any related agreements and all reports made to the Board for a period of not less than six years from the date of this Plan, the first two years in an easily accessible place.

ARTICLE XII. LIMITATION OF LIABILITY

No Fund of the Company shall be responsible for the obligations of any other Fund of the Company.

ARTICLE XIII. SELECTION OF DIRECTORS

While this Plan is in effect, the selection and nomination of Directors who are not interested persons of the Company shall be committed to the discretion of the Board of Directors who are not interested persons of the Company.

ARTICLE XIV. DEFINED TERMS

<PAGE>

As used in this Plan, the terms "majority of the outstanding voting shares" shall have the same meaning as the phrase "majority of the outstanding voting securities" has in the Act, and the phrases "interested person" and "assignment" shall have the same meaning as those phrases have in the Act.

Adoption Date: 08.02.06

</TD

</DOCUMENT>

# EXHIBIT 4

&lt;TYPE&gt;EX-99.G
&lt;SEQUENCE&gt;3
&lt;FILENAME&gt;b64571evexv99wg.txt
&lt;DESCRIPTION&gt;MASTER CUSTODIAN AGREEMENT
&lt;TEXT&gt;
&lt;PAGE&gt;

EXHIBIT G

EXECUTION COPY

MASTER CUSTODIAN CONTRACT

This Master Custodian Contract (this "Contract") is made as of February 8, 2007 by and among each registered investment company identified on the signature page hereto (each such investment company and each investment company subsequently made subject to this Contract in accordance with Section 21.1 below, shall hereinafter be referred to as a "FUND" and references made herein to "the Fund" shall be deemed references to each Fund), and STATE STREET BANK and TRUST COMPANY, a Massachusetts trust company (the "CUSTODIAN").

WITNESSETH:

WHEREAS, each Fund is authorized to issue shares of common stock or shares of beneficial interest in separate series ("SHARES"), with each such series representing interests in a separate portfolio of securities and other assets; and

WHEREAS, each Fund intends that this Contract be applicable to each of its series set forth on Appendix A hereto (such series together with all other series subsequently established by the Fund and made subject to this Contract in accordance with Section 21.2 below, shall hereinafter be referred to as the "PORTFOLIOS");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, the parties hereto agree as follows:

1.    Employment of Custodian and Property to be Held by It

Each Fund hereby employs the Custodian as a custodian of assets of the Portfolios, including securities which the Fund, on behalf of the applicable Portfolios, desires to be held in places within the United States ("DOMESTIC SECURITIES") and securities it desires to be held outside the United States ("FOREIGN SECURITIES"). Each Fund on behalf of the Portfolios agrees to deliver to the Custodian all securities and cash of the Portfolios, and all payments of income, payments of principal or capital distributions received by it with respect to all securities owned by the Portfolios from time to time, and the cash consideration received by it for such new or treasury shares of capital stock of the Fund representing Shares as may be issued or sold from time to time. The Custodian shall not be responsible for any property of a Portfolio which is not received by it or which is delivered out in accordance with Proper Instructions (as such term is defined in Article 9 hereof) including, without limitation, Portfolio property (i) held by brokers, private bankers or other entities on behalf of the Portfolio (each a "LOCAL AGENT"), (ii) held by Special Sub-Custodians (as such term is defined in Article 6 hereof), or (iii) held by entities which have advanced monies to or on behalf of the Portfolio and which have received Portfolio property as security for such advances (each a "PLEDGEE"). With respect to uncertificated shares (the "UNDERLYING SHARES") of registered "investment companies" (as defined in Section 3(a)(1) of the Investment Company Act of 1940, as amended from time to time (the "1940 ACT")), whether in the same "group of investment companies" (as defined in Section 12(d)(1)(G)(ii) of

&lt;PAGE&gt;

1940 Act (hereinafter sometimes referred to as the "UNDERLYING PORTFOLIOS") the holding of confirmation statements that identify the shares as being recorded in the Custodian's name on behalf of the Portfolios will be deemed custody for purposes hereof.

Upon receipt of Proper Instructions, the Custodian shall on behalf of the applicable Portfolios from time to time employ one or more sub-custodians, located in the United States as approved by the Board; provided, however, that the Custodian shall have no more or less responsibility or liability to the Funds on account of any actions or omissions of any sub-custodian so employed than any such sub-custodian has to the Custodian. The Custodian may place and maintain each Portfolio's foreign securities with foreign banking institution sub-custodians employed by the Custodian and/or foreign securities depositories, all as designated in Schedules A and B hereto, but only in accordance with the applicable provisions of Articles 3 and 4 hereof.

2.  Duties of the Custodian with Respect to Property of the Fund Held By the Custodian in the United States

2.1 Holding Securities. The Custodian shall hold and physically segregate for the account of each Portfolio all non-cash property to be held by it in the United States including all domestic securities owned by such Portfolio, other than (a) securities which are maintained pursuant to Section 2.9 in a clearing agency which acts as a securities depository or in a book-entry system authorized by the U.S. Department of the Treasury and certain federal agencies (each, a "U.S. SECURITIES SYSTEM") and (b) Underlying Shares owned by each Fund which are maintained pursuant to Section 2.11 hereof in an account with State Street Bank and Trust Company or such other entity which may from time to time act as a transfer agent for the Underlying Portfolios (the "UNDERLYING TRANSFER AGENT").

2.2 Delivery of Securities. The Custodian shall release and deliver domestic securities owned by a Portfolio held by the Custodian in a U.S. Securities System account of the Custodian only upon receipt of Proper Instructions from the Fund on behalf of the applicable Portfolio, which may be continuing instructions when deemed appropriate by the parties, and only in the following cases:

1)  Upon sale of such securities for the account of the Portfolio and receipt of payment therefor;

2)  Upon the receipt of payment in connection with any repurchase agreement related to such securities entered into by the Portfolio;

3)  In the case of a sale effected through a U.S. Securities System, in accordance with the provisions of Section 2.9 hereof;

4)  To the depository agent in connection with tender or other similar offers for securities of the Portfolio;

2

<PAGE>

5)  To the issuer thereof or its agent when such securities are called, redeemed, retired or otherwise become payable; provided that, in any such case, the cash or other consideration is to be delivered to the Custodian;

6)  To the issuer thereof, or its agent, for transfer into the name of the Portfolio or into the name of any nominee or nominees of the Custodian or into the name or nominee name of any agent appointed pursuant to Section 2.8 or into the name or nominee name of any sub-custodian appointed pursuant to Article 1; or for exchange for a different

aggregate face amount or number of units; provided that, in any such
case, the new securities are to be delivered to the Custodian;

7) Upon the sale of such securities for the account of the Portfolio, to
the broker or its clearing agent, against a receipt, for examination
in accordance with "street delivery" custom; provided that in any such
case, the Custodian shall have no responsibility or liability for any
loss arising from the delivery of such securities prior to receiving
payment for such securities except as may arise from the Custodian's
own negligence or willful misconduct;

8) For exchange or conversion pursuant to any plan of merger,
consolidation, recapitalization, reorganization or readjustment of the
securities of the issuer of such securities, or pursuant to provisions
for conversion contained in such securities, or pursuant to any
deposit agreement; provided that, in any such case, the new securities
and cash, if any, are to be delivered to the Custodian;

9) In the case of warrants, rights or similar securities, the surrender
thereof in the exercise of such warrants, rights or similar securities
or the surrender of interim receipts or temporary securities for
definitive securities; provided that, in any such case, the new
securities and cash, if any, are to be delivered to the Custodian;

10) For delivery in connection with any loans of securities made by the
Portfolio;

11) For delivery as security in connection with any borrowings by the Fund
on behalf of the Portfolio requiring a pledge of assets by the Fund on
behalf of the Portfolio, but only against receipt of amounts borrowed;

12) For delivery in accordance with the provisions of any agreement among
the Fund on behalf of the Portfolio, the Custodian and a broker-dealer
registered under the Securities Exchange Act of 1934, as amended (the
"EXCHANGE ACT") and a member of The National Association of Securities
Dealers, Inc. ("NASD"), relating to compliance with the rules of The
Options Clearing Corporation and of any registered national securities
exchange, or of any similar organization or organizations, regarding
escrow or other arrangements in connection with transactions by the
Fund on behalf of a Portfolio;

3

<PAGE>

13) For delivery in accordance with the provisions of any agreement among
the Fund on behalf of the Portfolio, the Custodian, and a Futures
Commission Merchant registered under the Commodity Exchange Act,
relating to compliance with the rules of the Commodity Futures Trading
Commission (the "CFTC") and/or any contract market, or any similar
organization or organizations, regarding account deposits in
connection with transactions by the Portfolio of the Fund;

14) Upon receipt of instructions from the transfer agent ("TRANSFER
AGENT") for the Fund, for delivery to such Transfer Agent or to the
holders of shares in connection with distributions in kind, as may be
described from time to time in the currently effective prospectus and
statement of additional information of the Fund, related to the
Portfolio ("PROSPECTUS"), in satisfaction of requests by holders of
Shares for repurchase or redemption; and

15) Upon the sale or other delivery of such securities (including, without
limitation, to one or more (a) Special Sub-Custodians or (b)
additional custodians appointed by the Fund, and communicated to the

authorized officer of the Fund, for the purpose of engaging in repurchase agreement or securities lending transactions, each a "REPO CUSTODIAN"), and prior to receipt of payment therefor, as set forth in written Proper Instructions (such delivery in advance of payment, along with payment in advance of delivery made in accordance with Section 2.6(7), as applicable, shall each be referred to herein as a "FREE TRADE"), provided that such Proper Instructions shall set forth (a) the securities of the Portfolio to be delivered and (b) the person(s) to whom delivery of such securities shall be made;

16) For delivery as initial or variation margin in connection with futures or options on futures contracts entered into by the Fund on behalf of the Portfolio; and

17) In the case of a sale processed through the Underlying Transfer Agent of Underlying Shares, in accordance with Section 2.11 hereof; and

18) For any other purpose, but only upon receipt of Proper Instructions from the Fund on behalf of the applicable Portfolio specifying (a) the securities of the Portfolio to be delivered and (b) the person or persons to whom delivery of such securities shall be made.

2.3 Registration of Securities. Domestic securities held by the Custodian (other than bearer securities) shall be registered in the name of the Portfolio or in the name of any nominee of a Fund on behalf of the Portfolio or of any nominee of the Custodian which nominee shall be assigned exclusively to the Portfolio, unless the Fund has authorized in writing the appointment of a nominee to be used in common with other registered investment companies having the same investment adviser as the Portfolio, or in the name or nominee name of any agent appointed pursuant to Section 2.8 or in the name or nominee name of any sub-custodian appointed pursuant to Article 1. All securities accepted by the Custodian on behalf of the Portfolio under the terms of this Contract shall be in "street name" or other

4

<PAGE>

good delivery form. If, however, a Fund directs the Custodian to maintain securities in "street name", the Custodian shall utilize its best efforts only to timely collect income due the Fund on such securities and to notify the Fund on a best efforts basis only of relevant corporate actions including, without limitation, pendency of calls, maturities, tender or exchange offers.

2.4 Bank Accounts. The Custodian shall open and maintain a separate bank account or accounts in the United States in the name of each Portfolio of each Fund, subject only to draft or order by the Custodian acting pursuant to the terms of this Contract, and shall hold in such account or accounts, subject to the provisions hereof, all cash received by it from or for the account of the Portfolio, other than cash maintained by the Portfolio in a bank account established and used in accordance with Rule 17f-3 under the 1940 Act. Funds held by the Custodian for a Portfolio may be deposited by it to its credit as Custodian in the banking department of the Custodian or in such other banks or trust companies as it may in its discretion deem necessary or desirable; provided, however, that every such bank or trust company shall be qualified to act as a custodian under the 1940 Act and that each such bank or trust company and the funds to be deposited with each such bank or trust company shall on behalf of each applicable Portfolio be approved by vote of a majority of the Board of Directors of the applicable Fund (in each case, the "BOARD"). Such funds shall be deposited by the Custodian in its capacity as Custodian and shall be withdrawable by the Custodian only in that capacity.

2.5  Collection of Income. Except with respect to Portfolio property released and delivered pursuant to Section 2.2(10) or 2.2(15) or purchased pursuant to Section 2.6(7), and subject to the provisions of Section 2.3, the Custodian shall collect on a timely basis all income and other payments with respect to registered domestic securities held hereunder to which each Portfolio shall be entitled either by law or pursuant to contract or custom in the securities business, and shall collect on a timely basis all income and other payments with respect to bearer domestic securities if, on the date of payment by the issuer, such securities are held by the Custodian or its agent thereof. Without limiting the generality of the foregoing, the Custodian shall detach and present for payment all coupons and all other income items requiring presentation as and when they become due and shall collect interest when due on securities held hereunder. The Custodian shall credit income to the Portfolio as such income is received or in accordance with Custodian's then current payable date income schedule. Any credit to the Portfolio in advance of receipt may be reversed when the Custodian determines that payment will not occur in due course and the Portfolio may be charged at the Custodian's applicable rate for time credited. Income on securities loaned other than from the Custodian's securities lending program shall be credited as received. Income due each Portfolio on securities loaned pursuant to the provisions of Section 2.2(10) shall be the responsibility of the applicable Fund. The Custodian will have no duty or responsibility in connection therewith, other than to provide the Fund with such information or data as may be necessary to assist the Fund in arranging for the timely delivery to the Custodian of the income to which the Portfolio is properly entitled.

5

<PAGE>

2.6  Payment of Fund Monies. Upon receipt of Proper Instructions on behalf of the applicable Portfolio, which may be continuing instructions when deemed appropriate by the parties, the Custodian shall pay out monies of a Portfolio in the following cases only:

1)  Upon the purchase of domestic securities, options, futures contracts or options on futures contracts for the account of the Portfolio but only (a) against the delivery of such securities or evidence of title to such options, futures contracts or options or options on futures contracts to the Custodian (or any bank, banking firm or trust company doing business in the United States or abroad which is qualified under the 1940 Act to act as a custodian and has been designated by the Custodian as its agent for this purpose) registered in the name of the Portfolio or in the name of a nominee of the Custodian referred to in Section 2.3 hereof or in proper form for transfer; (b) in the case of a purchase effected through a U.S. Securities System, in accordance with the conditions set forth in Section 2.9 hereof; (c) in the case of a purchase of Underlying Shares, in accordance with the conditions set forth in Section 2.11 hereof; (d) in the case of repurchase agreements entered into between the applicable Fund on behalf of the Portfolio and the Custodian, or another bank, or a broker-dealer which is a member of NASD, (i) against delivery of the securities either in certificate form or through an entry crediting the Custodian's account at the Federal Reserve Bank with such securities or (ii) against delivery of the receipt evidencing purchase by the Portfolio of securities owned by the Custodian along with written evidence of the agreement by the Custodian to repurchase such securities from the Portfolio or (e) for transfer to a time deposit account of the Fund in any bank, whether domestic or foreign; such transfer may be effected prior to receipt of a confirmation from a broker and/or the applicable bank pursuant to Proper Instructions from the Fund as defined in Article 9;

owned by the Portfolio as set forth in Section 2.2 hereof;

3) For the redemption or repurchase of Shares issued by the Portfolio as set forth in Article 7 hereof;

4) For the payment of any expense or liability incurred by the Portfolio, including but not limited to the following payments for the account of the Portfolio: interest, taxes, management, accounting, transfer agent and legal fees, and operating expenses of the Fund whether or not such expenses are to be in whole or part capitalized or treated as deferred expenses;

5) For the payment of any dividends on Shares of the Portfolio declared pursuant to the Fund's articles of incorporation or organization and by-laws or agreement or declaration of trust, as applicable, and Prospectus (collectively, "GOVERNING DOCUMENTS");

6) For payment of the amount of dividends received in respect of securities sold short;

6

<PAGE>

7) Upon the purchase of domestic securities including, without limitation, repurchase agreement transactions involving delivery of Portfolio monies to Repo Custodian(s), and prior to receipt of such investments, as set forth in written Proper Instructions (such payment in advance of delivery, along with delivery in advance of payment made in accordance with Section 2.2(15), as applicable, shall each be referred to herein as a "FREE TRADE"), provided that such Proper Instructions shall also set forth (a) the amount of such payment and (b) the person(s) to whom such payment is made; and

8) For delivery as initial or variation margin in connection with futures or options on futures contracts entered into by a Fund on behalf of a Portfolio; and

9) For any other purpose, but only upon receipt of Proper Instructions from the Fund on behalf of the applicable Portfolio specifying (a) the amount of such payment and (b) the person or persons to whom such payment is to be made.

2.7 Liability for Payment in Advance of Receipt of Securities Purchased. Except as specifically stated otherwise in this Contract, in any and every case where payment for purchase of domestic securities for the account of a Portfolio is made by the Custodian in advance of receipt of the securities purchased in the absence of specific written instructions from the Fund on behalf of such Portfolio to so pay in advance, the Custodian shall be absolutely liable to the Fund for such securities to the same extent as if the securities had been received by the Custodian.

2.8 Appointment of Domestic Sub-Custodians. The Custodian may at any time or times in its discretion appoint (and may at any time remove) any other bank or trust company which is itself qualified under the 1940 Act, to act as a custodian, as its sub-custodian to carry out such custodial functions under this Article 2 as the Custodian may from time to time direct; provided, however, that the appointment of any domestic sub-custodian shall not relieve the Custodian of or in any way abrogate its responsibilities or liabilities hereunder. An Underlying Transfer Agent shall not be deemed an agent or sub-custodian of the Custodian for purposes of this Section 2.8 or any other provision of this Contract.

2.9 Deposit of Fund Assets in U.S. Securities Systems. The Custodian may

Securities System in compliance with the conditions of Rule 17f-4 under the 1940 Act, as amended from time to time.

2.10 Segregated Account. The Custodian shall upon receipt of Proper Instructions on behalf of each applicable Portfolio establish and maintain a segregated account or accounts for and on behalf of each such Portfolio, into which account or accounts may be transferred cash and/or securities, including securities maintained in an account by the Custodian pursuant to Section 2.9 hereof, (i) in accordance with the provisions of any agreement among the Fund on behalf of the Portfolio, the Custodian and a broker-dealer registered under the Exchange Act and a member of the NASD (or any futures commission merchant registered under the Commodity Exchange Act), relating to compliance with the rules of The Options Clearing Corporation and of any registered national securities exchange (or the Commodity Futures

7

<PAGE>

Trading Commission or any registered contract market), or of any similar organization or organizations, regarding escrow or other arrangements in connection with transactions by the Portfolio, (ii) for purposes of segregating cash or government securities in connection with options purchased, sold or written by the Portfolio or commodity futures contracts or options thereon purchased or sold by the Portfolio, (iii) for the purposes of compliance by the Portfolio with the procedures required by Investment Company Act Release No. 10666, or any subsequent release or releases of the Securities and Exchange Commission relating to the maintenance of segregated accounts by registered investment companies and (iv) for any other purpose but only upon receipt of and in accordance with Proper Instructions from the Fund on behalf of the applicable Portfolio.

2.11 Deposit of Fund Assets with an Underlying Transfer Agent. Underlying Shares beneficially owned by a Fund, on behalf of a Portfolio, shall be deposited and/or maintained in an account or accounts maintained with an Underlying Transfer Agent. The Custodian's responsibilities with respect thereto shall be limited to the following:

   1) Upon receipt of a confirmation or statement from an Underlying Transfer Agent that such Underlying Transfer Agent is holding or maintaining Underlying Shares in the name of the Custodian (or a nominee of the Custodian) for the benefit of a Portfolio, the Custodian shall identify by book-entry that such Underlying Shares are being held by it as custodian for the benefit of the Portfolio.

   2) In respect of the purchase of Underlying Shares for the account of a Portfolio, upon receipt of Proper Instructions, the Custodian shall pay out monies of such Portfolio as so directed, and record such payment from the account of such Portfolio on the Custodian's books and records.

   3) In respect of the sale or redemption of Underlying Shares for the account of a Portfolio, upon receipt of Proper Instructions, the Custodian shall transfer such Underlying Shares as so directed, record such transfer from the account of such Portfolio on the Custodian's books and records and, upon the Custodian's receipt of the proceeds therefor, record such payment for the account of such Portfolio on the Custodian's books and records.

The Custodian shall not be liable to any Fund for any loss or damage to such Fund or any Portfolio resulting from the maintenance of Underlying Shares with an Underlying Transfer Agent except to the extent that such loss or damage results directly from the fraud, negligence or willful misconduct of the Custodian or any of its agents.

2.12 Ownership Certificates for Tax Purposes. The Custodian shall execute ownership and other certificates and affidavits for all federal and state tax purposes in connection with receipt of income or other payments with respect to domestic securities of each Portfolio held by it and in connection with transfers of securities.

2.13 Proxies. The Custodian shall, with respect to the domestic securities held hereunder, cause to be promptly executed by the registered holder of such securities, if the securities are

<div align="center">8</div>

<PAGE>

registered otherwise than in the name of the Portfolio or a nominee of the Portfolio, all proxies, without indication of the manner in which such proxies are to be voted, and shall promptly deliver to the Fund such proxies, all proxy soliciting materials and all notices relating to such securities.

2.14 Communications Relating to Portfolio Securities. Subject to the provisions of Section 2.3, the Custodian shall transmit promptly to the Fund for each Portfolio all written information (including, without limitation, pendency of calls and maturities of domestic securities and expirations of rights in connection therewith and notices of exercise of call and put options written by the Fund on behalf of the Portfolio and the maturity of futures contracts purchased or sold by the Portfolio) received by the Custodian from issuers of the securities being held for the Portfolio. With respect to tender or exchange offers, the Custodian shall transmit promptly to the Portfolio all written information received by the Custodian from issuers of the securities whose tender or exchange is sought and from the party (or his agents) making the tender or exchange offer. The Custodian shall not be liable for any untimely exercise of any tender, exchange or other right or power in connection with domestic securities or other property of the Portfolios at any time held by it unless (i) the Custodian is in actual possession of such domestic securities or property and (ii) the Custodian receives Proper Instructions with regard to the exercise of any such right or power, and both (i) and (ii) occur at least three business days prior to the date on which the Custodian is to take action to exercise such right or power. The Custodian shall also transmit promptly to the Fund for each applicable Portfolio all written information received by the Custodian regarding any class action or other litigation in connection with Portfolio securities or other assets issued in the United States and then held, or previously held, during the term of this Contract by the Custodian for the account of the Fund for such Portfolio, including, but not limited to, opt-out notices and proof-of-claim forms. For avoidance of doubt, upon and after the effective date of any termination of this Contract, with respect to a Fund or its Portfolio(s), as may be applicable, the Custodian shall have no responsibility to so transmit any information under this Section 2.14.

2.15 Investments in Loans. The provisions of this section shall apply with respect to Loans (as defined below).

    1)    For purposes of this section, the following terms shall have the following meanings:

        "FINANCING DOCUMENTS" means promissory notes, mortgages, security agreements, assignment agreements, settlement agreements, participation agreements, leases and other instruments, certificates, agreements and documents (or copies thereof) constituting, evidencing, representing or otherwise relating to Loans.

        "LOAN INFORMATION" for a Loan means (i) the Financing Documents, (ii)

the Loan and Financing Documents as the Custodian reasonably may require in order to perform its services hereunder.

9

<PAGE>

"LOANS" means Portfolio assets in the nature of loans and participations and other interests in loans in which a Fund on behalf of the applicable Portfolio is a lender, including leases used as financing transactions.

"OBLIGOR" means the party obligated under applicable Financing Documents to pay a Loan.

"PAYMENT SCHEDULE" an amortization schedule of payments identifying the amount and due dates of scheduled principal and interest payments and related payment amount information.

2) Safekeeping and Delivery of Financing Documents. The Custodian shall hold Financing Documents that the Fund delivers or causes to be delivered to Custodian from time to time in its vault facility but only pursuant to Proper Instructions from the Fund. Financing Documents other than those described in the foregoing sentence shall be held subject to the same security as other physical documents and records that the Custodian holds for the Fund. The Custodian is not obligated to require delivery of any Financing Documents or to require delivery of originals of Financing Documents that may be delivered to it as physical or electronic copies, or to inquire into the issuance of any Financing Documents or the existence of originals thereof, the Fund being solely responsible for determining the Financing Documents to be delivered, the form in which they are to be delivered and the method of acquiring and evidencing the ownership thereof. The Custodian shall promptly release any Financing Documents to the Fund or to any party specified to receive such Financing Documents pursuant to Proper Instructions from the Fund. The Custodian shall not be deemed to have or be charged with knowledge of the sale of any Loan unless the Custodian shall have received Proper Instructions from the Fund with respect thereto.

3) Responsibility for Financing Documents. The Custodian shall not be obligated to examine the contents or determine the sufficiency of any Financing Documents or to provide any certification with respect thereto, whether such Financing Documents are received by the Custodian as original documents, photocopies, electronic documents, by facsimile or otherwise. The Custodian shall be entitled to assume the genuineness, sufficiency and completeness of any Financing Documents received, and the genuineness and due authority of any signature appearing thereon. The Custodian shall not be obligated to examine Financing Documents or make other inquiries to determine the sufficiency, validity or genuineness of or title to any Financing Documents or whether the assignment or transfer of the related Loan or applicable interest or participation in the related Loan is effective or enforceable. Without limiting the generality of the foregoing, it is understood and agreed that the Company in its sole discretion may cause delivery of a Loan to the Custodian to be evidenced solely by delivery to the Custodian of an original or physical or electronic copy of an assignment or transfer agreement or a confirmation or certification stating that the Fund on

10

<PAGE>

behalf of the applicable Portfolio has acquired such Loan, with or without delivery of any promissory note, participation certificate or similar instrument.

4)  Record Keeping. The Custodian shall (i) record and track Loan payments on a daily basis; (ii) maintain detailed accrual information for each Loan, including but not limited to interest payments and fee payments received, receivables past due and principal payments received; (iii) value each Loan in accordance with the Fund's Proper Instructions utilizing the information sources designated in writing by the Fund; and (iv) provide reports and information from the books and records it maintains for the Fund in accordance with the Fund's Proper Instructions.

5)  Collection of Loan Payments. The Fund on behalf of the applicable Portfolio shall cause the Custodian to be named as its nominee for payment purposes under the Financing Documents or otherwise provide for the direct payment of the Loan payments to the Custodian. The Custodian shall credit to the Portfolio's account all payments with respect to a Loan actually received by the Custodian and identified as for the account of the Portfolio. All credits and payments credited to the Portfolio shall be conditional upon clearance and actual receipt by the Custodian of final payment thereon. If any Loan payments, whether principal or interest, are not received by the Custodian within three business days of the due date, the Custodian shall notify the Fund of the Obligor's failure to make the Loan payment. The Custodian shall have no obligations with respect to Loan payments and the collection thereof other than the duty to notify the Fund as provided in this paragraph. In no event shall the Custodian be under any obligation to make any advance of its own funds in respect of any Loan.

6)  Other Responsibilities of the Custodian. The Custodian shall have no responsibilities or duties whatsoever with respect to Loans or the Financing Documents, except as expressly set forth herein. Without limiting the generality of the foregoing, the Custodian shall have no obligation to preserve any rights against prior parties or to exercise any right or perform any obligation in connection with the Loans or any Financing Documents (including, without limitation, no obligation to take any action in respect of or upon receipt of any consent solicitation, notice of default or similar notice received from any bank agent or Obligor, except that the Custodian shall undertake reasonable efforts to forward any such notice to the Fund). The Custodian shall be entitled to rely upon the Loan Information provided to it by the Fund and any information and notices received by the Custodian from time to time from the related bank agent, Obligor or similar party with respect to the related Loan, without any obligation on the part of the Custodian independently to verify, investigate, recalculate, update or otherwise confirm the accuracy or completeness thereof. The Custodian shall have no liability for any delay or failure on the part of the Fund in providing necessary Loan Information to the Custodian, or for any inaccuracy therein or incompleteness thereof. In case any question arises as to its duties hereunder, the Custodian may request instructions from the Fund and shall be entitled at all times

11

<PAGE>

to refrain from taking any action unless it has received Proper Instructions from the Fund.

3.  Provisions Relating to Rules 17f-5 and 17f-7

3.1  Definitions. The following capitalized terms as used throughout this
     Contract shall have the following meanings:

     "COUNTRY RISK" means all factors reasonably related to the systemic risk of
     holding Foreign Assets in a particular country including, but not limited
     to, such country's political environment, economic and financial
     infrastructure (including any Eligible Securities Depository operating in
     the country), prevailing or developing custody and settlement practices,
     and laws and regulations applicable to the safekeeping and recovery of
     Foreign Assets held in custody in that country.

     "ELIGIBLE FOREIGN CUSTODIAN" has the meaning set forth in section (a)(1) of
     Rule 17f-5, including a majority-owned or indirect subsidiary of a U.S.
     Bank (as defined in Rule 17f-5), a bank holding company meeting the
     requirements of an Eligible Foreign Custodian (as set forth in Rule 17f-5
     or by other appropriate action of the U.S. Securities and Exchange
     Commission (the "SEC")), or a foreign branch of a Bank (as defined in
     Section 2(a)(5) of the 1940 Act) meeting the requirements of a custodian
     under Section 17(f) of the 1940 Act; the term does not include any Eligible
     Securities Depository.

     "ELIGIBLE SECURITIES DEPOSITORY" has the meaning set forth in section
     (b)(1) of Rule 17f-7 of the 1940 Act.

     "FOREIGN ASSETS" means any of the Portfolios' investments (including
     foreign currencies) for which the primary market is outside the United
     States and such cash and cash equivalents as are reasonably necessary to
     effect the Portfolios' transactions in such investments.

     "FOREIGN CUSTODY MANAGER" has the meaning set forth in section (a)(3) of
     Rule 17f-5 of the 1940 Act.

3.2  The Custodian as Foreign Custody Manager.

     1)  Delegation to the Custodian as Foreign Custody Manager. Each Fund, by
         resolution adopted by its Board, hereby delegates to the Custodian,
         subject to Section (b) of Rule 17f-5, the responsibilities set forth
         in this Section 3.2 with respect to Foreign Assets of the Portfolios
         held outside the United States, and the Custodian hereby accepts such
         delegation as Foreign Custody Manager with respect to the Portfolios.

     2)  Countries Covered. The Foreign Custody Manager shall be responsible
         for performing the delegated responsibilities defined below only with
         respect to the countries and custody arrangements for each such
         country listed on Schedule A to

                              12

<PAGE>

         this Contract, which list of countries may be amended from time to
         time by the Fund with the agreement of the Foreign Custody Manager.
         The Foreign Custody Manager shall list on Schedule A Eligible
         Foreign Custodians selected by the Foreign Custody Manager to maintain
         the assets of the Portfolios, which list of Eligible Foreign
         Custodians may be amended from time to time in the sole discretion of
         the Foreign Custody Manager. The Foreign Custody Manager will provide
         amended versions of Schedule A in accordance with Section 3.2(5)
         hereof.

         Upon the receipt by the Foreign Custody Manager of Proper Instructions
         to open an account or to place or maintain Foreign Assets in a country
         listed on Schedule A, and the fulfillment by the Fund, on behalf of
         the applicable Portfolios, of the applicable account opening

deemed to have been delegated by the Board on behalf of the Portfolios responsibility as Foreign Custody Manager with respect to that country and to have accepted such delegation. Execution of this Contract by a Fund shall be deemed to be a Proper Instruction to open an account, or to place or maintain Foreign Assets, in each country listed on Schedule A in which the Custodian has previously placed or currently maintains Foreign Assets pursuant to the terms of the Contract. Following the receipt of Proper Instructions directing the Foreign Custody Manager to close the account of a Portfolio with the Eligible Foreign Custodian selected by the Foreign Custody Manager in a designated country, the delegation by the Board on behalf of the Portfolios to the Custodian as Foreign Custody Manager for that country shall be deemed to have been withdrawn and the Custodian shall immediately cease to be the Foreign Custody Manager of the Portfolios with respect to that country.

The Foreign Custody Manager may withdraw its acceptance of delegated responsibilities with respect to a designated country upon written notice to the Fund. Thirty days (or such longer period to which the parties agree in writing) after receipt of any such notice by the Fund, the Custodian shall have no further responsibility in its capacity as Foreign Custody Manager to the Fund with respect to the country as to which the Custodian's acceptance of delegation is withdrawn.

3) Scope of Delegated Responsibilities:

a) Selection of Eligible Foreign Custodians. Subject to the provisions of this Section 3.2, the Foreign Custody Manager may place and maintain the Foreign Assets in the care of the Eligible Foreign Custodian selected by the Foreign Custody Manager in each country listed on Schedule A, as amended from time to time. In performing its delegated responsibilities as Foreign Custody Manager to place or maintain Foreign Assets with an Eligible Foreign Custodian, the Foreign Custody Manager shall determine that the Foreign Assets will be subject to reasonable care, based on the standards applicable to custodians in the country in which the Foreign Assets will be held by that Eligible Foreign Custodian, after considering

13

<PAGE>

all factors relevant to the safekeeping of such assets, including, without limitation the factors specified in Rule 17f-5(c)(1).

b) Contracts With Eligible Foreign Custodians. The Foreign Custody Manager shall determine that the contract governing the foreign custody arrangements with each Eligible Foreign Custodian selected by the Foreign Custody Manager will satisfy the requirements of Rule 17f-5(c)(2).

c) Monitoring. In each case in which the Foreign Custody Manager maintains Foreign Assets with an Eligible Foreign Custodian selected by the Foreign Custody Manager, the Foreign Custody Manager shall establish a system to monitor (i) the appropriateness of maintaining the Foreign Assets with such Eligible Foreign Custodian and (ii) the performance of the contract governing the custody arrangements established by the Foreign Custody Manager with the Eligible Foreign Custodian. In the event the Foreign Custody Manager determines that the custody arrangements with an Eligible Foreign Custodian it has selected

notify the Board in accordance with Section 3.2(5) hereunder.

4) Guidelines for the Exercise of Delegated Authority. For purposes of this Section 3.2, the Board shall be deemed to have considered and determined to accept such Country Risk as is incurred by placing and maintaining the Foreign Assets in each country for which the Custodian is serving as Foreign Custody Manager of the Portfolios.

5) Reporting Requirements. The Foreign Custody Manager shall report the withdrawal of the Foreign Assets from an Eligible Foreign Custodian and the placement of such Foreign Assets with another Eligible Foreign Custodian by providing to the Board an amended Schedule A at the end of the calendar quarter in which an amendment to such Schedule has occurred. The Foreign Custody Manager shall make written reports notifying the Board of any other material change in the foreign custody arrangements of the Portfolios described in this Section 3.2 after the occurrence of the material change.

6) Standard of Care as Foreign Custody Manager of a Portfolio. In performing the responsibilities delegated to it, the Foreign Custody Manager agrees to exercise reasonable care, prudence and diligence such as a person having responsibility for the safekeeping of assets of management investment companies registered under the 1940 Act would exercise.

14

<PAGE>

7) Representations with Respect to Rule 17f-5. The Foreign Custody Manager represents to the Fund that it is a U.S. Bank as defined in section (a)(7) of Rule 17f-5. The Fund represents to the Custodian that the Board has determined that it is reasonable for the Board to rely on the Custodian to perform the responsibilities delegated pursuant to this Contract to the Custodian as the Foreign Custody Manager of the Portfolios.

8) Effective Date and Termination of the Custodian as Foreign Custody Manager. The Board's delegation to the Custodian as Foreign Custody Manager of the Portfolios shall be effective as of the date hereof and shall remain in effect until terminated at any time, without penalty, by written notice from the terminating party to the non-terminating party. Termination will become effective thirty (30) days after receipt by the non-terminating party of such notice. The provisions of Section 3.2(2) hereof shall govern the delegation to and termination of the Custodian as Foreign Custody Manager of the Portfolios with respect to designated countries.

3.3 Eligible Securities Depositories.

1) Analysis and Monitoring. The Custodian shall (a) provide the Fund (or its duly-authorized investment manager or investment adviser) with an analysis of the custody risks associated with maintaining assets with the Eligible Securities Depositories set forth on Schedule B hereto in accordance with section (a)(1)(i)(A) of Rule 17f-7, and (b) monitor such risks on a continuing basis, and promptly notify the Fund (or its duly-authorized investment manager or investment adviser) of any material change in such risks, in accordance with section (a)(1)(i)(B) of Rule 17f-7.

2) Standard of Care. The Custodian agrees to exercise reasonable care, prudence and diligence in performing the duties set forth in Section 3.3(1).

4. 

Outside the United States

4.1 Definitions. Capitalized terms in this Article 4 shall have the following
meanings:

"FOREIGN SECURITIES SYSTEM" means an Eligible Securities Depository listed
on Schedule B hereto.

"FOREIGN SUB-CUSTODIAN" means a foreign banking institution serving as an
Eligible Foreign Custodian.

4.2 Holding Securities. The Custodian shall identify on its books as belonging
to the Portfolios the foreign securities held by each Foreign Sub-Custodian
or Foreign Securities System. The Custodian may hold foreign securities for
all of its customers, including the Portfolios, with any Foreign
Sub-Custodian in an account that is identified

15

<PAGE>

as belonging to the Custodian for the benefit of its customers, provided
however, that (i) the records of the Custodian with respect to foreign
securities of the Portfolios which are maintained in such account shall
identify those securities as belonging to the Portfolios and (ii), to the
extent permitted and customary in the market in which the account is
maintained, the Custodian shall require that securities so held by the
Foreign Sub-Custodian be held separately from any assets of such Foreign
Sub-Custodian or of other customers of such Foreign Sub-Custodian.

4.3 Foreign Securities Systems. Foreign securities shall be maintained in a
Foreign Securities System in a designated country through arrangements
implemented by the Custodian or a Foreign Sub-Custodian, as applicable, in
such country.

4.4 Transactions in Foreign Custody Account.

1) Delivery of Foreign Assets. The Custodian or a Foreign Sub-Custodian
shall release and deliver foreign securities of the Portfolios held by
the Custodian or such Foreign Sub-Custodian, or in a Foreign
Securities System account, only upon receipt of Proper Instructions,
which may be continuing instructions when deemed appropriate by the
parties, and only in the following cases:

a) upon the sale of such foreign securities for the Portfolio in
accordance with commercially reasonable market practice in the
country where such foreign securities are held or traded,
including, without limitation: (A) delivery against expectation
of receiving later payment; or (B) in the case of a sale effected
through a Foreign Securities System, in accordance with the rules
governing the operation of the Foreign Securities System;

b) in connection with any repurchase agreement related to foreign
securities;

c) to the depository agent in connection with tender or other
similar offers for foreign securities of the Portfolios;

d) to the issuer thereof or its agent when such foreign securities
are called, redeemed, retired or otherwise become payable;

e) to the issuer thereof, or its agent, for transfer into the name
of the Custodian (or the name of the respective Foreign
Sub-Custodian or of any nominee of the Custodian or such Foreign

certificates or other evidence representing the same aggregate face amount or number of units;

f) to brokers, clearing banks or other clearing agents for examination or trade execution in accordance with market custom; provided that in any such case the Foreign Sub-Custodian shall have no responsibility or liability for any loss arising from the delivery of such foreign securities prior to

16

<PAGE>

receiving payment for such foreign securities except as may arise from the Foreign Sub-Custodian's own negligence or willful misconduct;

g) for exchange or conversion pursuant to any plan of merger, consolidation, recapitalization, reorganization or readjustment of the securities of the issuer of such securities, or pursuant to provisions for conversion contained in such securities, or pursuant to any deposit agreement;

h) in the case of warrants, rights or similar foreign securities, the surrender thereof in the exercise of such warrants, rights or similar securities or the surrender of interim receipts or temporary securities for definitive securities;

i) for delivery as security in connection with any borrowing by a Fund on behalf of Portfolios requiring a pledge of assets by the Fund on behalf of such Portfolios;

j) in connection with trading in options and futures contracts, including delivery as original margin and variation margin;

k) in connection with the lending of foreign securities; and

(l) Upon the sale or other delivery of such foreign securities (including, without limitation, to one or more Special Sub-Custodians or Repo Custodians) as a Free Trade, provided that applicable Proper Instructions shall set forth (A) the foreign securities to be delivered and (B) the person or persons to whom delivery shall be made;

m) for any other purpose, but only upon receipt of Proper Instructions specifying the foreign securities to be delivered and naming the person or persons to whom delivery of such securities shall be made.

2) Payment of Portfolio Monies. Upon receipt of Proper Instructions, which may be continuing instructions when deemed appropriate by the parties, the Custodian shall pay out, or direct the respective Foreign Sub-Custodian or the respective Foreign Securities System to pay out, monies of a Portfolio in the following cases only:

a) upon the purchase of foreign securities for the Portfolio, unless otherwise directed by Proper Instructions, by (A) delivering money to the seller thereof or to a dealer therefor (or an agent for such seller or dealer) against expectation of receiving later delivery of such foreign securities; or (B) in the case of a purchase effected through a Foreign Securities System, in accordance with the rules governing the operation of such Foreign Securities System;

<PAGE>

      b)   in connection with the conversion, exchange or surrender of foreign securities of the Portfolio;

      c)   for the payment of any expense or liability of the Portfolio, including but not limited to the following payments: interest, taxes, investment advisory fees, transfer agency fees, fees under this Contract, legal fees, accounting fees, and other operating expenses;

      d)   for the purchase or sale of foreign exchange or foreign exchange contracts for the Portfolio, including transactions executed with or through the Custodian or its Foreign Sub-Custodians;

      e)   in connection with trading in options and futures contracts, including delivery as original margin and variation margin;

      f)   for payment of part or all of the dividends received in respect of securities sold short;

      g)   in connection with the borrowing or lending of foreign securities; and

      (h)   Upon the purchase of foreign investments including, without limitation, repurchase agreement transactions involving delivery of Portfolio monies to Repo Custodian(s), as a Free Trade, provided that applicable Proper Instructions shall set forth (A) the amount of such payment and (B) the person or persons to whom payment shall be made;

      i)   for any other purpose, but only upon receipt of Proper Instructions specifying the amount of such payment and naming the person or persons to whom such payment is to be made.

  3)   Market Conditions. Notwithstanding any provision of this Contract to the contrary, settlement and payment for Foreign Assets received for the account of the Portfolios and delivery of Foreign Assets maintained for the account of the Portfolios may be effected in accordance with the customary established securities trading or processing practices and procedures in the country or market in which the transaction occurs, including, without limitation, delivering Foreign Assets to the purchaser thereof or to a dealer therefor (or an agent for such purchaser or dealer) with the expectation of receiving later payment for such Foreign Assets from such purchaser or dealer.

The Custodian shall provide to the Boards the information with respect to custody and settlement practices in countries in which the Custodian employs a Foreign Sub-Custodian described on Schedule C hereto at the time or times set forth on such Schedule. The Custodian may revise Schedule C from time to time, provided that no such revision shall result in the Boards being provided with substantively less information than had been previously provided hereunder.

18

<PAGE>

4.5  Registration of Foreign Securities. The foreign securities maintained in the custody of a Foreign Sub-Custodian (other than bearer securities) shall be registered in the name of the applicable Portfolio or in the name of the Custodian or in the name of any Foreign Sub-Custodian or in the name of any

Portfolio agrees to hold any such nominee harmless from any liability as a holder of record of such foreign securities. The Custodian or a Foreign Sub-Custodian shall not be obligated to accept securities on behalf of a Portfolio under the terms of this Contract unless the form of such securities and the manner in which they are delivered are in accordance with reasonable market practice.

4.6  Bank Accounts. The Custodian shall identify on its books as belonging to the Fund cash (including cash denominated in foreign currencies) deposited with the Custodian. Where the Custodian is unable to maintain, or market practice does not facilitate the maintenance of, cash on the books of the Custodian, a bank account or bank accounts shall be opened and maintained outside the United States on behalf of a Portfolio with a Foreign Sub-Custodian. All accounts referred to in this Section shall be subject only to draft or order by the Custodian (or, if applicable, such Foreign Sub-Custodian) acting pursuant to the terms of this Contract to hold cash received by or from or for the account of the Portfolio. Cash maintained on the books of the Custodian (including its branches, subsidiaries and affiliates), regardless of currency denomination, is maintained in bank accounts established under, and subject to the laws of, The Commonwealth of Massachusetts.

4.7  Collection of Income. The Custodian shall use reasonable commercial efforts to collect all income and other payments with respect to the Foreign Assets held hereunder to which the Portfolios shall be entitled. In the event that extraordinary measures are required to collect such income, the Fund and the Custodian shall consult as to such measures and as to the compensation and expenses of the Custodian relating to such measures. The Custodian shall credit income to the applicable Portfolio as such income is received or in accordance with Custodian's then current payable date income schedule. Any credit to the Portfolio in advance of receipt may be reversed when the Custodian determines that payment will not occur in due course and the Portfolio may be charged at the Custodian's applicable rate for time credited. Income on securities loaned other than from the Custodian's securities lending program shall be credited as received.

4.8  Shareholder Rights. With respect to the foreign securities held pursuant to this Article 4, the Custodian will use reasonable commercial efforts to facilitate the exercise of voting and other shareholder rights, subject always to the laws, regulations and practical constraints that may exist in the country where such securities are issued. The Fund acknowledges that local conditions, including lack of regulation, onerous procedural obligations, lack of notice and other factors may have the effect of severely limiting the ability of the Fund to exercise shareholder rights.

4.9  Communications Relating to Foreign Securities. The Custodian shall transmit promptly to the Fund written information with respect to materials received by the Custodian via

19

<PAGE>

the Foreign Sub-Custodians from issuers of the foreign securities being held for the account of the Portfolios (including, without limitation, pendency of calls and maturities of foreign securities and expirations of rights in connection therewith). With respect to tender or exchange offers, the Custodian shall transmit promptly to the Fund written information with respect to materials so received by the Custodian from issuers of the foreign securities whose tender or exchange is sought or from the party (or its agents) making the tender or exchange offer. The Custodian shall not be liable for any untimely exercise of any tender, exchange or other right or power in connection with foreign securities or other property of the Portfolios at any time held by it unless (i) the Custodian or the

securities or property and (ii) the Custodian receives Proper Instructions with regard to the exercise of any such right or power, and both (i) and (ii) occur at least three business days prior to the date on which the Custodian is to take action to exercise such right or power. The Custodian shall also transmit promptly to the applicable Fund all written information received by the Custodian via the Foreign Sub-Custodians from issuers of the foreign securities being held for the account of the Portfolios regarding any class action or other litigation in connection with Portfolio foreign securities or other assets issued outside the United States and then held, or previously held, during the term of this Contract by the Custodian via a Foreign Sub-Custodian for the account of the Fund for such Portfolio, including, but not limited to, opt-out notices and proof-of-claim forms. For avoidance of doubt, upon and after the effective date of any termination of this Contract, with respect to a Fund or its Portfolio(s), as may be applicable, the Custodian shall have no responsibility to so transmit any information under this Section 4.9.

4.10 Liability of Foreign Sub-Custodians. Each agreement pursuant to which the Custodian employs a Foreign Sub-Custodian shall, to the extent possible, require the Foreign Sub-Custodian to exercise reasonable care in the performance of its duties, and to indemnify, and hold harmless, the Custodian from and against any loss, damage, cost, expense, liability or claim arising out of or in connection with the Foreign Sub-Custodian's performance of such obligations. At a Fund's election, the Portfolios shall be entitled to be subrogated to the rights of the Custodian with respect to any claims against a Foreign Sub-Custodian as a consequence of any such loss, damage, cost, expense, liability or claim if and to the extent that the Portfolios have not been made whole for any such loss, damage, cost, expense, liability or claim.

4.11 Liability of Custodian. Except as may arise from the Custodian's own negligence or willful misconduct or the negligence or willful misconduct of a Sub-Custodian, the Custodian shall be without liability to the Fund for any loss, liability, claim or expense resulting from or caused by anything which is part of Country Risk.

The Custodian shall be liable for the acts or omissions of a Foreign Sub-Custodian to the same extent as set forth with respect to sub-custodians generally in the Contract and, regardless of whether assets are maintained in the custody of a Foreign Sub-Custodian or a Foreign Securities System, the Custodian shall not be liable for any loss, damage, cost, expense, liability or claim resulting from nationalization, expropriation, currency

20

<PAGE>

restrictions, or acts of war or terrorism, or any other loss where the Foreign Sub-Custodian has otherwise acted with reasonable care.

5.    Contractual Settlement Services (Purchase / Sales)

5.1  The Custodian shall, in accordance with the terms set out in this section, debit or credit the appropriate cash account of each Portfolio in connection with (i) the purchase of securities for such Portfolio, and (ii) proceeds of the sale of securities held on behalf of such Portfolio, on a contractual settlement basis.

5.2  The services described above (the "CONTRACTUAL SETTLEMENT SERVICES") shall be provided for such instruments and in such markets as the Custodian may advise from time to time. The Custodian may terminate or suspend any part of the provision of the Contractual Settlement Services under this Contract at its sole discretion immediately upon notice to the applicable Fund on

force majeure events affecting settlement or any material disorder in applicable securities markets.

5.3   The consideration payable in connection with a purchase transaction shall be debited from the appropriate cash account of the applicable Portfolio as of the time and date that monies would ordinarily be required to settle such transaction in the applicable market. The Custodian shall promptly recredit such amount at the time that the Portfolio or the Fund notifies the Custodian by Proper Instruction that such transaction has been canceled.

5.4   With respect to the settlement of a sale of securities, a provisional credit of an amount equal to the net sale price for the transaction (the "SETTLEMENT AMOUNT") shall be made to the account of the applicable Portfolio as if the Settlement Amount had been received as of the close of business on the date that monies would ordinarily be available in good funds in the applicable market. Such provisional credit will be made conditional upon (i) the Custodian's having received Proper Instructions with respect to, or reasonable notice of, the transaction, as applicable; and (ii) the Custodian or its agent's having possession of the asset(s) (which shall exclude assets subject to any third party lending arrangement entered into by a Portfolio) associated with the transaction in good deliverable form and not being aware of any facts which would lead them to believe that the transaction will not settle in the time period ordinarily applicable to such transactions in the applicable market.

5.5   Simultaneously with the making of such provisional credit, the Fund on behalf of the applicable Portfolio agrees that the Custodian shall have, and hereby grants to the Custodian, a security interest in any property at any time held for the account of the Portfolio to the full extent of the credited amount, and each Portfolio hereby pledges, assigns and grants to the Custodian a continuing security interest and a lien on any and all such property under the Custodian's possession, in accordance with the terms of Article 17 of this Contract. In the event that the applicable Portfolio fails to promptly repay any

21

<PAGE>

provisional credit, the Custodian shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of The Commonwealth of Massachusetts.

5.6   The Custodian shall have the right to reverse any provisional credit or debit given in connection with the Contractual Settlement Services at any time when the Custodian believes, in its reasonable judgment, that such transaction will not settle in accordance with its terms or amounts due pursuant thereto will not be collectable or where the Custodian has not been provided Proper Instructions with respect thereto, as applicable, and the Portfolio shall be responsible for any costs or liabilities resulting from such reversal. Upon such reversal, a sum equal to the credited or debited amount shall become immediately payable by the Portfolio to the Custodian and may be debited from any cash account held for benefit of the Portfolio.

5.7   In the event that the Custodian is unable to debit an account in accordance with Section 5.6 above of the Portfolio, and the Portfolio fails to pay any amount due to the Custodian at the time such amount becomes payable in accordance with Section 5.6 this Contract, (i) the Custodian may charge the Portfolio for reasonable costs and expenses associated with providing the provisional credit, including without limitation the reasonable cost of funds associated therewith, (ii) the amount of any accrued dividends, interest and other distributions with respect to assets associated with

provisional credit and any such costs and expenses shall be considered an advance of cash for purposes of this Contract and (iv) the Custodian shall have the right to setoff against any property and the discretion to sell, exchange, convey, transfer or otherwise dispose of any property at any time held for the account of the Portfolio to the full extent necessary for the Custodian to make itself whole, provided, however, that the Custodian shall notify the applicable Fund promptly following any such disposition of any property of a Portfolio, state the reason for such disposition and list the property disposed of.

6.   Special Sub-Custodians

Upon receipt of Proper Instructions, the Custodian shall, on behalf of one or more Portfolios, appoint one or more Special Sub-Custodians for the purposes of effecting such transactions as may be designated in such Proper Instructions or to serve as a Foreign Sub-Custodian in such markets as may be designated in such Proper Instructions. In connection with the appointment of any Special Sub-Custodian, and in accordance with Proper Instructions, the Custodian shall enter into a sub-custodian agreement with the Fund and the Special Sub-Custodian in form and substance acceptable to the Custodian and approved by such Fund, provided that such agreement shall in all events comply with the provisions of the 1940 Act and the rules and regulations thereunder and the terms and provisions of this Contract. At a Fund's election, the Portfolios shall be entitled to be subrogated to the rights of the Custodian with respect to any claims against a Special Sub-Custodian as a consequence of any loss, damage, cost, expense, liability or claim if and to the extent that the Portfolios have not been made whole for any such loss, damage, cost, expense, liability or claim.

22

<PAGE>

7.   Payments for Sales or Repurchases or Redemptions of Shares of the Fund

The Custodian shall receive from the distributor for the Shares or from the Transfer Agent of the Fund and deposit into the account of the appropriate Portfolio such payments as are received for Shares of that Portfolio issued or sold from time to time by the applicable Fund. The Custodian will provide timely notification to the Fund on behalf of each such Portfolio and the Transfer Agent of any receipt by it of payments for Shares of such Portfolio.

From such funds as may be available for the purpose, the Custodian shall, upon receipt of instructions from the Transfer Agent, make funds available for payment to holders of Shares who have delivered to the Transfer Agent a request for redemption or repurchase of their Shares. In connection with the redemption or repurchase of Shares of a Portfolio, the Custodian is authorized upon receipt of instructions from the Transfer Agent to wire funds to or through a commercial bank designated by the redeeming shareholders.

8.   Tax Law

The Custodian shall have no responsibility or liability for any obligations now or hereafter imposed on the Fund, the Portfolios or the Custodian as custodian of the Portfolios by the tax law of the United States or of any state or political subdivision thereof. It shall be the responsibility of the Fund to notify the Custodian of the obligations imposed on the Fund with respect to the Portfolios or the Custodian as custodian of the Portfolios by the tax law of jurisdictions other than those mentioned in the above sentence, including responsibility for withholding and other taxes, assessments or other governmental charges, certifications and governmental reporting. The sole responsibility of the Custodian with regard to such tax law shall be to use reasonable efforts to assist the Fund with respect to any claim for exemption or refund under the tax law of jurisdictions for which the Fund has provided such

9.    Proper Instructions

        "PROPER INSTRUCTIONS," which may also be standing instructions, as such
term is used throughout this Contract shall mean instructions received by the
Custodian from a Fund, a Fund's duly authorized transfer agent, investment
manager or investment adviser, or a person or entity duly authorized by either
of them. Such instructions may be in writing signed by the authorized person or
persons or may be in a tested communication or in a communication utilizing
access codes effected between electro-mechanical or electronic devices or may be
by such other means and utilizing such intermediary systems and utilities as may
be agreed from time to time by the Custodian and the person(s) or entity giving
such instruction, provided that the Fund has followed any security procedures
agreed to from time to time by the applicable Fund and the Custodian including,
but not limited to, the security procedures selected by the Fund via the form of
Funds Transfer Addendum hereto. Oral instructions will be considered Proper
Instructions if the Custodian reasonably believes them to have been given by a
person authorized to provide such instructions with respect to the transaction
involved; the Fund shall cause all oral instructions to be confirmed in writing.
For purposes of this Section, Proper Instructions shall include instructions
received by the Custodian pursuant to any multi-party agreement which requires a
segregated asset account in accordance with Section 2.10 hereof.

                                      23

<PAGE>

        Concurrently with the execution of this Contract, and from time to time
thereafter, as appropriate, each Fund shall deliver to the Custodian, duly
certified by such Fund's Treasurer or Assistant Treasurer, a certificate setting
forth the names, titles, signatures and scope of authority of all persons
authorized to give Proper Instructions or any other notice, request, direction,
instruction, certificate or instrument on behalf of the Fund. Such certificate
may be accepted and relied upon by the Custodian as conclusive evidence of the
facts set forth therein and shall be considered to be in full force and effect
until receipt by the Custodian of a similar certificate to the contrary.

10.   Actions Permitted without Express Authority

        The Custodian may in its discretion, without express authority from the
applicable Fund on behalf of each applicable Portfolio:

        1)    make payments to itself or others for minor expenses of handling
              securities or other similar items relating to its duties under this
              Contract, provided that all such payments shall be accounted for to
              the Fund on behalf of the Portfolio;

        2)    surrender securities in temporary form for securities in definitive
              form;

        3)    endorse for collection, in the name of the Portfolio, checks, drafts
              and other negotiable instruments; and

        4)    in general, attend to all non-discretionary details in connection with
              the sale, exchange, substitution, purchase, transfer and other
              dealings with the securities and property of the Portfolio except as
              otherwise directed by the applicable Board.

11.   Evidence of Authority

        The Custodian shall be protected in acting upon any instructions, notice,
request, consent, certificate or other instrument or paper reasonably believed
by it to be genuine and to have been properly executed by or on behalf of the
applicable Fund. The Custodian may receive and accept a copy of a resolution

evidence (a) of the authority of any person to act in accordance with such resolution or (b) of any determination or of any action by the applicable Board as described in such resolution, and such resolution may be considered as in full force and effect until receipt by the Custodian of written notice to the contrary.

12. Duties of Custodian with Respect to the Books of Account and Calculation of Net Asset Value and Net Income

The Custodian shall cooperate with and supply necessary information to the entity or entities appointed by the applicable Board to keep the books of account of each Portfolio and/or compute the net asset value per share of the outstanding Shares of each Portfolio.

24

<PAGE>

13. Records

The Custodian shall with respect to each Portfolio create and maintain all records relating to its activities and obligations under this Contract in such manner as will meet the obligations of the Fund under the applicable provisions of the 1940 Act, with particular attention to Section 31 thereof and Rules 31a-1 and 31a-2 thereunder. All such records shall be the property of the Fund and shall at all times during the regular business hours of the Custodian be open for inspection by duly authorized officers, employees or agents of the Fund and employees and agents of the SEC. The Custodian shall, at the Fund's request, supply the Fund with a tabulation of securities owned by each Portfolio and held by the Custodian and shall, when requested to do so by the Fund and for such compensation as shall be agreed upon between the Fund and the Custodian, include certificate numbers in such tabulations.

Each Fund acknowledges and agrees that, with respect to investments maintained with an Underlying Transfer Agent, the Underlying Transfer Agent is the sole source of information on the number of shares of a fund held by it on behalf of a Portfolio and that the Custodian has the right to rely on holdings information furnished by the Underlying Transfer Agent to the Custodian in performing its duties under this Contract, including without limitation, the duties set forth in this Article 13; provided, however, that the Custodian shall be obligated to reconcile information as to purchases and sales of Underlying Shares contained in trade instructions and confirmations received by the Custodian and to report promptly any discrepancies to the Underlying Transfer Agent. Each Fund acknowledges that, with respect to Portfolio property released and delivered pursuant to Section 2.2(15), or purchased pursuant to Section 2.6(7) hereof, the Custodian is authorized and instructed to rely upon information provided to it by the Fund, the Fund's counterparty(ies), or the agents of either of them in performing its duties under this Contract, including without limitation, the duties set forth in this Article 13.

14. Intentionally omitted.

15. Reports to Fund by Independent Public Accountants

The Custodian shall provide the applicable Fund, on behalf of each of the Portfolios at such times as the Fund may reasonably require, with reports by independent public accountants on the accounting system, internal accounting control and procedures for safeguarding securities, futures contracts and options on futures contracts, including securities deposited and/or maintained in a U.S. Securities System or a Foreign Securities System (either, a "SECURITIES SYSTEM"), relating to the services provided by the Custodian under this Contract; such reports, shall be of sufficient scope and in sufficient detail, as may reasonably be required by the Fund to provide reasonable assurance that any material inadequacies would be disclosed by such examination,

16.  Compensation of Custodian

    The Custodian shall be entitled to reasonable compensation for its services and expenses as Custodian, as agreed upon in writing from time to time between each Fund on behalf of each applicable Portfolio and the Custodian.

25

<PAGE>

17.  Responsibility of Custodian

    So long as and to the extent that it is in the exercise of reasonable care, the Custodian shall not be responsible for the title, validity or genuineness of any property or evidence of title thereto received by it or delivered by it pursuant to this Contract and shall be held harmless in acting upon any notice, request, consent, certificate or other instrument reasonably believed by it to be genuine and to be signed by the proper party or parties, including any futures commission merchant acting pursuant to the terms of a three-party futures or options agreement. The Custodian shall be held to the exercise of reasonable care in carrying out the provisions of this Contract, but shall be kept indemnified by each Fund and shall be without liability to any Fund for any action taken or omitted by it in good faith without negligence, including, without limitation, acting in accordance with any Proper Instruction. It shall be entitled to rely on and may act upon advice of counsel (who may be counsel for the Fund) on all matters, and shall be without liability for any action reasonably taken or omitted pursuant to such advice. The Custodian shall be without liability to any Fund or Portfolio for any loss, liability, claim or expense resulting from or caused by anything which is part of Country Risk, including without limitation nationalization, expropriation, currency restrictions, or acts of war, revolution, riots or terrorism.

    Except as may arise from the Custodian's own negligence or willful misconduct or the negligence or willful misconduct of a sub-custodian or agent, the Custodian shall be without liability to any Fund for any loss, liability, claim or expense resulting from or caused by; (i) events or circumstances beyond the reasonable control of the Custodian or any sub-custodian or Securities System or any agent or nominee of any of the foregoing, including, without limitation, nationalization or expropriation, imposition of currency controls or restrictions, the interruption, suspension or restriction of trading on or the closure of any securities market, power or other mechanical or technological failures or interruptions, computer viruses or communications disruptions, acts of war or terrorism, riots, revolutions, work stoppages, natural disasters or other similar events or acts; (ii) errors by any Fund or its investment manager or investment adviser in their instructions to the Custodian provided such instructions have been in accordance with this Contract; (iii) the insolvency of or acts or omissions by a Securities System; (iv) any delay or failure of any broker, agent or intermediary, central bank or other commercially prevalent payment or clearing system to deliver to the Custodian's sub-custodian or agent securities purchased or in the remittance or payment made in connection with securities sold; (v) any delay or failure of any company, corporation, or other body in charge of registering or transferring securities in the name of the Custodian, any Fund, the Custodian's sub-custodians, nominees or agents or any consequential losses arising out of such delay or failure to transfer such securities including non-receipt of bonus, dividends and rights and other accretions or benefits; (vi) delays or inability to perform its duties due to any disorder in market infrastructure with respect to any particular security or Securities System; (vii) any act or omission of a Special Sub-Custodian including, without limitation, reliance on reports prepared by a Special Sub-Custodian; and (viii) any provision of any present or future law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or of any court of competent jurisdiction.

The Custodian shall be liable for the acts or omissions of a Foreign Sub-Custodian to the same extent as set forth with respect to sub-custodians generally in this Contract.

26

<PAGE>

If a Fund on behalf of a Portfolio requires the Custodian to take any action with respect to securities, which action involves the payment of money or which action may, in the opinion of the Custodian, result in the Custodian or its nominee assigned to the Fund or the Portfolio being liable for the payment of money or incurring liability of some other form, such Fund on behalf of the Portfolio, as a prerequisite to requiring the Custodian to take such action, shall provide indemnity to the Custodian in an amount and form satisfactory to it.

If a Fund requires the Custodian, its affiliates, subsidiaries or agents, to advance cash or securities for any purpose (including but not limited to securities settlements, foreign exchange contracts and assumed settlement) or in the event that the Custodian or its nominee shall incur or be assessed any taxes, charges, expenses, assessments, claims or liabilities in connection with the performance of this Contract, except such as may arise from its or its nominee's own negligent action, negligent failure to act or willful misconduct, any property at any time held for the account of the applicable Portfolio shall be security therefor and should the Fund fail to repay the Custodian promptly, the Custodian shall be entitled to utilize available cash and to dispose of such Portfolio's assets to the extent necessary to obtain reimbursement.

Except as may arise from the Custodian's own negligence or willful misconduct, each Fund shall indemnify and hold the Custodian harmless from and against any and all costs, expenses, losses, damages, charges, reasonable counsel fees, payments and liabilities which may be asserted against the Custodian (a) acting in accordance with any Proper Instruction including, without limitation, any Proper Instruction with respect to Free Trades including, but not limited to, cost, expense, loss, damage, liability, tax, charge, assessment or claim resulting from (i) the failure of the applicable Portfolio to receive income with respect to purchased investments, (ii) the failure of the applicable Portfolio to recover amounts invested on maturity of purchased investments, (iii) the failure of the Custodian to respond to or be aware of notices or other corporate communications with respect to purchased investments, or (iv) the Custodian's reliance upon information provided by the applicable Fund, the Fund's counterparty(ies) or the agents of either of them with respect to Fund property released, delivered or purchased pursuant to either of Section 2.2(15) or Section 2.6(7) hereof, or (b) for the acts or omissions of any Special Sub-Custodian.

In no event shall the Custodian be liable for indirect, special or consequential damages.

18.  Effective Period, Termination and Amendment

   1)  This Contract shall become effective as of its execution, shall continue in full force and effect until terminated as hereinafter provided, and may be amended at any time by mutual written agreement of the parties hereto.

   2)  At any time following the effective date of this Contract:

      (i)  the Funds may at any time by action of the applicable Board(s) of Directors immediately terminate this Contract in the event of the appointment of a conservator or receiver for the Custodian by an appropriate regulatory agency or court of competent jurisdiction; and

27

<PAGE>

      (ii) any party to this Contract may at any time terminate this
           Contract upon one hundred eighty (180) days prior written notice
           to the other party or parties.

3)    Notwithstanding the foregoing, no Fund shall terminate this Contract
     in contravention of any applicable federal or state regulations, or
     any provision of such Fund's Governing Documents.

4)    Any termination of this Contract may be with respect to any one
     particular Fund or Portfolio and, in such event, shall in no way
     affect the rights and duties under this Contract with respect to any
     other Fund or Portfolio.

5)    Upon termination of the Contract for any reason, the applicable Fund
     on behalf of each applicable Portfolio shall pay to the Custodian such
     compensation as may be due as of the date of such termination and
     shall likewise reimburse the Custodian for its costs, expenses and
     disbursements associated with its provision of services hereunder to
     such Portfolio.

19. Successor Custodian

    If a successor custodian for one or more of the Portfolios shall be
appointed by the applicable Board, the Custodian shall, upon termination and
receipt of Proper Instructions, deliver to such successor custodian at the
office of the Custodian, duly endorsed and in the form for transfer, all
securities of each applicable Portfolio then held by it hereunder and shall
transfer to an account of the successor custodian all of the securities of each
such Portfolio held in a Securities System or at an Underlying Transfer Agent.

    If no such successor custodian shall be appointed, the Custodian shall, in
like manner, upon receipt of Proper Instructions, deliver at the office of the
Custodian and transfer such securities, funds and other properties in accordance
with such Proper Instructions.

    In the event that no Proper Instructions designating a successor custodian
or alternative arrangements shall have been delivered to the Custodian on or
before the date when such termination shall become effective, then the Custodian
shall have the right to deliver to a bank or trust company, which is a "bank" as
defined in the 1940 Act, doing business in Boston, Massachusetts or New York,
New York, of its own selection, having an aggregate capital, surplus, and
undivided profits, as shown by its last published report, of not less than
$25,000,000, all securities, funds and other properties held by the Custodian on
behalf of each applicable Portfolio and all instruments held by the Custodian
relative thereto and all other property held by it under this Contract on behalf
of each applicable Portfolio and to transfer to an account of such successor
custodian all of the securities of each such Portfolio held in any Securities
System or at an Underlying Transfer Agent. Thereafter, such bank or trust
company shall be the successor of the Custodian under this Contract.

    In the event that securities, funds and other properties remain in the
possession of the Custodian after the date of termination hereof owing to
failure of any Fund to provide Proper Instructions, the Custodian shall be
entitled to fair compensation for its services during such period

28

<PAGE>

properties and the provisions of this Contract relating to the duties and obligations of the Custodian shall remain in full force and effect.

20. Interpretive and Additional Provisions

     In connection with the operation of this Contract, the Custodian and each Fund on behalf of each of the Portfolios, may from time to time agree on such provisions interpretive of or in addition to the provisions of this Contract as may in their joint opinion be consistent with the general tenor of this Contract; provided that no such interpretive or additional provisions shall contravene any applicable federal or state regulations or any provision of a Fund's Governing Documents. Any agreement as to interpretive or additional provisions shall be in a writing signed by the Custodian and each applicable Fund and shall be annexed hereto. Unless such writing specifically provides otherwise, no interpretive or additional provisions made as provided in this sub-section shall be deemed to be an amendment of this Contract.

21. Additional Funds and Portfolios

21.1 Additional Funds. In the event that any registered investment company in addition to those executing this Contract on the signature page hereto desires to have the Custodian render services as custodian under the terms hereof, it shall so notify the Custodian in writing, and if the Custodian agrees to provide such services, such registered investment company shall become a Fund hereunder and be bound by all terms and conditions and provisions hereof including, without limitation, the representations and warranties set forth in Article 22 below. The Custodian acknowledges that it will agree to render services as custodian to any additional registered investment companies that are determined to be acceptable pursuant to the Custodian's then-current new business acceptance policies and procedures, and that it will promptly notify any entity that is determined to be unacceptable.

21.2 Additional Portfolios. In the event that any Fund establishes one or more series of Shares in addition to those set forth on Appendix A hereto with respect to which it desires to have the Custodian render services as custodian under the terms hereof, it shall so notify the Custodian in writing, and if the Custodian agrees to provide such services, such series of Shares shall become a Portfolio hereunder. The Custodian acknowledges that that it will agree to render services as custodian to any additional portfolios provided that (a) the types of assets held by such portfolios, and (b) the services to be provided by the Custodian hereunder, are substantially the same as the types of assets and services relating to the then existing Portfolios and Funds. If the conditions of the preceding sentence do not apply to an additional portfolio, the parties agree to negotiate in good faith to reach mutually acceptable terms relating to the services, if any, to be provided by the Custodian and the compensation, if any, to be paid to the Custodian with regard to such services.

22. Representations and Warranties.

29

<PAGE>

     Each of the Custodian and the Funds hereby represents and warrants to the other parties hereto that (a) it is duly incorporated or organized and is validly existing in good standing in its jurisdiction of incorporation or organization; (b) it has the requisite power and authority under applicable law and its Governing Documents to enter into and perform this Contract; (c) all requisite proceedings have been taken to authorize it to enter into and perform this Contract; (d) this Contract constitutes its legal, valid, binding and enforceable agreement; and (e) its entrance into this Contract shall not cause a material breach or be in material conflict with any other agreement or

23. Massachusetts Law to Apply

This Contract shall be construed and the provisions thereof interpreted under and in accordance with laws of The Commonwealth of Massachusetts.

24. Prior Contracts

This Contract supersedes and terminates, as of the date hereof, all prior contracts between each Fund on behalf of each of the Portfolios and the Custodian relating to the custody of such Fund's assets.

25. Reproduction of Documents

This Contract and all schedules, exhibits, addenda, attachments and amendments hereto may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties hereto all/each agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

26. Remote Access Services Addendum.

The Custodian and each Fund agree to be bound by the terms of the Remote Access Services Addendum attached hereto.

27. Notices.

Any Proper Instruction, notice, communication or other instrument required to be given hereunder may be (a) delivered in person to the offices of the parties as set forth herein during normal business hours; or (b) effected directly between electro-mechanical or electronic devices as provided in Article 9 hereof; or (c) delivered by prepaid certified mail (in which case it shall be deemed to have been served on the delivery date specified on the return receipt ); or (d) delivered by telecopy (in which case it shall be deemed to have been served on the business day after the receipt thereof). Each party hereto shall designate from time to time the person(s) and address(es) for Proper Instructions and other communications related to the daily operations. Proper Instructions and other communications related to this Contract (including, but not limited

30

<PAGE>

to termination, breach, or default) shall be delivered at the following addresses or such other addresses as may be notified by any party from time to time.

To Custodian:

State Street Bank and Trust Company
801 Pennsylvania Avenue
Kansas City, MO 64105
Attention: Vice President, Custody
Telephone: 816-871-4100
Telecopy: 816-871-9675

To each Fund:

[Fund name]

500 Bielenberg Drive
Woodbury, MN 55125
Attention: Tami Fagely, Vice President
Tel: 651-738-5586
Fax: 651-738-0996

With a copy to:

The Hartford
Life Law Group - Mutual Funds Unit
200 Hopmeadow Street
Simsbury, CT 06070
Attention: Edward MacDonald, Assistant General Counsel
Tel: 860-843-9934
Fax: 860-297-8892

28. Counterparts.

    This Contract may be executed in several counterparts, each of which shall
be deemed to be an original, and all such counterparts taken together shall
constitute one and the same Contract.

29. Business Continuity.

    On or before the date of this Contract, the Custodian shall, at its
expense, have implemented, and shall continue to maintain and periodically test
and update a commercially reasonable business continuity and disaster recovery
plan to provide for the protection of information, data and assets of and
relevant to its customers, including the Funds.

31

<PAGE>

30. Severability; Waiver.

    If any provision or provisions of this Contract shall be held to be
invalid, unlawful or unenforceable, the validity, legality and enforceability of
the remaining provisions shall not in any way be affected or impaired. Failure
by any party to insist on strict compliance with this Contract will not be
considered a waiver by such party of any default or breach under the Contract.
The failure of any party to exercise any right under this Contract shall not to
any extent preclude such party from asserting or relying upon such right at any
other time or in any other instance.

31. Employment of Sub-contractors and Agents.

    Subject to Section 2.8 and Article 4, the Custodian may at any time or
times in its discretion employ (and may at any time remove) sub-contractors and
agents to carry out such functions as the Custodian may from time to time
direct; provided, however, that the employment of any sub-contractor or agent
shall not relieve the Custodian of its responsibilities or liabilities
hereunder.

31. Shareholder Communications

    SEC Rule 14b-2 requires banks which hold securities for the account of
customers to respond to requests by issuers of securities for the names,
addresses and holdings of beneficial owners of securities of that issuer held by
the bank unless the beneficial owner has expressly objected to disclosure of
this information. In order to comply with the rule, the Custodian needs each
Fund to indicate whether it authorizes the Custodian to provide the Fund's
names, address, and share position to requesting companies whose securities the
Fund owns. If a Fund tells the Custodian "no", the Custodian will not provide

this does not check either "yes" or "no" below, the Custodian is required by the rule
to treat the Fund as consenting to disclosure of this information for all
securities owned by the Fund or any funds or accounts established by the Fund.
For the Fund's protection, the Rule prohibits the requesting company from using
the Fund's name and address for any purpose other than corporate communications.
Please indicate below whether the Fund consents or object by checking one of the
alternatives below.

        Yes [ ] The Custodian is authorized to release the Fund's name,
        address, and share positions.

        No [X] The Custodian is not authorized to release the Fund's name,
        address, and share positions.

                    Next Page is Signature Page


                                    32

<PAGE>

IN WITNESS WHEREOF, each of the parties has caused this instrument to be
executed in its name and behalf by its duly authorized representative as of the
date first above-written.

STATE STREET BANK AND TRUST COMPANY     ATTEST


By: /s/ Kenneth A. Bergeron            By: /s/ Elizabeth G. Bruce
---------------------------------      ------------------------------------
Name: Kenneth A. Bergeron              Name: Elizabeth G. Bruce
Title: Senior Vice President

Each of the following registered investment companies acting with respect to
each of its series listed on Appendix A hereto or, if no such series is so
listed, acting for itself, severally and not jointly

HARTFORD SERIES FUND, INC.             ATTEST


By: /s/ Tamara L. Fagely               By: /s/ Edward P. Macdonald
---------------------------------      ------------------------------------
Name: Tamara L. Fagely                 Name: Edward P. Macdonald
Title: Vice President


THE HARTFORD MUTUAL FUNDS, INC.        ATTEST


By: /s/ Tamara L. Fagely               By: /s/ Edward P. Macdonald
---------------------------------      ------------------------------------
Name: Tamara L. Fagely                 Name: Edward P. Macdonald
Title: Vice President


THE HARTFORD MUTUAL FUNDS II, INC.     ATTEST


By: /s/ Tamara L. Fagely               By: /s/ Edward P. Macdonald
---------------------------------      ------------------------------------
Name: Tamara L. Fagely                 Name: Edward P. Macdonald
Title: Vice President


HARTFORD HLS SERIES FUND II, INC.      ATTEST

```
By: /s/ Tamara L. Fagely              By: /s/ Edward P. Macdonald
-------------------------------       -------------------------------------
Name: Tamara L. Fagely               Name: Edward P. Macdonald
Title: Vice President
```

HARTFORD INCOME SHARES FUND, INC.     ATTEST

```
By: /s/ Tamara L. Fagely              By: /s/ Edward P. Macdonald
-------------------------------       -------------------------------------
Name: Tamara L. Fagely               Name: Edward P. Macdonald
Title: Vice President
```

33

<PAGE>

APPENDIX A

The following registered management investment companies and series are parties
to the attached Custodian Contract as of February 8, 2007:

<TABLE>
<CAPTION>

| INVESTMENT COMPANY NAME, JURISDICTION OF ORGANIZATION AND TYPE OF ENTITY | NAME OF SERIES |
| --- | --- |
| <S> | <C> |
| Hartford Series Fund, Inc., a Maryland corporation | |
| The Hartford Mutual Funds, Inc., a Maryland corporation | |
| The Hartford Mutual Funds II, Inc., a Maryland corporation | |
| Hartford HLS Series Fund II, Inc., a Maryland corporation | |
| Hartford Income Shares Fund, Inc., a Maryland corporation | |

</TABLE>

1

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
| --- | --- |
| <S> | <C> |
| Argentina | Citibank, N.A. |
| Australia | Westpàc Banking Corporation |

</TABLE>

Citibank Pty. Limited

| | |
|---|---|
| Austria | Erste Bank der Osterreichischen Sparkassen AG |
| Bahrain | HSBC Bank Middle East (as delegate of the Hongkong and Shanghai Banking Corporation Li |
| Bangladesh | Standard Chartered Bank |
| Belgium | BNP Paribas Securities Services, S.A. |
| Benin | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Bermuda | The Bank of Bermuda Limited |
| Botswana | Barclays Bank of Botswana Limited |
| Brazil | Citibank, N.A. |
| Bulgaria | ING Bank N.V. |
| Burkina Faso | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Canada | State Street Trust Company Canada |
| Cayman Islands | Scotiabank & Trust (Cayman) Limited |
| Chile | BankBoston, N.A. |
| People's Republic of China | The Hongkong and Shanghai Banking Corporation Limited, Shanghai Shenzhen branches |

</TABLE>


1


<PAGE>


SCHEDULE A


STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS


<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
|---|---|
| ------- | ------------ |
| <S> | <C> |
| Colombia | Cititrust Colombia S.A. Sociedad Fiduciaria |
| Costa Rica | Banco BCT S.A. |
| Croatia | Privredna Banka Zagreb d.d |
| Cyprus | Cyprus Popular Bank Public Company Ltd. |
| Czech Republic | Ceskoslovenska Obchodni Banka, A.S. |
| Denmark | Skandinaviska Enskilda Bankken AB, Sweden (operating through its Copenhagen branch) |
| Ecuador | Banco de la Produccion S.A. PRODUBANCO |

| | |
|---|---|
| Egypt | HSBC Bank Egypt S.A.E. 163 |
| | (as delegate of The Hongkong and Shanghai Banking Corporation Li |
| Estonia | AS Hansabank |
| Finland | Nordea Bank Finland Plc. |
| France | BNP Paribas Securities Services, S.A. |
| | Deutsche Bank AG, Netherlands (operating through its Paris branc |
| Germany | Deutsche Bank AG |
| Ghana | Barclays Bank of Ghana Limited |
| Greece | National Bank of Greece S.A. |
| Guinea-Bissau | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory |
| Hong Kong | Standard Chartered Bank (Hong Kong) Limited |

</TABLE>

2

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
|---------|--------------|
| <S> | <C> |
| Hungary | HVB Bank Hungary Rt. |
| Iceland | Kaupthing Bank hf. |
| India | Deutsche Bank AG |
| | The Hongkong and Shanghai Banking Corporation Limited |
| Indonesia | Deutsche Bank AG |
| Ireland | Bank of Ireland |
| Israel | Bank Hapoalim B.M. |
| Italy | BNP Paribas Securities Services, S.A. |
| | Deutsche Bank S.p.A. |
| Ivory Coast | Societe Generale de Banques en Cote d'Ivoire |
| Jamaica | Bank of Nova Scotia Jamaica Ltd. |
| Japan | Mizuho Corporate Bank Ltd. |
| | Sumitomo Mitsui Banking Corporation |
| Jordan | HSBC Bank Middle East |

| | |
|---|---|
| Kazakhstan | HSBC Bank Kazakhstan<br>(as delegate of the Hongkong and Shanghai Banking Corporation Li |
| Kenya | Barclays Bank of Kenya Limited |
| Republic of Korea | Deutsche Bank AG |

</TABLE>

3

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
|---------|--------------|
| ------- | ------------ |
| <S> | <C><br>The Hongkong and Shanghai Banking Corporation Limited |
| Latvia | A/s Hansabanka |
| Lebanon | HSBC Bank Middle East<br>(as delegate of The Hongkong and Shanghai Banking Corporation Li |
| Lithuania | SEB Vilniaus Bankas AB |
| Malaysia | Standard Chartered Bank Malaysia Berhad |
| Mali | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory |
| Malta | The Hongkong and Shanghai Banking Corporation Limited |
| Mauritius | The Hongkong and Shanghai Banking Corporation Limited |
| Mexico | Banco Nacional de Mexico S.A. |
| Morocco | Attijariwafa bank |
| Namibia | Standard Bank Namibia Limited |
| Netherlands | Deutsche Bank AG |
| New Zealand | Westpac Banking Corporation |
| Niger | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory |
| Nigeria | Stanbic Bank Nigeria Limited |
| Norway | Nordea Bank Norge ASA |
| Oman | HSBC Bank Middle East Limited<br>(as delegate of The Hongkong and Shanghai Banking Corporation Li |

</TABLE>

4

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
| ------- | ------------ |
| <S> | <C> |
| Pakistan | Deutsche Bank AG |
| Palestine | HSBC Bank Middle East Limited (as delegate of The Hongkong and Shanghai Banking Corporation Li |
| Panama | HSBC Bank (Panama) S.A. |
| Peru | Citibank del Peru, S.A. |
| Philippines | Standard Chartered Bank |
| Poland | Bank Handlowy w Warszawie S.A. |
| Portugal | Banco Comercial Portugues S.A. |
| Puerto Rico | Citibank N.A. |
| Qatar | HSBC Bank Middle East Limited (as delegate of The Hongkong and Shanghai Banking Corporation Li |
| Romania | ING Bank N.V. |
| Russia | ING Bank (Eurasia) ZAO, Moscow |
| Senegal | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory |
| Serbia | HVB Bank Serbia and Montenegro a.d. |
| Singapore | DBS Bank Limited |
| | United Overseas Bank Limited |
| Slovak Republic | Ceskoslovenska Obchodni Banka, A.S., pobocka zahranicnej banky v |
| Slovenia | Bank Austria Creditanstalt d.d. - Ljubljana |

</TABLE>

5

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
| ------- | ------------ |
| <S> | <C> |

```
                          Standard Bank of South Africa Limited

Spain                     Deutsche Bank S.A.E.

Sri Lanka                 The Hongkong and Shanghai Banking Corporation Limited

Swaziland                 Standard Bank Swaziland Limited

Sweden                    Skandinaviska Enskilda Banken AB   .

Switzerland               UBS AG

Taiwan - R.O.C.           Central Trust of China

Thailand                  Standard Chartered Bank (Thai) Public Company Limited

Togo                      via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory

Trinidad & Tobago         Republic Bank Limited

Tunisia                   Banque Internationale Arabe de Tunisie

Turkey                    Citibank, A.S.

Uganda                    Barclays Bank of Uganda Limited

Ukraine                   ING Bank Ukraine

United Arab Emirates      HSBC Bank Middle East Limited
                          (as delegate of The Hongkong and Shanghai Banking Corporation Li

United Kingdom            State Street Bank and Trust Company, United kingdom Branch
</TABLE>
```

6

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

```
<TABLE>
<CAPTION>
COUNTRY                   SUBCUSTODIAN
-------                   ------------
<S>                       <C>
Uruguay                   BankBoston, N.A.

Venezuela                 Citibank, N.A.

Vietnam                   The Hongkong and Shanghai Banking Corporation Limited

Zambia                    Barclays Bank of Zambia Plc.

Zimbabwe                  Barclays Bank of Zimbabwe Limited
</TABLE>
```

7

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>
| COUNTRY | DEPOSITORIES |
| ------- | ------------ |
| <S> | <C> |
| Argentina | Caja de Valores S.A. |
| Australia | Austraclear Limited |
| Austria | Oesterreichische Kontrollbank AG (Wertpapiersammelbank Division) |
| Bahrain Exchange | Clearing, Settlement, and Depository System of the Bahrain Stock |
| Bangladesh | Central Depository Bangladesh Limited |
| Belgium | Banque Nationale de Belgique |
| | Euroclear Belgium |
| Benin | Depositaire Central - Banque de Reglement |
| Bermuda | Bermuda Securities Depository |
| Brazil (CETIP) | Central de Custodia e de Liquidacao Financeira de Titulos Privad |
| | Companhia Brasileira de Liquidacao e Custodia |
| | Sistema Especial de Liquidacao e de Custodia (SELIC) |
| Bulgaria | Bulgarian National Bank |
| | Central Depository AD |
| Burkina Faso | Depositaire Central - Banque de Reglement |
| Canada | The Canadian Depository for Securities Limited |
| Chile | Deposito Central de Valores S.A. |
| People's Republic | China Securities Depository and Clearing Corporation Limited |
</TABLE>

1

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>
COUNTRY                     DEPOSITORIES

| | |
|---|---|
| \<S\> | \<C\> |
| of China | Shanghai Branch |
| | China Securities Depository and Clearing Corporation Limited Shenzhen Branch |
| Colombia | Deposito Central de Valores |
| | Deposito Centralizado de Valores de Colombia S..A. (DECEVAL) |
| Costa Rica | Central de Valores S.A. |
| Croatia | Sredisnja Depozitarna Agencija d.d. |
| Cyprus | Central Depository and Central Registry |
| Czech Republic | Czech National Bank |
| | Stredisko cennych papiru - Ceska republika |
| Denmark | Vaerdipapircentralen (Danish Securities Center) |
| Egypt | Misr for Clearing, Settlement, and Depository S.A.E. |
| | Central Bank of Egypt |
| Estonia | AS Eesti Vaartpaberikeskus |
| Finland | Suomen Arvopaperikeskus Oy |
| France | Euroclear France |
| Germany | Clearstream Banking AG, Frankfurt |
| Greece | Apothetirion Titlon AE - Central Securities Depository |
| | Bank of Greece, System for Monitoring Transactions in Securities in Book-Entry F |
| Guinea-Bissau | Depositaire Central - Banque de Reglement |

\</TABLE\>

2

\<PAGE\>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

\<TABLE\>
\<CAPTION\>

| COUNTRY | DEPOSITORIES |
|---|---|
| ------- | ------------ |
| \<S\> | \<C\> |
| Hong Kong | Central Moneymarkets Unit |
| | Hong Kong Securities Clearing Company Limited |
| Hungary | Kozponti Elszamolohaz es Ertektar (Budapest) Rt. (KELER) |
| Iceland | Icelandic Securities Depository Limited |

| | |
|---|---|
| India | Central Depository Services (India) Limited |
| | National Securities Depository Limited |
| | Reserve Bank of India |
| Indonesia | Bank Indonesia |
| | PT Kustodian Sentral Efek Indonesia |
| Israel | Tel Aviv Stock Exchange Clearing House Ltd. (TASE Clearinghouse) |
| Italy | Monte Titoli S.p.A. |
| Ivory Coast | Depositaire Central - Banque de Reglement |
| Jamaica | Jamaica Central Securities Depository |
| Japan | Bank of Japan  - Net System |
| | Japan Securities Depository Center (JASDEC) Incorporated |
| Jordan | Securities Depository Center |
| Kazakhstan | Central Securities Depository |
| Kenya | Central Depository and Settlement Corporation Limited |
| | Central Bank of Kenya |

</TABLE>


3


<PAGE>


SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>

| COUNTRY | DEPOSITORIES |
|---|---|
| <S> | <C> |
| Republic of Korea | Korea Securities Depository |
| Latvia | Latvian Central Depository |
| Lebanon | Banque du Liban |
| | Custodian and Clearing Center of Financial Instruments for Leban the Middle East (Midclear) S.A.L. |
| Lithuania | Central Securities Depository of Lithuania |
| Malaysia | Bank Negara Malaysia |
| | Bursa Malaysia Depository Sdn. Bhd. |
| Mali | Depositaire Central - Banque de Reglement |
| Malta | Central Securities Depository of the Malta Stock Exchange |

```
Mauritius                    Bank of Mauritius

                             Central Depository and Settlement Co. Ltd.

Mexico                       S.D. INDEVAL, S.A. de C.V.

Morocco                      Maroclear

Namibia                      Bank of Namibia

Netherlands                  Euroclear Nederland

New Zealand                  New Zealand Central Securities Depository Limited

Niger                        Depositaire Central - Banque de Reglement
</TABLE>
```

4

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

```
<TABLE>
<CAPTION>
COUNTRY                      DEPOSITORIES
-------                      ------------
<S>                          <C>
Nigeria                      Central Securities Clearing System Limited

Norway                       Verdipapirsentralen (Norwegian Central Securities Depository)

Oman                         Muscat Depository & Securities Registration Company, SAOC

Pakistan                     Central Depository Company of Pakistan Limited

                             State Bank of Pakistan

Palestine                    Clearing, Depository and Settlement, a department of the Palesti
                             Stock Exchange

Panama                       Central Latinoamericana de Valores, S.A. (LatinClear)

Peru                         Caja de Valores y Liquidaciones, Institucion de

                             Compensacion y Liquidacion de Valores S.A

Philippines                  Philippine Depository & Trust Corporation

                             Registry of Scripless Securities (ROSS) of the Bureau of Treasur

Poland                       Rejestr Papierow Wartosciowych

                             Krajowy Depozyt Papierow Wartosciowych S.A.

Portugal                     INTERBOLSA - Sociedade Gestora de Sistemas de Liquidacao e de Si
                             Centralizados de Valores Mobiliarios, S.A.

Qatar                        Central Clearing and Registration (CCR), a
```

| | |
|---|---|
| Romania | Bucharest Stock Exchange Registry Division |
| | National Bank of Romania |
| Russia | Vneshtorgbank, Bank for Foreign Trade of the Russian Federation |

</TABLE>

5

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>

| COUNTRY | DEPOSITORIES |
|---------|--------------|
| \<S\> | \<C\> |
| Senegal | Depositaire Central - Banque de Reglement |
| Serbia | Central Registrar and Central Depository for Securities |
| Singapore | The Central Depository (Pte) Limited |
| | Monetary Authority of Singapore |
| Slovak Republic | Naodna banka slovenska |
| | Centralny depozitar cennych papierov SR, a.s. |
| Slovenia | KDD - Centralna klirinsko depotna druzba d.d. |
| South Africa | Share Transactions Totally Electronic (STRATE) Ltd. |
| Spain | IBERCLEAR |
| Sri Lanka | Central Depository System (Pvt) Limited |
| Sweden | Vardepapperscentralen  VPC AB (Swedish Central Securities Depository) |
| Switzerland | SegaIntersettle AG (SIS) |
| Taiwan - R.O.C. | Taiwan Depository and Clearing Corporation |
| Thailand | Thailand Securities Depository Company Limited |
| Togo | Depositaire Central - Banque de Reglement |
| Trinidad and Tobago | Trinidad and Tobago Central Bank |
| Tunisia | Societe Tunisienne Interprofessionelle pour la Compensation |

</TABLE>

6

<PAGE>

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

```
<TABLE>
<CAPTION>
COUNTRY                     DEPOSITORIES
-------                     ------------
<S>                         <C>
                            et de Depots des Valeurs Mobilieres (STICODEVAM)

Turkey                      Central Bank of Turkey

                            Central Registry Agency

Uganda                      Bank of Uganda

Ukraine                     Mizhregionalny Fondovy Souz

                            National Bank of Ukraine

United Arab Emirates        Clearing and Depository System,
                            a department of the Dubai Financial Market

United Kingdom              CrestCo.

Uruguay                     Banco Central del Uruguay

Venezuela                   Banco Central de Venezuela

                            Caja Venezolana de Valores

Vietnam                     Vietnam Securities Depository

Zambia                      Bank of Zambia

                            LuSE Central Shares Depository Limited

TRANSNATIONAL

Euroclear

Clearstream Banking, S.A.
</TABLE>
```

7

<PAGE>

SCHEDULE C

MARKET INFORMATION

```
<TABLE>
<CAPTION>
PUBLICATION/TYPE OF INFORMATION          BRIEF DESCRIPTION
-------------------------------          -----------------
<S>                                      <C>
(SCHEDULED FREQUENCY)

The Guide to Custody in World Markets    An overview of settlement and safekeeping procedures,
(hardcopy annually and regular           custody practices and foreign investor considerations
website updates)                         the markets in which State Street offers custodial se
```

| | |
|---|---|
| Global Custody Network Review<br>(annually) | Information relating to Foreign Sub-Custodians in Sta Street's Global Custody Network. The Review stands as integral part of the materials that State Street prov its U.S. mutual fund clients to assist them in comply with SEC Rule 17f-5. The Review also gives insight in State Street's market expansion and Foreign Sub-Custo selection processes, as well as the procedures and co used to monitor the financial condition and performan our Foreign Sub-Custodian banks. |
| Securities Depository Review<br>(annually) | Custody risk analyses of the Foreign Securities Depos presently operating in Network markets. This publicat an integral part of the materials that State Street p to its U.S. mutual fund clients to meet informational obligations created by SEC Rule 17f-7. |
| Global Legal Survey<br>(annually) | With respect to each market in which State Street off custodial services, opinions relating to whether loca restricts (i) access of a fund's independent public accountants to books and records of a Foreign Sub-Cus or Foreign Securities System, (ii) a fund's ability t recover in the event of bankruptcy or insolvency of a Foreign Sub-Custodian or Foreign Securities System, ( fund's ability to recover in the event of a loss by a Foreign Sub-Custodian or Foreign Securities System, a the ability of a foreign investor to convert cash and equivalents to U.S. dollars. |
| Subcustodian Agreements<br>(annually) | Copies of the contracts that State Street has entered with each Foreign Sub-Custodian that maintains U.S. m fund assets in the markets in which State Street offe custodial services. |
| Global Market Bulletin<br>(daily or as necessary) | Information on changing settlement and custody condit markets where State Street offers custodial services. Includes changes in market and tax regulations, depos developments, dematerialization information, as well other market changes that may impact State Street's c |
| Foreign Custody Advisories<br>(as necessary) | For those markets where State Street offers custodial services that exhibit special risks or infrastructure impacting custody, State Street issues market advisor highlight those unique market factors which might imp ability to offer recognized custody service levels. |
| Material Change Notices<br>(presently on a quarterly basis or<br>as otherwise necessary) | Informational letters and accompanying materials conf State Street's foreign custody arrangements, includin summary of material changes with Foreign Sub-Custodia have occurred during the previous quarter. The notice identify any material changes in the custodial risks associated with maintaining assets with Foreign Secur Depositories. |

</TABLE>

1

<PAGE>

## REMOTE ACCESS SERVICES ADDENDUM

To Custodian Contract by and between State Street Bank and Trust Company
and each registered investment company identified on the signature page
hereto, dated February 8, 2007

other systems which we utilize in conjunction with the services we provide to you (the "Systems"). In this regard, we maintain certain information in databases under our control and ownership that we make available on a remote basis to our customers (the "Remote Access Services").

The Services. This addendum shall govern use of all Systems that State Street may from time to time agree to provide you, the Customer, and your designated investment advisors, consultants or other third parties authorized by State Street who agree to abide by the terms of this Addendum ("Authorized Designees") in order to provide Remote Access Services for the purpose of obtaining and analyzing reports and information.

Security Procedures. You agree to comply, and to cause your Authorized Designees to comply, with remote access operating standards and procedures and with user identification or other password control requirements and other security procedures as may be issued from time to time by State Street for use of the Systems and access to the Remote Access Services. You agree to advise State Street immediately in the event that you learn or have reason to believe that any person to whom you have given access to the Systems or the Remote Access Services has violated or intends to violate the terms of this Addendum and you will cooperate with State Street in seeking injunctive or other equitable relief. You agree to discontinue use of the Systems and Remote Access Services, if requested, for any security reasons cited by State Street.

Fees. Fees and charges (if any) for the use of the Systems and the Remote Access Services and related payment terms shall be as set forth in the fee schedule in effect from time to time between the parties (the "Fee Schedule"). You shall be responsible for any tariffs, duties or taxes imposed or levied by any government or governmental agency by reason of the transactions contemplated by this Addendum, including, without limitation, federal, state and local taxes, use, value added and personal property taxes (other than income, franchise or similar taxes which may be imposed or assessed against State Street). Any claimed exemption from such tariffs, duties or taxes shall be supported by proper documentary evidence delivered to State Street.

Proprietary Information/Injunctive Relief. The Systems and Remote Access Services and the databases, computer programs, screen formats, report formats, interactive design techniques, formulae, processes, systems, software, know-how, algorithms, programs, training aids, printed materials, methods, books, records, files, documentation and other information made available to you by State Street as part of the Remote Access Services and through the use of the Systems and all copyrights, patents, trade secrets and other proprietary rights of State Street and its relevant licensors related thereto are the exclusive, valuable and confidential property of State Street and its relevant licensors, as applicable (the "Proprietary Information").

You agree on behalf of yourself and your Authorized Designees to keep the Proprietary Information confidential and to limit access to your employees and Authorized Designees (under a similar duty of confidentiality) who require access to the Systems for the purposes intended. The foregoing shall not apply to Proprietary Information in the public domain or required by law to be made public.

1

<PAGE>

You agree to use the Remote Access Services only in connection with the proper purposes of this Addendum. You will not, and will cause your employees and Authorized Designees not to, (i) permit any third party to use the Systems or the Remote Access Services, (ii) sell, rent, license or otherwise use the Systems or the Remote Access Services in the operation of a service bureau or for any purpose other than as expressly authorized under this Addendum, (iii) use the Systems or the Remote Access Services for any fund, trust or other

allow or cause any information transmitted from State Street's databases, including data from third party sources, available through use of the Systems or the Remote Access Services, to be redistributed or retransmitted for other than use for or on behalf of yourself, as our Customer.

You agree that neither you nor your Authorized Designees will modify the Systems in any way, enhance or otherwise create derivative works based upon the Systems, nor will you or your Authorized Designees reverse engineer, decompile or otherwise attempt to secure the source code for all or any part of the Systems.

You acknowledge that the disclosure of any Proprietary Information, or of any information which at law or equity ought to remain confidential, will immediately give rise to continuing irreparable injury inadequately compensable in damages at law, and that State Street and its licensor, if applicable, shall be entitled to obtain immediate injunctive relief against the breach or threatened breach of any of the foregoing undertakings, in addition to any other legal remedies which may be available.

Limited Warranties. State Street represents and warrants that it has the right to grant access to the Systems and to provide the Remote Access Services contemplated herein. Because of the nature of computer information technology, including but not limited to the use of the Internet, and the necessity of relying upon third-party sources, and data and pricing information obtained from third parties, the Systems and Remote Access Services are provided "AS IS", and you and your Authorized Designees shall be solely responsible for the investment decisions, results obtained, regulatory reports and statements produced using the Remote Access Services. State Street and its relevant licensors will not be liable to you or your Authorized Designees for any direct or indirect, special, incidental, punitive or consequential damages arising out of or in any way connected with the Systems or the Remote Access Services, nor shall either party be responsible for delays or nonperformance under this Addendum arising out of any cause or event beyond such party's control.

EXCEPT AS EXPRESSLY SET FORTH IN THIS ADDENDUM, STATE STREET FOR ITSELF AND ITS RELEVANT LICENSORS EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES CONCERNING THE SYSTEM AND THE SERVICES TO BE RENDERED HEREUNDER, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Infringement. State Street will defend or, at our option, settle any claim or action brought against you to the extent that it is based upon an assertion that access to any proprietary System developed and owned by State Street or use of the Remote Access Services through any such proprietary System by you under this Addendum constitutes direct infringement of any United States patent or copyright or misappropriation of a trade secret, provided that you notify State

2

<PAGE>

Street promptly in writing of any such claim or proceeding and cooperate with State Street in the defense of such claim or proceeding. Should any such proprietary System or the Remote Access Services accessed thereby or any part thereof become, or in State Street's opinion be likely to become, the subject of a claim of infringement or the like under the patent or copyright or trade secret laws of the United States, State Street shall have the right, at State Street's sole option, to (i) procure for you the right to continue using such System or Remote Access Services, (ii) replace or modify such System or Remote Access Services so that the System or the Remote Access Services becomes non-infringing, or (iii) terminate access to the Remote Access Services without further obligation.

Termination. Either party may terminate access to the Remote Access

eighty (180) days' prior written notice in the case of notice of termination by
State Street to you or thirty (30) days' notice in the case of notice from you
to State Street of termination, or (ii) immediately for failure of the other
party to comply with any material term and condition of the Addendum by giving
the other party written notice of termination. In the event of termination, you
will return to State Street all Proprietary Information in your possession or in
the possession of your Authorized Designees. The foregoing provisions with
respect to confidentiality and infringement will survive termination for a
period of three (3) years.

    Miscellaneous. Except as provided in the next sentence, this Addendum
constitutes our entire understanding with respect to access to the Systems and
the Remote Access Services. If any State Street custody, accounting or other
services agreement with you contains terms and conditions relating to computer
systems or data access, this Addendum shall constitute an amendment and
supplement to them, and in the event of any inconsistency the provisions
providing the greatest benefit to State Street shall control. This Addendum
cannot be modified or altered except in a writing duly executed by both of us
and shall be governed by and construed in accordance with the laws of the
Commonwealth of Massachusetts.

                              [next page is signature page]

                                    3

<PAGE>

CONFIRMED AND AGREED:

Each of the following registered investment companies acting with respect to
each of its series, if any, or, if it has no such series, acting for itself,
severally and not jointly

HARTFORD SERIES FUND, INC.

By: /s/ Tamara L. Fagely
    ----------------------------------
Name: Tamara L. Fagely
Title: Vice President

THE HARTFORD MUTUAL FUNDS, INC.

By: /s/ Tamara L. Fagely
    ----------------------------------
Name: Tamara L. Fagely
Title: Vice President

THE HARTFORD MUTUAL FUNDS II, INC.

By: /s/ Tamara L. Fagely
    ----------------------------------
Name: Tamara L. Fagely
Title: Vice President

HARTFORD HLS SERIES FUND II, INC.

By: /s/ Tamara L. Fagely

Name: Tamara L. Fagely
Title: Vice President


HARTFORD INCOME SHARES FUND, INC.

By: /s/ Tamara L. Fagely
    --------------------------------
Name: Tamara L. Fagely
Title: Vice President


4

</TEXT>
</DOCUMENT>

# EXHIBIT 5

\<TYPE>EX-99.H.(I)
\<SEQUENCE>5
\<FILENAME>b62326lcexv99whwxiy.txt
\<DESCRIPTION>TRANSFER AGENCY AND SERVICE AGREEMENT
\<TEXT>
\<PAGE>

EXECUTION COPY

Exhibit h.1
TRANSFER AGENCY AND SERVICE AGREEMENT

AGREEMENT made as of the 1 day of February, 2006, by and among The Hartford Mutual Funds, Inc., a Maryland corporation, having its principal office and place of business at 200 Hopmeadow Street, Simsbury, Connecticut 06089 and Hartford Mutual Funds II, Inc, a Maryland corporation having its principal office and place of business at 200 Hopmeadow Street, Simsbury, Connecticut 06089 (together, the "Funds"), and Hartford Administrative Services Company ("HASCO"), having its principal office and place of business at 500 Bielenberg Drive, Woodbury, Minnesota 55125. This Agreement is intended to take effect as if entered into among the Funds on behalf of each of its series of shares (each a "Portfolio"), severally, and HASCO, and the provisions of this Agreement shall be construed accordingly.

WHEREAS, the Funds are authorized to issue shares in separate series and classes within each series; and

WHEREAS, the Funds, on behalf of each Portfolio, desire to appoint HASCO as transfer agent, dividend disbursing agent and agent in connection with certain other activities, and HASCO desires to accept such appointment.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.    TERMS OF APPOINTMENT; DUTIES OF HASCO

1.1    Subject to the terms and conditions set forth in this Agreement, the Funds, on behalf of the Portfolios, hereby employ and appoint HASCO to act as, and HASCO agrees to act as its transfer agent for each of the Funds' authorized and issued shares of its common stock ("Shares"), dividend disbursing agent and agent, in connection with any accumulation, open-account or similar plans provided to the shareholders of each of the respective Portfolios of the Funds ("Shareholders") and set out in the currently effective prospectuses and statements of additional information ("prospectuses") of the Funds.

1.2    HASCO agrees that it will perform the following services:

(a)    In accordance with procedures as may be established from time to time by agreement between the Funds on behalf of each of the Portfolios, as applicable and HASCO, HASCO shall:

(i)    Receive for acceptance, orders for the purchase of Shares, and promptly deliver payment and appropriate documentation thereof to the custodian of the Funds (the "Custodian");

\<PAGE>

(ii)    Pursuant to purchase orders, issue the appropriate number of Shares and hold such Shares in the appropriate Shareholder accounts;

(iii)    Receive for acceptance redemption requests and redemption directions and deliver the appropriate documentation thereof

(iv) In respect to the transactions in items (i), (ii) and (iii) above, HASCO is authorized to accept purchase orders and redemption requests from broker-dealers authorized by the Funds and from investors;

(v) At the appropriate time as and when it receives monies paid to it by the Custodian with respect to any redemption, pay over or cause to be paid over in the manner requested such monies to the redeeming Shareholders;

(vi) Effect transfers of Shares by the registered owners thereof upon receipt of appropriate instructions;

(vii) Prepare and transmit payments for dividends and distributions declared by the Funds on behalf of each Portfolio; and effect (as requested by Shareholders) the reinvestment thereof;

(viii) Maintain Shareholder account records and advise the Funds and their Shareholders as to the foregoing;

(ix) Record the issuance of shares of the Funds and maintain pursuant to SEC Rule 17Ad-10(e) a record of the total number of Shares that are authorized, issued and outstanding. HASCO shall also provide the Funds on a regular basis with the total number of shares that are authorized, issued and outstanding and shall have no obligation, when recording the issuance of shares, to be responsible for any laws relating to the issue or sale of such shares, which function shall be the sole responsibility of the Funds; and

(x) Upon instruction from the principal underwriter of the Funds, deduct applicable front end sales charges from purchase payments and applicable deferred sales charges from redemption payments and remit them to the appropriate party.

(b) In addition to the services set forth in paragraph (a), HASCO shall (i) perform the customary services of a transfer agent, dividend disbursing agent and, as relevant, agent in connection with accumulation, open-account or other similar plans (including without limitation any periodic

-2-

<PAGE>

investment plan or periodic withdrawal program), including but not limited to: maintaining Shareholder accounts, preparing Shareholder meeting lists, mailing proxies, mailing Shareholder reports and prospectuses to current Shareholders, withholding taxes on U.S. resident and non-resident alien accounts, preparing and filing U.S. Treasury Department Forms 1099 and other appropriate forms required with respect to dividends and distributions by federal authorities for all Shareholders, preparing and mailing confirmation forms and statements of account to Shareholders for purchases and redemptions of Shares and other confirmable transactions in Shareholder accounts (as are required by law), preparing and mailing activity statements for Shareholders, and providing Shareholder account information, and (ii) provide a system which will enable the Funds to monitor the total shares sold in each state.

(c) The Funds shall (i) identify to HASCO in writing those

reporting for each State and (iii) verify the establishment of transactions for each State on the system prior to activation and thereafter monitor the daily activity for each State. The responsibility of HASCO for the Fund's blue sky State registration status is solely limited to the initial establishment of transactions subject to blue sky compliance by the Funds and the reporting of such transactions to the Funds as provided above.

(d)     HASCO may, in its discretion and without further consent on the part of the Funds, subcontract with a sub-transfer agent or broker-dealer (each a "Designated Partner") for the performance of HASCO's obligations to provide services hereunder to accounts of Shareholders who are clients of such Designated Partner, provided, further, that HASCO shall be as fully responsible to the Funds for the acts and omissions of any Designated Partner as it is for its own acts and omissions.

(e)     HASCO may, in its discretion and without further consent on the part of the Funds, appoint third party plan administrators (each a "TPA") to provide record keeping and related services to participants in plans which are Shareholders in the Funds, provided that HASCO shall be as fully responsible to the Funds for the acts and omissions of any TPA as it is for its own acts and omissions.

(f)     HASCO shall provide additional services on behalf of the Funds (e.g., escheatment services) which may be agreed upon in writing between the Funds and HASCO.

(g)     HASCO shall provide all services necessary to monitor shareholder activity in the funds in order to detect and prevent market timing and excessive trading in shares of the Funds as described in the Policies and Procedures Relating to Market Timing and Excessive Trading in Shares of

-3-

<PAGE>

the Funds, as such may be amended by the Board of Directors of the Funds from time to time.

(h)     HASCO will ensure Designated Partners and TPAs appointed by HASCO shall agree (i) to provide HASCO with information regarding trading in Fund shares by participant accounts sufficient to enable HASCO to enforce the market timing policy set forth in the Funds' prospectus; and (ii) to the extent required by Rule 22c-2 under the Investment Company Act of 1940, to execute HASCO's instructions to restrict or prohibit further purchases or exchanges of Fund shares by a specific participant who has violated the Funds' policy.

(i)     HASCO hereby acknowledges receipt of a copy of the Funds' anti-money laundering ("AML") compliance program, and HASCO agrees to implement the requirements of the AML compliance program with respect to purchases of the Funds' shares. In accordance with mutually-agreed procedures, HASCO shall use its best efforts in carrying out such agreed functions consistent with the requirements of the Funds' AML program. The Funds acknowledge that their Shareholders are customers of the Funds and not customers of HASCO and the Funds retain legal responsibility under the USA PATRIOT Act for AML compliance with respect to transactions in their shares. HASCO agrees to

Government agencies having jurisdiction over the Funds for information and records relating to the Funds' AML program and consents to inspection by such examiners for this purpose.

(j) In accordance with Regulation S-P of the Securities and Exchange Commission, "Nonpublic Personal Information" includes (1) all personally identifiable financial information; (2) any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available information; and (3) any information derived therefrom. HASCO must not use or disclose Nonpublic Personal Information for any purpose other than to carry out the purpose for which Nonpublic Personal Information was provided to HASCO as set forth in this Agreement, and agrees to cause its employees, agents, representatives, or any other party to whom HASCO may provide access to or disclose Nonpublic Personal Information to limit the use and disclosure of Nonpublic Personal Information to that purpose. HASCO agrees to implement appropriate measures designed to ensure the security and confidentiality of Nonpublic Personal Information, to protect such information against any anticipated threats or hazards to the security or integrity of such information, and to protect against unauthorized access to, or use of, Nonpublic Personal Information that could result in substantial harm or inconvenience to any customer of the Funds. HASCO

-4-

<PAGE>

further agrees to cause all its agents, representatives, subcontractors, or any other party to whom HASCO may provide access to, or disclose, Nonpublic Personal Information to implement appropriate measures designed to meet the objectives set forth in this paragraph. With respect only to the provisions of this Section, HASCO agrees to indemnify and hold harmless the Funds and any officer or director or trustee of the Board ("Board member"), against losses, claims, damages, expenses, or liabilities to which the Funds, or any officer or Board member of the Funds, may become subject as the result of (1) a material breach of the provisions of this section of the Agreement or (2) any acts or omissions of HASCO, or of any of its officers, directors, employees, representatives, subcontractors or agents, that are not in accordance with this Agreement, including, but not limited to, any violation of any federal statute or regulation. Notwithstanding the foregoing, no party shall be entitled to indemnification pursuant to this Section if such loss, claim, damage, expense, or liability is due to the willful misfeasance, bad faith, gross negligence, or reckless disregard of duty by the party seeking indemnification.

(k) Procedures establishing criteria to be used by HASCO in selecting Designated Partners and TPAs with respect to these services in this Section 1 shall be established from time to time by agreement between the Funds on behalf of each Portfolio and HASCO.

2. FEES AND EXPENSES

2.1 For the performance by HASCO pursuant to this Agreement, the Funds agree on behalf of each of the Portfolios to pay HASCO an annual maintenance fee (the "TA Fee") for each Shareholder Participant Account (as defined below) per Portfolio according to the Fee Schedule

advances identified under Section 1.3 below may be changed from time to time subject to mutual written agreement between the Funds and HASCO. A "Shareholder Participant Account" shall mean (i) any shareholder account maintained on the books and records of HASCO, (ii) any shareholder account maintained on the books and records of a Designated Partner appointed by HASCO pursuant to Section 1.2(d), and (iii) the account of any plan participant that is a beneficial owner of Shares which is maintained on the books and records of a TPA engaged by HASCO pursuant to Section 1.2(e).

2.2 Unless otherwise provided in Exhibit A hereto, in addition to the fee paid under Section 2.1 above, the Funds agree on behalf of each of the Portfolios to reimburse HASCO for reasonable out-of-pocket expenses specifically incurred and directly related to the services provided hereunder, including but not limited to: confirmation production, postage, forms, telephone, microfilm, microfiche, tabulating proxies, records storage, or advances incurred by HASCO for the items

-5-

<PAGE>

set out in the fee schedule attached hereto. In addition, any other expenses incurred by HASCO at the request or with the consent of the Funds, will be reimbursed by the Funds on behalf of the applicable Portfolio.

2.3 The Funds agree on behalf of each of the Portfolios to pay all fees and reimbursable expenses within fifteen days following the receipt of the respective billing notice. Postage for mailing of dividends, proxies, Fund reports and other mailings to all Shareholders Participant Accounts shall be advanced to HASCO by the Funds at least seven (7) days prior to the mailing date of such materials.

3. REPRESENTATIONS AND WARRANTIES OF HASCO

HASCO represents and warrants to the Funds that:

3.1 It is a corporation duly organized and existing and in good standing under the laws of Minnesota.

3.2 It is duly qualified to carry on its business in the State of Minnesota and is duly registered as a transfer agent pursuant to Section 17A(c)(2) of the Securities Exchange Act of 1934, as amended.

3.3 It is empowered under applicable laws and by its Charter and By-Laws to enter into and perform this Agreement.

3.4 All requisite corporate proceedings have been taken to authorize it to enter into and perform this Agreement.

3.5 It has and will continue to have access to the necessary facilities, equipment and personnel to perform its duties and obligations under this Agreement.

3.6 It has and will continue to have necessary procedures and policies in place reasonably designed to comply with Rule 38a -1 of the Investment Company Act of 1940, as amended.

4. REPRESENTATIONS AND WARRANTIES OF THE FUNDS

The Funds represent and warrant to HASCO that:

4.1 They are each corporations duly organized and existing and in good

4.2 Each is empowered under applicable laws and by its Articles of Incorporation and By-Laws to enter into and perform this Agreement.

4.3 All corporate proceedings required by such Articles of Incorporation and By-Laws have been taken to authorize them to enter into and perform this Agreement.

-6-

<PAGE>

4.4 Each is registered as an open-end, management investment company under the Investment Company Act of 1940, as amended.

4.5 A registration statement under the Securities Act of 1933, as amended, is currently effective, and will remain in effect, for each series and class of Shares, and appropriate securities law filings have been made and will continue to be made with the SEC with respect to all of the Funds. The Funds shall notify HASCO when such registration statement shall have been amended to include additional series of the Fund and shall notify HASCO if such registration statement or any state securities registration or qualification has been terminated or a stop order has been entered with respect to the Shares.

5.    DATA ACCESS AND PROPRIETARY INFORMATION

5.1 The Funds acknowledge that the data bases, computer programs, screen formats, report formats, interactive design techniques, and documentation manuals furnished to the Funds by HASCO as part of their ability to access certain Funds-related data ("Customer Data") maintained by HASCO on data bases under the control and ownership of HASCO ("Data Access Services") constitute copyrighted, trade secret, or other proprietary information (collectively, "Proprietary Information") of substantial value to HASCO or other third party. In no event shall Proprietary Information be deemed Customer Data. The Funds agree to treat all Proprietary Information as proprietary to HASCO and further agree that it shall not divulge any Proprietary Information to any person or organization except as may be provided hereunder. Without limiting the foregoing, the Funds agree for themselves and their employees and agents:

(a)    to access Customer Data solely from locations as may be designated in writing by HASCO and solely in accordance with HASCO's applicable user documentation;

(b)    to refrain from copying or duplicating in any way the Proprietary Information;

(c)    to refrain from obtaining unauthorized access to any portion of the Proprietary Information, and if such access is inadvertently obtained, to inform in a timely manner of such fact and dispose of such information in accordance with HASCO's instructions;

(d)    to refrain from causing or allowing the data acquired hereunder from being retransmitted to any other computer facility or other location, except with the prior written consent of HASCO;

(e)    that the Funds shall have access only to those authorized transactions agreed upon by the parties;

-7-

(f) to honor all reasonable written requests made by HASCO to protect at HASCO' expense the rights of HASCO in Proprietary Information at common law, under federal copyright law and under other federal or state law.

5.2 Each party shall take reasonable efforts to advise its employees of their obligations pursuant to this Section 5. The obligations of this Section shall survive any termination of this Agreement.

5.3 If the Funds notify HASCO that any of the Data Access Services do not operate in material compliance with the most recently issued user documentation for such services, HASCO shall endeavor in a timely manner to correct such failure. Organizations from which HASCO may obtain certain data included in the Data Access Services are solely responsible for the contents of such data and the Funds agree to make no claim against HASCO arising out of the contents of such third-party data, including, but not limited to, the accuracy thereof. DATA ACCESS SERVICES AND ALL COMPUTER PROGRAMS AND SOFTWARE SPECIFICATIONS USED IN CONNECTION THEREWITH ARE PROVIDED ON AN AS IS, AS AVAILABLE BASIS. HASCO EXPRESSLY DISCLAIMS ALL WARRANTIES EXCEPT THOSE EXPRESSLY STATED HEREIN INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6. INDEMNIFICATION

6.1 HASCO shall not be responsible for, and the Funds shall, on behalf of the applicable Portfolio, indemnify and hold HASCO harmless from and against, any and all losses, damages, costs, charges, reasonable counsel fees, payments, expenses and liability arising out of or attributable to:

(a) All actions of HASCO or its agents or subcontractors required to be taken pursuant to this Agreement, provided that such actions are taken in good faith and without negligence or willful misconduct.

(b) Lack of good faith, negligence or willful misconduct on the part of the Funds or the breach of any representation or warranty of the Funds hereunder.

(c) The reliance on or use by HASCO or its agents or subcontractors of information, records, documents or services which (i) are received by HASCO or its agents or subcontractors, and (ii) have been prepared, maintained or performed by the Funds or any other person or firm on behalf of the Funds.

-8-

<PAGE>

(d) The reliance on, or the carrying out by HASCO or its agents or subcontractors of any instructions or requests of the Funds on behalf of the applicable Portfolio.

(e) The offer or sale of Shares in violation of any requirement under the federal securities laws or regulations or the securities laws or regulations of any state or in violation of any stop order or other determination or ruling by any federal agency or any state with respect to the offer or sale of such Shares in such state, unless such violation is the result of HASCO's or HASCO's affiliate's negligent or willful failure to comply with the provisions of Section 1.2 of this Agreement.

instructions, and may consult with legal counsel to the Funds with respect to any matter arising in connection with the services to be performed by HASCO under this Agreement, and HASCO and its agents or subcontractors (excluding Designated Partners and TPAs) shall not be liable and shall be indemnified by the Funds on behalf of the applicable Portfolio for any action taken or omitted by it in reliance upon such instructions or upon the opinion of such counsel. HASCO, its agents and subcontractors (excluding Designated Partners and TPAs) shall be protected and indemnified in acting upon any paper or document furnished by or on behalf of the Funds, reasonably believed to be genuine and to have been signed by the proper person or persons, or upon any instruction, information, data, records or documents provided HASCO or its agents or subcontractors (excluding Designated Partners and TPAs) by machine readable input, telex, CRT data entry or other similar means authorized by the Funds, and shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Funds. HASCO, its agents and subcontractors (excluding Designated Partners and TPAs) shall also be protected and indemnified in recognizing stock certificates which are reasonably believed to bear the proper manual of facsimile signatures of the officer or officers of the Funds, and the proper countersignature of any former transfer agent or registrar, or of a co-transfer agent or co-registrar.

6.3   The Funds shall not be responsible for, and HASCO shall indemnify and hold the Funds harmless from and against, any and all losses, damages, costs, charges, reasonable counsel fees, payments, expenses and liability arising out of or attributable to failure by HASCO to comply with the terms of this Agreement due to HASCO's negligence or willful misconduct or the breach of any representation or warranty of HASCO hereunder.

6.4   In the event either party is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other causes reasonably beyond its control, such party shall not be liable for damages to the other for any damages resulting from such failure to perform or otherwise from such causes.

-9-

<PAGE>

Notwithstanding the above, HASCO shall not be excused from liability in the event any telecommunications, power or equipment (of HASCO, its agents or subcontractors) failures could have been avoided or minimized by such parties having maintained adequate industry standard backup systems or plan and a disaster recovery plan.

6.5   In order that the indemnification provisions contained in this Section 6 shall apply, upon the assertion of a claim for which the Funds may be required to indemnify HASCO, HASCO shall promptly notify the Funds of such assertion, and shall keep the Funds advised with respect to all developments concerning such claim. The Funds shall have the option to participate with HASCO in the defense of such claim or to defend against said claim in its own name or in the name of HASCO. HASCO shall in no case confess any claim or make any compromise in any case in which the Funds may be required to indemnify HASCO except with the Funds' prior written consent. For clarity, to the extent any obligation to provide indemnity under this Section 6 arises in respect of a Portfolio or Portfolios, the obligation so to indemnify shall be the obligation only of such Portfolio or Portfolios, and of no other Portfolio.

HASCO shall at all times act in good faith, and agrees to use due care and its best efforts within reasonable limits to insure the accuracy of all services performed under this Agreement, but assumes no responsibility and shall not be liable for loss or damage due to errors unless said errors are caused by its negligence, bad faith, or willful misconduct or that of its employees, agents or subcontractors and its Designated Partners and TPAs.

8.    COVENANTS OF THE FUNDS AND HASCO

   8.1  The Funds shall on behalf of each of the Portfolios promptly furnish to HASCO the following:

      (a)  A certified copy of the resolution of the Board of Directors of the Funds authorizing the appointment of HASCO and the execution and delivery of this Agreement.

      (b)  A copy of the Articles of Incorporation and By-Laws of the Funds and all amendments thereto.

   8.2  HASCO shall keep records relating to the services to be performed hereunder, in the form and manner as it may deem advisable. To the extent required by Section 31 of the Investment Company Act of 1940, as amended, and the Rules thereunder, HASCO agrees that all such records prepared or maintained by HASCO relating to the services to be performed by HASCO hereunder are the property of the Funds and will be preserved, maintained and made available in accordance with such Section and Rules, and will be surrendered promptly to the

-10-

<PAGE>

         Funds on and in accordance with its request. Records surrendered hereunder shall be in machine readable form, except to the extent that HASCO has maintained such a record only in paper form.

   8.3  HASCO and the Funds agree that all books, records, information and data pertaining to the business of the other party which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law.

   8.4  In case of any requests or demands for the inspection of the Shareholder records of the Funds, HASCO will notify the Funds and endeavor to secure instructions from an authorized officer of the Funds as to such inspection. HASCO reserves the right, however, to exhibit the Shareholder records to any person whenever it is advised by its counsel that it may be held liable for the failure to exhibit the Shareholder records to such person.

9.    TERMINATION OF AGREEMENT

   9.1  This Agreement may be terminated by either party upon ninety (90) days written notice to the other.

   9.2  Should the Funds exercise their right to terminate, all out-of-pocket expenses associated with the movement of records and material will be borne by the Funds on behalf of the applicable Portfolio(s). Additionally, HASCO reserves the right to charge for any other reasonable expenses associated with such termination.

10.   ADDITIONAL FUNDS

additional series or classes of Shares to which it desires to have HASCO render services as transfer agent under the terms hereof, it shall so notify HASCO in writing, and if HASCO agrees in writing to provide such services, such series or classes of Shares shall be included under this agreement.

11. ASSIGNMENT

   11.1 Except as otherwise provided in Section 1 of this Agreement, neither this Agreement nor any rights or obligations hereunder may be assigned by either party without the written consent of the other party.

   11.2 This Agreement shall inure to the benefit of and be binding upon the parties and their respective permitted successors and assigns.

-11-

<PAGE>

12. AMENDMENT

   This Agreement may be amended or modified by a written agreement executed by both parties and authorized or approved by a resolution of the Board of Directors of the Funds.

13. CONNECTICUT LAW TO APPLY

   This Agreement shall be construed and the provisions thereof interpreted under and in accordance with the laws of Connecticut.

14. CONSEQUENTIAL DAMAGES

   No party to this Agreement shall be liable to another party for consequential damages under any provision of this Agreement or for any consequential damages arising out of any act or failure to act hereunder.

15. MERGER OF AGREEMENT

   This Agreement constitutes the entire agreement between the parties hereto and supersedes any prior agreement with respect to the subject matter hereof whether oral or written.

16. COUNTERPARTS

   This Agreement may be executed by the parties hereto on any number of counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

-12-

<PAGE>

   IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their names and on their behalf by and through their duly authorized officers, as of the day and year first above written.

                         THE HARTFORD MUTUAL FUNDS, INC.,
                         Severally, on behalf of their respective
                         Series of Shares,

                         BY: /s/ Robert M. Arena
                         ------------------------------------
                         Name: Robert Arena

THE HARTFORD MUTUAL FUNDS II, INC.,
Severally, on behalf of their respective
Series of Shares,

BY: /s/ Robert M. Arena
-------------------------------------
Name: Robert Arena
Title: Vice President


HARTFORD ADMINISTRATIVE SERVICES COMPANY

BY: /s/ Denise A. Settimi
-------------------------------------
Name: Denise A. Settimi
Title: Operations Officer

-13-

<PAGE>

EXIBIT A

TA FEE SCHEDULE

CLASS A, B, AND C SHARES:

     $25 per Shareholder Participant Account per Portfolio.

CLASS Y SHARES:

     0.05% of assets in each Portfolio; provided however, that the annual
aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

The TA Fee shall include all out of pocket expenses otherwise payable by a
Portfolio pursuant to Section 2.2 and 2.3 of the Agreement except for postage,
solicitation, tabulation and printing expenses related to proxy solicitation,
unless otherwise agreed to by the Funds and HASCO.
</TEXT>
</DOCUMENT>

<TYPE>EX-99.H(II)
<SEQUENCE>7
<FILENAME>b63114evexv99whxiiy.txt
<DESCRIPTION>AMENDMENT NO. 1 TO TRANSFER AGENCY AND SERVICE AGREEMENT
<TEXT>
<PAGE>

Exhibit H.(II)

AMENDMENT NUMBER 1 TO
TRANSFER AGENCY AND SERVICE AGREEMENT

Pursuant to the Transfer Agency and Service Agreement by and among THE HARTFORD MUTUAL FUNDS, INC., THE HARTFORD MUTUAL FUNDS II, INC. and HARTFORD ADMINISTRATIVE SERVICES COMPANY dated as of February 1, 2006, Exhibit A attached hereto is hereby amended.

THE HARTFORD MUTUAL FUNDS, INC.
THE HARTFORD MUTUAL FUNDS II, INC.


By: /s/ David M. Znamierowski
------------------------------------
Name: David M. Znamierowsi
Title: President


HARTFORD ADMINISTRATIVE SERVICES COMPANY


By: /s/ Robert M. Arena
------------------------------------
Name: Robert M. Arena
Title: Vice President

Effective Date: November 1, 2006

<PAGE>

EXHIBIT A

TA FEE SCHEDULE
(as amended on November 1, 2006)

Class A, B, C and I Shares:

        $32 per Check & App Shareholder Participant Account
        $24 per Omnibus Shareholder Participant Account
        $20 per Network Shareholder Participant Account
        $18 per Third Party Shareholder Participant Account

Class Y Shares:

        0.05% of assets in each Portfolio; provided however, that the annual aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

The TA Fee shall include all out of pocket expenses otherwise payable by a Portfolio pursuant to Section 2.2 and 2.3 of the Agreement except for postage, solicitation, tabulation and printing expenses related to proxy solicitation, unless otherwise agreed to by the Funds and HASCO.
</TEXT>
</DOCUMENT>

```
<TYPE>EX-99.H(XI)
<SEQUENCE>8
<FILENAME>b63114evexv99whxxiy.txt
<DESCRIPTION>SEVENTH AMENDMENT TO THE FUND ACCOUNTING AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT H.(XI)
SEVENTH AMENDMENT TO FUND ACCOUNTING AGREEMENT

Effective November 30, 2006

The Fund Accounting Agreement dated January 3, 2000 by and between THE
HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby
amended to add The Hartford LargeCap Growth Fund as a new series to Schedule A
and to amend and restate Schedule A as attached hereto.

THE HARTFORD MUTUAL FUNDS, INC.


/s/ John C. Walters
----------------------------------------
John C. Walters
Vice President


HARTFORD LIFE INSURANCE COMPANY


/s/ Robert M. Arena
----------------------------------------
Name: Robert M. Arena
Title: Vice President

```
<PAGE>
```

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund
The Hartford Aggressive Growth Allocation Fund
The Hartford Balanced Allocation Fund
The Hartford Balanced Income Fund
The Hartford Capital Appreciation Fund
The Hartford Capital Appreciation II Fund
The Hartford Conservative Allocation Fund
The Hartford Disciplined Equity Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Income Fund
The Hartford Floating Rate Fund
The Hartford Focus Fund
The Hartford Global Communications Fund
The Hartford Global Financial Services Fund
The Hartford Global Health Fund
The Hartford Global Leaders Fund
The Hartford Global Technology Fund
The Hartford Growth Allocation Fund
The Hartford High Yield Fund
The Hartford Income Allocation Fund
The Hartford Income Fund
The Hartford Inflation Plus Fund
The Hartford International Capital Appreciation Fund

```
The Hartford International SmCap Company Fund
The Hartford LargeCap Growth Fund
The Hartford MidCap Fund
The Hartford MidCap Growth Fund
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Retirement Income Fund
The Hartford Select MidCap Growth Fund
The Hartford Select MidCap Value Fund
The Hartford Select SmallCap Growth Fund
The Hartford Select SmallCap Value Fund
The Hartford Short Duration Fund
The Hartford Small Company Fund
The Hartford Stock Fund
The Hartford Target Retirement 2010 Fund
The Hartford Target Retirement 2020 Fund
The Hartford Target Retirement 2030 Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund
```

</TEXT>
</DOCUMENT>

<TYPE>EX-99.H(III)
<SEQUENCE>4
<FILENAME>b63389a1exv99whxiiiy.txt
<DESCRIPTION>AMENDMENT #2 TO TRANSFER AGENCY AND SERVICE AGREEMENT
<TEXT>
<PAGE>

EXHIBIT H.(III)
AMENDMENT NUMBER 2 TO
TRANSFER AGENCY AND SERVICE AGREEMENT

Pursuant to the Transfer Agency and Service Agreement by and among THE
HARTFORD MUTUAL FUNDS, INC., THE HARTFORD MUTUAL FUNDS II, INC. and HARTFORD
ADMINISTRATIVE SERVICES COMPANY dated as of February 1, 2006, Exhibit A attached
hereto is hereby amended to add Class R3, Class R4 and Class R5.

                         THE HARTFORD MUTUAL FUNDS, INC.
                         THE HARTFORD MUTUAL FUNDS II, INC.


                         By: /s/ John C. Walters
                         ------------------------------------
                         Name: John C. Walters
                         Title: Vice President


                         HARTFORD ADMINISTRATIVE SERVICES COMPANY


                         By: /s/ Robert M. Arena
                         ------------------------------------
                         Name: Robert M. Arena
                         Title: Vice President

Effective Date: December 15, 2006

<PAGE>

                                                           EXHIBIT A

TA FEE SCHEDULE
(as amended on December 15, 2006)

Class A, B, C and I Shares:

     $32 per Check & App Shareholder Participant Account
     $24 per Omnibus Shareholder Participant Account
     $20 per Network Shareholder Participant Account
     $18 per Third Party Administrator Shareholder Participant Account

Class R3, R4 and R5 Shares:

     $32 per Check & App Shareholder Account
     $24 per Omnibus Shareholder Account
     $20 per Network Shareholder Account
     $18 per Third Party Administrator Shareholder Account

Class Y Shares:

     0.05% of assets in each Portfolio; provided however, that the annual
aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

The TA Fee shall include all out of pocket expenses otherwise payable by a
Portfolio pursuant to Section 2.2 and 2.3 of the Agreement except for postage,
solicitation, tabulation and printing expenses related to proxy solicitation,

```
</TEXT>
</DOCUMENT>
```

```
<TYPE>EX-99.(H)(IV)
<SEQUENCE>7
<FILENAME>b68643a1exv99wxhyxivy.txt
<DESCRIPTION>AMENDMENT NO. 3 TO TRANSFER AGENCY AND SERVICE AGREEMENT
<TEXT>
<PAGE>
```

AMENDMENT NUMBER 3 TO
TRANSFER AGENCY AND SERVICE AGREEMENT

Pursuant to the Transfer Agency and Service Agreement by and among THE
HARTFORD MUTUAL FUNDS, INC., THE HARTFORD MUTUAL FUNDS II, INC. and HARTFORD
ADMINISTRATIVE SERVICES COMPANY dated as of February 1, 2006, Exhibit A attached
hereto is hereby amended.

                              THE HARTFORD MUTUAL FUNDS, INC.
                              THE HARTFORD MUTUAL FUNDS II, INC.


                              By: /s/ Robert Arena
                              ------------------------------------
                              Name: Robert Arena
                              Title: Vice President


                              HARTFORD ADMINISTRATIVE SERVICES COMPANY


                              By: /s/ Robert M. Arena
                              ------------------------------------
                              Name: Robert M. Arena
                              Title: Senior Vice President

Effective Date: November 1, 2007

```
<PAGE>
```

EXHIBIT A

TA FEE SCHEDULE
(as amended on November 1, 2007)

Class A, B, C and I Shares:

     $32.50 per Check & App Shareholder Participant Account
     $21.00 per Omnibus Shareholder Participant Account
     $19.75 per Network Shareholder Participant Account
     $17.00 per Third Party Administrator Shareholder Participant Account

Class R3, R4 and R5 Shares:

     $32.50 per Check & App Shareholder Account
     $21.00 per Omnibus Shareholder Account
     $19.75 per Network Shareholder Account
     $17.00 per Third Party Administrator Shareholder Account

Class Y Shares:

     0.05% of assets in each Portfolio; provided however, that the annual
aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

Out of pocket expenses pursuant to Section 2.2 and 2.3 of the Agreement do not
include postage, solicitation, tabulation and printing expenses related to proxy
solicitations, unless otherwise agreed to by the Funds and HASCO.

```
</TEXT>
```

&lt;DOCUMENT&gt;
&lt;TYPE&gt;EX-99.H(IV)(B)
&lt;SEQUENCE&gt;7
&lt;FILENAME&gt;b72688a1exv99whxivyxby.txt
&lt;DESCRIPTION&gt;AMENDMENT NO. 4 TO TRANSFER AGENCY AND SERVICE AGREEMENT
&lt;TEXT&gt;
&lt;PAGE&gt;

<div align="center">

AMENDMENT NUMBER 4 TO
TRANSFER AGENCY AND SERVICE AGREEMENT

</div>

Pursuant to the Transfer Agency and Service Agreement by and among THE HARTFORD MUTUAL FUNDS, INC., THE HARTFORD MUTUAL FUNDS II, INC. and HARTFORD ADMINISTRATIVE SERVICES COMPANY dated as of February 1, 2006, Exhibit A attached hereto is hereby amended.

THE HARTFORD MUTUAL FUNDS, INC.
THE HARTFORD MUTUAL FUNDS II, INC.

By: /s/ Robert Arena
-------------------------------------
Name: Robert Arena
Title: Vice President

HARTFORD ADMINISTRATIVE SERVICES COMPANY

By: /s/ Tamara Fagely
-------------------------------------
Name: Tamara Fagely
Title: Chief Financial Officer and
      Vice President

Effective Date: November 1, 2008

&lt;PAGE&gt;

EXHIBIT A

<div align="center">

TA FEE SCHEDULE
(as amended on November 1, 2008)

</div>

Class A, B, C, and I Shares:

$31.50 per Check & App Shareholder Participant Account

$22.00 per Omnibus Shareholder Participant Account

$21.00 per Network Shareholder Participant Account

$16.00 per Third Party Administrator Shareholder Participant Account

Class R3, R4 and R5 Shares:

$31.50 per Check & App Shareholder Account

$22.00 per Omnibus Shareholder Account

$21.00 per Network Shareholder Account

$16.00 per Third Party Administrator Shareholder Account

Class Y Shares:

0.05% of assets in each Portfolio; provided however, that the annual

Out of pocket expenses pursuant to Section 2.2 and 2.3 of the Agreement do not include postage, solicitation, tabulation and printing expenses related to proxy solicitations, unless otherwise agreed to by the Funds and HASCO.
</TEXT>
</DOCUMENT>

## AMENDMENT NUMBER 5 TO
## TRANSFER AGENCY AND SERVICE AGREEMENT

Pursuant to the Transfer Agency and Service Agreement by and among **The Hartford Mutual Funds, Inc., The Hartford Mutual Funds II, Inc.** and **Hartford Administrative Services Company** dated as of February 1, 2006, Exhibit A attached hereto is hereby amended.

THE HARTFORD MUTUAL FUNDS, INC.
THE HARTFORD MUTUAL FUNDS II, INC.

By:   /s/Robert Arena
Name:  Robert Arena
Title:   President

HARTFORD ADMINISTRATIVE SERVICES COMPANY

By:   /s/Tamara Fagely
Name:  Tamara Fagely
Title:   Chief Financial Officer and Vice President

Effective Date: November 1, 2009

**TA FEE SCHEDULE**

(as amended on November 1, 2009)

Class A, B, C, and I Shares:

   $28.75 per Check & App Shareholder Participant Account
   $20.50 per Omnibus Shareholder Participant Account
   $18.00 per Network Shareholder Participant Account
   $14.50 per Third Party Administrator Shareholder Participant Account

Class R3, R4 and R5 Shares:

   $28.75 per Check & App Shareholder Account
   $20.50 per Omnibus Shareholder Account
   $18.00 per Network Shareholder Account
   $14.50 per Third Party Administrator Shareholder Account

Class Y Shares:

   0.05% of assets in each Portfolio; provided however, that the annual aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

Out of pocket expenses pursuant to Section 2.2 and 2.3 of the Agreement do not include postage, solicitation, tabulation and printing expenses related to proxy solicitations, unless otherwise agreed to by the Funds and HASCO.

**AMENDMENT NUMBER 6 TO**
**TRANSFER AGENCY AND SERVICE AGREEMENT**

Pursuant to the Transfer Agency and Service Agreement by and among **The Hartford Mutual Funds, Inc., The Hartford Mutual Funds II, Inc.** and **Hartford Administrative Services Company** dated as of February 1, 2006, Exhibit A attached hereto is hereby amended.

THE HARTFORD MUTUAL FUNDS, INC.
THE HARTFORD MUTUAL FUNDS II, INC.

By:     /s/Robert Arena
Name:   Robert Arena
Title:  President

HARTFORD ADMINISTRATIVE SERVICES COMPANY

By:     /s/Tamara Fagely
Name:   Tamara Fagely
Title:  Chief Financial Officer and Vice President

Effective Date: November 1, 2009

**TA FEE SCHEDULE**

(as amended on November 1, 2009)

Class A, B, C, and I Shares:

      $26.50 per Check & App Shareholder Participant Account
      $20.50 per Omnibus Shareholder Participant Account
      $18.00 per Network Shareholder Participant Account
      $14.50 per Third Party Administrator Shareholder Participant Account

Class R3, R4 and R5 Shares:

      $26.50 per Check & App Shareholder Account
      $20.50 per Omnibus Shareholder Account
      $18.00 per Network Shareholder Account
      $14.50 per Third Party Administrator Shareholder Account

Class Y Shares:

      0.05% of assets in each Portfolio; provided however, that the annual aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

Out of pocket expenses pursuant to Section 2.2 and 2.3 of the Agreement do not include postage, solicitation, tabulation and printing expenses related to proxy solicitations, unless otherwise agreed to by the Funds and HASCO.

# EXHIBIT 6

```
<DOCUMENT>
<TYPE>EX-99.(H)(XIX)
<SEQUENCE>11
<FILENAME>b68643a1exv99wxhyxxixy.txt
<DESCRIPTION>TRANSFER AGENCY FEE WAIVER AGREEMENT
<TEXT>
<PAGE>
```

Exhibit H.(XIX)

TRANSFER AGENCY FEE WAIVER AGREEMENT

THIS AGREEMENT, dated as of February 6, 2008, between The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (each a "Company" and collectively, the "Companies") on behalf of each series of the Companies (each a "Fund" and collectively, the "Funds") and Hartford Administrative Services Company (the "Transfer Agent").

WHEREAS, the Transfer Agent has been appointed the transfer agent of each of the Funds pursuant to a Transfer Agency and Service Agreement between each Company, on behalf of the Funds, and the Transfer Agent; and

WHEREAS, each Company and the Transfer Agent desire to enter into the arrangements described herein relating to the transfer agency fees of the Funds;

NOW, THEREFORE, each Company and the Transfer Agent hereby agree as follows:

1. For the period commencing November 1, 2007 through February 28, 2009, the Transfer Agent hereby agrees to reimburse any portion of the transfer agency fees over 0.30% of the average daily net assets per fiscal year for each class of shares for each Fund.

2. The reimbursement described in Section 1 above is not subject to recoupment by the Transfer Agent.

3. The Transfer Agent understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Companies on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

4. This Agreement shall renew automatically for one-year terms unless the Transfer Agent provides written notice of termination prior to the start of such term.
```
<PAGE>
```

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.


Name: /s/ Tamara L. Fagely
      -------------------------------
      Tamara L. Fagely
Title: Vice President, Treasurer and
       Controller


THE HARTFORD MUTUAL FUNDS II, INC.


Name: /s/ Tamara L. Fagely
      -------------------------------

Title: Vice President, Treasurer and
       Controller


HARTFORD ADMINISTRATIVE SERVICES COMPANY

Name: /s/ Robert Arena
      ------------------------------
      Robert Arena
Title: Director and Senior Vice
       President

2

</TEXT>
</DOCUMENT>

## TRANSFER AGENCY FEE WAIVER AGREEMENT

**THIS AGREEMENT,** dated as of October 2, 2009, between The Hartford Mutual Funds, Inc. (the "Company") on behalf of The Hartford Dividend and Growth Fund, a series of the Company, (the "Fund") and Hartford Administrative Services Company (the "Transfer Agent").

**WHEREAS,** the Transfer Agent has been appointed the transfer agent of the Fund pursuant to a Transfer Agency and Service Agreement between the Company, on behalf of the Fund, and the Transfer Agent;

**WHEREAS,** the Transfer Agent, pursuant to a separate agreement on behalf of the Fund, has contractually agreed to reimburse any portion of the transfer agency fees over 0.30% of the average daily net assets per fiscal year for each class of shares of the Fund; and

**WHEREAS,** the Transfer Agent now has determined to add an additional fee waiver with respect to Classe A shares and Class C shares of the Fund, and the Company and the Transfer Agent now desire to enter into the arrangement described herein with respect to this additional fee waiver;

**NOW, THEREFORE,** the Company and the Transfer Agent hereby agree as follows:

1.      For the period commencing October 2, 2009 through October 31, 2010, the Transfer Agent hereby agrees to waive a portion of its transfer agency fees with respect to the Class A shares and Class C shares of the Fund, in the amounts as described on Schedule A hereto.

2.      The reimbursement described in Section 1 above and in Schedule A hereto is not subject to recoupment by the Transfer Agent.

3.      The Transfer Agent understands and intends that the Fund will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Company on Form N-1A with the Securities and Exchange Commission, (2) in accruing the Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Fund to do so.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.

Name: /s/Tamara L. Fagely
        Tamara L. Fagely
Title:
        Vice President, Treasurer and Controller


HARTFORD ADMINISTRATIVE SERVICES COMPANY

Name: /s/Robert Arena
        Robert Arena
Title:
        Director and Senior Vice President

2

Schedule A

Pursuant to Section 1 of this Agreement and for the duration of the time period described in that Section, the amount of the transfer agency fee waiver shall be as follows:

### Class A

| Gross Transfer Agency Fee | Net Transfer Agency Fees (after transfer agency fee waiver) |
|---|---|
| If 0.35% or higher | 0.30% |
| 0.34% | 0.29% |
| 0.33% | 0.28% |
| 0.32% | 0.27% |
| 0.31% | 0.26% |
| 0.30% | 0.25% |
| If 0.25%-0.29% | 0.24% |
| If 0.24% or less | No waiver |

### Class C

| Gross Transfer Agency Fee | Net Transfer Agency Fees (after transfer agency fee waiver) |
|---|---|
| If 0.35% or higher | 0.30% |
| 0.34% | 0.29% |
| 0.33% | 0.28% |
| 0.32% | 0.27% · |
| 0.31% | 0.26% |
| 0.30% | 0.25% |
| If 0.29% or less | No waiver |

3

## TRANSFER AGENCY FEE WAIVER AGREEMENT

**THIS AGREEMENT,** dated as of May 28, 2010, between The Hartford Mutual Funds, Inc. (the "Company") on behalf of The Hartford Global All-Asset Fund, The Hartford Global Real Asset Fund and The Hartford International Value Fund, series of the Company, (the "Funds") and Hartford Administrative Services Company (the "Transfer Agent").

**WHEREAS,** the Transfer Agent has been appointed the transfer agent of the Funds pursuant to a Transfer Agency and Service Agreement between the Company, on behalf of the Funds, and the Transfer Agent; and

**WHEREAS,** each Company and the Transfer Agent, desire to enter into the arrangements described herein relating to the transfer agency fees of the Funds;

**NOW, THEREFORE,** the Company and the Transfer Agent hereby agree as follows:

1.     For the period commencing May 28, 2010 through February 28, 2012, the Transfer Agent hereby agrees to reimburse any portion of the transfer agency fees over 0.30% of the average daily net assets per fiscal year for each class of shares for each Fund.

2.     The reimbursement described in Section 1 above is not subject to recoupment by the Transfer Agent.

3.     The Transfer Agent understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Company on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

4.     This Agreement shall renew automatically for one-year terms unless the Transfer Agent provides written notice of termination prior to the start of such term.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.

Name: /s/Robert Arena .
      Robert Arena
Title: President


HARTFORD ADMINISTRATIVE SERVICES COMPANY

Name: /s/Tamara L. Fagely
      Tamara L. Fagely
Title: Chief Financial Officer and Vice President

2

# EXHIBIT 7

EXHIBIT 99.e(i)

## PRINCIPAL UNDERWRITING AGREEMENT

The ITT Hartford Mutual Funds, Inc. (the "Company")
on behalf of

ITT Hartford Capital Appreciation Fund
ITT Hartford Dividend and Growth Fund
ITT Hartford International Opportunities Fund
ITT Hartford Small Company Fund
ITT Hartford Stock Fund
ITT Hartford Advisers Fund
ITT Hartford Bond Income Strategy Fund
ITT Hartford Money Market Fund

July 22, 1996

Hartford Securities Distribution Company, Inc.
200 Hopmeadow Street
Simsbury, CT  06089

Re:  Underwriting Agreement

Gentlemen:

The Company is a Maryland corporation registered as an investment company
under the Investment Company Act of 1940, as amended (the "1940 Act") and has
shares of capital stock (hereinafter the "Shares") representing interests in
investment portfolios of the Company hereto (individually the "Fund" and
collectively the "Funds") which are registered under the Securities Act of 1933,
as amended (the "1933 Act") and securities acts of various states and
jurisdictions.

You have informed us that your company, Hartford Securities Distribution
Company ("HSD"), is registered as a broker-dealer under the provisions of the
Securities Exchange Act of 1934 (the "1934 Act") and that HSD is a member in
good standing of the National Association of Securities Dealers, Inc. You have
indicated your desire to become the exclusive selling agent and principal
underwriter for the Company. We have been authorized to execute and deliver this
Agreement to you, which Agreement has been approved by a vote of a majority of
the company's directors (the "Directors") who are not parties to such Agreement
or "interested persons" of any party thereto, cast in person at a meeting called
for the purpose of voting on the Approval of this Agreement.

<PAGE>

1. Appointment of Underwriter. Upon the execution of this Agreement
and in consideration of the agreements on your part herein expressed and upon
the terms and conditions set forth herein, we hereby appoint you as the
exclusive sales agent for distribution of the Shares (other than sales made
directly by the Company without sales charge) and agree that we will deliver to
you such shares as you may sell. You agree to use your best efforts to promote
the sale of the Shares, but you are not obligated to sell any specific number of
the Shares.

2. Independent Contractor. You will undertake and discharge your
obligations hereunder as an independent contractor and shall have no authority
or power to obligate or bind the Company by your actions, conduct, or contracts,

of the Shares as our agent. You may appoint sub-agents or distribute the Shares through dealers (or otherwise) as you may determine necessary or desirable from time to time. This Agreement shall not, however, be construed as authorizing any dealer or other person to accept orders for sale or repurchase on our behalf or to otherwise act as our agent for any purpose.

3. Offering Price. Shares shall be offered for sale at a price equivalent to their net asset value plus, as appropriate, a variable percentage of the public offering price as a sales load, as set forth in the Company's Prospectus for the Shares, as amended from time to time. On each business day on which the New York Stock Exchange is open for business, we will furnish you with the net asset value of the Shares, which shall be determined and become effective as of the close of business of the New York Stock Exchange on that day. The net asset value so determined shall apply to all orders for the purchase of the Shares received by dealers prior to such determination, and you are authorized in your capacity as our agent to accept orders and confirm sales at such net asset value; provided that, such dealers notify you of the time when they received the particular order and that the order is placed with you prior to your close of business on the day on which the applicable net asset value is determined. To the extent that our Shareholder Servicing and Transfer Agent (collectively "Ägent") and the Custodian(s) for any pension, profit-sharing, employer or self-employed plan receive payments on behalf of the investors, such Agent and Custodian(s) shall be required to record the time of such receipt with respect to each payment, and the applicable net asset value shall be that which is next determined and effective after the time of receipt by them. In all events, you shall forthwith notify all of the dealers comprising your selling group and the Agent and Custodian(s) of the effective net asset value as received from us. Should we at any time calculate our net asset value more frequently than once each business day, you and we will follow procedures with respect to such additional price or prices comparable to those set forth above in this Section 3.

4. Sales Commission. (a) You shall be entitled to charge a sales commission on the sale of certain classes of Shares in the amount set forth in the Company's Prospectus (including any supplements or amendments thereto) then in effect under the 1933 Act and the 1940 Act. Such commission (subject to any quantity or other discounts or eliminations of commission as set forth in our then currently effective Prospectus) shall be an amount mutually agreed upon by the Company and HSD and shall be equal to the difference between the net asset value and the public offering price of the Shares.

<PAGE>

(b) In addition, in accordance with the distribution plans adopted pursuant to Rule 12b-1 under the 1940 Act (the "Distribution Plans") for certain classes of Shares, you will be entitled to be paid a sales commission not exceeding the product of the price received by the Company for sales of its Shares (excluding reinvestment of dividends and distributions) multiplied by the percentage set forth in the Prospectus and mutually agreed to by the Company and HSD from time to time. In connection with the Shares, you may also be entitled to be paid by the Company an interest fee (calculated in accordance with the Prospectus and the Distribution Plan). Payment of the sales commissions and separate interest fee, if applicable, shall be spread over a period of time and shall be paid in the manner described in such Prospectus and the Distribution Plan.

(c) In addition to the payments of the sales commissions to you provided for in paragraphs 4(a) and 4(b), you may also receive reimbursement for expenses or a maintenance or trail fee as may be required by and described in the Distribution Plans adopted by the Company for the various classes of Shares.

(d) You may allow appointed sub-agents or dealers such commissions or discounts (not exceeding the total sales commission) as you shall deem advisable, so long as any such commissions or discounts are set forth in the Company's then current Prospectus, to the extent required by the applicable

5. Payment for Shares. At or prior to the time of delivery of any of
our Shares you will pay or cause to be paid to the Custodian, for our account,
an amount in cash equal to the net asset value of such Shares. In the event that
you pay for shares sold by you prior to your receipt of payment from purchasers,
you are authorized to reimburse yourself for the net asset value of such Shares
from the offering price of such Shares when received by you.

6. Registration of Shares. No Shares shall be registered on our
books until (i) receipt by us of your written request therefor; (ii) receipt by
the Custodian and Agent of a certificate signed by an officer of the Company
stating the amount to be received therefor; and (iii) receipt of payment of that
amount by the Custodian. We will provide for the recording of all Shares
purchased in unissued form in "book accounts," unless a request in writing for
certificates (if available) is received by the Agent, in which case certificates
for Shares in such names and amounts as is specified in such writing will be
delivered by the Agent, as soon as practicable after registration thereof on the
books.

7. Purchases for Your Own Account. You shall not purchase Shares for
your own account for purposes of resale to the public, but you may purchase
Shares for your own investment account upon your written assurance that the
purchase is for investment purposes only and that the Shares will not be resold
except through redemption by us.

8. Sale of Shares to Affiliates. You may sell the Shares at net
asset value, plus a varying sales charge as appropriate, pursuant to a uniform
offer described in the

<PAGE>

Company's current Prospectus (i) to our Directors and officers, our investment
manager and its affiliates, and/or any sub-adviser to the Company, or your
company or affiliated companies thereof, (ii) to the bona fide, full time
employees or sales representatives of any of the foregoing, (iii) to any trust,
pension, profit-sharing, or other benefit plan for such persons, or (iv) to any
other person set forth in the Company's then current Prospectus; provided that
such sales are made in accordance with the rules and regulations under the 1940
Act and that such sales are made upon the written assurance of the purchaser
that the purchases are made for investment purposes only, not for the purpose of
resale to the public and that the Shares will not be resold except through
redemption by us.

9. Allocation of Expenses. (a) We will pay the following expenses in
connection with the sales and distribution of Shares of the Company:

(i) expenses pertaining to the preparation of our audited and
certified financial statements to be included in any
amendments ("Amendments") to our Registration Statements under
the 1933 Act, including the Prospectuses and Statements of
Additional Information included therein;

(ii) expenses pertaining to the preparation (including legal
fees) and printing of all Amendments or supplements filed with
the Securities and Exchange Commission, including the copies
of the Prospectuses and Statements of Additional Information
included in the Amendments and the first ten (10) copies of
the definitive Prospectuses and Statements of Additional
Information or supplements thereto, other than those
necessitated by or related to your (including your "Parent")
activities where such amendments or supplements result in
expenses which we would not otherwise have incurred;

(iii) expenses pertaining to the preparation, printing, and
distribution of any reports or communications, including

> (iv) filing and other fees to federal and state securities
> regulatory authorities necessary to register and maintain
> registration of the Shares; and

> (v) expenses of the Agent, including all costs and expenses in
> connection with the issuance, transfer and registration of the
> Shares, including but not limited to any taxes and other
> governmental charges in connection therewith.

(b) Except to the extent that you are entitled to reimbursement
under the provisions of any of the Distribution Plans for the Company, you will
pay the following expenses:

<PAGE>

> (i) expenses of printing additional copies of the Prospectuses
> and Statement of Additional Information and any amendments or
> supplements thereto which are necessary to continue to offer
> our shares to the public;

> (ii) expenses pertaining to the preparation (excluding legal
> fees) and printing of all amendments and supplements to our
> Registration Statements if the Amendment or supplement arises
> from or is necessitated by or related to your (including your
> "Parent") activities where those expenses would not otherwise
> have been incurred by us; and

> (iii) expenses pertaining to the printing of additional
> copies, for use by you as sales literature, of reports or
> other communications which have been prepared for distribution
> to our existing shareholders or incurred by you in
> advertising, promoting and selling our Shares to the public.

10. Furnishing of Information. We will furnish to you such
information with respect to our Company and its Shares, in such form and signed
by such of our officers as you may reasonably request, and we warrant that the
statements therein contained when so signed will be true and correct. We will
also furnish you with such information and will take such action as you may
reasonably request in order to qualify our Shares for sale to the public under
the Blue Sky Laws or in jurisdictions in which you may wish to offer them. We
will furnish you at least annually with audited financial statements of our
books and accounts certified by independent public accountants, and with such
additional information regarding our financial condition, as you may reasonably
request from time to time.

11. Conduct of Business. Other than currently effective Prospectuses
and Statements of Additional Information, you will not issue any sales material
or statements except literature or advertising which conforms to the
requirements of federal and state securities laws and regulations and which have
been filed, where necessary, with the appropriate regulatory authorities. You
will furnish us with copies of all such material prior to their use and no such
material shall be published if we shall reasonably and promptly object.

You shall comply with the applicable federal and state laws and
regulations where our Shares are offered for sale and conduct your affairs with
us and with dealers, brokers, or investors in accordance with the Rules of Fair
Practice of the National Association of Securities Dealers, Inc.

12. Redemption or Repurchase within Seven Days. If Shares are
tendered to us for redemption or are repurchased by us within seven (7) business
days after your acceptance of the original purchase order for such shares, you
will immediately refund to us the full amount of any sales commission (net of
allowances to dealers or brokers) allowed to you on the original sale, and will

the balance of sales commissions reallowed by you. We shall notify you of such tender for

<PAGE>

redemption within ten (10) days of the day on which notice of such tender for redemption is received by us.

13. Other Activities. Your services pursuant to this Agreement shall not be deemed to be exclusive, and you may render similar services and act as an underwriter, distributor or dealer for other investment companies in the offering of their shares.

14. Term of Agreement. This Agreement shall become effective on the date of its execution and shall remain in effect for a period of two (2) years from the date of this Agreement. This Agreement shall continue annually thereafter for successive one (1) year periods if approved at least annually (i) by a vote of a majority of the outstanding voting securities of the Company or by a vote of the Directors of the Company, and (ii) by a vote of a majority of the Directors of the Company who are not parties to this Agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on this Agreement.

15. Termination. This Agreement: (i) may be terminated at any time without the payment of any penalty, either by vote of the Directors of the Company or by a vote of a majority of the outstanding voting securities of the Company, on sixty (60) days' written notice to you; (ii) shall terminate immediately in the event of its assignment; and (iii) may be terminated by you on sixty (60) days' written notice to us.

16. Suspension of Sales. We reserve the right at all times to suspend or limit the public offering of the Shares upon written notice to you, and to reject any order in whole or in part.

17. Miscellaneous. This Agreement shall be subject to the laws of the State of Connecticut and shall be interpreted and construed to further and promote the operation of the Company as an open-end investment company. As used herein, the terms "Net Asset Value," "Offering Price," "Investment Company," "Open-End Investment Company," "Assignment," "Principal Underwriter," "Interested Person," and "Majority of the Outstanding Voting Securities," shall have the meanings set forth in the 1933 Act and the 1940 Act, as applicable, and the rules and regulations promulgated thereunder.

18. Liability. Nothing contained herein shall be deemed to protect you against any liability to us or to our shareholders to which you would otherwise be subject by reason of willful misfeasance, bad faith, or gross negligence in the performance of your duties hereunder, or by reason of your reckless disregard of your obligations and duties hereunder.

<PAGE>

If the foregoing meets with your approval, please acknowledge your acceptance by signing below whereupon this shall constitute a binding agreement as of the date first above written.

Very truly yours,

ITT Hartford Mutual Funds, Inc.
on behalf of:

ITT Hartford Capital Appreciation Fund
ITT Hartford Dividend and Growth Fund
ITT Hartford International Opportunities Fund
ITT Hartford Small Company Fund
ITT Hartford Stock Fund

ITT Hartford Bond Income Strategy Fund
ITT Hartford Money Market Fund

By: /s/ Andrew W. Kohnke
    ------------------------------------------

Print Name: Andrew W. Kohnke
            ----------------------------------

Its: Vice President
     -------------------------------------------

Agreed to and Accepted:

Hartford Securities Distribution Company, Inc.

By: /s/ Peter W. Cummins
    ----------------------------------

Print Name: Peter W. Cummins
            -------------------------

Its: Vice President
     ----------------------------------

</TEXT>
</DOCUMENT>

<DOCUMENT>
<TYPE>EX-99.E.III
<SEQUENCE>20
<FILENAME>b45788h1exv99wewiii.txt
<DESCRIPTION>AMEND. #1 TO PRINCIPAL UNDERWRITING AGRMT.
<TEXT>
<PAGE>

EXHIBIT 99.e(iii)

AMENDMENT NUMBER 1 TO PRINCIPAL UNDERWRITING AGREEMENT

Effective July 22, 1997, the following section is added as Section 19 to the
Principal Underwriting Agreement:

19. Sub-Accounting Services. In addition to your traditional distribution
functions, you are authorized to appoint sub-agents to perform sub-accounting
services as long as you have determined that 1) the services are necessary for
the Company and not a duplication of services performed by the Company's
transfer agent, 2) the sub-agent is competent to perform such services, and 3)
the price per account is competitive with the prices charged by other third
parties performing similar services. Such sub-accounting services may include:
a) the maintenance of separate records for each customer reflecting all account
activities such as sales and purchases of the Company's shares, b) the
transmittal to the Company of share purchase and redemption orders, c) the
transmittal of periodic account statements, and d) the transmittal of customer
proxy materials, reports and other information required to be sent to
shareholders under the federal securities laws. Upon receipt of the invoice for
such services, and after you verify the accuracy of the invoice, you are
authorized to rebill, or cause to be billed, the Company for such services in
the amount invoiced by the sub-agent.

                         ITT Hartford Mutual Funds, Inc.
                         on behalf of:

                         ITT Hartford Capital Appreciation Fund
                         ITT Hartford Dividend and Growth Fund
                         ITT Hartford International Opportunities Fund
                         ITT Hartford Small Company Fund
                         ITT Hartford Stock Fund
                         ITT Hartford Advisers Fund
                         ITT Hartford Bond Income Strategy Fund
                         ITT Hartford Money Market Fund

                         By: /s/ Joseph H. Gareau
                         ----------------------------------------
                             Joseph H. Gareau
                             President

Agreed to and Accepted:

Hartford Securities Distribution Company

By: /s/ Peter W. Cummins
    ----------------------------------------
         Peter W. Cummins
         Vice President

</TEXT>
</DOCUMENT>

<DOCUMENT>
<TYPE>EX-99.E.X
<SEQUENCE>26
<FILENAME>b45788h1exv99wewx.txt
<DESCRIPTION>AMEND. #7 TO PRINCIPAL UNDERWRITING AGRMT.
<TEXT>
<PAGE>

EXHIBIT 99.e(x)

AMENDMENT NUMBER 7 TO
PRINCIPAL UNDERWRITING AGREEMENT

Pursuant to the Principal Underwriting Agreement between Hartford
Securities Distribution Company, Inc. and The Hartford Mutual Funds, Inc.
(formerly known as ITT Hartford Mutual Funds, Inc.) dated July 22, 1996, as
amended and as assigned to Hartford Investment Financial Services, LLC (formerly
known as Hartford Investment Financial Services Company) on November 1, 1998
(the "Agreement"), The Hartford Income Fund, The Hartford Inflation Plus Fund,
The Hartford Short Duration Fund, The Hartford Tax-Free California Fund and The
Hartford Tax-Free New York Fund are hereby included as five new Funds. All
provisions in the Agreement shall apply to The Hartford Income Fund, The
Hartford Inflation Plus Fund, The Hartford Short Duration Fund, The Hartford
Tax-Free California Fund and The Hartford Tax-Free New York Fund.

This amended Agreement is effective for a period of two years from the
date hereof and shall continue in effect thereafter in accordance with the
provisions of Section 14 of the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this amendment to be
executed on the 31st day of October, 2002.

HARTFORD INVESTMENT FINANCIAL SERVICES, LLC

By: /s/ David M. Znamierowski
-----------------------------------------
David M. Znamierowski
Senior Vice President, Investments

THE HARTFORD MUTUAL FUNDS, INC.
on behalf of:
The Hartford Income Fund
The Hartford Inflation Plus Fund
The Hartford Short Duration Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund

By: /s/ David M. Znamierowski
-----------------------------------------
David M. Znamierowski
President

</TEXT>
</DOCUMENT>

```
<TYPE>EX-99.E(VI)
<SEQUENCE>3
<FILENAME>b41808hlex99-evi.txt
<DESCRIPTION>ASSIGNMENT OF PRINCIPAL UNDERWRITING AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT e. (vi)

Assignment of Principal Underwriting Agreement from Hartford Securities
Distribution Company, Inc. to Hartford Investment Financial Services Company
```
<PAGE>
```
ASSIGNMENT OF PRINCIPAL UNDERWRITING AGREEMENT

Pursuant to the authorization provided by the Board of Directors of The
Hartford Mutual Funds, Inc. (the "Company") at a meeting duly called and held in
person on July 15, 1998, the Principal Underwriting Agreement dated July 22,
1996, as amended, (the "Agreement") between the Company and Hartford Securities
Distribution Company, Inc. is hereby assigned to Hartford Investment Financial
Services Company. All terms and conditions of the Agreement remain in full force
and effect including any rights and obligations resulting from distribution
plans adopted under Rule 12b-1 of the Investment Company Act of 1940. This
Assignment is effective November 1, 1998.

                    The Hartford Mutual Funds, Inc.
                            on behalf of:
                    The Hartford Small Company Fund
                    The Hartford Capital Appreciation Fund
                    The Hartford MidCap Fund
                    The Hartford International Opportunities Fund
                    The Hartford Global Leaders Fund
                    The Hartford Stock Fund
                    The Hartford Growth and Income Fund
                    The Hartford Dividend and Growth Fund
                    The Hartford Advisers Fund
                    The Hartford High Yield Fund
                    The Hartford Bond Income Strategy Fund
                    The Hartford Money Market Fund

                    By:   /s/ Joseph H. Gareau
                       -------------------------------------------
                          Joseph H. Gareau
                          President


                    Hartford Securities Distribution Company

                    By:   /s/ Peter W. Cummins
                       -------------------------------------------
                          Peter W. Cummins
                          Senior Vice President


                    Hartford Investment Financial Services Company

                    By:   /s/ Peter W. Cummins
                       -------------------------------------------
                          Peter W. Cummins
                          Vice President, Sales and Distribution

```
</TEXT>
</DOCUMENT>
```

# EXHIBIT 8

<TYPE>EX-99.H(IX)
<SEQUENCE>10
<FILENAME>b60453a1exv99whxixy.txt
<DESCRIPTION>FUND ACCOUNTING AGREEMENT DATED JANUARY 3, 2000
<TEXT>
<PAGE>

### EXHIBIT h.(ix)

### FUND ACCOUNTING AGREEMENT

THIS AGREEMENT is made as of this 3rd day of January, 2000, by and between the mutual funds listed on Schedule A (each a "Fund" and together the "Funds") and HARTFORD LIFE INSURANCE COMPANY (the "Fund Accountant") a Connecticut corporation.

WHEREAS, the Funds are comprised of one or more registered open-end, diversified management investment companies under the Investment Company Act of 1940, as amended, (the "1940 Act") and are currently offering shares of common stock (such shares, of all series and classes, are hereinafter called the "Shares"); and

WHEREAS, the Funds desire that the Fund Accountant perform certain fund accounting services for each Fund; and

WHEREAS, the Fund Accountant is prepared to perform such services on the terms and conditions set forth in this Agreement,

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and intending to be legally bound hereby, the parties agree as follows:

1. SERVICES AS FUND ACCOUNTANT

The Fund Accountant will provide such fund accounting services as the Funds may reasonably request, including daily pricing of portfolio securities, computation of the net asset value and the net income of the Funds in accordance with the Funds' prospectuses and statements of additional information; calculation of the dividend and capital gain distributions (including that needed to avoid all Federal excise taxes), if any; calculation of yields on all applicable Funds and all classes thereof; preparation of the following reports: (i) a current security position report; (ii) a summary report of transactions and pending maturities (including the principal, cost, and accrued interest on each portfolio security in maturity date order); and (iii) a current cash position report (including cash available from portfolio sales and maturities and sales of a Fund's Shares less cash needed for redemptions and settlement of portfolio purchases); and such other similar services with respect to a Fund as may be reasonably requested by the Funds. With regard to securities for which market quotations are available, the Fund Accountant may use one or more external pricing services as selected and authorized by the Fund on the Pricing Authorization Form attached hereto as Schedule B. The Fund Accountant will keep and maintain the following books and records of each Fund pursuant to Rule 31a-1 under the 1940 Act (the "Rule"): journals containing an itemized daily record in detail of all purchases and sales of securities, all receipts and disbursements of cash and all other debits and credits, as required by subsection (b)(1) of the Rule; general and auxiliary ledgers reflecting all asset, liability, reserve, capital, income and expense accounts, including interest accrued and interest received, as required by subsection (b)(2)(i) of the Rule; separate ledger accounts required by subsection

<PAGE>

(b)(2)(ii) and (iii) of the Rule; and a monthly trial balance of all ledger accounts (except shareholder accounts) as required by subsection (b)(8) of the Rule.

In compliance with the requirements of Rule 31a-3 under the 1940 Act, Fund Accountant hereby agrees that all records which it maintains for the Funds are the property of the Funds and further agrees to surrender promptly to the Funds any of such records upon the Funds' request. However, Fund Accountant has the right to make copies of such records, in its discretion. Fund Accountant further agrees to preserve for the periods prescribed by Rule 31a-2 under the 1940 Act the records required to be maintained by Rule 31a-1 under the 1940 Act. Fund Accountant may delegate some or all of its responsibilities under this Agreement with the consent of the Funds, which will not be unreasonably withheld.

2.   COMPENSATION

In consideration of services rendered and expenses assumed pursuant to this Agreement, each of the Funds will pay the Fund Accountant on the first business day of each month, or at such time(s) as the Fund Accountant shall request and the parties hereto shall agree, a fee calculated at the applicable annual rate set forth on Schedule C hereto. Net asset value shall be computed at least once a day, as set forth in the Funds' prospectuses. Upon any termination of this Agreement before the end of any month, the fee for such part of a month shall be payable upon the date of termination of this Agreement.

The Fund Accountant will from time to time employ or associate with such person or persons as the Fund Accountant may believe to be particularly fitted to assist it in the performance of this Agreement. Such person or persons may be officers, or employees who are employed by both Fund Accountant and the Funds. The compensation of such person or persons shall be paid by the Fund Accountant and no obligation may be incurred on behalf of the Funds in such respect. Other expenses to be incurred in the operation of the Funds including taxes, interest, brokerage fees and commissions, if any, fees of Directors who are not officers, directors, shareholders or employees of the Fund Accountant or the investment adviser or distributor for the Funds, SEC fees and state Blue Sky qualification fees, advisory and administration fees, transfer and dividend disbursing agents' fees, certain insurance premiums, auditing and legal expenses, costs of maintenance of corporate existence, typesetting and printing prospectuses for regulatory purposes and for distribution to current Shareholders of the Funds, costs of Shareholders' reports and meetings and any extraordinary expenses will be borne by the Funds.

3.   CONFIDENTIALITY

The Fund Accountant agrees to treat confidentially and as the proprietary information of the Funds, all records and other information relative to the Funds and prior, present, or potential Shareholders, and not to use such records and information for any purpose other than performance of its responsibilities and duties hereunder, except after prior notification to and approval in writing by the Funds, which approval shall not be unreasonably withheld and may not be withheld where the Fund Accountant may be exposed to civil or criminal contempt proceedings for failure to comply, when requested to divulge such information by duly constituted authorities, or when so requested by the Funds.

2

<PAGE>

4.   INDEMNIFICATION

The Fund Accountant shall use its best efforts to insure the accuracy of all services performed under this Agreement, but shall not be liable to the Funds for any action taken or omitted by the Fund Accountant in the absence of bad faith, willful misfeasance or gross negligence. The Fund Accountant assumes no responsibility hereunder, and shall not be liable, for any damage, loss of data, delay, or any other loss whatsoever caused by events beyond its reasonable control.

who may be or become an officer, trustee, employee, or agent of the Funds shall be deemed, when rendering services to the Funds, or acting on any business of that party, to be rendering such services to or acting solely for that party and not as an employee, or agent or one under the control or direction of the Fund Accountant even though paid by them.

The Funds agree to indemnify and hold the Fund Accountant harmless from all taxes, charges, expenses, assessments, claims and liabilities (including, without limitation, liabilities arising under the Securities Act of 1933, the Securities Exchange Act of 1934, the 1940 Act, and any state and foreign securities and blue sky laws, all as amended from time to time) and expenses, including (without limitation) attorneys' fees and disbursements arising directly or indirectly from any action or thing which the Fund Accountant takes or does or omits to take or do hereunder, provided that the Fund Accountant shall not be indemnified against any liability to the Funds or to their Shareholders (or any expenses incident to such liability) arising out of the Fund Accountant's negligent failure to perform its duties under this Agreement.

5.   TERM

This Agreement shall become effective on January 3, 2000 and may be terminated upon at least sixty (60) days' written notice to the other party.

6.   NOTICES

All notices and other communications (collectively referred to as a "Notice" or "Notices" in this paragraph) hereunder shall be in writing or by telegram, cable, telex or facsimile sending device. Notices shall be addressed (a) if to the Fund Accountant, at their address, 200 Hopmeadow Street, Simsbury, CT 06089, Attn: George R. Jay; (b) if to the Funds, at their principal place of business or (c) if to neither of the foregoing, at such other address as to which the sender shall have been notified by any such Notice or other communication. The Notice may be sent by first-class mail, in which case it shall be deemed to have been given three days after it is sent, or if sent by confirming telegram, cable, telex, or facsimile sending device, it shall be deemed to have been given immediately.

7.   FURTHER ACTIONS

3

<PAGE>

Each party agrees to perform such further acts and execute such further documents as are necessary to effectuate the purposes hereof.

8.   ASSIGNMENT

This Agreement and the rights and duties hereunder shall not be assignable with respect to a Fund by either of the parties hereto except by the specific written consent of the other party which, in the case of assignment to an affiliate, shall not be unreasonably denied.

9.   AMENDMENTS

This Agreement or any part hereof may be changed or waived only by an instrument in writing signed by the party against which enforcement of such change or waiver is sought.

10.  GOVERNING STATE LAW

This Agreement shall be governed by and its provisions shall be construed in accordance with the laws of the State of Connecticut.

This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. The captions in this Agreement are included for convenience of reference only and in no way define or delimit any of the provisions hereof or otherwise affect their construction or effect. If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

4

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

                    The Hartford Mutual Funds, Inc.
                       on behalf of:
                       The Hartford Advisers Fund
                       The Hartford Bond Income Strategy Fund
                       The Hartford Capital Appreciation Fund
                       The Hartford Dividend and Growth Fund
                       The Hartford Global Leaders Fund
                       The Hartford Growth and Income Fund
                       The Hartford High Yield Fund
                       The Hartford International Opportunities Fund
                       The Hartford MidCap Fund
                       The Hartford Money Market Fund
                       The Hartford Small Company Fund
                       The Hartford Stock Fund


                    By: /s/ David M. Znamierowski
                       --------------------------------------------
                       David M. Znamierowski, President


                    Hartford Life Insurance Company

                    By: /s/ George R. Jay
                       --------------------------------------------
                       George R. Jay, Assistant Vice President

<PAGE>

SCHEDULE A

to the Fund Accounting Agreement

NAME OF FUND

The Hartford Mutual Funds, Inc.
   on behalf of:
   The Hartford Advisers Fund
   The Hartford Bond Income Strategy Fund
   The Hartford Capital Appreciation Fund
   The Hartford Dividend and Growth Fund
   The Hartford Global Leaders Fund
   The Hartford Growth and Income Fund
   The Hartford High Yield Fund
   The Hartford International Opportunities Fund

The Hartford Money Market Fund
The Hartford Small Company Fund
The Hartford Stock Fund

<PAGE>

## SCHEDULE B

### to the Fund Accounting Agreement

#### PRICING AUTHORIZATION FORM

Each Fund hereby authorizes Fund Accountant to use the following price sources, market indices and tolerance ranges for performing fund pricing and evaluating the reasonability of security prices for each Fund.

<TABLE>
<CAPTION>

| SECURITY TYPE | SOURCE/TYPE OF QUOTE | TOLERANCE LEVEL | GENERAL BACK-UP |
|---------------|----------------------|-----------------|-----------------|
| <S> | <C> | <C> | <C> |
| Bonds (domestic) | IDC/Broker Quotes | 1% | Broker Quotes |
| Equities (domestic) | Reuters/last sale or mean between bid and ask if no last sale | 5% | Bloomberg |
| Bonds (foreign) | IDC/Broker Quotes | 1% | Broker Quotes |
| Equities (foreign) | IDC/ last sale or mean between last bid and ask if no last sale | 5% | Bloomberg |

</TABLE>

<PAGE>

## SCHEDULE C

### to the Funding Accounting Agreement

#### MUTUAL FUND ACCOUNTING FEES

<TABLE>
<CAPTION>

| AGGREGATE FUND NET ASSETS | ANNUAL FEE |
|---------------------------|------------|
| <S> | <C> |
| All Assets | 1.5 Basis Points |

</TABLE>
</TEXT>
</DOCUMENT>

<TYPE>EX-99.H(X)
<SEQUENCE>11
<FILENAME>b60453a1exv99whxxy.txt
<DESCRIPTION>AMENDMENT NUMBER 1 TO THE FUND ACCOUNTING AGREEMENT, DATED JULY 23, 2001
<TEXT>
<PAGE>

EXHIBIT h.(x)

AMENDMENT NUMBER 1 TO
FUND ACCOUNTING AGREEMENT

The Fund Accounting Agreement dated January 3, 2000 between The Hartford
Mutual Funds, Inc. on behalf of: The Hartford Advisers Fund, The Hartford Bond
Income Strategy Fund, The Hartford Capital Appreciation Fund, The Hartford
Dividend and Growth Fund, The Hartford Global Leaders Fund, The Hartford Growth
and Income Fund, The Hartford High Yield Fund, The Hartford International
Opportunities Fund, The Hartford MidCap Fund, The Hartford Money Market Fund,
The Hartford Small Company Fund and The Hartford Stock Fund (each a "Fund" and
together the "Funds") and HARTFORD LIFE INSURANCE COMPANY (the "Fund
Accountant") a Connecticut corporation, (the "Agreement") is hereby amended. All
provisions in the Agreement shall apply to the Funds except as stated below.

Schedules A and C of the Agreement are hereby amended and restated as
follows:

[The remainder of page is intentionally left blank]

<PAGE>

SCHEDULE A
to the Fund Accounting Agreement

NAME OF FUND

The Hartford Mutual Funds, Inc.
   on behalf of:
   The Hartford Advisers Fund
   The Hartford Bond Income Strategy Fund
   The Hartford Capital Appreciation Fund
   The Hartford Dividend and Growth Fund
   The Hartford Focus Fund
   The Hartford Focus Growth Fund
   The Hartford Global Communications Fund
   The Hartford Global Financial Services Fund
   The Hartford Global Health Fund
   The Hartford Global Leaders Fund
   The Hartford Global Technology Fund
   The Hartford Growth Fund
   The Hartford Growth and Income Fund
   The Hartford High Yield Fund
   The Hartford International Capital Appreciation Fund
   The Hartford International Opportunities Fund
   The Hartford International Small Company Fund
   The Hartford MidCap Fund
   The Hartford MidCap Value Fund
   The Hartford Money Market Fund
   The Hartford Small Company Fund
   The Hartford Stock Fund
   The Hartford Value Fund

2

<PAGE>

SCHEDULE 2
to the Funding Accounting Agreement

MUTUAL FUND ACCOUNTING FEES

```
<TABLE>
<CAPTION>
AGGREGATE FUND NET ASSETS      ANNUAL FEE
-------------------------      --------------
<S>                            <C>
      All Assets               2 Basis Points
</TABLE>
```

3

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be
duly executed as of the 23rd day of July, 2001.

                    The Hartford Advisers Fund
                    The Hartford Bond Income Strategy Fund
                    The Hartford Capital Appreciation Fund
                    The Hartford Dividend and Growth Fund
                    The Hartford Focus Fund
                    The Hartford Focus Growth Fund
                    The Hartford Global Communications Fund
                    The Hartford Global Financial Services Fund
                    The Hartford Global Health Fund
                    The Hartford Global Leaders Fund
                    The Hartford Global Technology Fund
                    The Hartford Growth Fund
                    The Hartford Growth and Income Fund
                    The Hartford High Yield Fund
                    The Hartford International Capital Appreciation Fund
                    The Hartford International Opportunities Fund
                    The Hartford International Small Company Fund
                    The Hartford MidCap Fund
                    The Hartford MidCap Value Fund
                    The Hartford Money Market Fund
                    The Hartford Small Company Fund
                    The Hartford Stock Fund
                    The Hartford Value Fund


                    By: /s/ David M. Znamierowski
                        --------------------------------------------
                        David M. Znamierowski, President


                    Hartford Life Insurance Company


                    By: /s/ George R. Jay
                        --------------------------------------------
                        George R. Jay, Assistant Vice President


                                      4

```
</TEXT>
</DOCUMENT>
```

<TYPE>EX-99.H(XI)
<SEQUENCE>12
<FILENAME>b60453a1exv99whxxiy.txt
<DESCRIPTION>SECOND AMENDMENT TO THE FUND ACCOUNTING AGREEMENT, DATED OCTOBER 31, 2002
<TEXT>
<PAGE>

EXHIBIT H.(XI)

SECOND AMENDMENT TO FUND ACCOUNTING AGREEMENT

Effective October 31, 2002

The Fund Accounting Agreement dated January 3, 2000 between THE HARTFORD MUTUAL
FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby amended to add the
following series to Schedule A.

The Hartford Income Fund
The Hartford Inflation Plus Fund
The Hartford Short Duration Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund

THE HARTFORD MUTUAL FUNDS, INC.

/s/ David M. Znamierowski
----------------------------------------
David M. Znamierowski
President

HARTFORD LIFE INSURANCE COMPANY

/s/ David M. Znamierowski
----------------------------------------
David M. Znamierowski
Senior Vice President

</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-99.H(XII)
<SEQUENCE>13
<FILENAME>b60453a1exv99whxxiiy.txt
<DESCRIPTION>THIRD AMENDMENT TO THE FUND ACCOUNTING AGREEMENT, DATED AUGUST 25, 2003
<TEXT>
<PAGE>
```

EXHIBIT H.(XII)

THIRD AMENDMENT TO FUND ACCOUNTING AGREEMENT

EFFECTIVE 8/25/2003

The Fund Accounting Agreement dated January 3, 2000 by and between THE HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby amended to add THE HARTFORD EQUITY INCOME FUND to Schedule A and to amend and restate Schedule A as attached hereto.

THE HARTFORD MUTUAL FUNDS, INC.

/s/ David M. Znamierowski
----------------------------------------
David M. Znamierowski
President

HARTFORD LIFE INSURANCE COMPANY

/s/ David M. Znamierowski
----------------------------------------
David M. Znamierowski
Senior Vice President

```
<PAGE>
```

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

```
The Hartford Advisers Fund
The Hartford Capital Appreciation Fund
The Hartford Disciplined Equity Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Income Fund
The Hartford Focus Fund
The Hartford Global Communications Fund
The Hartford Global Financial Services Fund
The Hartford Global Health Fund
The Hartford Global Leaders Fund
The Hartford Global Technology Fund
The Hartford High Yield Fund
The Hartford Income Fund
The Hartford Inflation Plus Fund
The Hartford International Capital Appreciation Fund
The Hartford International Opportunities Fund
The Hartford International Small Company Fund
The Hartford MidCap Fund
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Short Duration Fund
The Hartford Small Company Fund
```

The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund
</TEXT>
</DOCUMENT>

```
<TYPE>EX-99.H(XIII)
<SEQUENCE>14
<FILENAME>b60453a1exv99whxxiiiy.txt
<DESCRIPTION>FOURTH AMENDMENT TO THE FUND ACCOUNTING AGREEMENT, DATED SEPTEMBER 27, 2005
<TEXT>
<PAGE>
```

EXHIBIT H.(XIII)

FOURTH AMENDMENT TO FUND ACCOUNTING AGREEMENT

Effective September 27, 2005

The Fund Accounting Agreement dated January 3, 2000 by and between THE HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby amended to add the series listed below to Schedule A and to amend and restate Schedule A as attached hereto.

- The Hartford Aggressive Growth Allocation Fund

- The Hartford Balanced Allocation Fund

- The Hartford Capital Appreciation II Fund

- The Hartford Conservative Allocation Fund

- The Hartford Floating Rate Fund

- The Hartford Growth Allocation Fund

- The Hartford Income Allocation Fund

- The Hartford Select MidCap Growth Fund

- The Hartford Select MidCap Value Fund

- The Hartford Select SmallCap Growth Fund

- The Hartford Retirement Income Fund

- The Hartford Target Retirement 2010 Fund

- The Hartford Target Retirement 2020 Fund

- The Hartford Target Retirement 2030 Fund

THE HARTFORD MUTUAL FUNDS, INC.


/s/ John C. Walters
----------------------------------------
John C. Walters
Vice President


HARTFORD LIFE INSURANCE COMPANY


/s/ Mary Jane Fortin
----------------------------------------
Mary Jane Fortin
Senior Vice President

```
<PAGE>
```

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund
The Hartford Aggressive Growth Allocation Fund
The Hartford Balanced Allocation Fund
The Hartford Capital Appreciation Fund
The Hartford Capital Appreciation II Fund
The Hartford Conservative Allocation Fund
The Hartford Disciplined Equity Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Income Fund
The Hartford Floating Rate Fund
The Hartford Focus Fund
The Hartford Global Communications Fund
The Hartford Global Financial Services Fund
The Hartford Global Health Fund
The Hartford Global Leaders Fund
The Hartford Global Technology Fund
The Hartford Growth Allocation Fund
The Hartford High Yield Fund
The Hartford Income Allocation Fund
The Hartford Income Fund
The Hartford Inflation Plus Fund
The Hartford International Capital Appreciation Fund
The Hartford International Opportunities Fund
The Hartford International Small Company Fund
The Hartford MidCap Fund
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Retirement Income Fund
The Hartford Select MidCap Growth Fund
The Hartford Select MidCap Value Fund
The Hartford Select SmallCap Growth Fund
The Hartford Short Duration Fund
The Hartford Small Company Fund
The Hartford Stock Fund
The Hartford Target Retirement 2010 Fund
The Hartford Target Retirement 2020 Fund
The Hartford Target Retirement 2030 Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund
</TEXT>
</DOCUMENT>

```
<TYPE>EX-99.H.XIII
<SEQUENCE>9
<FILENAME>b65590a1exv99whwxiii.txt
<DESCRIPTION>EIGHTH AMENDMENT TO THE FUND ACCOUNTING AGREEMENT 5/31/07
<TEXT>
<PAGE>
```

EXHIBIT H.XIII
EIGHTH AMENDMENT TO FUND ACCOUNTING AGREEMENT

Effective May 31, 2007

The Fund Accounting Agreement dated January 3, 2000 by and between THE HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby amended to add The Hartford Checks and Balances Fund, The Hartford High Yield Municipal Bond Fund, and The Hartford Strategic Income Fund (the "Funds") as new series to Schedule A and to amend and restate Schedule A as attached hereto.

THE HARTFORD MUTUAL FUNDS, INC.

/s/ John C. Walters
----------------------------------------
John C. Walters
Vice President

HARTFORD LIFE INSURANCE COMPANY

/s/ Robert M. Arena
----------------------------------------
Name: Robert M. Arena
Title:  Senior Vice President

```
<PAGE>
```

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund

The Hartford Balanced Allocation Fund

The Hartford Balanced Income Fund

The Hartford Capital Appreciation Fund

The Hartford Capital Appreciation II Fund

The Hartford Checks and Balances Fund

The Hartford Conservative Allocation Fund

The Hartford Disciplined Equity Fund

The Hartford Dividend and Growth Fund

The Hartford Equity Income Fund

The Hartford Equity Growth Allocation Fund, (formerly The Hartford Aggressive Growth Allocation Fund)

The Hartford Floating Rate Fund

The Hartford Fundamental Growth Fund, (formerly The Hartford Focus Fund)

The Hartford Global Communications Fund

The Hartford Global Financial Services Fund

The Hartford Global Health Fund

The Hartford Global Leaders Fund

The Hartford Global Technology Fund

The Hartford Growth Allocation Fund

The Hartford High Yield Fund

The Hartford High Yield Municipal Bond Fund

The Hartford Income Allocation Fund

The Hartford Income Fund

The Hartford Inflation Plus Fund

The Hartford International Capital Appreciation Fund

The Hartford International Opportunities Fund

The Hartford International Small Company Fund

The Hartford LargeCap Growth Fund

The Hartford MidCap Fund

The Hartford MidCap Growth Fund

The Hartford MidCap Value Fund

The Hartford Money Market Fund

The Hartford Retirement Income Fund

The Hartford Select MidCap Growth Fund

The Hartford Select MidCap Value Fund

The Hartford Select SmallCap Growth Fund

The Hartford Select SmallCap Value Fund

The Hartford Short Duration Fund

The Hartford Small Company Fund

The Hartford Strategic Income Fund

The Hartford Stock Fund

<PAGE>

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Target Retirement 2010 Fund

The Hartford Target Retirement 2020 Fund

The Hartford Target Retirement 2030 Fund

The Hartford Tax-Free California Fund

The Hartford Tax-Free New York Fund

The Hartford Total Return Bond Fund

The Hartford Value Fund
</TEXT>
</DOCUMENT>

```
<TYPE>EX-99.H(XIV)
<SEQUENCE>6
<FILENAME>b67619a1exv99whxxivy.txt
<DESCRIPTION>NINTH AMENDMENT TO THE FUND ACCOUNTING AGREEMENT, NOVEMBER 30, 2007
<TEXT>
<PAGE>
```

NINTH AMENDMENT
TO FUND ACCOUNTING AGREEMENT

Effective: November 30, 2007

The Fund Accounting Agreement dated January 3, 2000 by and between
THE HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby
amended to add The Hartford Global Enhanced Dividend Fund (the "Fund") as a new
series to Schedule A and to amend and restate Schedule A as attached hereto.

THE HARTFORD MUTUAL FUNDS, INC.

/s/ Robert Arena
---------------------------------------
Name: Robert Arena
Title: Vice President

HARTFORD LIFE INSURANCE COMPANY

/s/ Robert Arena
---------------------------------------
Name: Robert Arena
Title: Senior Vice President

```
<PAGE>
```

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund
The Hartford Balanced Allocation Fund
The Hartford Balanced Income Fund
The Hartford Capital Appreciation Fund
The Hartford Capital Appreciation II Fund
The Hartford Checks and Balances Fund
The Hartford Conservative Allocation Fund
The Hartford Disciplined Equity Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Growth Allocation Fund, (formerly The Hartford Aggressive
Growth Allocation Fund)
The Hartford Equity Income Fund
The Hartford Floating Rate Fund
The Hartford Fundamental Growth Fund, (formerly The Hartford Focus Fund)
The Hartford Global Communications Fund
The Hartford Global Enhanced Dividend Fund
The Hartford Global Financial Services Fund
The Hartford Global Growth Fund, (formerly The Hartford Global Leaders Fund)
The Hartford Global Technology Fund
The Hartford Growth Allocation Fund
The Hartford High Yield Fund
The Hartford High Yield Municipal Bond Fund
The Hartford Income Fund

The Hartford Income Allocation Fund
The Hartford Inflation Plus Fund
The Hartford International Growth Fund (formerly The Hartford International
Capital Appreciation Fund)
The Hartford International Opportunities Fund
The Hartford International Small Company Fund
The Hartford LargeCap Growth Fund
The Hartford MidCap Fund
The Hartford MidCap Growth Fund
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Retirement Income Fund
The Hartford Select MidCap Growth Fund
The Hartford Select MidCap Value Fund
The Hartford Select SmallCap Value Fund
The Hartford Short Duration Fund
The Hartford Small Company Fund
The Hartford Stock Fund
The Hartford Strategic Income Fund

<PAGE>

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Target Retirement 2010 Fund
The Hartford Target Retirement 2020 Fund
The Hartford Target Retirement 2030 Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund
</TEXT>
</DOCUMENT>

<TYPE>EX-99.(H)(XVI)
<SEQUENCE>8
<FILENAME>b68643a1exv99wxhyxxviy.txt
<DESCRIPTION>TENTH AMENDMENT TO THE FUND ACCOUNTING AGREEMENT
<TEXT>
<PAGE>

                         TENTH AMENDMENT
                     TO FUND ACCOUNTING AGREEMENT

                      Effective: January 1, 2008


      The Fund Accounting Agreement dated January 3, 2000 by and between THE
HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby
amended to restate Schedule C as attached hereto.

                          THE HARTFORD MUTUAL FUNDS, INC.


                          /s/ Tamara L. Fagely
                          ----------------------------------------
                          Name: Tamara L. Fagely
                          Title: Vice President, Treasurer and
                                 Controller


                          HARTFORD LIFE INSURANCE COMPANY


                          /s/ Robert Arena
                          ----------------------------------------
                          Name: Robert Arena
                          Title: Senior Vice President

<PAGE>
                            SCHEDULE C

                   To the Fund Accounting Agreement

                  THE HARTFORD MUTUAL FUNDS, INC.


      Annual Fee Calculated at the following annual rate based on the Aggregate
Fund Net Assets:

   Advisers Fund, Balanced Income Fund, Capital Appreciation Fund, Floating Rate
Fund, Global Enhanced Dividend Fund, High Yield Fund, High Yield Municipal Bond
Fund, Income Fund, Inflation Plus Fund, International Growth Fund, International
     Opportunities Fund, International Small Company Fund, Short Duration Fund,
             Strategic Income Fund and Total Return Bond Fund

<TABLE>
<CAPTION>

| Average Daily Net Assets | Annual Fee |
| --- | --- |
| <S> | <C> |
| On first $5 billion | 0.018% |
| On next $5 billion | 0.016% |
| Over $10 billion | 0.014% |

</TABLE>

   Capital Appreciation II Fund, Equity Income Fund, Global Health Fund, Income
       Allocation Fund, MidCap Fund, MidCap Growth Fund(1), MidCap Value Fund,
Retirement Income Fund, Stock Fund, Tax-Free California Fund, Tax-Free New York
                         Fund and Value Fund

```
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On first $5 billion           0.014%
On next $5 billion            0.012%
Over $10 billion              0.010%
</TABLE>
```

                        Fundamental Growth Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
All assets                    0.010%
</TABLE>
```

Disciplined Equity Fund, Dividend and Growth Fund, Global Equity Fund(3) Global
          Growth Fund, Money Market Fund and Small Company Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On First $5 billion           0.016%
On next $5 billion            0.014%
Over $10 billion              0.012%
</TABLE>
```

   Balanced Allocation Fund, Checks and Balances Fund, Conservative Allocation
      Fund, Equity Growth Allocation Fund, Global Communications Fund, Global
     Financial Services Fund, Global Technology Fund, Growth Allocation Fund,
    LargeCap Growth Fund, Select MidCap Growth Fund(1, 2), Select MidCap Value
  Fund, Select SmallCap Value Fund, Target Retirement 2010 Fund, Target Retirement
                 2020 Fund and Target Retirement 2030 Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On First $5 billion           0.012%
Over $5 billion               0.010%
</TABLE>
```

(1)  Effective 2-25-08, the MidCap Growth Fund will be merged into Select MidCap
     Growth Fund.

(2)  Effective 2-25-08, the Select MidCap Growth Fund will be known as the
     MidCap Growth Fund.

(3)  Global Equity Fund commenced operations as of 3-1-08.
</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-99.(H)(XVII)
<SEQUENCE>9
<FILENAME>b68643a1exv99wxhyxxviiy.txt
<DESCRIPTION>ELEVENTH AMENDMENT TO THE FUND ACCOUNTING AGREEMENT
<TEXT>
<PAGE>
```

AMENDMENT NUMBER ELEVEN
TO FUND ACCOUNTING AGREEMENT

Effective: March 1, 2008

The Fund Accounting Agreement dated January 3, 2000 by and between THE
HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby
amended to add The Hartford Global Equity Fund (the "Fund") as a new series to
Schedule A and to amend and restate Schedule A as attached hereto.

THE HARTFORD MUTUAL FUNDS, INC.

/s/ Tamara L. Fagely
----------------------------------------
Name: Tamara L. Fagely
Title: Vice President, Treasurer and
       Controller

HARTFORD LIFE INSURANCE COMPANY

/s/ Robert Arena
----------------------------------------
Name: Robert Arena
Title: Senior Vice President

```
<PAGE>
```

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund
The Hartford Balanced Allocation Fund
The Hartford Balanced Income Fund
The Hartford Capital Appreciation Fund
The Hartford Capital Appreciation II Fund
The Hartford Checks and Balances Fund
The Hartford Conservative Allocation Fund
The Hartford Disciplined Equity Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Growth Allocation Fund, (formerly The Hartford Aggressive
Growth Allocation Fund)
The Hartford Equity Income Fund
The Hartford Floating Rate Fund
The Hartford Fundamental Growth Fund, (formerly The Hartford Focus Fund)
The Hartford Global Communications Fund
The Hartford Global Enhanced Dividend Fund
The Hartford Global Equity Fund
The Hartford Global Financial Services Fund
The Hartford Global Growth Fund, (formerly The Hartford Global Leaders Fund)
The Hartford Global Health Fund
The Hartford Global Technology Fund
The Hartford Growth Allocation Fund

The Hartford High Yield Municipal Bond Fund
The Hartford Income Fund
The Hartford Income Allocation Fund
The Hartford Inflation Plus Fund
The Hartford International Growth Fund (formerly The Hartford International
Capital Appreciation Fund)
The Hartford International Opportunities Fund
The Hartford International Small Company Fund
The Hartford LargeCap Growth Fund
The Hartford MidCap Fund (formerly The Hartford Select MidCap Growth Fund)
The Hartford MidCap Growth Fund
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Retirement Income Fund
The Hartford Select MidCap Value Fund
The Hartford Select SmallCap Value Fund
The Hartford Short Duration Fund
The Hartford Small Company Fund
The Hartford Stock Fund
The Hartford Strategic Income Fund

<PAGE>

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Target Retirement 2010 Fund
The Hartford Target Retirement 2020 Fund
The Hartford Target Retirement 2030 Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund
</TEXT>
</DOCUMENT>

<DOCUMENT>
<TYPE>EX-99.H(XIX)
<SEQUENCE>8
<FILENAME>b72688a1exv99whxxixy.txt
<DESCRIPTION>THIRTEENTN AMENDMENT TO THE FUND ACCOUNTING AGREEMENT, XXXX,2008
<TEXT>
<PAGE>

FORM OF
AMENDMENT NUMBER THIRTEENTH
TO FUND ACCOUNTING AGREEMENT

Effective: October 31, 2008

)

The Fund Accounting Agreement dated January 3, 2000 by and between THE
HARTFORD MUTUAL FUNDS, INC. and HARTFORD LIFE INSURANCE COMPANY is hereby
amended to add The Hartford Target Retirement 2015 Fund, The Hartford Target
Retirement 2025 Fund, The Hartford Target Retirement 2035 Fund, The Hartford
Target Retirement 2040 Fund, The Hartford Target Retirement 2045 Fund, and The
Hartford Target Retirement 2050 Fund (the "Funds") as a new series and to amend
and restate Schedule A and Schedule C as attached hereto.

THE HARTFORD MUTUAL FUNDS, INC.


/s/ Tamara L. Fagely
----------------------------------------
Name: Tamara L. Fagely
Title: Vice President, Treasurer and
       Controller


HARTFORD LIFE INSURANCE COMPANY


/s/ Robert Arena
----------------------------------------
Name: Robert Arena
Title: Executive Vice President

<PAGE>

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund
The Hartford Balanced Allocation Fund
The Hartford Balanced Income Fund
The Hartford Capital Appreciation Fund
The Hartford Capital Appreciation II Fund
The Hartford Checks and Balances Fund
The Hartford Conservative Allocation Fund
The Hartford Disciplined Equity Fund
The Hartford Diversified International Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Growth Allocation Fund, (formerly The Hartford Aggressive
Growth Allocation Fund)
The Hartford Equity Income Fund
The Hartford Floating Rate Fund
The Hartford Fundamental Growth Fund, (formerly The Hartford Focus Fund)
The Hartford Global Communications Fund
The Hartford Global Enhanced Dividend Fund
The Hartford Global Equity Fund

```
The Hartford Global Growth Fund, (formerly The Hartford Global Leaders Fund)
The Hartford Global Health Fund
The Hartford Global Technology Fund
The Hartford Growth Allocation Fund
The Hartford High Yield Fund
The Hartford High Yield Municipal Bond Fund
The Hartford Income Fund
The Hartford Income Allocation Fund
The Hartford Inflation Plus Fund
The Hartford International Growth Fund (formerly The Hartford International
Capital Appreciation Fund)
The Hartford International Opportunities Fund
The Hartford International Small Company Fund
The Hartford LargeCap Growth Fund
The Hartford MidCap Fund
The Hartford MidCap Growth Fund (formerly The Hartford Select MidCap Growth
Fund)
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Retirement Income Fund
The Hartford Select MidCap Value Fund
The Hartford Select SmallCap Value Fund
The Hartford Short Duration Fund
```

<PAGE>

SCHEDULE A

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

```
The Hartford Small Company Fund
The Hartford Stock Fund
The Hartford Strategic Income Fund
The Hartford Target Retirement 2010 Fund
The Hartford Target Retirement 2015 Fund
The Hartford Target Retirement 2020 Fund
The Hartford Target Retirement 2025 Fund
The Hartford Target Retirement 2030 Fund
The Hartford Target Retirement 2035 Fund
The Hartford Target Retirement 2040 Fund
The Hartford Target Retirement 2045 Fund
The Hartford Target Retirement 2050 Fund
The Hartford Tax-Free California Fund
The Hartford Tax-Free New York Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund
```

<PAGE>

SCHEDULE C

To the Fund Accounting Agreement

THE HARTFORD MUTUAL FUNDS, INC.

Annual Fee Calculated at the following annual rate based on the
Aggregate Fund Net Assets:

Advisers Fund, Balanced Income Fund, Capital Appreciation Fund, Diversified
International Fund, Floating Rate Fund, Global Enhanced Dividend Fund, High
Yield Fund, High Yield Municipal Bond Fund, Income Fund, Inflation Plus Fund,
International Growth Fund, International Opportunities Fund, International Small
Company Fund, Short Duration Fund, Strategic Income Fund and Total Return Bond

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On first $5 billion           0.018%
On next $5 billion            0.016%
Over $10 billion              0.014%
</TABLE>
```

  Capital Appreciation II Fund, Equity Income Fund, Global Health Fund, Income
  Allocation Fund, MidCap Fund, MidCap Value Fund, Retirement Income Fund, Stock
     Fund, Tax-Free California Fund, Tax-Free New York Fund and Value Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On first $5 billion           0.014%
On next $5 billion            0.012%
Over $10 billion              0.010%
</TABLE>
```

                          Fundamental Growth Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
All assets                    0.010%
</TABLE>
```

   Disciplined Equity Fund, Dividend and Growth Fund, Global Equity Fund, Global
              Growth Fund, Money Market Fund and Small Company Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On First $5 billion           0.016%
On next $5 billion            0.014%
Over $10 billion              0.012%
</TABLE>
```

     Balanced Allocation Fund, Checks and Balances Fund, Conservative Allocation
        Fund, Equity Growth Allocation Fund, Global Communications Fund, Global
      Financial Services Fund, Global Technology Fund, Growth Allocation Fund,
     LargeCap Growth Fund, MidCap Growth Fund, Select MidCap Value Fund, Select
   SmallCap Value Fund, Target Retirement 2010 Fund, Target Retirement 2015 Fund,
  Target Retirement 2020 Fund, Target Retirement 2025 Fund, Target Retirement 2030
        Fund, Target Retirement 2035 Fund, Target Retirement 2040 Fund, Target
                 Retirement 2045 Fund and Target Retirement 2050 Fund

```
<TABLE>
<CAPTION>
Average Daily Net Assets    Annual Fee
------------------------    ----------
<S>                         <C>
On First $5 billion           0.012%
Over $5 billion               0.010%
</TABLE>
```

</TEXT>
</DOCUMENT>

**AMENDMENT NUMBER FOURTEEN**
**TO FUND ACCOUNTING AGREEMENT**

Effective: May 28, 2010

The Fund Accounting Agreement dated January 3, 2000 by and between **THE HARTFORD MUTUAL FUNDS, INC.** and **HARTFORD LIFE INSURANCE COMPANY** is hereby amended to add **The Hartford Global All-Asset Fund, The Hartford Global Real Asset Fund** and **The Hartford International Value Fund** as new series and to amend and restate Schedule A and Schedule C as attached hereto.

**THE HARTFORD MUTUAL FUNDS, INC.**

/s/Tamara L. Fagely

Name: Tamara L. Fagely
Title: Vice President, Treasurer and Controller

**HARTFORD LIFE INSURANCE COMPANY**

/s/Robert Arena

Name: Robert Arena
Title: Executive Vice President

HMF, Inc.

## SCHEDULE A

To the Fund Accounting Agreement

## THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Advisers Fund
The Hartford Balanced Allocation Fund
The Hartford Balanced Income Fund
The Hartford Capital Appreciation Fund
The Hartford Capital Appreciation II Fund
The Hartford Checks and Balances Fund
The Hartford Conservative Allocation Fund
The Hartford Disciplined Equity Fund
The Hartford Diversified International Fund
The Hartford Dividend and Growth Fund
The Hartford Equity Growth Allocation Fund
The Hartford Equity Income Fund
The Hartford Floating Rate Fund
The Hartford Fundamental Growth Fund
The Hartford Global All-Asset Fund
The Hartford Global Enhanced Dividend Fund
The Hartford Global Growth Fund
The Hartford Global Health Fund
The Hartford Global Real Asset Fund
The Hartford Global Research Fund
The Hartford Growth Allocation Fund
The Hartford High Yield Fund
The Hartford High Yield Municipal Bond Fund
The Hartford Income Fund
The Hartford Inflation Plus Fund
The Hartford International Growth Fund
The Hartford International Opportunities Fund
The Hartford International Small Company Fund
The Hartford International Value Fund
The Hartford MidCap Fund
The Hartford MidCap Value Fund
The Hartford Money Market Fund
The Hartford Select SmallCap Value Fund
The Hartford Short Duration Fund

## SCHEDULE A

To the Fund Accounting Agreement

### THE HARTFORD MUTUAL FUNDS, INC.

The Hartford Small Company Fund
The Hartford Small/Mid Cap Equity Fund
The Hartford Strategic Income Fund
The Hartford Target Retirement 2010 Fund
The Hartford Target Retirement 2015 Fund
The Hartford Target Retirement 2020 Fund
The Hartford Target Retirement 2025 Fund
The Hartford Target Retirement 2030 Fund
The Hartford Target Retirement 2035 Fund
The Hartford Target Retirement 2040 Fund
The Hartford Target Retirement 2045 Fund
The Hartford Target Retirement 2050 Fund
The Hartford Total Return Bond Fund
The Hartford Value Fund

# SCHEDULE C

To the Fund Accounting Agreement

## THE HARTFORD MUTUAL FUNDS, INC.

Annual Fee Calculated at the following annual rate based on the Aggregate Fund Net Assets:

Advisers Fund, Balanced Income Fund, Capital Appreciation Fund, Diversified International Fund, Floating Rate Fund, Global Enhanced Dividend Fund, High Yield Fund, High Yield Municipal Bond Fund, Income Fund, Inflation Plus Fund, International Growth Fund, International Opportunities Fund, International Small Company Fund, International Value Fund, Short Duration Fund, Strategic Income Fund and Total Return Bond Fund

| Average Daily Net Assets | Annual Fee |
|---|---|
| On first $5 billion | 0.018% |
| On next $5 billion | 0.016% |
| Over $10 billion | 0.014% |

Capital Appreciation II Fund, Equity Income Fund, Global Health Fund, MidCap Fund, MidCap Value Fund and Value Fund

| Average Daily Net Assets | Annual Fee |
|---|---|
| On first $5 billion | 0.014% |
| On next $5 billion | 0.012% |
| Over $10 billion | 0.010% |

Fundamental Growth Fund

| Average Daily Net Assets | Annual Fee |
|---|---|
| All assets | 0.010% |

Global All-Asset Fund and Global Real Asset Fund

| Average Daily Net Assets | Annual Fee |
|---|---|
| First $5 billion | 0.25% |
| Next $5 billion | 0.020% |
| Over $10 billion | 0.015% |

Disciplined Equity Fund, Dividend and Growth Fund, Global Research Fund, Global Growth Fund, Money Market Fund and Small Company Fund

| Average Daily Net Assets | Annual Fee |
|---|---|
| On First $5 billion | 0.016% |
| On next $5 billion | 0.014% |
| Over $10 billion | 0.012% |

Balanced Allocation Fund, Checks and Balances Fund, Conservative Allocation Fund, Equity Growth Allocation Fund, Growth Allocation Fund, Select SmallCap Value Fund, Small/Mid Cap Equity Fund, Target Retirement 2010 Fund, Target Retirement 2015 Fund, Target Retirement 2020 Fund, Target Retirement 2025 Fund, Target Retirement 2030 Fund, Target Retirement 2035 Fund, Target Retirement 2040 Fund, Target Retirement 2045 Fund and Target Retirement 2050 Fund

| Average Daily Net Assets | Annual Fee |
|---|---|
| On First $5 billion | 0.012% |
| Over $5 billion | 0.010% |

# EXHIBIT 9

&lt;DOCUMENT&gt;
&lt;TYPE&gt;EX-99.H(V)
&lt;SEQUENCE&gt;7
&lt;FILENAME&gt;b50650mfexv99whxvy.txt
&lt;DESCRIPTION&gt;SHARE PURCHASE AGREEMENT
&lt;TEXT&gt;
&lt;PAGE&gt;

THE HARTFORD MUTUAL FUNDS, INC.
THE HARTFORD MUTUAL FUNDS II, INC.
SHARE PURCHASE AGREEMENT


HARTFORD LIFE INSURANCE COMPANY ("HL"), a Connecticut Corporation, as Sponsor-Depositor, now and in the future, of certain separate accounts ("Separate Accounts"), and issuer of certain variable funding agreements (the "Contracts") issued with respect to such Separate Accounts, hereby agrees as of the 3rd day of May 2004 with THE HARTFORD MUTUAL FUNDS, INC. and THE HARTFORD MUTUAL FUNDS II, INC., each an open-end management investment company (each, a "Fund" and together, the "Funds"), to this Share Purchase Agreement, which contemplates an arrangement whereby Fund shares shall be made available to serve as the underlying investment media for the Contracts, subject to the following provisions:

1. Fund shares shall be purchased at the net asset value applicable to each order as established in accordance with the provisions of the then currently effective prospectus of the Fund. Fund shares shall be ordered in such quantity and at such times as determined by HL (or its successor) to be necessary to meet the requirements of the Contracts. Confirmations of Fund share purchases will be sent directly to HL by the Fund. All Fund share purchases shall be maintained in a book share account in the name of HL. Payment for shares shall be made directly to the Fund by HL and payment for redemption shall be made directly to HL by the Fund, all within the applicable time periods allowed for settlement of securities transactions. If payment is not received by the Fund within such period, the Fund may, without notice, cancel the order and hold HL responsible for any loss suffered by the Fund resulting from such failure to receive timely payment.

   Notice shall be furnished promptly to HL by the Fund of any dividend or distribution payable on Fund shares. HL elects to receive all such dividends or distributions in the form of additional Fund shares. HL reserves the right to revoke this election and to receive in cash all such dividends and distributions declared after the Fund's receipt of notice of HL's revocation of this election.

2. (a) The Fund represents that its shares are registered under the Securities Act of 1933, as amended, and that all appropriate federal and state registration provisions have been complied with as to such shares and that such shares may properly be made available for the purposes of this Agreement. The Fund shall bear the cost of any such registration, as well as the expense of any taxes assessed upon the issuance or transfer of Fund shares pursuant to this Agreement.

   (b) The Fund shall supply to HL, in a timely manner and in a sufficient number to allow distribution by HL to each owner of or participant under a Contract (i) annual and semiannual reports of the Fund's condition, and (ii) any other Fund shareholder notice, report or document required by law to be

&lt;PAGE&gt;

delivered to shareholders. The Fund shall bear the cost of preparing and supplying the foregoing materials and the cost of any distribution thereof.

   (c) HL represents that it has registered or will register under the

as amended (the "1940 Act"), unless exempt from such registration, the Contracts. HL will maintain such registrations to the extent required by law. The Contracts will be issued in compliance with all applicable federal and state laws and regulations.

(d)  HL has legally and validly established each Separate Account prior to any issuance or sale as a segregated asset account under the Connecticut Insurance Code and has registered or, prior to any issuance or sale of the Contracts, will register and will maintain the registration of, each Separate Account as a unit investment trust in accordance with the 1940 Act, unless exempt from such registration.

3.  HL shall not make any representation concerning Fund shares except those contained in the then current prospectus of the Fund and in printed information subsequently issued by the Fund as information supplemental to the prospectus.

4.  This Agreement shall terminate:

(a)  At the option of HL or the Fund upon six months' advance notice to the other;

(b)  At the option of HL if Fund shares are not available for any reason to meet the requirements of any of the Contracts but then only as to those Contracts;

(c)  At the option of HL, upon institution of formal proceedings against the Fund by the Securities and Exchange Commission or any other regulatory body;

(d)  Upon assignment of this Agreement, unless made with the written consent of the other party to this Agreement;

(e)  If Fund shares are not registered, issued or sold in conformance with applicable federal or state law or if such laws preclude the use of Fund shares as the underlying investment media of the Contracts. Prompt notice shall be given to HL in the event the conditions of this provision occur.

Notice of termination hereunder shall be given promptly by the party desiring to terminate to the other party to this Agreement.

5.  Termination as the result of any cause listed in the preceding paragraph shall not affect the Fund's obligation to furnish Fund shares in connection with Contracts then in force for which the shares of the Fund serve or may serve as the underlying investment media, unless further sale of Fund shares is proscribed by the Securities and Exchange Commission or other regulatory body, or if Fund shares of the requisite Series are no longer available.

<PAGE>
6.  This Agreement shall supersede any prior agreement between the parties hereto relating to the same subject matter.

7.  Each notice required by this Agreement shall be given in writing as follows:

                    If to the Fund:
                    --------------

                    The Hartford Mutual Funds
                    P.O. Box 2999
                    Hartford, Connecticut 06104-2999
                    Attn: Counsel to the Fund

                    Hartford Life Insurance Company
                    P.O. Box 2999
                    Hartford, Connecticut 06104-2999
                    Attn: General Counsel

8.   This Agreement shall be construed in accordance with the laws of the State
of Connecticut.

9.   The Fund will provide HL with copies of its proxy solicitations applicable
to each series of the Fund (each a "Series"). HL will, to the extent required by
law, (a) distribute proxy materials applicable to the Series to eligible
Contract owners; (b) solicit voting instructions from eligible Contract owners;
(c) vote the Series shares in accordance with instructions received from
Contract owners; (d) if required by law, vote Series shares for which no
instructions have been received in the same proportion as shares of the Series
for which instructions have been received; and (e) calculate voting privileges
in a manner consistent with other life insurance companies to whose separate
accounts Series shares are offered. Unregistered separate accounts subject to
the Employee Retirement Income Security Act of 1974 ("ERISA") will refrain from
voting shares for which no instructions are received if such shares are held
subject to the provisions of ERISA.

<PAGE>

Dated: May 3, 2004

                            THE HARTFORD MUTUAL FUNDS, INC.

                            By: /s/ David M. Znamierowski
                               -------------------------------------
                               David M. Znamierowski


                            THE HARTFORD MUTUAL FUNDS II, INC.

                            By: /s/ David M. Znamierowski
                               -------------------------------------
                               David M. Znamierowski

                            HARTFORD LIFE INSURANCE COMPANY

                            By: /s/ Eric H. Wietsma
                               -------------------------------------
                               Eric H. Wietsma

</TEXT>
</DOCUMENT>

# EXHIBIT 10

# MUTUAL FUND ADVISORY FEES: NEW EVIDENCE AND A FAIR FIDUCIARY DUTY TEST

JOHN P. FREEMAN,* STEWART L. BROWN** & STEVE POMERANTZ***

## *Introduction*

Anyone looking for a truly good investment should not consider a mutual fund; instead, the choice should be stock in a mutual fund sponsor. Nobel Laureate Paul Samuelson realized this more than forty years ago: "I decided that there was only one place to make money in the mutual fund business—as there is only one place for a temperate man to be in a saloon, behind the bar and not in front of the bar. And I invested in . . . [a] management company."[1]

The mutual fund industry is a financial force in this country, managing assets for more than 90 million Americans, roughly half the nation's households.[2] This massive market penetration has resulted in enormous profits for the mutual fund industry's service providers—the fund sponsors. Profits the fund sponsors have banked while attracting surprisingly little attention, at least until recently.

In the mutual fund industry, fund sponsors are often called mutual fund "advisers" or mutual fund "managers." They are in the business of creating mutual funds to which they sell portfolio management services as well as

---

* Campbell Professor of Legal and Business Ethics, University of South Carolina. B.B.A., 1967; J.D., 1970, University of Notre Dame; LL.M., 1976, University of Pennsylvania. Member, Ohio and South Carolina Bars.

** Professor of Finance, Emeritus, Florida State University. B.S.B.A., 1970; M.B.A., 1971; Ph.D., 1974, University of Florida.

*** B.A., 1981, Queens College, City University of New York; Ph.D., 1986, University of California-Berkeley.

From time to time each of the authors has served as a litigation consultant or as an expert witness on behalf of mutual fund shareholders in litigation challenging the fairness of mutual fund fees.

1. *Mutual Fund Legislation of 1967: Hearing on S. 1659 Before the S. Comm. on Banking and Currency*, 90th Cong. 353 (1967) (testimony of Paul Samuelson). The investment paid off. *Id*; *see also* Ruth Simon, *How Funds Get Rich at Your Expense*, MONEY, Feb. 1995, at 130, 131 ("It is far more lucrative to own a mutual fund company than to invest in the company's products.").

2. INV. CO. INST., 2006 INVESTMENT COMPANY FACT BOOK (46th ed. 2006), *available at* http://www.ici.org/pdf/2006_factbook.pdf. According to one industry insider, most of the money saved by Americans from 1999-2001 was used to purchase mutual fund shares. *See* John C. Bogle, Founder and Former CEO, The Vanguard Group, The End of Mutual Fund Dominance, Keynote Address Before the Financial Planning Association (Apr. 25, 2002), *transcript available at* http://www.vanguard.com/bogle_site/sp20020425.html (noting that $320 billion was used to purchase fund shares out of $385 billion in savings).

*OKLAHOMA LAW REVIEW*      [Vol. 61:83

administrative and "distribution" or marketing services.[3]   The adviser establishes the mutual fund and thereafter controls a number of seats on the fund's board. Though legal requirements mandate that mutual fund boards are also populated by independent directors, it is the adviser who dominates the board and controls the fund's activities. The Second Circuit, in the seminal mutual fund fee case, described the board's relationship with its fund as virtually "unseverable."[4] Because of this "unseverable" relationship, the fund is usually limited to buying advisory services from a single provider. Fees, which compensate advisers for portfolio management, are negotiated annually between the adviser and its captive fund's board.[5] But, because the adviser dominates the board, the fee negotiation cannot truly be arm's-length. Consequently, despite functioning in a tightly regulated environment,[6] advisers (and their affiliated companies) are able to extract outsized rewards, even when producing sub-par results, while facing virtually no risk of getting fired for poor performance.[7] In short, the set-up is perfectly crafted to allow mutual fund advisers and their affiliates to overpay themselves at fund shareholders' expense.

This article focuses on money paid by mutual funds for portfolio management—selecting and managing pooled investments. This portfolio management function is the single most important service performed for actively managed mutual funds. Shareholders purchase portfolio management when they invest in professionally managed mutual funds, and it is the most crucial service fund sponsors deliver. While fund advisers or their affiliates typically derive revenue from distributing the fund's shares or performing other administrative services (such as serving as the fund's transfer agent),

---

3. A report on mutual fund distribution behavior and legal issues arising therefrom is presented in John P. Freeman, *The Mutual Fund Distribution Expense Mess*, 32 J. CORP. L. 739 (2007).

4. Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 929 (2d Cir. 1982).

5. It is harsh, but accurate, to refer to mutual funds as "captives" of the advisers who set them up. The United States Supreme Court recognized this reality in *Burks v. Lasker*, 441 U.S. 471 (1979), observing that a fund "cannot, as a practical matter sever its relationship with the adviser." *Id.* at 481 (quoting S. REP. NO. 91-184, at 5 (1969), *as reprinted in* 1970 U.S.C.C.A.N. 4897, 4901).

6. In the words of former SEC Chairman Ray Garrett, Jr.: "No issuer of securities is subject to more detailed regulation than mutual fund." Letter from Ray Garrett, Jr., Chairman, Sec. Exch. Comm'n, to Sen. John Sparkman, at v (Nov. 4, 1974), *quoted in* John P. Freeman, *Marketing Mutual Funds and Individual Life Insurance*, 28 S.C. L. REV. 1, 77 (1976).

7. In an exception to this rule, in 2002, Japan Fund's directors and shareholders agreed to hire Fidelity Management & Research to manage the fund's portfolio, shunning a Deutsche Bank affiliate. *See* Ian McDonald, *Seven Questions*, WALL ST. J. ONLINE, Dec. 23, 2002 (on file with the authors).

*MUTUAL FUND ADVISORY FEES*

advisory income from portfolio management is the fund adviser's profit
center.[8]

Building on previous studies finding advisory fees wildly out of line with
the fees received for similar investment advisory services in the free market,
this article examines the legal environment that has enabled fund sponsors to
charge above-market fees and earn abnormally high profits for their efforts.
We begin by discussing the unique management structure of mutual funds at
the heart of the excessive fee phenomenon. We then consider new data
confirming the findings of past studies, which show that fund sponsors'
compensation pay is excessive.[9] Our new data compares the advisory fees
charged to Vanguard, which engages in true arm's-length bargaining with its
outside fund advisers, with the advisory fees charged to other mutual funds.
Because of the conflicts of interests described above, other mutual funds do
not engage in arm's-length bargaining with fund advisers. This comparison
demonstrates that advisory fees are set at rates that enable fund sponsors to
earn "economic profits"—profits typically garnered by companies facing little
or no competition in the marketplace.[10] We next analyze evidence by fund
industry supporters, principally Professors John Coates and Glenn Hubbard,
who contend fees charged for mutual fund advisory services are fair and
reasonable.[11]

Reasons why mutual fund fees have soared are then evaluated, focusing on
aspects of the regulatory and legal setting that have given us noncompetitive
pricing for mutual fund advisory services. We analyze section 36(b) of the
Investment Company Act,[12] the key weapon in shareholders' arsenal to attack

8. This has long been so, even for mutual funds that charge sales loads to incoming
investors. *See* Sec. Exch. Comm'n Historical Soc'y, Roundtable on Investment Company
Regulation 94 (Dec. 4, 2002) (remarks of Joel Goldberg, former Director of Investment
Management, Securities and Exchange Commission), *available at* http://
www.sechistorical.org/collection/oralHistories/roundtables/investmentCoRegulation/
INV1204Transcript.pdf.

9. *See* WHARTON SCH. OF FIN. & COMMERCE, A STUDY OF MUTUAL FUNDS, H.R. REP. NO.
87-2274 (1962) [hereinafter WHARTON REPORT]; *see also* SEC. EXCH. COMM'N, PUBLIC POLICY
IMPLICATIONS OF INVESTMENT COMPANY GROWTH, H.R. REP. NO. 89-2337 (1966) [hereinafter
PPI STUDY], *available at* http://sechistorical.org/collection/papers/1960/1966_InvestCoGrowth/;
John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of
Interest*, 26 J. CORP. L. 609 (2001). The Freeman & Brown article will be referred to textually
as "Freeman-Brown."

10. The concept of "economic profits" is discussed *infra* note 26 and accompanying text.

11. *See* John C. Coates IV & R. Glenn Hubbard, *Competition in the Mutual Fund Industry:
Evidence and Implications for Policy*, 33 J. CORP. L. 151 (2007). This article will be referred
to textually as "Coates-Hubbard." Background concerning different versions of Coates-
Hubbard is set forth *infra* note 79.

12. Investment Company Act of 1940 § 36(b), 15 U.S.C. § 80a-35(b) (2000).

*OKLAHOMA LAW REVIEW*          [Vol. 61:83

fee gouging.[13]  Though Congress enacted 36(b) because it recognized the potential for abuse and wanted to empower shareholders to police excessive fees, section 36(b) is impotent in practice.  Because of the impractical proof standard for succeeding in a 36(b) lawsuit, no plaintiff has ever won a fee case brought under section 36(b).  In large part, this is because the key case interpreting the provision, the Second Circuit's opinion in *Gartenberg v. Merrill Lynch Asset Management, Inc.*,[14] created an unworkable, unfair, scavenger hunt-style liability test.  *Gartenberg* demands fund shareholders prove their case with evidence that is usually hidden and, once found, subject to bitter disputes between the parties' experts.  Even worse, *Gartenberg* permits a mutual fund adviser to defend its excessive fees by using as benchmarks other excessive fees set by similarly conflict-ridden boards.  To top it off, courts have read *Gartenberg* to *bar* use at trial of the best evidence of fair pricing for investment portfolio advisory services—prices charged by investment advisers managing investment portfolios in the free market.[15]

The current system for evaluating mutual fund advisory fees is a failure. *Gartenberg* and its progeny fail to account sufficiently for the structurally anti-competitive nature of the fund industry and have allowed fund fees to float ever higher, free from the competitive market's gravitational pull.  This article calls for a re-orientation in the way fund advisory fees are evaluated.  We demonstrate there is a free market in which investment advisory services are priced and sold, and we show that this free market pricing can, and should, guide pricing in the fund market.  While we concede the data is sometimes less than pristine, the arm's-length pricing data drawn from free market transactions offers a necessary reality check usable by both courts, in judging

---

13. *See infra* Part IV.A.

14. 694 F.2d 923 (2d Cir. 1982).

15. *See, e.g.*, Gallus v. Ameriprise Fin., Inc., 497 F. Supp. 2d 974, 982 (D. Minn. 2007) ("Since *Gartenberg*, courts have held that other mutual funds provide the relevant comparison for measuring fees—not non-mutual fund institutional clients."); Order Granting Defendants' Motion in Limine, Baker v. Am. Century Inv. Mgmt., Inc., No. 04-4039-CV-C-ODS (W.D. Mo. July 17, 2006) (barring introduction of evidence related to non-mutual fund accounts); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990) ("[T]o the extent that comparisons are probative at all, a mutual fund adviser-manager must be compared with members of an appropriate universe: adviser-managers of similar funds."), *aff'd*, 928 F.2d 590 (2d Cir. 1991).  In *Kalish*, the district court went so far as to suggest that even a fee pricing comparison to a similar Vanguard mutual fund managed by an outside adviser was "seriously flawed" because Vanguard furnished various administrative services to its funds on an at-cost basis. *Id.* at 1231, 1250. Assuming the comparison focused purely on fees for advisory services rendered by the Franklin fund and the similar Vanguard fund, the comparison would not be "seriously flawed."  The comparison would be highly appropriate.

whether fees are too high, and by mutual fund boards when negotiating fee levels with their funds' advisers.

We conclude by setting forth a new analytical framework for evaluating mutual fund fees. Under our approach, evidence a fund adviser or one of its affiliates treats an outsider more favorably than the very party to whom the adviser owes statutorily-provided fiduciary duties needs to be recognized for what it is: prima facie evidence of a breach of fiduciary duty. Courts should replace the outdated, impractical, and cumbersome *Gartenberg* factors with a new framework, as provided by the Supreme Court in an analogous circumstance in *McDonnell Douglas Corp. v. Green*.[16] By the same token, fund boards should heed a call we made in back in 2001.[17] Fund boards should impose the "most favored nation" concept, demanding that mutual funds pay a price for portfolio management that is no higher than that charged by the fund's adviser or its affiliates when managing the investment portfolios of third-party customers (such as pension funds, endowment funds, and the Vanguard funds) who bargain at arm's-length.

Use of free market comparative data by directors when negotiating with fund advisers over fees, and by courts in evaluating those fees, can pave the ways for investors to save billions of dollars annually. The analytical starting point for courts called on to determine whether advisory fees charged captive mutual funds by their advisers bear the earmarks of arms-length bargaining needs to be a comparison of the prices paid by the captive funds with actual prices negotiated in free market transactions by independent (i.e., non-captive) purchasers of similar investment advisory services.

## I. Mutual Funds' Conflicted Management Structure

Any discussion of mutual fund fees must begin with a discussion of mutual fund's unique management structure. Mutual funds do not function like normal businesses. In a normal business, the firm's management is free to hire and fire outside service providers. In the mutual fund industry, as a rule, the set-up is different. Instead of firm management being in charge, outside managers actually have de facto control of the fund and its board. This industry-standard arrangement is sometimes referred to "external management" in recognition of the fact that the nearly all mutual funds are captives of outside manager-service providers. The practical economic consequence of this conflicted relationship was explained by one industry pioneer who noted that one almost always finds mutual funds

---

16. 411 U.S. 792 (1973).

17. *See generally* Freeman & Brown, *supra* note 9 (discussing the structure of mutual fund fees in relation to pension fund fees).

*OKLAHOMA LAW REVIEW* [Vol. 61:83]

> operated by external . . . management companies which seek to
> earn high returns for fund investors, to be sure, but seek at the same
> time to earn the highest possible returns for themselves. Some of
> these companies are publicly-held, in which case their shares are
> held by investors who own their shares for the same reason that
> investors own Microsoft or General Motors: To make money for
> themselves.[18]

The adviser's grip on the fund management starts when the fund is formed and tends to be strong and enduring.[19]

Recognizing the inherent conflict of interest between the fund's investment adviser and the fund when bargaining over compensation, Congress decreed, when it enacted the Investment Company Act of 1940, that fund boards needed the presence of independent directors to perform a "watchdog"[20] function.[21]

---

18. John C. Bogle, Honing the Competitive Edge in Mutual Funds, Remarks Before the Smithsonian Forum 5 (Mar. 23, 1999) (transcript on file with the authors).

19. Referring to testimony offered by fund industry executives, one former SEC Commissioner emphasized the adviser's dominant position vis-à-vis the controlled fund:

> They also made the point that the investment adviser creates the fund, and
> operates it in effect as a business. Many of them stated that "It is our fund, we run
> it, we manage it, we control it," and I don't think there is anything wrong [with]
> them saying it. They were just admitting what is a fact of life.
>     The investment adviser does control the fund.

*Investment Company Act Amendments of 1967: Hearings on H.R. 9510 and H.R. 9511 Before the Subcomm. on Commerce & Fin. of the H. Comm. on Interstate and Foreign Commerce*, 90th Cong. 674 (1967) (statement of Manuel F. Cohen, Comm'r, Securities Exchange Commission).

20. Burks v. Lasker, 441 U.S. 471, 484 (1979).

21. The number of independent directors varies. For any funds formed under the special provisions of section 10(d) of the Investment Company Act of 1940, 15 U.S.C. § 80a-10(d) (2000), only a single independent director is required. Normally, however, 40% of the board must be comprised of independent directors. *Id.* § 80a-10(a). Various SEC exemptive rules require as a condition of obtaining the exemption that funds have at least half of their board seats filled by independent directors. *See, e.g.*, 17 C.F.R. § 270.12b-1(b)(1) (2007). In 2004, the SEC proposed a rule requiring that funds that rely on certain exemptions, such as Rule 12b-1, have a supermajority (at least 75%) of independent directors and that an independent director chair the board. *See* Investment Company Governance, Investment Company Act Release No. 26,323, 69 Fed. Reg. 3472 (proposed Jan. 23, 2004) (to be codified at 17 C.F.R. pt. 270). The SEC subsequently adopted Rule 0-1(a)(7), 17 C.F.R. § 270.0-1(a)(7) (2007). *See* Investment Company Governance, Investment Company Act Release No. 26,520, 69 Fed. Reg. 46,378, 46,389 (Aug. 2, 2004). The original compliance date for the governance changes was January 16, 2006. *Id.* Before the Rule could take effect, however, the SEC's action was attacked in a suit filed by the Chamber of Commerce of the United States. The U.S. Court of Appeals for the D.C. Circuit subsequently ruled that, in promulgating the Rule, the SEC had failed to satisfy certain rulemaking requirements, remanding the matter to the SEC to address the deficiencies. Chamber of Commerce of the U.S. v. SEC, 412 F.3d 133, 144-45 (D.C. Cir. 2005). Following

In addition, the statutory scheme for mutual funds requires fund boards to approve a new portfolio management contract with the fund's adviser each year.[22] These protections, however, do little to cure the essential and underlying conflict affecting mutual fund governance. Because the adviser simultaneously functions as service seller while controlling the service-buying fund, the adviser straddles both sides of the transaction. As we show in the next part, that essential conflict and the resulting lack of arm's-length bargaining leads to excessive fees.

### II. Mutual Fund Sponsors—Your Best Investment Choice

Just how lucrative the mutual fund management industry business can be was recently shown by a study listing the best performing American stocks over the last twenty-five years. Two of the top three were mutual fund sponsors. Franklin Resources led the list with an overall return of 64,224%; Boston-based fund manager, Eaton Vance, was third, up 38,444%.[23] The two publicly-held mutual fund sponsors' market performance far outdistanced the overall return for the large-cap segment of the broad stock market as represented by the S&P 500 Index, which returned less than 2000% over the same period.[24] Both fund sponsors also handily beat the stock market performance turned in by software behemoth Microsoft, which placed eighth place in the stock performance rating with an investment return of 29,266%.[25]

---

that defeat, the SEC promptly issued a release declaring that it had determined not to modify, or seek further public comment, on its heightened independence requirements. Investment Company Governance, Investment Company Act Release No. 26,985, 70 Fed. Reg. 39,390 (July 7, 2005). The Chamber of Commerce then filed a new petition for review with the D.C. Circuit. The court subsequently ruled that, in addressing the issues remanded to it, the SEC once again erred, this time by relying improperly on materials outside the rulemaking record. Chamber of Commerce of the U.S. v. SEC, 443 F.3d 890, 909 (D.C. Cir. 2006). Instead of striking down the SEC's rulemaking, however, the court has allowed the SEC to continue to study the issue. *Id.* This study presumably continues, as the SEC has not yet filed its definitive response.

22. *See* Investment Company Act of 1940 § 15(a), 15 U.S.C. § 80a-15(a). Under section 15(a) of the Investment Company Act of 1940, the fund's financial dealings with its investment adviser must be governed by a written advisory contract. Independent directors have special responsibilities regarding the advisory agreement. A majority of the independent directors must vote in person at a specially designated meeting to approve it and its renewals every year. The board can terminate the contract at any time, without penalty, on sixty-days notice. *Id.*

23. *If Only I Had Bought . . .* , USA TODAY, Apr. 16, 2007, at 8B, *available at* http://www.usatoday.com/money/top25-stocks.htm.

24. According to Morningstar's Principia database, the actual return for the S&P 500 index over the period was 1944%.

25. The top ten ranking stocks of the twenty-five covered by the *USA Today* study were:

*OKLAHOMA LAW REVIEW*        [Vol. 61:83

Data drawn from publicly held mutual fund sponsors confirm that these management companies earn substantial "economic profits" (sometimes called "economic rents" or "rents") reflecting extraordinary profitability consistent with returns earned by firms in monopolistic, non-competitive industries.[26]

As Table 1 below makes clear,[27] the excellent market returns earned by Franklin Resources (a compound annual return of 32.9%) and Eaton Vance (a compound annual return of 27.9%) are consistent with the generally excellent stock market performance turned in by fund management companies as a whole over the twenty-five-year period ending in 2006.[28]   Compound

---

1. Franklin Resources, up 64,224%
2. Danaher, up 47,913%
3. Eaton Vance, up 38,444%
4. UnitedHealth, up 37,672%
5. Cisco Systems, up 33,632%
6. International Gaming Technology, up 33,436%
7. Biomet, up 30,531%
8. Microsoft, up 29,266%
9. Best Buy, up 28,703%
10. Oracle, up 28,535%

*If Only I Had Bought . . . , supra* note 23.

26. It is possible to calculate economic profits by looking at what is called "economic value added" (EVA), a term coined by a consulting firm, Stern Stewart & Co. For a discussion of the economic value added concept and its utility, see EVA Dimensions LLC, http://www.evadimensions.com/main.php (last visited Mar. 31, 2008). In order to calculate whether a firm is generating economic profits, one considers both its cost of capital as well as the returns generated by the business. A firm is generating economic profits when its revenue exceeds the total cost of inputs, including normal returns on capital. This difference is referred to as the economic value added. EVA thus captures not only the financial result reflected by the income statement, but also the opportunity cost of the capital invested to generate accounting profits. The authors' study of public financial data for four publicly held mutual fund sponsors—Eaton Vance, Federated Investors, Franklin Resources, and Waddell & Reed—shows each to have earned economic profits exceeding the firm's weighted average cost of capital from 2003-05. In percentage terms, for Eaton Vance, economic profits averaged 11.4% over and above the firm's weighted average cost of capital; for Federated Investors, the number was 18.9%; for Waddell & Reed, it was 7.6%; while for Franklin Resources it was a comparatively small 2%.

27. The beginning dates in Table 1 correspond to the availability of data from the Center for Research on Securities Prices database. The fund sponsors presented are the largest publicly traded firms with at least fifteen years of return data.

28. Computations made by Stewart Brown, one of this article's co-authors, demonstrate that the universe of publicly traded fund sponsors earned statistically significant risk adjusted excess returns over the twenty-five-year-period from 1982 to 2006. A capitalization weighted index of publicly traded fund sponsors had a compound average annual return of 27.8% versus 13.4% for the S&P 500 index over the same period. The ability of specific fund sponsors to earn returns in excess of those generated by other companies is demonstrated by the data in Table 1. As shown there, stock market returns generated by large publicly held fund sponsors tended to more than double those turned in by S&P 500 companies over the years in question.

*MUTUAL FUND ADVISORY FEES*

average annual returns for the five largest publicly traded fund sponsors were more than double returns on the S&P 500 market index over corresponding periods. Moreover, the average level of market risk for these five firms was equal to the market as a whole (average beta coefficient equal to one) so the excess returns were not the result of a market risk premium.

TABLE 1

COMPOUND ANNUAL EQUITY RETURNS FOR LARGE FUND SPONSORS

| Fund Sponsor | Market Capitalization ($Billions) | Beg Dates | Ending Dates | Months | Sponsor Beta | Compound Annual Return Over Period | Compound Annual S&P 500 Return Over Period | Difference Compound Annual Return |
|---|---|---|---|---|---|---|---|---|
| Alliance Bernstein | $6.81 | May-88 | Dec-06 | 224 | 1.00 | 29.4% | 12.0% | 17.4% |
| Eaton Vance Corp | $4.18 | Jan-82 | Dec-06 | 300 | 1.08 | 27.9% | 13.4% | 14.5% |
| Franklin Resources | $27.83 | Oct-83 | Dec-06 | 279 | 0.13 | 32.9% | 12.5% | 20.4% |
| Legg Mason Inc | $15.34 | Sep-82 | Dec-06 | 280 | 1.34 | 19.1% | 12.5% | 6.6% |
| T Rowe Price | $11.54 | May-86 | Dec-06 | 248 | 1.55 | 21.0% | 11.7% | 9.3% |
| Averages | $13.2 | | | | 1.02 | 26.1% | 12.4% | 13.6% |

The fund business was not always so lucrative. In 1980, the total sum of expense money extracted annually by all sponsors from the entire mutual fund industry was around $1.5 billion.[29] In November 2006, the mutual fund industry's assets climbed past $10 trillion.[30] Given that the weighted average expense ratio (costs excluding brokerage commissions, sales loads and redemption charges) for all mutual funds is reportedly around 0.91%,[31] annual payments for fund managers and their affiliates and service providers totaled more than $90 billion.[32] This means that in less than three decades, annual payments to fund sponsors and service providers have increased by an astonishing factor of *sixty times*: from $1.5 billion to $90 billion per year. Far less clear is whether the skyrocketing fund expense pay-outs that fuel the

29. Freeman, *supra* note 3, at 773.

30. Daisy Maxey, *Mutual Funds Pass $10 Trillion Mark: Investors' Focus on Stocks Helped Lift October Assets to Level for the First Time*, WALL ST. J., Nov. 30, 2006, at C11.

31. Rebecca Knight, *Making a Success out of Simplicity— Mutual Funds: Hedge Funds and ETFs Have Their Admirers but Mutual Funds Keep Growing, Says Rebecca Knight*, FIN. TIMES, June 20, 2006, at 10.

32. For professionally managed equity mutual funds, the kind used by many fund shareholders to indirectly invest in the stock market, the weighted average expense ratio is 1.12%, significantly higher than the industry average. *See* JASON KARCESKI ET AL., PORTFOLIO TRANSACTIONS COSTS AT U.S. EQUITY MUTUAL FUNDS 16 tbl.2 (2004), http://www.zero alphagroup.com/news/Execution_CostsPaper_Nov_15_2004.pdf.

growth in fund management companies' stock prices is driven by conduct that is lawful, much less competitive.

### III. A Basic Premise: Fund Advisory Fees Are Too High

An old adage warns, "If it ain't broke, don't fix it." Obviously, there would be no point in discussing what can be done about fund advisory payouts if they are not excessive in the first place. Naturally, fund sponsors do not concede that fees are excessive by any measure. Our starting point thus must be a review of the evidence demonstrating that price gouging over portfolio management fees is a way of life in the fund industry.

The principal product sold by the mutual fund industry is portfolio management services.[33] The funds agree to pay for those services based on yearly contracts negotiated by fund boards which, as a rule, are populated by at least some directors employed by the outside advisory firm.[34] These interested-director contracts are "related party transactions,"[35] carrying the ever-present risk of unfair dealing. Evaluating fee pricing in an industry where conflicts of interest are an ingrained business practice is challenging, since prices routinely contaminated by conflicts of interest are a poor substitute for prices established in a free and competitive marketplace.

A recent article in *The Economist* called attention to the fund industry's flagrantly non-competitive fee pricing structure:

> Imagine a business in which other people hand you their money to look after and pay you handsomely for doing so. Even better, your fees go up every year, even if you are hopeless at the job. It sounds perfect.
>
> That business exists. It is called fund management. . . .
>
> Under the normal rules of capitalism, any industry that can produce double-digit annual growth should soon be swamped by eager competitors until returns are driven down. But in fund management that does not seem to be happening. The average

---

33. Some mutual funds are index funds which are constructed around unmanaged portfolios designed to replicate the holdings of various benchmarks such as the S&P 500 index. These index funds lack the professional management feature common to the rest of the fund industry. *See* Sec. Exch. Comm'n, Index Funds, http://www.sec.gov/answers/indexf.htm (last visited Mar. 31, 2008).

34. A key exception to this rule is the Vanguard Group of funds. *See infra* notes 40-42 and accompanying text.

35. Traditionally, due to the potential for over-reaching and self-dealing, these sorts of contracts have called for detailed disclosure under the securities laws. *See* 17 C.F.R. § 229.404 (2007) (describing disclosure requirements for "[t]ransactions with related persons" where the sum involved exceeds $120,000).

*MUTUAL FUND ADVISORY FEES*

> profit margin of the fund managers that took part in a survey by
> Boston Consulting Group was a staggering 42%. In part, this is
> because most fund managers do not compete on price.[36]

Because fund sponsors as a rule chose not to (and do not have to) compete on price, trying to establish reasonableness by comparing one sponsor's prices to another's is a fool's game. Fair pricing connotes arm's-length bargains reached where neither side is under any compulsion to deal. In the conflicted fund industry, fair bargaining is impossible because captive funds are under compulsion to buy services from or through their controlling sponsor.

At present, when mutual fund fees are evaluated no effort is made to account for the fact that essentially all fees are negotiated by conflicted boards. Rather, mutual fund fees typically are set in fund boardrooms and judged in federal courtrooms based on prices charged by other mutual funds.[37] These comparisons are skewed.[38] The measurement system is akin to judging the

---

36. *Money for Old Hope*, ECONOMIST, Mar. 1, 2008, at 3. For a further, carefully worded expression of concern over evidence of a lack of competition in setting fund fees, see Brian G. Cartwright, Gen. Counsel, Sec. Exch. Comm'n, Remarks Before the 2006 Securities Law Developments Conference Sponsored by the Investment Company Institute Educational Foundation (Dec. 4, 2006), *transcript available at* http://www.sec.gov/news/speech/2006/spch1 20406bgc.htm (recognizing "the possibility that many investors are paying more for the services provided by their mutual funds than they would if the price had been set in a satisfactorily competitive market").

37. *See infra* Part V.D and accompanying text; *see also infra* notes 170-71, 220, 223-29 and accompanying text.

38. Currently, the comparables commonly used in evaluating fund advisory fees are distorted for two reasons. First, conflicted boards compare fund fees to the prices negotiated by other conflicted boards, meaning that fees set by agreements where a party was under compulsion to deal are used. This is antithetical to the concept of arm's-length bargaining where, by definition, neither side is under any compulsion to deal. Second, the fee comparators themselves are tainted. In the authors' experience, fee comparator data tends to be supplied to fund boards by Lipper Analytical Services, which is the leading supplier of fund fee data. Lipper clients manage more than 95% of the United States' fund assets. *See* Oversight Hearing on Mutual Funds: Hidden Fees, Misgovernance and Other Practices that Harm Investors: Hearing Before the Subcomm. on Fin. Mgmt., the Budget, and Int'l Sec. of the S. Comm. on Governmental Affairs, 108th Cong. 181 (2004) [hereinafter *Oversight Hearing on Mutual Funds*] (prepared statement of Jeffrey C. Keil, Vice-President, Lipper Inc.), *available at* http://www.access.gpo.gov/congress/senate/pdf/108hrg/92686.pdf

The authors believe Lipper-generated comparators are based on biased methodology. To understand the problem in Lipper's methods, one must first understand that in the fund industry there are a large number of small funds and a much smaller number of large funds. The bulk of mutual fund assets are concentrated in the largest funds where fees tend to be lower. The first problem arises because, when examining and reporting on comparative funds, Lipper looks at funds of all different sizes and compares the subject fund's fees to the median of the comparative funds. In a highly skewed distribution, with fees tending to decline as assets rise,

reasonableness of a person's body fat ratio by reference only to samples drawn
from new members in Overeaters Anonymous. Depending on what is held up
as a comparison, that which might appear reasonable may not *actually* be
reasonable at all.

In the fund industry's closed fee comparison system, at any point in time,
a significant proportion of funds are charging below average fees. This means
that the advisers receiving those below average fees appear under-compensated
in relation to their peers. The supposedly underpaid advisers have grounds to
argue they deserve a pay hike, which, if obtained, leads to some other fund
sponsor falling below the norm. This pernicious leap-frog game, with
payment decisions effectively based on and checked against no-bid, conflict-
ridden contracts, has yielded a payment system that is out of control. Mutual
fund advisory fees are subject to great dispersion.[39] Because of this, nearly any
fund fee schedule can be presented as more moderate and fair than an array of
others extant in the industry.

Fortunately, the fund marketplace provides an exception to the norm of
conflicted decision-making in the form of the Vanguard Group of funds.
Unlike the standard practice elsewhere in the fund industry, no Vanguard fund
director is employed by any entity selling investment advice to Vanguard.[40]
Thus, no Vanguard board or board member is under any compulsion to buy
advisory services from any particular third-party portfolio manager. Each fund

---

the median fee will be higher than the mean. By using the median rather than the mean, the fees
of the largest funds appear relatively lower. In an attempt to correct for this problem, Lipper
introduced the second data problem. The second problem arises because Lipper takes the
comparative funds and calculates assumed fees for them based on their current fee schedules,
but assuming they hold assets at the level of the subject fund. The problem here is that smaller
funds typically have either a fixed fee schedule or a fee schedule that often stops far below the
level of assets for the subject fund. Comparative fees at the higher asset levels are biased
upward because smaller funds typically introduce breakpoints (i.e., tiered schedules with lower
management fee percentages at higher asset levels) as assets grow. Extrapolating from an
existing fee schedule for these small funds with truncated fee schedules can only overestimate
what the fee will actually be at far higher asset levels. Thus, for large subject funds—those
whose fees are most likely to be attacked as unfair—Lipper's evaluation system overstates what
the subject fund's Lipper-picked peer group funds would be charging at the subject fund's asset
level. By showing higher peer fee levels than actually exists in the marketplace, the
methodology is skewed to make the subject funds' look low in comparison—thus benefitting
the sponsor.

39. *See infra* Figure 4.

40. As Vanguard's founder, John C. Bogle, explained: "[A]t Vanguard, none of our
external managers are represented . . . ." John C. Bogle, Address at the "Is There a Better Way
to Regulate Mutual Funds?" Event Series of the American Enterprise Institute of Public Policy
Research (May 9, 2006), *transcript available at* http://www.aei.org/events/filter.all,eventID.
1317/transcript.asp.

therefore controls the advisory service provider, rather than vice versa. It is
to the Vanguard pricing and business model that we now turn.

*A. Evidence Advisory Fees Are Too High: The Vanguard Experience*

Vanguard has been going to the free market since 1975 to hire outside
advisers,[41] called "sub-advisers," to manage its professionally-advised mutual
funds.[42] The Vanguard experience with buying portfolio management services
in the free market thus offers—a long-running laboratory experiment useful in evaluating the effect of free market pricing for
advisory services within the fund industry. Operating with no compulsion to
buy portfolio management services from any particular investment adviser,
Vanguard gives us a setting where advisory fee decision-making is
uncontaminated by conflicts of interest.

As of 2004, twenty-one Vanguard equity and balanced funds were "actively
managed," meaning they were not index funds.[43] Each of these twenty-one
funds had their portfolios managed by sub-advisers hired in the free market by
the funds' boards. These twenty-one actively managed Vanguard funds
accounted for $155 billion in assets. The average total expense ratio (all
expenses, including portfolio advisory costs, divided by average fund assets)
for these Vanguard funds managed by sub-advisers was 40 basis points (or
bps) on a market-weighted basis.[44] A basis point is one one-hundredth of a
percent, meaning that Vanguard's expense ratio of .40%, or 40 bps, was less
than one-half the industry average of 91 bps.[45] The Vanguard experience is
illustrated by the fee schedules established by Vanguard and its sub-advisers

---

41.  While Vanguard is "internally managed" in the sense that its managers operate purely
in the interests of the funds and their shareholders, the assets in its particular funds are managed
by third-party or "external" advisers, sometimes leading to confusing terminology. Here, we
use the terms "outside advisers" or "outsiders" whenever possible when referring to the third-
party advisers Vanguard hires to manage the assets of its funds.

42.  In 1975, the Vanguard Group of funds emerged as a free-standing mutual fund complex
outside any adviser's domination. What are known today as the Vanguard funds previously had
been controlled by the Wellington Group of Investment Companies. *See* John C. Bogle, *Re-
Mutualizing the Mutual Fund Industry—The Alpha and the Omega*, 45 B.C. L. REV. 391, 399-
404 (2004) (discussing the key events in Vanguard funds' emergence as free-standing,
independent entities previously dominated by their funding adviser, Wellington Management
Company).

43.  *See* Vanguard Investments, http://global.vanguard.com/international/hEurEN/research/
portfolioEN.htm (last visited Mar. 31, 2008).  The index funds do not require active
management and are managed by Vanguard in-house.

44.  Data for these funds has been provided to the authors by the Bogle Financial Markets
Research Center, as well as annual reports for the individual funds. The data is on file with the
authors.

45.  *See supra* text accompanying note 31.

96          *OKLAHOMA LAW REVIEW*          [Vol. 61:83

over the years.[46]  Since 1975, there has been significant growth in the assets under management at the various Vanguard funds.  Figure 1 below illustrates the number of funds and assets managed in millions from 1975 through 2004. A list of the funds in this program with their inception date is included in Appendix A.

FIGURE 1

ASSETS AND FUNDS MANAGED BY OUTSIDE ADVISERS
FOR VANGUARD GROUP 1975-2004



According to a mutual fund sponsors' lobbying organization, the Investment Company Institute[47] ("ICI"): "The bedrock principle of the mutual fund industry is that the interests of investors always come first."[48]  Within the

---

46.  ROBERT SLATER, JOHN BOGLE AND THE VANGUARD EXPERIMENT (1997).

47.  The ICI has done a splendid job of advancing the interests of fund sponsors, while drawing a major portion of its operating funds from mutual fund assets—and hence from mutual fund shareholders. *See* Kathleen Day, *So Sweet and Sour: Investor Fees Finance Interests of Lobbyists*, WASH. POST, Jan. 11, 2004, at F01; Paula Dwyer et al., *Breach of Trust: The Mutual-Fund Scandal Was a Disaster Waiting to Happen*, BUS. WK., Dec. 15, 2003, at 98, *available at* http://www.businessweek.com/magazine/content/03_50/b3862015.htm?chan= search. When the interests of fund shareholders diverge from fund sponsors' interests, the ICI regularly takes the side of the fund sponsors. *See* Paul B. Farrell, *A Mutual Fund Tale from Oz: Fund Lobbyists Twist Away from Shareholder Interests*, MARKETWATCH, Oct. 18, 2005, http:// www.marketwatch.com/news/story/fund-lobbyists-put-wicked-twist/story.aspx?guid=%7BF F2B7205-45DA-47C7-9D5D-ED0DF09CA0A2%7D.

48.  *Mutual Funds: Trading Practices and Abuses that Harm Investors: Hearing Before the Subcomm. on Fin. Mgmt., the Budget, and Int'l Sec. of the S. Comm. on Governmental Affairs,*

Vanguard Group, this bedrock principle is more than just "public relation" talk; it is a core value.  As shown by the following two figures, with the growth of Vanguard funds' assets, the advisory fee for Vanguards' sub-advised funds has been declining.  This decline demonstrates the presence of both arm's-length bargaining and "economies-of-scale" pricing.[49]  In other words, as fund size grows, costs-per-dollar-managed decrease, with Vanguard fund boards passing on those cost savings to fund shareholders in the form of reduced fees.  Figure 2 below shows that, between 1975 and 2002 the average advisory fee charged for Vanguard's sub-advised funds has been declining on both an equal-weighted and dollar-weighted basis.[50]

FIGURE 2
AVERAGE ADVISORY FEES PAID FOR VANGUARD FUNDS
MANAGED BY SUB-ADVISERS FOR 1975-2004



108th Cong. 187 (2003) [hereinafter *Trading Practices Hearing*] (prepared statement of Matthew Fink, President, Investment Company Institute), *available at* http://frwebgate.access. gpo.gov/cgi-bin/getdoc.cgi?dbname=108_senate_hearings&docid=f:91038.pdf.

49.  As a theoretical matter, one would expect "economies-of-scale" pricing to mean that, as the fund gets bigger, prices come down because it is not ten times more difficult for a portfolio manager to decide to buy 100,000 shares of a company's stock rather than 10,000 shares.  Nevertheless, some have questioned whether such savings exist within the fund industry.  *See infra* note 209 and accompanying text.  The Vanguard cost data in this article shows that economies of scale in the portfolio management business truly do exist and, at least at Vanguard, provide substantial savings to fund investors.

50.  Fee data for these funds has been provided by the Bogle Financial Markets Research Center, as well as annual reports for the individual funds.

*OKLAHOMA LAW REVIEW*

In Figure 3 below we illustrate the relationship between the total assets under management in the program versus the weighted average advisory fee, with the regression results also shown.[51]

FIGURE 3

REGRESSION ANALYSIS OF AVERAGE ADVISORY FEES PAID BY
SUB-ADVISED VANGUARD FUNDS 1975-2004



$y = 77.817x^{-0.1602}$
$R^2 = 0.8522$

The left-most points are the earliest years, and the fact that they are above the regression line is indicative of an earlier pricing schedule that was modified with the change in fund governance. For example, the top-left most point corresponds to 1975, when the average fee was 38 bps on $1.68 billion in assets. Since 1975, average fees for the sub-advised Vanguard funds have tended to decline as the amount of assets under management has grown. This shows two important things: the existence of economies of scale in the mutual fund portfolio management business and the capturing of those economies for the benefit of Vanguard's shareholders, by bringing fee levels down as assets increase.

---

51. The form of the regression is: ln *(Fee(bp))* = *A* + *B* \* *ln(Assets)*. The regression has as a dependent variable the natural logarithm of the fee in basis points, and has as an independent variable the natural logarithm of fund assets. The regression estimates an intercept coefficient (A) and a slope coefficient (B).

The sub-advised Vanguard funds have written fee arrangements with the outside managers who oversee the investments.  A list of funds with their respective sub-advisers is set forth in Appendix B.  Some of these funds have only one sub-adviser; some have as many as four.  In total, as of 2004, there were thirty-six external managers represented by these twenty-one funds, each with their own fee schedule.[52]  Taken collectively, as shown in Table 2 below, in 2004 the fee schedules had the following characteristics for various asset levels:

TABLE 2
VANGUARD FEES BASED ON FUND ASSET LEVELS – 2004

| Assets Managed ($ millions)[53] | 10 | 100 | 1000 | 10000 | 25000 |
|---|---|---|---|---|---|
| Minimum Fee (bps) | 10 | 10 | 10 | 5 | 4 |
| Maximum Fee (bps) | 50 | 50 | 37 | 26 | 25 |
| Mean Fee (bps) | 28 | 27 | 20 | 14 | 13 |

Economies of scale are evident in the pricing for these funds, where almost all of the sub-advisers charge substantially less for higher asset levels.  The mean fee assessed against assets at the $25 billion level is less than half the mean fee assessed at the $100 million level.

The above figures and tables just compare fees paid by certain actively-managed Vanguard funds over a range of asset levels.  Critically, Vanguard's pricing model provides a way to gauge the impact of conflicts of interest on pricing for advisory services.  This is because nineteen of the thirty-six sub-advisers hired by Vanguard also manage their own mutual funds.  When these same portfolio managers sell identical investment advisory services for their own captive funds, the captive funds' boards of directors often approve very different fee schedules, with prices significantly higher than those paid by the Vanguard funds.  This pricing disparity works to the detriment of the captive funds' shareholders.  Measuring the disparity is not difficult.  For Vanguard's nineteen sub-advisers which simultaneously manage their own funds, we have compared the portfolio advisory fees they charge their own captive funds

---

52. Actual fee schedules and breakpoints are available through the SEC-filed Statement of Additional Information for each fund.  These are available using the SEC's EDGAR database.  *See* SEC Filings & Forms (EDGAR), http://www.sec.gov/edgar.shtml (last visited Mar. 31, 2008).

53. Breakpoint fee rates normally apply on an incremental basis.  Thus, the first $100 million of a $1 billion fund would be charged at the higher rate, and the remaining $900 million would be charged at the lower rate.  *See, e.g., Oversight Hearing on Mutual Funds, supra* note 38, at 190 (prepared statement of Jeffrey C. Keil, Vice-President, Lipper Inc.).

(based on data filed by the funds with the Securities and Exchange Commission) ("SEC" or "Commission"),[54] with the portfolio advisory fees they charge Vanguard with whom they bargain at arm's-length. The results are set forth below.

TABLE 3

COMPARISON OF ADVISORY FEES CHARGED BY VANGUARD'S SUB-ADVISERS TO FEES THE SAME SUB-ADVISERS CHARGED THEIR OWN CAPTIVE FUNDS - 2004

| Assets Managed ($ millions) | 10 | 100 | 1000 | 10000 | 25000 |
|---|---|---|---|---|---|
| Captive Fund Mean (bps) | 70 | 69 | 66 | 64 | 63 |
| Vanguard Mean (bps) | 29 | 27 | 22 | 15 | 14 |

Table 3's first set of calculations ("Captive Fund Mean") reflects the advisory fee levels (as opposed to total expense ratios) charged by the Vanguard's sub-advisers when dealing with their own captive funds. The second set of numbers ("Vanguard Mean") represents the average of the Vanguard-negotiated fee schedules applicable to the Vanguard funds.[55] Table 3 shows that, at each asset management level, the captive funds paid at least double the level of advisory fees for identical services.

Table 3 also shows economies of scale. As funds increased in size from $10 million to $25 billion, the average fee charged Vanguard's shareholders declined from 29 bps to 14 bps—a reduction of more than 50%. Obviously, economies of scale exist, and Vanguard's boards capture those cost savings and pass that savings on to Vanguard's shareholders. When managing their own captive funds, however, Vanguard's sub-advisers reduced their fees from an average of 70 bps to only 63 bps, a decline of a meager 10%. Thus, for the captive funds, economies of scale are shared only very grudgingly, if at all.

Translating these schedules into dollar terms is enlightening. Vanguard has negotiated to limit the fees their funds pay to $35 million for the larger portfolio ($25 billion x 14 bps). The *same* external managers when dealing with their captive funds have been able to increase their compensation to $157 million ($25 billion x 63 bps). Vanguard's sub-advisers are thus able to

---

54. Through 2004, these sub-advisory fee schedules were published in each fund's SEC-filed Statement of Additional Information and are reflected in the SEC's EDGAR database. *See* SEC Filings & Forms (EDGAR), *supra* note 52.

55. Even though this subset only contains nineteen of the thirty-six managers included above in Table 2, their combined Vanguard fee mean is within one basis point of the average for the entire sample.

extract far more money from their own captive funds than they charge Vanguard for the same work. The differential amounts to a potential windfall of more than $122 million in 2004 alone.

The Vanguard experience should stand as a model for the rest of the mutual fund industry to emulate. To put the fee savings in perspective, consider that the weighted average advisory fee paid by Vanguard to its funds' sub-advisers was 12.3 bps in 2004. For the fund industry's 500 largest equity funds, excluding Vanguard's, the advisory fee rate charged was 59 bps, nearly five times higher.[56] Figure 4, below, based on data obtained from Morningstar, compares the fees Vanguard pays its outside portfolio managers with advisory fees paid by the 500 largest actively managed equity mutual funds, excluding funds in the Vanguard Group.

FIGURE 4

ADVISORY FEES ON ACTIVELY MANAGED VANGUARD EQUITY FUNDS VERSUS ADVISORY FEES ON THE 500 LARGEST NON-VANGUARD EQUITY FUNDS - 2004



56. This fee rate is lower than the industry weighted average expense ratio of 91 bps mentioned earlier, *supra* text accompanying note 31, because for a great many funds it captures only charges for portfolio management services, and thus excludes administrative expense items such as transfer agency costs, printing and custodial services. Also excluded are marketing and distribution costs. See *infra* notes 95-96 for a typical itemization of different types of mutual fund expenses, including advisory fees and custodial charges. The industry's weighted average expense ratio of 91 bps is in turn lower than the 112 bps expense ratio for equity funds, *see infra* note 126 and accompanying text, since some funds, such as bond and money market funds, tend to have lower expense ratios than equity funds. For tables reflecting weighted average expense ratios for different categories of mutual funds from 1970 to 2004, see Todd Houge & Jay Wellman, *The Use and Abuse of Mutual Fund Expenses*, 70 J. BUS. ETHICS 23, 28 (2007).

*OKLAHOMA LAW REVIEW*          [Vol. 61:83

Figure 4 illustrates the dramatic savings that Vanguard shareholders enjoy due to their boards' freedom to engage in true arm's-length negotiations. At the end of 2004, the 500 largest non-Vanguard equity funds held approximately $2.8 trillion in assets. With a mean weighted average advisory fee of 59 bps, these funds paid roughly $16.5 billion in gross advisory fees. If they had instead paid the 12.3 bps weighted average fee Vanguard pays outside portfolio advisers, shareholders of these 500 equity funds would have saved on the order of $13.1 billion. Even if the average portfolio advisory fees paid by the 500 non-Vanguard funds were *double* what Vanguard paid its own outside portfolio advisers, shareholders of these 500 funds would have saved more than $9.5 billion annually.

Supporters of the status quo in mutual fund pricing may argue that references to Vanguard are off-point because, unlike its peers, Vanguard functions as a "mutual" company, in the sense that the company is client-owned, and therefore the fund manager does not work to turn a profit for outside shareholders (as do the managers at Franklin Resources and Eaton Vance, for example). Rather, the Vanguard director works exclusively for the *fund's* shareholders. Vanguard furnishes distribution and administrative services (such as custodian and transfer agency, telephone access, internet services, printing, regulatory compliance, etc.) at cost. Thus, Vanguard shareholders enjoy savings because they do not pay the fund adviser or its affiliates cash reflecting a reasonable profit on those administrative charges. This expense mark-up is a cost item routinely charged by fund sponsors elsewhere in the fund industry. However, this expense item is not large.[57]

The Vanguard Group's business model can prove puzzling even to sophisticated industry observers. A study analyzing mutual fund fees recently published by the American Enterprise Institute[58] correctly found that the fund industry features "a unique system of price setting, one that does not include vigorous price competition."[59] The authors then tried to explain what it is

---

57. For example, the total costs of all administrative expenses for equity mutual funds on a weighted average basis can be estimated at no more than 25 bps, which is the weighted average expense ratio for equity index funds. *See infra* notes 123-24 and accompanying text. This is in line with Freeman-Brown's calculation of equity fund administrative fees to be 21 bps on a weighted average basis. Freeman & Brown, *supra* note 9, at 624 tbl.2. For the equity index fund sample, profit to the advisers for the rendition of administrative services is included in the all-in charge of 25 bps. The only thing excluded is the cost of advisory services, and that is the expense item that accounts for the bulk of the costs showing up in actively managed funds' expense ratios. It also accounts for the bulk of fund sponsors' profitability.

58. PETER J. WALLISON & ROBERT E. LITAN, COMPETITIVE EQUITY: A BETTER WAY TO ORGANIZE MUTUAL FUNDS (2007).

59. *Id.* at 76.

about the Vanguard Group that causes its expense levels to be so much lower than industry averages. The authors contended Vanguard's organizational structure as a "mutual" company is what creates shareholder savings within the Vanguard Group.[60] This explanation is only partially correct. It holds water only insofar as it relates to Vanguard administrative and distribution services which, as noted above, are supplied to fund shareholders at cost. Though Vanguard is not in the business of profiting off the services it performs for its fund shareholders, the outside fund portfolio advisers it hires to manage its various actively managed funds certainly are. There is nothing non-profit about the work these advisory firms perform or the prices they charge the funds they manage. The portfolio managers for Vanguard's outsider-advised funds are simply independent contractors hired to render services, and those services are rendered on a *for-profit* basis. That Vanguard's funds pay low prices for advisory services simply reflect hard bargaining by the Vanguard funds' loyal and unconflicted board members.

Table 3 features a true "apples-to-apples" comparison of Vanguard's advisory fees with those charged by Vanguard's advisers when billing their captive funds for services. We see that captive shareholders are obligated to pay far more than Vanguard shareholders pay to the very same managers *for performing the very same work*. From a fiduciary duty standpoint, this is both disturbing and enlightening. This comparison demonstrates that advisory fees outside the Vanguard Group are grossly inflated.

The true extent of the fund market versus free market pricing disparity is driven home by Figure 4. Again, this is an apples-to-apples analysis, comparing what Vanguard funds pay with what shareholders of many other large funds pay for equivalent advisory services. That Vanguard's costs are far below fund industry averages should be an embarrassment to the rest of the fund industry. The Vanguard experience proves that the conflicts of interest influencing advisory contract negotiations in the great many sponsor-controlled funds causes those funds' shareholders to be substantially overcharged. As discussed below, this ultimate conclusion is nothing new.

*B. Past Scholarly Studies Have Shown Mutual Fund Advisory Fees Are Inflated*

Academics at the Wharton School's Securities Research Unit performed the first detailed and comprehensive study raising questions about the reasonableness of mutual fund fees in 1962. Their study was commissioned by the SEC and is known as the *Wharton Report*.[61] Four years after the

---

60. *Id.* at 84.
61. WHARTON REPORT, *supra* note 9.

*OKLAHOMA LAW REVIEW* [Vol. 61:83

*Wharton Report*'s publication, the SEC published its own study of the mutual fund industry, entitled *Public Policy Implications of Investment Company Growth (PPI Study)*.[62] The *Wharton Report* and the *PPI Study* each found evidence of unusually high fees in the mutual fund industry for advisory services.

Each also found that mutual fund advisers consistently charged significantly higher fees when selling portfolio management services to their captive funds, as compared to when the same advisers sold equivalent services on the open market.[63] They ascribed this disparity in fee structures to the same phenomenon discussed above: fund advisers' ability to capitalize on the conflict of interest inherent in most funds' management structures and convert it into the power to set non-competitive prices.[64] The *Wharton Report* identified fifty-four investment advisers with both mutual fund clients and other clients.[65] Of this sample, fee rates charged the mutual fund clients were at least 50% higher in thirty-nine out of the fifty-four cases.[66] Of this group of thirty-nine advisers, twenty-four charged their captive mutual funds fees that were 200% higher than they charged their institutional clients; nine charged their captive funds fees that were at least 500% higher.[67] Likewise, in its *PPI Study*, the SEC revisited the *Wharton Report*'s findings and determined that, "[t]he Wharton Report's conclusions correspond to those reached by the more intensive examination of selected mutual funds and mutual fund complexes made by the Commission's staff."[68] The Commission noted that advisory fee rates for pension and profit sharing plans (fees

---

62. PPI STUDY, *supra* note 9.

63. Specifically, the *Wharton Report*'s authors found that where fund advisers had outside advisory clients, there was a "tendency for systematically higher advisory fee rates to be charged open-end [mutual fund] clients." WHARTON REPORT, *supra* note 9, at 493.

64. The price disparity was explained as follows:

> The principal reason for the differences in rates charged open-end companies and other clients appears to be that with the latter group "a normal procedure in negotiating a fee is to arrive at a fixed fee which is mutually acceptable." In the case of fees charged open-end companies, they are typically fixed by essentially the same persons who receive the fees, although in theory the fees are established by negotiations between independent representatives of separate legal entities, and approved by democratic vote of the shareholders. This suggests that competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds.

*Id.* at 493-94 (footnote omitted).

65. *Id.* at 489.

66. *Id.*

67. *Id.*

68. PPI STUDY, *supra* note 9, at 120.

negotiated by parties dealing at arm's-length) were less than "one-eighth of the 0.50 percent rate commonly charged to mutual funds of that size."[69]

Following the *PPI Study*, a good deal of time passed without fee levels in the fund industry receiving much scrutiny, although from time-to-time, articles uncomplimentary toward mutual fund governance did appear in the financial press.[70] Similarly, over the decades, the findings of those scholarly reports about comparable fees were never challenged. In 2001, two of this article's authors, John Freeman and Stewart Brown, again scrutinized mutual fund fees.[71]

Freeman-Brown compared mutual fund portfolio management fees to portfolio management fees paid by government pension plans and found that the former were much higher than the latter.[72] Freeman-Brown relied on two main sources of data. The first was data collected from questionnaire responses received from public pension funds reporting on fee levels charged by the pension funds' external equity fund managers.[73] The other main source

---

69. *Id.* at 115.

70. One of those articles noted the disparity between what fund investors pay for advice and what institutions pay, noting that fund shareholders "pay nearly twice as much as institutional investors for money management." Simon, *supra* note 1, at 131. Ms. Simon also noted that the "calculation doesn't even include any front- or back-end sales charges you may also pony up." *Id.*; *see also* Robert Barker, *Fund Fees Are Rising. Who's to Blame?*, BUS. WK., Oct. 26, 1998, at 162 ("If expenses are too high, it's the independent directors who have failed."); Robert Barker, *High Fund Fees Have Got to Go*, BUS. WK., Aug. 16, 1999, at 122 ("Since 1984, Morningstar reports, the average cost of actively run no-load U.S. stock funds fell less than 10%, even as their assets multiplied 32 times. Vast economies of scale benefited mutual-fund companies, not investors."); Thomas Easton, *The Fund Industry's Dirty Secret: Big Is Not Beautiful*, FORBES, Aug. 24, 1998, at 116, 117-18 ("The dirty secret of the business is that the more money you manage, the more profit you make—but the less able you are to serve your shareholders. . . . In most businesses size is an advantage. In mutual funds it is an advantage only to the sponsor, not to the customer."); Charles Gasparino, *Some Say More Could Be Done to Clarify Fees*, WALL ST. J., May 20, 1998, at C1 ("[I]s the industry really rising to the challenge? Is it doing all it can to clearly and simply explain how much investors are paying in fees and expenses?"); Tracey Longo, *Days of Reckoning: Congress Is Finally Starting to Look into Why Mutual Fund Fees Keep Rising*, FIN. PLAN., Nov. 1, 1998, at 171 ("Several leading mutual fund analysts and critics are also making the case that not only do higher fees not mean better performance, often the opposite is true."); Linda Stern, *Watch Those Fees*, NEWSWEEK, Mar. 23, 1998, at 73 ("Today's financial marketplace is a bizarre bazaar: in the flourishing fund industry, the law of supply and demand sometimes works backward, and heightened competition can mean higher prices.").

71. Freeman & Brown, *supra* note 9.

72. Key Freeman-Brown findings are discussed in DAVID F. SWENSEN, UNCONVENTIONAL SUCCESS: A FUNDAMENTAL APPROACH TO PERSONAL INVESTMENT 241 (2005).

73. The hundred largest public pension funds were surveyed. The cover letter asked for cooperation, mentioning that the request should be viewed as a Freedom of Information Act request by those disinclined to cooperate without compulsion. Fifty-three pension funds

was Morningstar's Principia Pro database. Fee breakdowns in that database are drawn from mutual funds registration statements.[74] Within the Morningstar data, Freeman-Brown's focus was on advisory fees only; costs designated by the funds as administrative (legal, transfer agency services, etc.), for distribution, or marketing were excluded from the comparisons.

Using this data, Freeman-Brown showed inter alia that the equity pension fund portfolio featured an average size of $443 million and an asset weighted average advisory fee of 28 bps. In comparison, the average equity mutual fund had an average asset size of $1.3 billion and an asset weighted average advisory fee level of 56 bps. Thus, despite the savings from economies of scale that one would expect, mutual fund managers were paid twice as much (56 bps rather than 28 bps) to manage funds that, on average, were almost three times as big (averaging $1.3 billion rather than $443 million). In dollar terms, the fee average for equity pension funds was $1.2 million; for the equity mutual funds, featuring a much higher fee level and a bigger asset base, it was roughly six times as much, around $7.28 million.

*C. Fund Sponsors' Counterattack; The ICI Response and Coates-Hubbard*

The Freeman-Brown study made waves[75] and triggered calls for reform.[76]

---

responded, of which thirty-six provided usable data. The thirty-six pension funds had average total assets of $21 billion. Freeman & Brown, *supra* note 9, at 630.

74. Financial data within those registration statements is trustworthy because material misrepresentations in registration statements filed under the Act are actionable civilly and criminally under the Securities Act of 1933. *See* Securities Act of 1933 §§ 11, 17, 15 U.S.C. §§ 77k, 77q (2000).

75. *See, e.g.*, Tom Lauricella, *This Is News?: Fund Fees Are Too High, Study Says*, WALL ST. J., Aug. 27, 2001, at C1. The article quotes Don Phillips, head of Morningstar, the mutual fund industry's leading performance and expense tracking company, saying: "[T]he [Freeman-Brown] study is dead-on in its methodology and findings. . . . This study is very damning . . . . It shows that retail mutual funds are not competitively priced." *Id.*

76. For instance, former SEC Chairman Arthur Levitt testified before a House Subcommittee and confirmed Freeman-Brown's findings and demanded radical reform. He testified: "The largest mutual funds pay money management advisory fees that are more than twice those paid by pension funds." Thus, he argued:

> It is essential that investment company boards be required to solicit competitive bids from those who wish to undertake the management function. Furthermore, boards should justify to their bosses, fund shareholders, why they chose a particular investment advisor and each year should demonstrate that they have aggressively and competitively negotiated management fees.

*Mutual Funds: Who's Looking out for Investors?: Hearing Before the Subcomm. on Capital Mkts., Ins. and Gov't Sponsored Enters. of the H. Comm. on Fin. Servs.*, 108th Cong. 48 (2003) (statement of Arthur Levitt, Chairman, Securities Exchange Commission), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=108_house_hearings&docid=f:92982.pdf.

Then, as one would expect, defenders of the status quo sought to discredit the
study. In 2003, the ICI published a report which purported to show that fund
advisory fee levels were about the same as portfolio management fees paid by
public pension plans.[77] The ICI's research eventually was embraced by two
academics, Professors John C. Coates, IV of Harvard Law School and R.
Glenn Hubbard, Dean of Columbia's School of Business. With funding by ICI
Mutual, the insurance company affiliated with the ICI that insures mutual fund
directors and advisers against liability claims,[78] Professors Coates and Hubbard
have written an article appearing in the Fall 2007 edition of the *Journal of
Corporation Law* entitled *Competition in the Mutual Fund Industry: Evidence
and Implications for Policy*.[79]

Coates-Hubbard's thesis is that mutual funds operate in competitive
markets, and excessive fees do not exist in competitive markets; therefore,
mutual funds do not have excessive fees. In reaching this surprising
conclusion,[80] Coates-Hubbard rejects the various, detailed studies that show

---

77. Sean Collins, *The Expenses of Defined Benefit Pension Plans and Mutual Funds*, ICI
PERSPECTIVE, Dec. 2003, at 1, 8, *available at* http://www.ici.org/pdf/per09-06.pdf.

78. *See* Coates & Hubbard, *supra* note 11, at 151 n.aa1.

79. The paper was initially published in June 2006 under the auspices of the American ·
Enterprise Institute. John C. Coates IV & R. Glenn Hubbard, *Competition and Shareholder
Fees in the Mutual Fund Industry: Evidence and Implications for Policy*, (Am. Enter. Inst.,
Working Paper No. 127, 2006) [hereinafter *Coates-Hubbard Working Paper*], *available at*
http://www.aei.org/publications/pubID.24577/pub_detail.asp. This article will be referred to
textually as the "Coates-Hubbard Working Paper." Fidelity Investments then presented the
Coates-Hubbard Working Paper to the SEC as an authoritative analysis of mutual fund fees by
submitting it for inclusion in SEC File S7-03-04, a file relating to mutual fund governance
issues pending before the Commission. *See* Letter from Eric D. Roiter, Sr. Vice Pres. & Gen.
Counsel, Fidelity Inv., to Nancy M. Morris, Secretary, Sec. Exch. Comm'n (Mar. 2, 2007),
*available at* http://www.sec.gov/rules/proposed/s70304/s70304-554.pdf. Fidelity used the
Coates-Hubbard Working Paper research in support of their joint opposition to an SEC
governance proposal calling for more independence in fund boardrooms. The Coates-Hubbard
Working Paper is an attachment to the Fidelity submission, beginning on page 27. *Id.* at 27.
The Chamber of Commerce of the United States adopted as authoritative the Coates-Hubbard
Working Paper research as well. *See* Letter from David Chavern, Chief Operating Officer &
Sr. Vice Pres., Chamber of Commerce of the U.S., to Nancy M. Morris, Secretary, Sec. Exch.
Comm'n 5 (Mar. 2, 2007), *available at* http://www.sec.gov/rules/proposed/s70304/
dcchavern8764.pdf. A subsequent version of the Coates-Hubbard Working Paper was published
on the Social Science Research Network in August 2007. *See* John C. Coates & R. Glenn
Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy*
(Harvard Univ. John M. Olin Discussion Paper Series, Discussion Paper No. 592, 2007),
*available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1005426.

80. As noted earlier, there is substantial evidence that fund advisory firms earn statistically
significant risk-adjusted returns. *See supra* note 28 and accompanying text. Brown's study,
covering the twenty-five-year period from 1982-2006, concludes that fund sponsors' profits and
returns are accelerating rather than decelerating as increased competition would predict. The

excessive fees exist.[81]   Coates-Hubbard dismisses the *Wharton Report*'s comparative fee analysis as superficial, which it was not,[82] and dismisses the *PPI Study* as simply "accepting without question" the *Wharton Report*'s findings,[83] which is a false characterization.[84]  In essence, the *Wharton Report* and the SEC's *PPI Study* are rejected out of hand by Coates-Hubbard as irrelevant, old-school, meaningless 1960s research featuring "nonsensical" fee comparisons of different products with different services.[85]

As for Freeman-Brown, it is dismissed on the ground that pension fund advisory costs cannot be compared with mutual funds; Coates-Hubbard contends it amounts to a meaningless apples-to-oranges comparison.[86] Coates-Hubbard claims this is so for two reasons.  First, "[m]utual funds report different costs in the same categories of expenses.  Management fees sometimes include administrative and costs other than pure portfolio management."[87]  The second ground they give is that differences in liquidity frustrate comparisons.[88]  Each contention is explored below.

---

study confirms the finding, noted earlier, that fund sponsors earn economic profits, contrary to the predictions of the model of perfect competition.  *See supra* note 26 and accompanying text; *see also supra* note 36 and accompanying text.

81.  Their view also collides with findings that the mutual fund industry features a distinct absence of price competition.  *See, e.g.,* GEN. ACCOUNTING OFFICE, MUTUAL FUND FEES: ADDITIONAL DISCLOSURE COULD ENCOURAGE PRICE COMPETITION 62 (2000), *available at* http://www.gao.gov/archive/2000/gg00126.pdf (finding that mutual funds tend not to compete based on the operating expenses investors pay); WALLISON & LITAN, *supra* note 58, at 61-76 (concluding that, contrary to the Coates-Hubbard thesis, funds do not compete effectively on pricing of services).

82.  Coates & Hubbard, *supra* note 11, at 156.  The *Wharton Report* was also derided by Coates-Hubbard as "primitive and misleading."  *Id.* at 153.

83.  *Id.* at 156.

84.  In truth, the *PPI Study* traveled well beyond the *Wharton Report*'s scope with fresh analysis supporting the same conclusion.  The SEC confirmed, for example, that competition among advisers seeking to supply funds with services does not exist in the fund industry.  It found instead that "[m]utual funds are formed by persons who hope to profit from providing management services to them," PPI STUDY, *supra* note 9, at 127, with the captive funds' managers seldom thereafter competing with each other for fund advisory contract business, *id.* at 126.  Most importantly, based on its study of new and different data, the SEC determined mutual funds pay far more for advisory services than pension and profit-sharing plans.  *See supra* notes 61-69 and accompanying text.

85.  Coates & Hubbard, *supra* note 11, at 186.

86.  *See id.* at 183.

87.  Coates & Hubbard, *supra* note 11, at 186-87.  Moreover, though Coates-Hubbard faults Freeman-Brown for not isolating the data, their article correctly admits: "Data are not readily available to accurately isolate the pure costs of portfolio management . . . ."  *Id.* at 187-88.

88.  *Id.* at 188.

### 1. The Commingling of Expenses in Management Fees

As to the first concern dealing with occasional expense commingling, it is undoubtedly correct that a minor amount of commingling of expense items sometimes exists and—quite regrettably—frustrates perfect apples-to-apples comparisons on a universal basis.[89] But Coates-Hubbard overstates the problem's size,[90] exaggerates its impact, and ignores Freeman-Brown's efforts to adjust for expense commingling.[91]

Moreover, the authors are unaware of any competent data establishing that free market advisory costs cannot be compared with fund market advisory

---

89. This problem could easily be eliminated if the SEC insisted that funds follow a uniform, clearly-defined system of expense reporting, an improvement called for by Freeman-Brown and reiterated here. As observed in Freeman-Brown:

> [T]o facilitate comparative cost disclosures, the SEC needs to require financial reporting on a standardized basis so that categories of expense are comparable on an industry-wide basis. Currently, some funds blend administrative costs into the advisory fee. This bundling frustrates cost comparisons and detailed analysis (most prominently by the SEC staff itself), and it needs to be stopped.

Freeman & Brown, *supra* note 9, at 669.

90. In making this argument, Coates-Hubbard essentially adopts the views expressed by the ICI. As discussed *infra* in notes 104 and 131, the ICI claims that various extraneous expenses are sometimes embedded in advisory fees, making it impossible to isolate true portfolio advisory costs. Specifically, Collins, *supra* note 77, at 7, lists certain expense categories that are sometimes included in advisory fees. We have considered each of these expense categories and averaged the closest expense categories for funds that report those expenses separately to Lipper Analytical Services. As explained *infra* in note 104, based on our analysis of this Lipper data, we conclude that when the spillover of non-advisory expenses into fund advisory expenses occurs, the amount of added costs approximates no more than 3 bps. Neither Coates-Hubbard nor any other source has attempted to quantify the amount of non-advisory costs included by some sponsors in their advisory fees. Of course, if the number was quantified by fund sponsors' defenders, it could be adjusted for, and the purported ground for fund fees being incapable of comparison would disappear.

91. Specifically, in framing the Freeman-Brown study, we determined that, on average, domestic equity mutual funds paid 21 bps for administrative services such as transfer agency, custodial, and legal fees. Freeman-Brown's operating expense (advisory and administrative fees) ratios were comparable to those found in the ICI's own cost study conducted in 1999. *See* John D. Rea et al., *Operating Expense Ratios, Assets, and Economies of Scale in Equity Mutual Funds*, ICI PERSPECTIVE, Dec. 1999, at 1, *available at* http://www.ici.org/pdf/per05-05.pdf. To hone our fund expense data down to advisory fee payments, we eliminated explicitly disclosed administrative fees together with the large amount of hidden administrative costs embedded in funds' 12b-1 expenses. At this point, after further investigation, we concluded that any residual administrative expenses embedded in fund advisory fees were de minimis. We then calibrated the mutual fund sample to closely resemble our pension fund sample. We found that the cost of advisory (stock picking) services for a large sample of domestic equity funds averaged 56 basis points. We found that public pension funds pay an average of 28 bps for the same services. This comparison led us to conclude that mutual funds pay around double what pension funds pay solely for stock picking services. *See generally* Freeman & Brown, *supra* note 9.

costs. A pool of stocks is not inherently harder to manage because the legal owner is a pension fund as opposed to being a mutual fund. Indeed, competing for advisory business in the free market necessitates a significant cost that fund advisers need not pay: the cost of finding business in a competitive marketplace. Fund managers escape paying that cost due to their unseverable tie with the fund.

Furthermore, Coates-Hubbard ignores the pure apples-to-apples data that does exist supporting Freeman-Brown's central thesis that fee gouging is rampant within the fund industry. One example of pure apples-to-apples data is the Vanguard data reviewed earlier in this article.[92] Another came to light in a 2004 Senate Subcommittee hearing. At that hearing examining excessive fees within the mutual fund industry, then-New York Attorney General Eliot Spitzer testified that, in the course of his investigation, he had asked for the "best apples to apples comparison for identical services" from Putnam Investments.[93] In response, Putnam gave him data showing Putnam's mutual fund investors were charged 40% more for advisory services than Putnam's institutional investors, meaning Putnam mutual fund investors paid $290 million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients.[94]

Alliance Capital provides further apples-to-apples data. In 2002, according to its Certified Shareholder Report filed on Form N-CSR with the SEC,[95]

---

92. *See supra* Part III.A. The Vanguard phenomenon was also explored (although to a lesser extent) in Freeman-Brown. *See* Freeman & Brown, *supra* note 9, at 637-40. Coates-Hubbard criticized Freeman-Brown for not explaining why Vanguard pays sub-advisors 13 basis points on a weighted average basis for providing advisory services, whereas the price paid by public pension plans holding the largest group of assets is more, 20 bps. Coates & Hubbard, *supra* note 11, at 187. But the answer is simple and apparent from Freeman-Brown's text. The weighted average size of the Vanguard outside-managed funds featured in Freeman-Brown was $11.6 billion. *See* Freeman & Brown, *supra* note 9, at 638 tbl.6. The weighted average asset size for the largest pension fund decile in the Freeman-Brown sample was much smaller: $1.55 billion, less than one-seventh the size of the average Vanguard portfolio. *Id.* at 632. The Vanguard fee rate is lower due to economies of scale being captured at Vanguard for the benefit of fund shareholders. Freeman-Brown's text showed that working for Vanguard is nonetheless lucrative. Applying the average fee rate to the average asset size yields an advisory fee to the sub-adviser of $15.1 million. The average numbers for pension managers yields far less, $3.10 million.

93. *Oversight Hearing on Mutual Funds, supra* note 38, at 23 (testimony of Eliot L. Spitzer, N.Y. Att'y Gen.).

94. *Id.* at 16.

95. A copy of the Alliance Fund's shareholder report is available on the SEC's EDGAR database. *See* AllianceBernstein Premier Growth Fund, Annual Report (Form N-CSR) (Oct. 14, 2003), *available at* http://www.sec.gov/Archives/edgar/data/889508/000093677203000412/0000936772-03-000412.txt.

Alliance Premier Growth Fund paid total advisory, distribution, and administrative expenses of $198 million.[96]  Included in that sum was an advisory fee of $88 million paid by the fund to its sponsor, Alliance Capital.[97]  Based on average assets of $9.1 billion, the advisory fee thus exceeded 90 bps.[98]  At about the same time, Alliance was managing the Vanguard U.S. Growth Fund for 11 bps, a $672 million portfolio for the Kentucky Retirement System for 24 bps, a $1.7 billion portfolio for the Minnesota State Board of Investment for 20 bps, a $730 million equities portfolio for the Missouri Retirement System for 18.5 bps, and a $975 million equity portfolio for the Wyoming Retirement System for 10 bps.[99]

These price discrepancies cannot be justified on the basis of expense commingling.  Alliance's certified shareholder report separately disclosed administrative, transfer agency, distribution, printing, custodian, registration, and audit and legal fees, among others; those items were not jumbled with the separately disclosed "Advisory fee."[100]  Nor can they be justified on the basis of differences in service or personnel.  Alliance Capital has publicly proclaimed that its mutual funds and institutional accounts are "managed by the same investment professionals."[101]  According to the prospectus for the Alliance Stock Fund, the management company's institutional accounts and the Alliance Premier Growth Fund also shared "substantially the same

---

96.  *Id.* at 13. The expenses for the year ended November 30, 2002 were:

| | |
|---|---:|
| Advisory fee | $88,128,426 |
| Distribution fee--Class A | $8,300,777 |
| Distribution fee--Class B | $42,133,265 |
| Distribution fee--Class C | $15,548,417 |
| Transfer agency | $37,578,580 |
| Printing | $5,398,494 |
| Custodian | $652,328 |
| Audit and legal | $121,314 |
| Administrative | $150,000 |
| Registration fees | $145,000 |
| Directors' fees and expenses | $23,000 |
| Miscellaneous | $199,011 |
| Total expenses | $198,378,612 |

*Id.* Notice that, contrary to Coates-Hubbard's suggestion that fund fees customarily are jumbled, expense items usually are itemized separately with advisory fees easily broken out as an individual item.

97.  *Id.* at 13, 17.

98.  *Id.* at 25.

99.  *See* Second Amended Class Action Complaint at 24-25, Miller v. Mitchell Hutchins Asset Mgmt., Inc., No. 01-CV-0192-DRH (S.D. Ill. Apr. 1, 2002).

100.  *See supra* notes 95-96 and accompanying text.

101.  Alliance Capital Mgmt. L.P., Annual Report (Form 10-K), at 8 (Mar. 28, 2000), *available at* http://www.sec.gov/Archives/edgar/data/1109448/0001104659-00-000074.txt.

investment objectives and policies" and were managed with "essentially the same investment strategies and techniques."[102] Moreover the different clients shared a "nearly identical composition of investment holdings and related percentage weightings."[103]

Obviously, free market competition has worked well for the institutional buyers of Alliance Capital's portfolio management services. For example, the managers of the Wyoming Retirement System's pension plan paid Alliance Capital less than $1 million per year for essentially the same advice, given by the same people, who were being compensated by Alliance Premier Fund's shareholders to the tune of $88 million yearly. But the price differential in dollar terms of *eighty-eight times* between advisory services sold in the free market versus the fund market for portfolio management by Alliance Capital tells us that price competition for advisory services in the fund market is not robust; it is on life-support, if it can be said to exist at all.

The point is this: Proof of price gouging in the fund portfolio management business is findable and has been found. We agree with Coates-Hubbard that the data are not always pristine. Because of the way the SEC has allowed mutual funds to blur expense definitions, it is not always easy to compare mutual fund portfolio management fees and portfolio management fees negotiated on the free market. It should be easier. And it would be if the SEC used its regulatory authority to bar mutual funds from commingling expense categories and demanded that the industry calculate expense items on a uniform basis. Nonetheless, expense overlaps are a minor problem,[104] and the

---

102. Alliance Premier Growth Fund, Inc., Prospectus (Form 485BPOS), at 46 (Jan. 30, 2002), *available at* http://www.sec.gov/Archives/edgar/data/889508/000091957402000122/0000919574-02-000122.txt.

103. *Id.*

104. *See* Collins, *supra* note 77, at 6. Collins and the ICI contend that, in addition to portfolio management, the adviser's management fee

> typically also covers the costs of administrative and business services that the fund must have to operate. These include fund and portfolio accounting, valuation of portfolio securities, oversight of the fund's transfer agent and custodian, legal analysis to ensure compliance with federal and state laws and regulations, preparation and filing of regulatory and tax reports, and preparation and distribution of prospectuses and shareholder reports. The management fee also compensates the adviser for its expenses related to the salaries of fund officers and the costs of clerical staff, office space, equipment, and certain accounting and recordkeeping facilities. Finally, the management fee must offer the fund's adviser a competitive rate of return on capital.

*Id.* The authors have considered and analyzed each of these items. In many cases they are illusory. For example, in the case of Alliance Capital's handling of Alliance Premier Growth Fund, discussed above, the fund's transfer agency services were supplied by an Alliance affiliate, meaning that a monitoring charge to compensate Alliance for "oversight of the fund's

*MUTUAL FUND ADVISORY FEES*

apples-to-apples data that does exist powerfully confirms the Freeman-Brown thesis and debunks any claim that robust competition keeps prices for portfolio advisory services low in the mutual fund industry.

### 2. Questions of Differences in Liquidity

Another comparability-based argument made by Coates-Hubbard challenges Freeman-Brown's use of pension data. Coates-Hubbard contends pension funds and mutual funds cannot be credibly compared because of "differences in liquidity."[105] The point Coates-Hubbard seeks to make is that, because mutual funds are constantly selling and redeeming shares, mutual funds have a constant, unique liquidity challenge. This, Coates-Hubbard argues, makes mutual fund portfolio management unlike, and not comparable with, portfolio management for other institutional investors. According to Coates-Hubbard, "differences in liquidity" will always "prevent a one-to-one comparison of portfolio management costs."[106]

The Coates-Hubbard liquidity factor deserves special attention, for it lies at the heart of fund managers' strategy for disarming shareholder attacks and preserving the status quo. The strategy bars critics from evaluating fund fees based on free market comparables. To fund sponsors' defenders, "differences in liquidity" is the "X factor," a shield protecting mutual fund advisers from having their fees judged by comparison to free market benchmarks. This issue is a red herring.

Tellingly, though presented as an economic analysis, the Coates-Hubbard study never seeks to isolate and quantify the supposed "differences in liquidity" factor. Nor does it cite any authoritative source providing the liquidity factor any measurable weight at all. Moreover, this liquidity factor

---

transfer agent" would basically amount to paying Alliance Capital to monitor itself. Other items mentioned in the Collins-ICI listing are typically covered in administrative expenses although they may not be labeled in precisely the same way. For instance, printing and distribution of prospectuses and shareholder reports would have been covered by the $5 million in printing costs in the Alliance Premier Growth Fund. *See supra* notes 95-96. Costs such as office space, equipment, and competitive rates of return on capital are also likely to be associated with institutional accounts and thus are included in both fees. About one-third of large cap funds in the Lipper database report fund accounting fees separately, and these had a weighted average cost of 1.1 bps for the 2006 fiscal year. We conclude that, in the aggregate, the various miscellaneous items do not account for more than 3 bps of the average mutual fund's advisory fee. We note further that study of cost allocations for one adviser who has both captive mutual funds and institutional clients shows that the institutional clients actually are more expensive to service than the mutual funds. *See infra* notes 227-29 and accompanying text. This suggests fund fee levels should be lower than institutional prices, rather than far higher, as they are.

105. Coates & Hubbard, *supra* note 11, at 188.

106. *Id.*

*OKLAHOMA LAW REVIEW*

tends not to be visible or quantifiable in the real world. For example, it does not translate into differences in pricing for portfolio management services rendered to mutual funds and closed end funds (which do not issue redeemable securities and which do not constantly sell new shares to the public) by investment company sponsors who manage both.[107]

Interestingly, the ICI's own position is inconsistent with Coates-Hubbard's "liquidity" theory. In 2003, the ICI claimed that the true cost of managing a mutual fund portfolio on a weighted average basis is around 31 bps,[108] leading to the ICI's conclusion that "mutual fund and pension plans pay like fees for like portfolio management services."[109] Accepting this finding as true, which it is not,[110] the fee equivalence debunks the alleged "liquidity" factor featured by Coates-Hubbard, since the ICI's contention carries with it the implicit premise that pension fund and mutual fund portfolio advisory services are very similar, because, after all, the fees are "virtually identical."[111] Thus, the ICI's position on the comparability of fund and pension fees leads to the conclusion

---

107. Investment company manager Mario Gabelli's advisory firm manages seventeen mutual funds that invest in stocks and/or bonds and nine closed-end funds. The management fee charged each of the twenty-six funds annually is set at 1%, with two exceptions. Gabelli's ABC Mutual Fund charges a fee of only .5%; the closed-end Global Deal Fund charges a performance fee that is a minimum of .5%, rising to 2% if the fund's total return exceeds the T-Bill index return by 6%. *See generally* Gabelli Home Page, http://www.gabelli.com/ (last visited Mar. 31, 2008). By definition, closed-end funds feature less liquidity pressure than mutual funds since their shares are not redeemable, and new shares are not constantly being sold. *See* Roger M. Klein, *Who Will Manage the Managers?: The Investment Company Act's Antipyramiding Provision and Its Effect on the Mutual Fund Industry*, 59 OHIO ST. L.J. 507 (1998) (describing characteristics of closed-end funds). If the "differences in liquidity" factor cited by Coates-Hubbard is real and had significant weight, it presumably would manifest itself in the need for substantially more work to be done by the mutual fund portfolio manager, who in turn presumably would charge higher fees to compensate for the greater effort being exerted. However, there is no drop off in fees for Gabelli's closed-end funds in comparison to the mutual funds. *See* Gabelli Home Page, *supra*. This indicates that the redeemability factor is either nonexistent, or is sufficiently insubstantial enough to not be worth building into the cost.

108. Collins, *supra* note 77, at 8.

109. *Id.* at 17. Indeed, the headline of the press release published by the ICI announcing its study attacking Freeman-Brown stated: "Mutual Fund and Pension Fund Fee Levels Are Similar, ICI Research Study Finds." Press Release, Inv. Co. Inst., Mutual Fund and Pension Fund Fee Levels Are Similar, ICI Research Study Finds (Jan. 6, 2004) [hereinafter ICI Press Release], *available at* http://ici.org/statements/nr/2004/04_news_dbplans.html.

110. The falsity arises due to fund advisers' practice of tacking on extra costs to the sub-advisers' fees, padding and thus inflating the overall advisory charges borne by the sub-advised fund and its shareholders. *See infra* Part III.D.

111. The ICI claims to have found: "Mutual fund subadvisors and pension plan investment managers charge 'investment advisory fees' that are virtually identical." *See* ICI Press Release, *supra* note 109. Coates-Hubbard adopted the ICI's flawed methodology and its unsupportable findings. *See* Coates & Hubbard, *supra* note 11.

that the unquantified "differences-in-liquidity" factor cited by Coates-Hubbard is something of a financial Loch Ness monster—a phenomenon talked about but never seen in real life.[112] Finally, to the extent "differences in liquidity" ever matter, they certainly cannot prevent comparisons of Vanguard's portfolio management costs with those charged elsewhere in the fund industry. After all, Vanguard's managers, just like other funds', must deal daily with the liquidity factor. The devastating Vanguard free market vs. fund market advisory fee comparison, as shown in Table 3 and Figure 4, *supra*, cannot be dismissed on this basis.

Another flaw with Coates-Hubbard's broader contention that free market comparators cannot be used in evaluating fund fees is that this "can't do" attitude goes against the grain of accepted financial evaluation practices. For example, business valuation experts and real estate appraisers typically study comparables and adjust them in reaching opinions about the value to be assigned to the property they are appraising. When it comes to business or real estate valuations, bond ratings, or innumerable other free market pricing calculations, nobody insists that the comparables' attributes be absolutely identical to the item being valued. All that is required is that the comparable be reasonably similar with appropriate adjustments being taken to make the comparisons persuasive.[113]

The Coates-Hubbard view that mutual fund fees can never be analyzed on a comparative basis[114] is unvarnished advocacy advanced on behalf of those who seek to preserve the status quo. Like other Coates-Hubbard claims,[115] it

---

112. Indeed, the ICI has admitted as much. In the ICI's attempted defense of fund industry pricing, the ICI's lead researcher declared: "[I]t is possible to compare the portfolio management fees incurred by public pension plans with a comparable measure by examining the sub-advisory fees of mutual funds." Collins, *supra* note 77, at 8.

113. Another major problem with the industry's approach to fund fee comparisons is that too much reliance is placed on basis points, and too little attention is given to dollars. Translating basis points to dollars vividly underscores our conclusion that fees in the mutual fund industry are excessive. Freeman-Brown's data showed the top 10% largest pension funds hold on average $1.55 billion in assets, with a 20 bps management fee ratio. Freeman & Brown, *supra* note 9, at 631 tbl.3, 638 tbl.6. For mutual funds, the top 10% in size have assets of $9.7 billion and a 50 bps fee level. *Id.* Many mutual funds are much bigger than pension funds, and so even minor differences in basis points are amplified. Fund managers are paid roughly fifteen times as much for managing the largest mutual funds compared to managers of the largest public equity pension fund portfolios. Contrast this reality with the ICI's contention, adopted by Coates-Hubbard, that fees charged by pension fund portfolio managers and mutual fund managers are "virtually identical." *See infra* note 117 and accompanying text.

114. Coates & Hubbard, *supra* note 11, at 185-86.

115. For example, in support of their claim that the fund industry is highly competitive, Coates-Hubbard makes much of the entry into the industry of twenty new sponsors between 1994-2004. *See id.* at 167-68. They fail to mention that, at the end of 2004, these new sponsors

accounted for less than 1% of the industry's $8.1 trillion in assets. *Compare id.* at 168 tbl.4
(showing that the twenty new sponsors have $77.7 billion in combined assets), *with* INV. CO.
INST., 2005 INVESTMENT COMPANY FACT BOOK 102 tbl.44 (45th ed. 2005), *available at*
http://www.ici.org/pdf/2005_factbook.pdf (showing that mutual fund assets in the U.S. totaled
over $8.1 trillion at the end of 2004). The total assets accumulated by all funds offered by the
twenty new sponsors cited by Coates-Hubbard added up to less than *one half* of the total assets
held by a *single* mutual fund, the Growth Fund of America, in early 2007. *See* GROWTH FUND
OF AM., SEMI-ANNUAL REPORT FOR THE SIX MONTHS ENDED FEBRUARY 28, 2007, at 10 (2007),
*available at* http://www.americanfunds.com/pdf/mfgesr-905_gfas.pdf (showing net assets of
over $165 billion). Contrary to Coates-Hubbard's claim of increasing.competition, the very
evidence they cite shows the industry is becoming more concentrated and less competitive over
·time. Indeed, Coates-Hubbard cites Herfindahl-Hirschman Index ("HHI") numbers in an effort
to establish the industry is not concentrated. Coates & Hubbard, *supra* note 11, at 165 tbl.1.
However, the cited data shows increasing concentration at the complex level. *Id.* Data
generated by the ICI similarly shows increasing concentration between 1995-2006. Over those
years, the percentage of industry assets held by the largest five, ten and twenty-five complexes
increased in each case. *See* INV. CO. INST., 2007 INVESTMENT COMPANY FACT BOOK 17 fig.2.2
(47th ed. 2007), *available at* http://www.ici.org/pdf/2007_factbook.pdf.

     Moreover, Coates-Hubbard ignores that the mutual fund industry features a marketplace
segmented between load funds and no-load funds. *See* RICHARD J. TEWELES & EDWARD S.
BRADLEY, THE STOCK MARKET 416-17 (7th ed. 1998). In the load fund segment, more than one
half of the Morningstar fund categories—twenty-seven out of fifty-one—feature an HHI number
higher than 1800, reflecting concentrated markets. *See* Dep't of Justice, The Herfindahl-
Hirschman Index, http://www.usdoj.gov/atr/public/testimony/hhi.htm (last visited Mar. 31,
2008). Our calculations show another fifteen of the fifty-one Morningstar load fund categories
feature HHI numbers between 1000 and 1800, reflecting "moderately concentrated" markets.
*Id.* Only nine of the fifty-one load fund Morningstar categories have index numbers lower than
1000.

     Coates-Hubbard is also wrong in presenting the fund industry as a paragon of price
competition, brimming with price-conscious investors benefiting from the free market's
tendency to drive prices down. In fact, competition in.the fund industry is most aggressively
manifested by fund sponsors paying money to fund retailers to compensate them for offering
a given sponsor's shares. For example, the industry pays more than $2 billion per year in
"revenue sharing," a shady practice called the fund industry's "dirty little secret," in order to
encourage retailer loyalty and selling effort. *See* Freeman, *supra* note 3, at 792-96. Predictably,
this behavior functions to drive prices up, for it consists of advisers extracting outsized fees to
pay high distribution costs to win favor among fund retailers.

     Contradicting the Coates-Hubbard price competition thesis are data showing that from
1970 to 2000, the expense ratios for the funds that are the most expensive for fund shareholders
to buy, the load funds, more than doubled, whereas expense ratios declined for no-load funds.
*See* Houge & Wellman, *supra* note 56, at 28 tbl.I. In the index fund area, where products are
most similar, prices have been rising with the most expensive funds receiving the greatest
market acceptance. *See* Edwin J. Elton et al., Are Investors Rational?: Choices Among Index
Funds (Oct. 2002) (unpublished manuscript), *available at* http://papers.ssrn.com/sol3/papers.
cfm?abstract_id=340482.

     The fact that the most expensive form of an identical market offering receives the greatest
market acceptance contradicts the position that there is strong price competition in the

is unfounded. While we agree that data with which to compare mutual fund fees to fees charged in the free market is not always pristine, objective fee benchmarks are available and illuminating.

### D. The Sub-advisory Fee Argument Is a Sham

Careful analysis of the fund industry's sub-advisory fee argument defending the status quo exposes the flaws in this rationale. Mutual fund advisers sometimes delegate the task of managing their funds' portfolios to third parties. These third parties, called "sub-advisers," manage less than 20% of the fund industry's assets.[116] The ICI relies on fund cost data involving sub-advisers to support its position that fund portfolio management fees are "virtually identical" to those charged by pension funds.[117] Coates-Hubbard adopts the ICI argument, also using sub-advisory management contracts as a proxy for fund advisory fees.[118] Rather than supporting the industry's position, however, close inspection of fund sub-advisory contract dealings reveals additional disturbing evidence of price gouging in the fund industry.

For one thing, as noted above, sub-advisory contracts are used to manage only a minor fraction of the fund business. Further, in focusing on sub-advisory fees, critics ignore that fund managers (save Vanguard, discussed above) routinely add a hefty "premium" or "monitoring fee" to the sub-advisers' charge. True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will then typically pad the bill, adding an additional twenty to thirty basis point "premium" before passing along the

marketplace. Under the Coates-Hubbard view, the most expensive funds ought to be redeemed out of existence, but this is not happening. In the fund industry, as between load funds and no-load funds, the load funds are the worst products at the point of sale because investors need to pay the load. Academic studies have shown that load funds are also proving to be the worst (i.e., most expensive) products for investors to own post-sale, because they tend to be cursed with the highest annual expense charges. *See, e.g.*, Daniel Bergstresser et al., *Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry* 30 tbl.5 (Harvard Bus. Sch. Fin. Unit Research Paper Series, Working Paper No. 616981, 2007), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=616981 (noting the lack of evidence of buyer price-consciousness in the load fund marketplace where investors pay more to get the worst products). This phenomenon is not indicative of strong price competition.

116. *See* Matt Ackermann, *How Scandals May Change Playing Field for Subadvisers*, AM. BANKER, June 8, 2004, at 1, 9 ("Ten percent of the $5 trillion in long-term mutual fund assets . . . are subadvised, according to Financial Research."); *see also Oversight Hearing on Mutual Funds*, *supra* note 38, at 17 (testimony of Eliot L. Spitzer, N.Y. Att'y Gen.) (putting the number of sub-advised mutual funds at fewer than 20%). The ICI never quantified the extent to which sub-advisers are used in the mutual fund industry, noting only that "advisers of some mutual funds" use sub-advisers. *See* Collins, *supra* note 77, at 7.

117. Collins, *supra* note 77, at 7-8; ICI Press Release, *supra* note 109.

118. Coates & Hubbard, *supra* note 11, at 187.

advisory fee charge to fund shareholders.[119]  In fact, overall fee levels for sub-advised funds are substantially higher than for funds managed in-house.[120] The effect of bill padding over sub-advisory services is huge.  Table 4 below compares sub-advisory fees to the full, total amount of advisory fees actually charged by the advisers to their funds (sub-advisory fees plus the advisers' markups in the form of "monitoring" charges).[121]

TABLE 4

ADVISORY AND SUB-ADVISORY FEES FOR A SAMPLE OF SUB-ADVISED
CAPTIVE EQUITY MUTUAL FUNDS – DECEMBER 2006

| Fund Name | Morningstar Category | Assets 12/31/06 ($millions) | Advisory Fees (bps) | Sub-Advisory Fees (bps) | Difference | Sub Adviser |
|---|---|---|---|---|---|---|
| AXA Ent Growth | Large Growth | $1,107 | 73 | 21 | 52 | Montag & Caldwell Inc. |
| Dreyfus Prem Alpha Gr | Large Growth | $1,313 | 75 | 25 | 50 | Bear Stearns Asset Mgt |
| FBR Small Cap | Mid-Cap Growth | $1,050 | 90 | 46 | 44 | Akre Capital Mgt, LLC |
| Hartford Div & Gr | Large Value | $3,596 | 64 | 14 | 50 | Wellington Mgt, LLC |
| Ivy Cundill Global Val | Foreign Large Val | $976 | 96 | 48 | 48 | Mackenzie Financial |
| Phoenix Mid-Cap Value | Mid-Cap Value | $541 | 75 | 48 | 27 | Sasco Capital Inc |
| Pioneer Cullen Value | Large Value | $2,428 | 70 | 35 | 35 | Cullen Capital. Mgt LLC |
| RiverSource Value | Large Value | $403 | 67 | 29 | 38 | Lord, Abbet & Co, LLC |
| STI Classic Agg GrSt | Large Growth | $324 | 110 | 62 | 48 | Zevenbergen Cap Inv LLC |
| Touchstone Lg Cp Gr | Large Growth | $1,076 | 71 | 40 | 31 | Navellier & Assoc,Inc. |
| USAA Aggressive Gro | Large Growth | $1,182 | 50 | 29 | 21 | Marsico Capital Mgt,LLC |
| USAA Growth & Inc | Large Blend | $1,482 | 57 | 20 | 37 | Loomis, Sales, L.P. |
| USAA Income Stock | Large Value | $2,363 | 50 | 13 | 37 | GMO LLC |
| | Average | $1,372 | | | | |
| | Asset Weighted Averages | | 68 | 27 | 41 | |

119.  *Oversight Hearing on Mutual Funds, supra* note 38, at 17 (testimony of Eliot L. Spitzer, N.Y. Att'y Gen.).  As Spitzer noted:

> The [2003] ICI report used the amount charged by the sub-advisers without accounting for the premiums tacked on by the mutual funds and passed on to shareholders.  The result is that even in mutual funds that are sub-advised, shareholders pay more for advisory services than the actual cost for that service incurred by the management company.

*Id.*

120.  *See* Virginia Munger Kahn, *Investing: Mutual Fund Expertise, For Rent*, N.Y. TIMES, July 14, 2002, at B7 (reporting that actively managed funds with sub-advisers have an annual average expense ratio of 1.19 percent compared to 1.04 for funds managed directly by the fund's adviser).

121.  The data is drawn from reports by Morningstar and Lipper Analytical.

Table 4 shows over $72 million annually in bill-padding by advisers of the listed sub-advised funds.[122] The sub-advisory fee data presented in Table 4 by no means exhausts the evidence reflecting inflation of overall advisory fees by fund managers who contract out the portfolio management function to sub-advisers.[123] Rather than support the industry's position that fund fees are fair, consideration of sub-advisory charges actually supports our thesis that mutual fund fees are grossly inflated and demonstrates how far conflicted fund managers have strayed from honest fiduciary principles.

There is another way to evaluate the industry's position that sub-advisory fees reflect the true cost of fund portfolio management. This way of testing the ICI/Coates-Hubbard thesis is to explore the ramifications of it being true as claimed that, on a weighted average basis, equity funds' portfolio investment management function actually costs only around 30 bps per year. The cost of all the rest of fund operations over and above the advisory function can readily be gauged. The weighted average expense ratio for the mutual fund industry's equity index funds is around 25 bps.[124] This is a telling figure, for it represents the true cost, on a weighted average basis, of performing all administrative and distribution services required to run a mutual fund with an

---

122. Calculated by applying the 41 bps difference against the thirteen funds' $17.8 billion asset base.

123. For another example of advisory fee gouging despite the use of sub-advisers, consider this example involving sub-advisory services contracted out to Bernstein Investment Research and Management by Principal Management Corporation ("PMC"), the Principal Partners LargeCap Value Fund's investment manager:

| ASSETS | MANAGEMENT FEES | | | | OTHER FEES | |
| (Millions) | Bernstein | PMC | Total | 12b-1 Fee | Other Expenses | Total Expenses |
|---|---|---|---|---|---|---|
| 10 | 0.600 | 0.150 | 0.750 | 0.910 | 0.850 | 2.510 |
| 50 | 0.470 | 0.280 | 0.750 | 0.910 | 0.850 | 2.510 |
| 100 | 0.385 | 0.365 | 0.750 | 0.910 | 0.850 | 2.510 |
| 500 | 0.245 | 0.506 | 0.750 | 0.910 | 0.850 | 2.510 |
| 1,000 | 0.222 | 0.528 | 0.750 | 0.910 | 0.850 | 2.510 |
| 5,000 | 0.204 | 0.546 | 0.750 | 0.910 | 0.850 | 2.510 |

SWENSEN, *supra* note 72, at 240 tbl.8.7. Here, Bernstein is the sub-adviser, who bargained with PMC at arm's-length; PMC, the adviser, pads the bill. Note that Bernstein's management fees drop as the size of the fund increases, reflecting economies of scale. Note further that the savings realized by those economies of scale are diverted *completely* to PMC, which charges an escalated "management fee" to capture every last penny of savings.

124. *See* KARCESKI ET AL., *supra* note 32, at 16 tbl.2. Other data confirms a mutual fund can be organized and run on a total expense budget of less than 25 bps per year. The data from another source shows the weighted average annual expense ratio for no-load equity mutual funds during 1995-2004 to be a mere 19 bps. Houge & Wellman, *supra* note 56, at 28.

equity portfolio.[125]   Stated differently, the only essential cost component
missing for index funds, and present for actively managed funds, is portfolio
management.  If the average cost of advisory services approximates 30 bps,
then the weighted average cost of the typical actively managed equity mutual
fund ought to be around 55 bps (i.e., 30 bps for management plus 25 bps for
everything else).  Instead, for actively managed equity funds it is more than
twice that—112 bps.[126]

The difference between the all-in cost of running an equity index mutual
fund (25 bps) and the cost of running a typical managed equity fund (112 bps)
thus is 87 bps.  Adjusting that net number downward by 25 bps to account for
so-called 12b-1 fees that many (but by no means all) actively-managed equity
funds charge that index funds typically do not, still leaves a difference of 62
bps,[127] a number in line with the 59 bps average advisory fee for the industry's
500 largest actively managed equity funds noted earlier.[128]

The 62 bps number logically reflects the cost of portfolio advisory services,
since advisory services are the only expenses (save 12b-1 fees, which we have
already adjusted for in the preceding paragraph) that actively managed equity
funds usually bear that equity index funds, as a rule, do not pay.[129]  The 62 bps

---

125. "Index funds, after all, actually are mutual funds." Freeman, *supra* note 3, at 773.
Index funds lack advisory fees because they are not actively managed, but that is all they lack.
Thus,

> [t]hey have shares, daily pricing, boards of directors, SEC regulatory
> requirements, prospectuses, 800 numbers, shareholder reports, etc. Fund sponsors
> set them up to make a profit for themselves, so profit to the sponsor is included,
> too, in the all-in cost of 25 [bps].

*Id.* at 773-74.

126. *See* KARCESKI ET AL., *supra* note 32, at 16 tbl.2. The difference between the 112 bps
expense ratio noted here and the 91 bps expense ratios for mutual funds generally cited earlier,
*supra* notes 31, 56 and accompanying text, is easily explained. Equity mutual funds tend to be
more expensive to manage in comparison to other funds, such as bond funds and money market
funds. *See* Chester S. Spatt, Chief Economist & Dir., Sec. Exch. Comm'n, Address to the
Pennsylvania Association of Public Employee Retirement Systems (Apr. 12, 2007), *transcript
available at* http://www.sec.gov/news/speech/2007/spch041207css.htm (noting that "equity
portfolios often are more expensive to manage than fixed-rate accounts"). So an average of
expense ratios in the fund industry as a whole will always be lower than the average expense
ratio for the equity fund segment. Likewise easily explained is the difference between the 112
bps number and the results in Figure 4 suggesting lower expenses. Figure 4 reflects only
advisory fee costs, not total expense ratios, which also include, *inter alia*, administrative and
distribution costs.

127. Freeman-Brown found the weighted average advisory fee for equity funds was around
56 bps. *See* Freeman & Brown, *supra* note 9, at 631 tbl.3.

128. *See supra* text accompanying note 56.

129. No index fund pays any substantial portfolio advisory fee, since there is no active
management. Most index funds do not charge 12b-1 fees, but some do. *See* Shauna Croome-

number is more than *double* the fee the ICI represents and Coates-Hubbard accepts[130] as the true cost of managing equity mutual fund portfolios, namely, around 30 bps. The roughly 30 bps gap between the typical advisory fee for managed equity mutual funds and the sub-advisors' typical fee of around 30 bps cannot be explained by the presence of hidden non-advisory expense items being imbedded in the advisory fee.[131]  Rather, it confirms that mutual fund directors are grossly overpaying for fund advisory services, and gives some idea of the enormity of fund advisors' advisory profits.

### E. High Fees Drive Advisers' Profitability and Stock Market Performance

A final problem with Coates-Hubbard's defense of the status quo for fund industry fee levels is that truly competitive pricing and fee levels ought to yield net financial returns for fund sponsors' traded stocks in line with the market generally.  Instead, as one industry insider admitted on the record, fund sponsors preside over what is, for them, an "enormously profitable industry."[132]  The fund management business is enormously profitable because of rampant fee gouging.  To credibly advance the contrary position, Coates-Hubbard needs to demonstrate the cause for the outsized financial returns

---

Carther, *You Can't Judge an Index Fund by Its Cover*, INVESTOPEDIA, June 11, 2003, http:// www.investopedia.com/articles/mutualfund/03/061103.asp.

130. *See* Coates & Hubbard, *supra* note 11, at 187; Collins, *supra* note 77, at 8.

131. In so many words, this is the position taken by the ICI and adopted by Coates-Hubbard. *See supra* notes 90, 104 and accompanying text.  The ICI contends, and Coates-Hubbard implies, that sub-advisory costs represent the true cost of providing portfolio management advice to mutual funds, with the difference between average fund sub-advisory costs (around 30 bps) and average advisory fees (around 60 bps) being explained by hidden non-advisory expenses buried in the advisory fee and not reported separately. *See generally* Coates & Hubbard, *supra* note 11; Collins, *supra* note 77.  Keep in mind that major administrative expenses (custodial, transfer agent, printing, etc.), when separately itemized, total only 21 bps on average.  Freeman & Brown, *supra* note 9, at 624 tbl.2.  So, in order for the ICI and Coates-Hubbard to be correct in arguing that hidden expenses explain the difference between fund advisory fees on the one hand, and fund sub-advisory and pension advisory fees on the other, there would have to be about 30 bps of *additional* administrative costs in fund advisory fees, more than the average total level of identified and scheduled administrative fees reported by mutual funds to the SEC.  This assumption simply is not credible.  It is absurd to contend that, over and above a mutual fund's major scheduled administrative cost items, there are super-secret administrative costs that are too minor to mention separately yet systematically swamp those administrative costs that are itemized and disclosed.  If this kind of financial misrepresentation were occurring, it would make funds' income statements materially misleading and the prospectuses presenting them actionable under section 11 of the Securities Act of 1933, 15 U.S.C. § 77k (2000).

132. Sec. Exch. Comm'n Historical Soc'y, *supra* note 8, at 33 (remarks of Joel Goldberg, former Director of Investment Management, Securities and Exchange Commission).

122               *OKLAHOMA LAW REVIEW*          [Vol. 61:83

generated by sponsors' companies, other than extremely high revenue levels, consistent with a monopolistic industry.[133]

## IV. The Regulatory Framework Is Broken

Profitability at the levels encountered in the fund sponsor business is unheard of in regulated industries.[134]  This makes the stock market performance of mutual fund managers all the more stunning for, in all of corporate finance, no securities issuers are subject to more intensive regulation than mutual funds.[135] Statutes, regulations, and decisions all have failed to rein in excessive fees. The question is, why?

The SEC surely deserves part of the blame.  As the mutual fund marketplace's resident enforcement chief, the SEC talks a good game.  For example, speaking of mutual funds costs, the Commission has proclaimed:

> While we all applaud fair and reasonable fees, we think the best way to ensure them is a marketplace of vigorous, independent, and diligent mutual fund boards coupled with fully-informed investors who are armed with complete, easy-to-digest disclosure about the fees paid and the services rendered.[136]

---

133. We showed earlier in Table 1, *supra*, that the market returns for five large publicly traded fund sponsors averaged 26.1% compared to an average return of 12.4% over matched periods for the S&P 500. As explained *supra* in note 28, a capitalization-weighted index of the universe of publicly traded fund sponsors (twenty-nine firms) had a compound average annual return of 27.8% from 1982-2006. A $100 investment in an index consisting of the universe of publicly traded fund sponsors starting in 1982 would have grown to over $46,000 by the end of 2006; the same money invested in the S&P 500 index over that period would have grown to $2300.

134. For example, public utilities, the paradigmatic regulated industry, have profit margins around 7.67%. *See* Utilities Sector - Yahoo! Finance Industry Browser, http://biz.yahoo.com/p/9qpmu.html (last visited Feb. 25, 2008).  In contrast, profit margins for the asset management industry are over 17%.  *See* Financial Sector - Yahoo! Finance Industry Browser, http://biz.yahoo.com/p/4qpmu.html (last visited Feb. 25, 2008). Some mutual fund sponsors boast profit margins that are far higher. Indeed, Bernstein lists a profit margin of 90%. *See* Yahoo! Finance Asset Management Industry Company List, http://biz.yahoo.com/p/422qpmd.html (last visited Feb. 25, 2008).  That profit margin is more than eleven times higher than the typical profit margin for public utilities.

135. *See supra* note 6 and accompanying text.

136. Press Release, Sec. Exch. Comm'n, Alliance Capital Management Will Pay Record $250 Million and Make Significant Governance and Compliance Reforms to Settle SEC Charges (Dec. 18, 2003) [hereinafter SEC Press Release], *available at* http://www.sec.gov/news/press/2003-176.htm.

Even so, the SEC has failed to use its significant regulatory and enforcement power to make the "fair and reasonable fees" it talks about a reality.[137]  As we have shown, "fair and reasonable" are not how an honest person would describe portfolio advisory fees charged, outside the Vanguard Group.  Nor does one find compelling evidence that the fund marketplace is policed by "vigorous, independent, and diligent mutual fund boards."[138]  Indeed, investor Warren Buffett has ridiculed directors for exhibiting "zombie-like" behavior "that makes a mockery of stewardship."[139]  Yet, to date, the SEC has not brought a single action under Investment Company Act section 36(b) attacking fund portfolio management fees for being excessive.

The SEC has also failed mutual fund investors by not requiring mutual funds to supply investors with "complete, easy-to-digest disclosure" information, with clearly defined and segregated advisory costs.[140]  This regulatory failure provides cover for those like Coates-Hubbard and the ICI who argue against the comparability of fund pricing data.[141]  The agency's condonation of incomplete and inadequate expense disclosures subverts market forces and undermines fundamental purpose of ensuring full and fair disclosure.[142]  By failing to insist on uniform expense categories and detailed disclosure of cost items, the SEC has played into the hands of fund sponsors who have no interest in seeing unfair pricing practices exposed or price competition flourishing.[143]

Congress, too, has not been solicitous of mutual fund investors, which is particularly noteworthy since members of Congress themselves are allowed to

---

137. *Id.*

138. *Id.*

139. BERKSHIRE HATHAWAY INC., 2002 ANNUAL REPORT 17-18 (2003), *available at* http://www.berkshirehathaway.com/2002ar/2002ar.pdf.

140. *See supra* note 89.

141. Coates & Hubbard, *supra* note 11, at 185-86.

142. Henry T.C. Hu, *Faith and Magic: Investor Beliefs and Government Neutrality*, 78 TEX. L. REV. 777, 838 (2000) ("The specific philosophy governing the establishment of the SEC is . . . that the SEC should ensure that companies provide full and fair disclosure . . . .").

143. We agree with Coates-Hubbard that fee discrepancies can affect investors' purchasing patterns and can have a "material impact on advisers." Coates & Hubbard, *supra* note 11, at 212.  But for the data to inform accurately, it needs to be uniform, complete, and clearly presented.  This is not the case today.  As one industry observer has complained, "Mutual funds have constructed a system where the costs are practically invisible." *Mutual Fund Industry Practices and Their Effect on Individual Investors: Hearing Before the Subcomm. on Capital Mkts., Ins., and Gov't Sponsored Enters. of the H. Comm. on Fin. Servs.*, 108th Cong. 157 (2003) (prepared statement of Gary Gensler, former Undersecretary for Domestic Finance, Dep't of the Treasury), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname =108_house_hearings&docid=f:87798.pdf.  An industry where costs are "practically invisible" is an industry where price competition is disadvantaged.

invest for their retirements in mutual fund-like entities operated for federal employees under the Thrift Savings Plan, similar to private 401(k) plans.[144] These index fund investments feature expense ratios of 11 bps or less, far less than the expense ratio's paid by virtually all mutual fund investors in the private sector.[145]  When it comes to policing investment company expenses, Congress does a good job, so long as its members and their fellow federal employees are the purchasing investors.  For the public at large, congressional indifference is palpable.  Lacking sufficient protection from the SEC or from the halls of Congress, investors are left to obtain relief from excessive fees in federal courts.  It is to these court actions to which we now turn.

### A. Introduction to the Federal Fiduciary Duty Scheme

Analysis of fiduciary duty law applicable to mutual fund managers starts simply.  The focus is on one statute, section 36(b) of the Investment Company Act ("ICA").[146]  Section 36(b) was enacted in 1970.  Between the ICA's 1940 enactment and 36(b)'s inclusion in 1970, the ICA lacked any "mechanism by which the fairness of management contracts could be tested in court."[147] Congress' decision to add section 36(b) was based on evidence generated by the SEC's PPI study that economies of scale stemming from booming growth in mutual fund assets in the 1950s and 1960s were not being fairly shared with fund shareholders.[148]  The express civil liability provision was added as a tribute to the congressional finding that "the forces of arm's-length bargaining [did] not work in the mutual fund industry in the same manner as they [did] in other sectors of the American economy."[149]  Section 36(b) provides, inter alia, that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services," and it empowers security holders to bring civil actions if investment advisers breach their fiduciary duties "in respect of such compensation or payments paid."[150]

Before the ICA was amended in 1970, mutual fund fees were evaluated pursuant to the "waste test" applied by state courts.  The waste test is notoriously difficult to satisfy, requiring the plaintiff to show the challenged transaction was one that no reasonable person could view as representing "a

---

144. The federal retirement investment vehicle is discussed in *Oversight Hearing on Mutual Funds*, *supra* note 38, at 2 (opening statement of Sen. Peter G. Fitzgerald).

145. *Id.*

146. 15 U.S.C. § 80a-35(b) (2000).

147. S. Rep. No. 91-184, at 5 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 4897, 4901.

148. PPI Study, *supra* note 9, at 10-12.

149. S. Rep. No. 91-184, at 5.

150. 15 U.S.C. § 80a-35(b).

fair exchange."[151]  To win a state court waste case, moreover, all the defendant needed to show was that "any reasonable person might conclude that the deal made sense."[152]  In enacting section 36(b), Congress recognized that the stiff burden imposed by the waste test was too demanding and, critically, sought to craft a "plaintiff-friendly" statute to lower the burden.[153]  Specifically, Congress determined that, because "marketplace forces are not likely to operate as effectively," in the mutual fund industry, the corporate waste test was "unduly restrictive" and needed to be relaxed.[154]  Yet, despite its promise, section 36(b), as interpreted and applied by the federal courts, has not served its intended purpose.

### B. *Fund Shareholders' Nemesis: The* Gartenberg *Standards*

#### 1. *Introduction to the* Gartenberg *Ruling*

Congress was not alone in noting the pervasiveness of conflicts throughout mutual fund management and the need for a way to counterbalance those conflicts.  The United States Supreme Court also has recognized the crucial flaw in the industry's peculiar governance structure.[155]  While seeing and understanding a problem is one thing, fixing it is something else.

Just as one statute, ICA section 36(b), set the key fiduciary standard applicable to mutual fund compensation, one case has set the standard for how section 36(b) is interpreted and applied.  *Gartenberg v. Merrill Lynch Asset*

---

151.  Steiner v. Meyerson, Civ. A. No. 13139, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995).

152.  *Id.*

153.  Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 229 (3d Cir. 2001).  In *Green*, the Third Circuit recognized the congressional intent for section 36(b) claims to be treated more leniently than excessive compensation claims would be treated under state law.  *Id.* at 28-29.

154.  S. REP. No. 91-184, at 5.

155.  In *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984), the Supreme Court pointed out that within the fund industry, advisers typically do not compete by endeavoring to sell advisory services to existing funds.  Rather, they create their own clients by forming mutual funds, setting up the funds' boards of directors, and then contracting with the boards to sell services to the captive client funds.  The Supreme Court took notice that fund advisers typically established the mutual fund and frequently control the boards of directors with whom the advisers then sells services under annually approved advisory contracts.  *See id.* at 536 ("Unlike most corporations, [a mutual fund] is typically created and managed by a pre-existing external organization known as an investment adviser . . . [that] often selects affiliated persons to serve on the [fund's] board of directors . . . ." (citation omitted)).  Earlier, in *Burks v. Lasker*, the Court noted that, because self-dealing is ingrained in the adviser-fund relationship from its inception, "[t]he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest."  441 U.S. 471, 480-81 (1979) (quoting Galfand v. Chestnutt Corp., 545 F.2d 807, 808 (2d Cir. 1976)) (alteration in original).

*Management, Inc.*,[156] decided on appeal in 1982, is still the leading section 36(b) case decided to date.[157]

   *Gartenberg* was the first major fund industry fee case tried to a verdict. The trial judge, Milton Pollack, set a very high proof threshold,[158] and the Second Circuit's affirmance entrenched the "*Gartenberg* factors" as the principal yardstick for section 36(b) mutual fund fee litigation.[159] The *Gartenberg* factors have destroyed the promise held out by Congress in 1970 when it presented section 36(b) to fund shareholders as a fiduciary duty enforcement weapon. Despite stratospheric fees and resultant adviser profitability, to date, no complaining shareholder has ever won a lawsuit contesting mutual fund fee payouts under section 36(b).

   A central point of this article is that the *Gartenberg* factors are passé. They were of limited use originally, but today they are of no use at all. Part of the reason why *Gartenberg* sets a failed standard for judging fiduciary duty breaches lies in the case's unique circumstances. Understanding *Gartenberg* requires an understanding of the economic times and the factual setting in which the case arose.

   *Gartenberg* was a money market fund excessive fee case. The fund in question was Merrill Lynch's Ready Asset Trust. In late 1981 when the district court case was decided, the Merrill Lunch fund was "by far the largest

---

156. 694 F.2d 923 (2d Cir. 1982). The U.S. District Court for the Southern District of New York decided the verdict in *Gartenberg* the year before. *See* Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038 (S.D.N.Y. 1981).

157. *See* Jeffrey S. Puretz, *Recent Developments for Mutual Funds and Fund Advisers*, *in* LIFE INS. CO. PRODS. 475, 532 (A.L.I.-A.B.A. Continuing Legal Educ. ed., 2006), *available at* Westlaw, SM039 ALI-ABA 475 (noting *Gartenberg* "was for many years followed by every court in reported decisions"). Numerous decisions endorsed *Gartneberg*. *See, e.g.*, *In re* Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222 (S.D.N.Y. 2005), *aff'd sub nom.* Bellikoff v. Eaton Vance Corp., 481 F.3d 110 (2d Cir. 2007); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); Meyer v. Oppenheimer Mgmt. Corp., 715 F. Supp. 574 (S.D.N.Y. 1989), *aff'd*, 895 F.2d 861 (2d Cir. 1990); Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 493-94 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 973-74 n.38 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987). For a more complete listing of cases adopting *Gartneberg*, see James N. Benedict et al., *Recent Developments in Litigation Under the Investment Company Act of 1940*, *in* CORPORATE LAW AND PRACTICE COURSE HANDBOOK SERIES 571, 578 (Practising L. Inst. ed., 2003), *available at* Westlaw, 1373 PLI/Corp 571.

158. *See Gartenberg*, 528 F. Supp. 1038.

159. Very few fee cases have ever gone to trial on the merits. The first one that did post-*Gartenberg* was *Schuyt*, 663 F. Supp. 962. Like *Gartenberg*, *Schuyt* concerned a challenge to advisory fees charged for managing a money market fund. *Id.* And like *Gartenberg*, *Schuyt* was brought and decided in the Southern District of New York. *Id.* Other cases have also been won after trial by fund sponsors. *See Kalish*, 742 F. Supp. 1222; *Meyer*, 715 F. Supp. 574; *Krinsk*, 715 F. Supp. 472.

money market fund in existence,"[160] having exploded from $100 million in assets to over $19 billion "in just a few years."[161] Plaintiffs challenged as excessive the advisory fee paid to Merrill Lynch by its fast-growing money market fund.[162] Making the facts in *Gartenberg* distinctly different from those in modern fund fee cases was the fact that the Ready Asset fund was integrated into Merrill Lynch's sprawling branch office system. The fund had over 1.1 million shareholders,[163] and thousands of account executives were on hand at over 400 local offices to aid in processing and administering the 30,000-plus share orders received daily.[164] The orders were handled by the sales force "without any commission," leading to vexing cost accounting issues and considerable uncertainty over how much Merrill Lynch was paying for shareholder servicing and how much it was making as the fund's sponsor. Depending on how the numbers were crunched, and by whom, the fund's manager in 1980 either lost money or enjoyed an enviable profit margin exceeding 38%.[165]

### 2. Evaluating Fiduciary Breaches Under Gartenberg

The district court commenced its fiduciary duty analysis by acknowledging that under section 36(b), the adviser's conduct is to "be governed by the 'duty of uncompromising fidelity' and 'undivided loyalty.'"[166] The adviser must function "with an eye single to the best interests of the beneficiaries."[167] The

---

160. *Gartenberg*, 528 F. Supp. at 1042.

161. *Id.*

162. *Gartenberg*, 694 F.2d at 925.

163. *Gartenberg*, 528 F. Supp. at 1040.

164. *Id.* at 1041.

165. *Gartenberg*, 694 F.2d at 926. In 1980, the fund's assets exceeded $11 billion and generated a management fee of $33 million. *Id.* The defense's contention that managing the fund was unprofitable was premised on viewing the work of the Merrill Lynch brokers writing the ticket for the money market fund order as a loss item. The defense ignored the fact that the broker writing that ticket typically made a commission on the other side of that order, either purchasing stocks paid for out of the money market fund, or selling stocks generating cash to be deposited into the fund. Though the stock market side of Ready Assets transactions were enormously profitable to Merrill Lynch and its sales force, those benefits were ignored by the district court, which found: "[A]ny study of the benefits to Merrill Lynch as a result of the Fund's existence would be difficult, time-consuming and expensive, and probably entirely inconclusive, even if all of the logical problems could be resolved." *Gartenberg*, 528 F. Supp. at 1056. The court of appeals rejected the notion that estimating Merrill Lynch's fall-out benefits was impossible but found those benefits could not be considered because the plaintiffs never proved what they were. *Gartenberg*, 694 F.2d at 932.

166. *Gartenberg*, 528 F. Supp. at 1047 (citing Galfand v. Chestnutt, 545 F.2d 807, 809, 811 (2d Cir. 1976)).

167. *Id.* (citing Rosenfeld v. Black, 445 F.2d 1337, 1342 (2d Cir. 1971)).

court also found that candor and fair dealing are mandatory when the adviser deals with the fund over fees.[168] Distilled down, the district court held: "The essence of the [fiduciary duty] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain."[169]    The foregoing pronouncements are unexceptionable and consistent with section 36(b)'s plain language and legislative intent.

The trial court then held that section 36(b) requires proof of unfairness, giving due consideration to the "nature, quality and extent" of the services rendered to the fund in relation to the fee paid[170] plus "the money market fund industry practice and level of management fees."[171]  This latter consideration was a problem.  In suggesting that fund industry practices or fee levels provide useful standards for evaluating fees, the court did investors a massive disservice.  Section 36(b) was created *precisely* because the fund industry's uniquely conflicted governance system could not be trusted to deliver fair pricing.  Evaluating no-bid contract prices against other no-bid contract prices is futile.  The lower court properly proclaimed: "The market price—freely available and competitively set—serves as a standard to test the fairness of the investment advisory fee . . . ."[172]  Nonetheless, the lower court improperly permitted Merrill Lynch to defend its fees in reference to other similarly-tainted transactions, failing to recognize that, because of the conflicts described in Part I, mutual fund fees are not "competitively set" and thus are ineffective guideposts for use in judging arm's-length bargaining or pricing fairness.

On appeal, the plaintiffs in *Gartenberg* tried to convince the appellate court that the lower court's fairness standard tied to a "market price . . . freely available and competitively set"[173] sounded reasonable but bore no relationship to fund market reality.[174]  The Second Circuit evidently recognized the no-bid nature of fund industry pricing, pointing to "the existence in most cases of an *unseverable relationship* between the adviser-manager and the fund it services."[175]   But the appellate court nevertheless rejected the plaintiffs' contentions.  The court held that, in a section 36(b) fee case, the plaintiff must

---

168. Specifically, the court noted that "it is well settled that the investment adviser owes a duty of full disclosure to the trustees and shareholders of the Fund.  And even when full disclosure has been made, the courts must subject the transaction to rigorous scrutiny for fairness."  *Id.* (citations omitted) (internal quotation marks omitted).

169. *Id.* (quoting Pepper v. Litton, 308 U.S. 295, 306-07 (1939)).

170. *Id.*

171. Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 927 (2d Cir. 1982).

172. *Gartenberg*, 528 F. Supp. at 1067.

173. *Id.*

174. *Gartenberg*, 694 F.2d at 929.

175. *Id.* (emphasis added).

*MUTUAL FUND ADVISORY FEES*

demonstrate that "the adviser-manager [charges] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."[176] Whether it did so deliberately, the appellate court imported into section 36(b) actions a de facto waste requirement, precisely the proof threshold Congress sought to eliminate by drafting section 36(b) in the first place.

This important substantive ruling was paired with an equally important and devastating evidentiary finding. The Second Circuit rejected the plaintiffs' contention that comparisons with fees charged pension plans were a worthy "criterion for determining fair advisory fees for money market funds."[177] According to the court, pension funds do not "face the myriad of daily purchases and redemptions throughout the nation which must be handled by the Fund, in which a purchaser may invest for only a few days."[178] As discussed below, the *Gartenberg* court's greatest failing was its refusal to accept that the pricing of investment advisory services offered in the free market provides a legitimate and helpful guidepost for evaluating such services in the fund market.

There are three reasons why the court's refusal to consider this comparative data made no sense. First, the cost of servicing accounts—of handling purchases and redemptions—is an administrative cost, not a cost associated with the portfolio management. The focus in fund fee cases belongs on the portfolio advisory function, not on administrative matters. Administrative costs need to be—and almost always are—broken out and accounted for separately. Second, if the defense's position was that the advisory function was made more expensive by having to adjust for inflows and outflows of cash, then the extra labor and the cost thereof should have been isolated and used as a variable to justify an increase (very likely slight)[179] in mutual fund portfolio management pricing. The key is that the extra cost item needed to be identified and quantified; it needed to be proved. The third reason why

---

176. *Id.* at 928.

177. *Id.* at 930 n.3.

178. *Id.*

179. The so-called liquidity factor was alluded to by the Second Circuit in *Gartenberg* when it referred to fund managers having to deal with "the myriad of daily purchases and redemptions" by fund shareholders. *Id.* As we have seen, the alleged liquidity factor is a bogus justification for differentiating fund advisory fees from those charged for managing pension assets. The factor has been talked about but has never been quantified, and there is some evidence it does not exist at all. *See supra* notes 105-12 and accompanying text. It is thus absurd to bar use of pension fee comparisons based on a supposedly special, distinctive mutual fund cost factor that has never been quantified. Moreover, if the elusive "liquidity factor" ever were identified and quantified, all anyone making fee comparisons using non-fund data would need to do is adjust for it.

*OKLAHOMA LAW REVIEW*          [Vol. 61:83

*Gartenberg* erred in excluding comparative free market data has to do with a basic statistical concept. Missing from the court's analysis is recognition of the law of large numbers,[180] the statistical concept that guarantees a money fund manager's investment job is not made dramatically more difficult by constant inflows and outflows caused by individual trades.[181] Contrary to the court of appeals' analysis, a mutual fund portfolio manager, like the pension fund portfolio adviser, confronts each day a single net dollar inflow or outflow number calling for investment decision-making.[182] The *Gartenberg* court made a mistake in refusing to admit comparative free market data—a mistake that freed fund sponsors' advisory fees from the searching scrutiny Congress wanted.

### 3. The Gartenberg *Factors, and Why They Stack the Deck Against Fund Shareholders*

Rather than permit the introduction of real free market data in the form of pension fund fee advisory fee evidence, the court enumerated the following six factors, today commonly known as "the *Gartenberg* factors,"[183] to be weighed in determining fee disproportionality: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the adviser; (3) economies of scale; (4) comparative fee structures;[184] (5) fallout benefits (i.e., indirect profits

---

180. In the investment context:

> [T]he law of large numbers suggests that institutional funds need to trade . . . far less often than individuals do. Institutions represent ever-changing pools of individual investors. So long as new investors buy in at roughly the same rate that old investors redeem their interests . . . the fund can meet individuals' liquidity needs without buying or selling assets. Liquidity buying and selling is only necessary for institutions when large numbers of individuals simultaneously either put money into, or draw money out of, the fund.

Lynn A. Stout, *Are Stock Markets Costly Casinos?: Disagreement, Market Failure, and Securities Regulation*, 81 VA. L. REV. 611, 665 n.171 (1995). To state the law of large numbers more precisely, the mean of a sample approaches the expected value of a sample size as the sample size tends toward infinity—the difference between the sample's mean and the expected value shrinks as the size of the sample gets larger. *See* Jeffrey D. Blume & Richard M. Royall, *Illustrating the Law of Large Numbers (and Confidence Intervals)*, AM. STATISTICIAN, Feb. 2003, at 51.

181. It is relatively certain that the court received no such information. Admissible evidence about pension fund advisory fees, and a full explanation why that evidence is probative, apparently was not submitted to the lower court for its consideration.

182. This is so for money market funds as well.

183. *See, e.g.*, Benedict et al., *supra* note 157, at 578 (discussing various 36(b) cases in light of holdings on the "*Gartenberg* factors").

184. Historically, this factor called for analysis of fees and expense ratios of other similar mutual funds. In light of SEC rulemaking, *see infra* notes 237-41 and accompanying text, today, mutual funds must reveal if the board considered the fees charged by the adviser to other

derived by the adviser as an outgrowth of its control position); and (6) the care and conscientiousness of the fund directors.[185] By relying on the above six factors to determine disproportionality, rather than real free market data (from Vanguard, pension funds, separate accounts, or the like), *Gartenberg* and its progeny demand that fund shareholders, bold enough to launch fiduciary duty attacks, build their cases largely out of data that is always skewed, often hidden, and, if found, invariably subject to ferocious disputes in subjective interpretation.

We begin with factor 2, the fund's profitability to the adviser. "Profitability is one of the most difficult factors to analyze in reviewing an advisory contract."[186] Profitability is difficult to calculate, for starters, because it is tough to obtain the raw data necessary to make the calculations. For instance, to calculate profits, one must first look to the adviser's cost of servicing the fund, data mutual funds jealously guard. Indeed, some years ago, the SEC's Chief Economist was asked about seeking to collect industry-wide data on fund advisory firms' revenue, costs, and profitability. He responded: "As to your suggestion that the SEC's Chief Economist do a revenue/cost/profit study, I know I'd be interested, but I don't think the industry would oblige us."[187] To even start a profitability analysis, a plaintiff must marshal evidence the SEC itself does not have and says it cannot obtain.[188] Exacerbating the difficulties, uniform expense categories and accounting methodologies do not exist, as the SEC staff's inability to analyze portfolio management costs, discussed further *infra*, shows.[189]

Next, even if the raw data is found, profitability calculations involve cost allocation issues that are subject to dispute, and there is no universally accepted methodology for making the analysis. This means that, in practice, profitability is bitterly contested. Recall that in *Gartenberg*, the experts' analysis of the advisers' profitability left the court in doubt whether the adviser had enjoyed a lush profit margin in 1980 of 38% or more or had suffered a

---

non-mutual fund clients and if not, why not. The SEC rulemaking, we (and others) contend, brings comparative free market data into play under the *Gartenberg* test. *See* Laurin Blumenthal Kleiman & Carla G. Teodoro, *Forming, Organizing and Operating a Mutual Fund: Legal and Practical Considerations*, *in* THE ABCS OF MUTUAL FUNDS 2007, at 9, 31 & n.32 (Practising L. Inst. ed., 2007), *available at* Westlaw, 1612 PLI/Corp 9 (suggesting that comparative data cannot be ignored by boards in light of the SEC's rulemaking).

185.  Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 929-30 (2d Cir. 1982).

186.  Am. Bar Ass'n, *Fund Director's Guidebook*, 52 BUS. LAW. 229, 250 (1996).

187.  Letter from Erik Sirri, Chief Economist, Sec. Exch. Comm'n, to John C. Bogle, Chairman, The Vanguard Group (Mar. 23, 1999) (on file with the authors).

188.  The SEC has also announced that it is unable to evaluate economies of scale in the fund industry because the data is lacking. *See infra* notes 205-07 and accompanying text.

189. *See infra* notes 205-07 and accompanying text.

loss.[190]  In another Merrill Lynch-related fund case brought under section 36(b), the plaintiff's expert testified that, in a given year, Merrill Lynch's Cash Management Account generated pre-tax profits of $47.5 million and a pre-tax return on revenues of 28.5%.[191]  For the same period, Merrill Lynch's chief expert reported a loss of $77 million and a *negative* profitability of 55.8%.[192]  Over a three-year period, plaintiff's expert determined average annual profitability of the fee contract to the adviser was 40.4%; the defense expert's estimate was an annual return of *minus* 32.7%.[193]  After disparaging both sides' presentations on profitability, the court concluded that a weighted average of pre-tax profitability over the three-year test period "would probably fall in a range from at least a few percentage points greater than 0% to perhaps as much as 33%."[194]  In other words, all the parties' efforts, complete with expert reports and testimony, left the court clueless when gauging the adviser's profitability over the period in question.  Likewise, in another fee case, the court found that calculating the adviser's cost of servicing the captive fund was a "virtually impossible task."[195]  Given that profitability data is hidden, subject to fierce dispute once found, and next to impossible for courts to analyze, it is unclear what is gained by making proof about the adviser's profitability a criterion for recovery in cases attacking advisory fees.

Factor 3, economies of scale, is no less vexing.  It is common knowledge that, as one fund industry pioneer has stated, "the economies of scale in fund operations are truly staggering."[196]  The reason for this, according to one fund industry insider, is that "[t]he marginal costs of managing increasing dollars is minimal."[197]

---

190.  *Gartenberg*, 694 F.2d at 926.

191.  Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 489 (S.D.N.Y. 1988) (showing estimated profits and profitability percentages in a table comparing three studies), *aff'd*, 875 F.2d 404 (2d Cir. 1989).

192.  *Id.* (showing a table containing data from Merrill Lynch's expert).

193.  *Id.* at 494.

194.  *Id.* According to the plaintiffs, Merrill Lynch's average annual profitability for 1984 to 1986 was 40.4%; the defendants' expert estimated average profitability for the same period to be -32.7%. *Id.*

195.  Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 978 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987).  The same court held that the fund adviser's profit did not need to be disclosed to investors because profitability was not a material fact, *id.* at 990, even though the adviser's pretax profit margin was colossal, exceeding 77%. *Id.* at 977.  If it is true that the adviser's profitability is not an important fact for plaintiffs to know about, then it follows shareholders should not be required to assemble and present profitability data in order to win fee cases.

196.  Bogle, *supra* note 42, at 417.

197.  Kahn, *supra* note 120, at B7 (quoting Jeffrey S. Molitor, Dir. of Portfolio Review, Vanguard Group).

There is no shortage of proof that economies of scale exist. In Part III, we
show in Figure 3 and Tables 2 and 3 how Vanguard harnesses economies of
scale to save its investors millions annually. Freeman-Brown found that
advisory fees dropped sharply in the public pension marketplace as the pension
funds' asset size increased.[198] Likewise, fund adviser Franklin Resource's
tremendous success as a growth stock has been fueled by its ability to benefit
from the economies of scale available as the size of fund assets under
management grows. As Greg Johnson, CEO of Franklin Resources, explained:
"We benefit from economies of scale. . . . As our asset base grows, the cost
of servicing our shareholders does not grow proportionately."[199] Johnson's
admission that economies of scale benefit the fund adviser tremendously
comes as no surprise. Economies of scale obviously exist and are there to be
realized.

And of course this makes sense. It is not that much harder to manage $1
billion than $100 million. Regardless of the size of the fund, one must
evaluate and buy portfolio investments; the bigger the fund, the more shares
you buy. Yet if one charged 2% to manage the $100 million fund, he would
make $2 million annually, and to manage the $1 billion fund, he would make
ten times as much. Recognizing this, pension managers insist that fees drop
sharply as assets under management grow.[200] Vanguard's board does the
same.[201] Outside the Vanguard Group, however, advisory fee levels fall little
as funds' asset size skyrockets.[202]

Knowing that fund advisers exploit "staggering" economies of scale which
are not being fairly shared with captive funds is one thing.[203] Proving it in a
court of law is something different entirely. To prove factor 3—that
economies of scale generated by fund asset growth have been converted into

---

198. Freeman & Brown, *supra* note 9, at 632.

199. John Eckhouse, *Franklin Wins Again*, S.F. CHRON., Apr. 20, 1992, at D6.

200. Freeman & Brown, *supra* note 9, at 627-34.

201. *See supra* Table 2, Table 3 & Figure 3.

202. *See supra* Table 3 and accompanying text. Freeman-Brown found that, in mutual
funds, the average fee charged was essentially flat through the fund sample's first seven deciles
(covering the funds making up the first 70% of the sample, ranked according to size) and the
fee charged was consistently greater than 70 bps. Freeman & Brown, *supra* note 9, at 632. Fees
declined when fund size increased above about $750 million, but the decline was modest when
compared to significant declines seen in pension funds. *Id.*

203. One experienced fund industry observer had this to say about economies of scale in the
asset management side of the mutual fund industry and the extent to which the industry's
advisers share them with fund shareholders:

The staggering economies that I . . . know exist in the field of money management
failed to materialize as total equity fund expenses rose [from 1980-2005] from
$280 million a year to $37 billion a year, 129 times over.

Bogle, *supra* note 40.

unfairly high profits and improperly diverted by the fund's adviser—the plaintiff must have detailed cost[204] and profitability data. As explained above, data about the adviser's operations are viewed as proprietary and are not readily available even to the SEC,[205] much less to fund shareholders. A conclusion reached in a 2000 SEC report on mutual fund fees vividly illustrates the difficulty of obtaining this data.[206] In that study, the SEC staff explained that it was unable to "analyze directly the cost of providing portfolio management services to a mutual fund in order to determine whether economies exist (*because the data are unavailable*)."[207] This means that the SEC's own staff of lawyers and financial economists, specialized mutual fund experts all, have solemnly informed us they cannot locate cost data sufficient to permit them to analyze and opine upon whether economies of scale even exist in the fund industry because the staff lacks access to industry cost data regarding the portfolio management function. Given that the SEC has been left in the dark, it follows that mere fund shareholders, lacking the SEC's expertise, resources, and clout, also are apt to have a grave problem locating the cost and profitability data needed to make economies of scale calculations in litigation under *Gartenberg*.

Even assuming the cost and profitability data needed to generate economies-of-scale data can be obtained through discovery, the data still are subject to bitter arguments over accuracy and completeness.[208] Arguments are

---

204. Cost data is especially difficult to isolate because even if the most easily calculated type of cost information—direct expenses for pure portfolio management—were available, costing out the advisory function (i.e., excluding administrative and distribution costs) would still necessitate allocating an appropriate share of the advisory firm's indirect costs, including overhead.

205. *See supra* notes 187-88 and accompanying text.

206. DIV. OF INV. MGMT., SEC. EXCH. COMM'N, REPORT ON MUTUAL FUND FEES AND EXPENSES (2000), *available at* http://www.sec.gov/news/studies/feestudy.htm.

207. *Id.* (emphasis added).

208. For example, consider the following complaints over deceptive accounting and misleading board disclosures advanced by investors in one fund fee case:

> Plaintiffs adduced an assortment of evidence that Harris provided the board with materially misleading and inaccurate information directly bearing on the reasonableness of Harris's fees. Among other things, Plaintiffs demonstrated that Harris grossly understated its profit margins to the board by accounting for huge profit-sharing payments to its partners as business expenses. Plaintiffs also demonstrated that Harris failed to supply the board with an economies-of-scale analysis and instead furnished it with misleading cost information that masked Harris's economies of scale. In addition, Harris provided the board with information regarding marketing and distribution payments that failed to disclose that Harris's accounting methodologies had caused the funds to bear an inappropriately large portion of these payments.

Reply Brief of Plaintiffs-Appellants at 18-19, Jones v. Harris Assocs. L.P., No. 2007-1624 (7th

inevitable, in part, because there is no standard methodology to evaluate economies of scale within the mutual fund industry. Furthermore, in the authors' experience, fund companies have no problem finding and hiring well-credentialed experts to argue that the types of mutual funds most commonly involved in fee litigation (huge equity funds charging huge fees and generating enormous profits for the adviser) actually have no economies of scale at all.[209] Establishing that economies of scale both exist and have not been properly shared are crucial undertakings for plaintiffs in section 36(b) cases.[210] Because of the foregoing problems, to put it mildly, success is by no means guaranteed.

Likewise daunting for plaintiffs is the subject matter covered by items (5) and (6), fall-out benefits and directors' conscientiousness. Fall-out benefits are

---

Cir. July 2, 2007) (citations omitted), *available at* http://www.ca7.uscourts.gov/briefs.htm (search for "07-1624"; then follow "07-1624 005.pdf" hyperlink).

209. The claim is that fund portfolio management offers no economies of scale on a marginal or forward-looking basis. The defense contention is that the only thing relevant to assessing economies is whether future operations will yield additional economies of scale that would justify a fee cut. The problem with this view is that in any given year, the fee contract being negotiated covers *all* assets under management, not just assets apt to be brought into the fund over the next yearly period covered by the advisory fee. The fee level set by the prevailing fee schedule is not the adviser's property. It is up for re-negotiation on an annual basis. No aspect of the fund's advisory fee payments are beyond questioning by fund boards. The Investment Company Act's governance scheme is intentionally slanted to give fund boards power over advisers who may believe they have a proprietary right to current fee levels. The statute requires annual approval of the fund's advisory contract covering all assets. *See* 15 U.S.C. § 80a-15(c) (2000). Congress deliberately gave fund boards annually-renewable power to fire the adviser and put the management contract covering all those assets up for bid. *See* Am. Bar Ass'n, *supra* note 186, at 249 ("The independent directors' ability, indeed their obligation, to consider the investment advisory agreement annually is the principal source of their leverage in dealing with the investment adviser."). Thus, it is simply wrong to say that economies of scale realized in the future are the only ones relevant in setting fund advisory fees.

210. The essence of an unfair fee case is that the adviser is profiting unfairly at the expense of fund shareholders. The simplest way to show this is to prove that the adviser captures a disproportionate share of the gains realized as revenues grow faster than expenses. This analysis calls for recognition that annual approval of the advisory contract places in issue, each year, the entire revenue stream for the advisory function, not just an incremental amount reflecting the amount to be spent based on expected fund asset growth over the next year. It is the board's job to monitor and control the advisory function. The fund's board controls fee setting. It has the power to replace the adviser each time the fee contract comes up for renewal. Thus, the fee approval undertaking addresses not a marginal cost, but every single dollar to be paid. In other words, there is not an ongoing fee contract with a layer of fee payments that is not eligible for inspection, analysis, or rejection. A guidebook written to educate fund directors about their fiduciary duties recognizes that review of the fund's growth over time is the crucial inquiry. *See* Am. Bar Ass'n, *supra* note 186, at 250 (calling on directors to analyze "the extent to which the adviser has realized economies of scale as a fund grows").

money-making tie-ins available to a fund's adviser by reason of its position.[211]

---

211. A listing of various potential types of fall-out benefits that supposedly "are passed on to shareholders," was set forth by Professors Coates and Hubbard in an earlier version of their article published as a working paper by the American Enterprise Institute. *See Coates-Hubbard Working Paper*, *supra* note 79, at 57-58 n.123. It is by no means clear that, as the Coates-Hubbard Working Paper suggests, fund shareholders are on the receiving end of abundant fall-out benefits. Missing from their report is any data backing up these claims. Among other things, the Coates-Hubbard Working Paper contends shareholders profit through economies of scale when new investors are brought into the fund. *Id.* This economies argument was, of course, one of the major selling points when Rule 12b-1 was adopted. The idea that sales to new investors financed out of fund assets are beneficial to existing fund shareholders is dubious and not supported by the literature. *See, e.g.*, LORI WALSH, THE COSTS AND BENEFITS TO FUND SHAREHOLDERS OF 12B-1 PLANS 2 (2004) *available at* http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf.

Other supposed fall-out benefits accruing to fund shareholders, according to the Coates-Hubbard Working Paper, are "[a]lleged rebates and soft dollar payments." *Coates-Hubbard Working Paper*, *supra* note 79, at 57-58 n.123. An "alleged" rebate has no recognized meaning and is thus hard to view as a benefit, if it exists at all. Actual rebates from service providers returning costs borne by the fund clearly are bad unless they are 100% paid into the fund, and in two cases rebates (akin to kickbacks) were demanded by the adviser from the funds' service providers, causing the funds to be overcharged and the adviser to be unjustly enriched. *See SEC v. Jones*, No. 05 Civ. 7044(RCC), 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006); *In re* BISYS Fund Servs., Inc., Investment Advisers Act Release No. 2554, Investment Company Act Release No. 27,500, SEC Admin. Proc. File No. 3-12432 (Sept. 26, 2006), *available at* http://www.sec.gov/litigation/admin/2006/ia-2554.pdf. As for soft dollars, they undercut price competition if undisclosed. The practice of padding brokerage costs (which, of course, are not reflected in funds' expense ratios) to generate money to pay for advisory services raises major policy issues. If the expenditures do not go to reduce the fund's advisory fees, the true amount being paid for advisory services is distorted, and fiduciary duty issues of fairness and full disclosure are implicated.

Additional supposed "fall-out" benefits singled out by the Coates-Hubbard Working Paper as beneficial to fund shareholders are particularly puzzling. One such category is "[r]eusing research and portfolio management." *Coates-Hubbard Working Paper*, *supra* note 79, at 57-58 n.123. Here is what the Coates-Hubbard Working Paper says in explaining how the fund benefits when the adviser resells the research know-how it developed at fund shareholders' expense:

Using the research for additional portfolio management business, such as contracting to become a sub-advisor for another fund or an external portfolio manager for an institutional client, allows the fund to gain further incremental revenues toward covering total costs, benefiting all fund investors.

*Id.* This is a peculiar statement. It assumes that when, for example, Alliance Capital sold its services to the Wyoming Plan for 10 bps as discussed above, *see supra* note 99 and accompanying text, this transaction financially benefited Alliance Capital's Premier Growth Fund shareholders. But we are unaware of any tradition of fee sharing between advisers and funds in such cases. We are unaware of any instances—and the Coates-Hubbard Working Paper provides no examples—where "incremental revenues" collected by fund advisers are forwarded to the fund that paid for the original advisory work. What instead seems to be the norm is that

*MUTUAL FUND ADVISORY FEES*

.They were considered in *Gartenberg* because the fund in question, the Ready Asset Trust, was developed and flourished as an integral part of the Merrill Lynch brokerage operation.[212]  Merrill Lynch enjoyed substantial fall-out benefits under the *Gartenberg* facts because cash inflows or outflows from the firm's money market fund often were tied to brokerage transactions creating commission income for the firm and its brokers.  The same logic does not apply in a contemporary standard fund fee case challenging pure portfolio advisory fees.  Unlike Merrill Lynch's situation in *Gartenberg*, today's typical fee case involves a free-standing mutual fund operation with no captive sales force.  Typically the adviser and its affiliates operate under separate contracts covering the advisory, distribution, and administrative functions.  In this different—and far more common—setting, there is no good reason why fall-out benefits must or should be analyzed as part of the advisory fee reasonableness calculus.[213]

This is especially true since weighing fall-out benefits is no easy task.  Fall-out data is hard to find because, at present, public disclosures of advisers' business dealings with the fund tend to be summary "laundry lists," devoid of useful and necessary detail.[214]  Information about fall-out benefits that would

---

advisers take sensitive, proprietary research paid for by the fund and convert the asset to their personal benefit.  The advisers thus use the funds' property—the information gleaned—to sub-advise other entities, keeping the profits for themselves, and raising fiduciary duty/corporate opportunity problems in the process.  What is particularly odd, in the authors' experience, is that the sub-adviser's work tends to be done for others at a much lower price than was charged for the work performed for the originating fund.

212.  Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038, 1055-56 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

213.  The presence or absence of fall-out benefits has next-to-nothing to do with the reasonableness of the adviser's pay for doing a specific task, namely running the fund's portfolio advisory operation.  Each potential fall-out benefit is a separate, free-standing source of potential revenue for both the fund itself and the fund sponsor's organization.  Sensible governance requires that these free-standing opportunities be the subject of separate negotiations and agreements between the fund's board and the adviser.  Because each potential benefit relates to a discrete corporate opportunity that presumptively belongs to the fund, each needs to be disclosed, accounted for, quantified, and then approved by the fund's board upon terms that are fair to the fund and its shareholders.

214.  *See, e.g.*, Fidelity Magellan Fund, Prospectus (Form 485BPOS) (May 29, 2005) [hereinafter Fidelity Prospectus], *available at* http://www.sec.gov/Archives/edgar/data/61397/ 000006139705000004/main.htm.  The Fidelity Prospectus discusses the fund board's consideration of the adviser's fall-out benefits as follows:

The Board of Trustees . . . also considered the character and amount of fees paid by the fund and the fund's shareholders for services provided by the Investment Advisers and their affiliates, including fees for services like transfer agency, fund accounting, and direct shareholder services.  It also considered the allocation of fund brokerage to brokers affiliated with the Investment Advisers, the receipt of

be useful in fashioning a legal complaint is hidden from public view. Given that fall-out benefits are usually irrelevant and always burdensome, the scale should tip against courts requiring this fifth *Gartenberg* factor.

Data on the sixth *Gartenberg* factor, directors' diligence, likewise is hard to find and evaluate. Not until June 2004, twenty-two years after the lower court's ruling in *Gartenberg*, did the SEC begin to require that mutual fund boards disclose the material factors considered by fund boards in approving advisory contracts.[215] Even now, the required disclosure is generally made in vague terms. They are mere recitations of the many factors considered, and are devoid of details about how fees were determined or other specifics a shareholder would need to know in order to evaluate the director's level of care.[216] Moreover, directors' care and diligence is hard to evaluate. Neither

---

sales loads and payments under Rule 12b-1 plans in respect of certain of the Fidelity funds, and benefits to the Investment Advisers from the use of "soft" commission dollars to pay for research and brokerage services. [It] also considered the revenues and profitability of the Investment Advisers' businesses other than their mutual fund business, including the Investment Advisers' retail brokerage, correspondent brokerage, capital markets, trust, investment advisory, pension record keeping, insurance, publishing, real estate, international research and investment funds, and others. [It also] considered the intangible benefits that accrue to the Investment Advisers and their affiliates by virtue of their relationship with the fund.

*Id.* Note the lack of specific data. Without clear identification of the fall-out benefits being evaluated, their dollar values, and the extent to which they are shared by the adviser with the fund, a shareholder has no means of analyzing, based on publicly available information, whether the adviser's dealings with fall-out benefits was handled properly.

215. Disclosure Regarding Approval of Investment Advisory Contracts by Directors of Investment Companies, Securities Act Release No. 8433, Exchange Act Release No. 49,909, Investment Company Act Release No. 26,486, 69 Fed. Reg. 39,798 (June 30, 2004).

216. For example, consider this description of advisory fee decision-making presented in the Fidelity Prospectus:

The Board of Trustees has established two Fund Contract Committees: the Equity Contract Committee (composed of Messrs. Stavropoulos (Chair), Gamper, and Lautenbach, Dr. Heilmeier, and Ms. Small) and the Fixed-Income Contract Committee (composed of Ms. Small (Chair), Mr. Dirks, and Ms. Knowles). . . . With respect to each fund under its purview, each committee: requests and receives information on the nature, extent, and quality of services provided to the shareholders of the Fidelity funds by the investment advisers and their respective affiliates, fund performance, the investment performance of the investment adviser, and such other information as the committee determines to be reasonably necessary to evaluate the terms of the investment advisory agreements; considers the cost of the services to be provided and the profitability and other benefits that the investment advisers and their respective affiliates derive or will derive from their contractual arrangements with each of the funds (including tangible and intangible "fall-out benefits"); considers the extent to which economies of scale

the SEC nor the fund industry have ever attempted to articulate a set of minimum standards directors must meet in order to fulfill their fiduciary obligations.[217]

In sum, the federal fiduciary standard applied in section 36(b) cases under *Gartenberg* is an infirm and warped legal standard requiring scrutiny of hidden or essentially undiscoverable data that, even if found, are subject to wildly different interpretations by well paid and highly-credentialed experts. It is not plaintiff-friendly, as Congress intended. It is not an improvement on the common law of waste standard. In truth, it is not a competent, legitimate fiduciary duty standard at all.

## V. A Better Way to Evaluate Mutual Fund Fees

Section 36(b), informed by *Gartenberg*, has thus proven to be the least useful express federal securities remedy for private litigants and has failed for thirty-seven years to yield a single trial verdict for plaintiffs. Meanwhile, fund shareholders pay fees generating astronomical profit margins[218] to their conflicted fiduciaries who typically provide investment returns lagging

> would be realized as the funds grow and whether fee levels reflect those economies of scale for the benefit of fund investors; considers methodologies for determining the extent to which the funds benefit from economies of scale and refinements to these methodologies; considers information comparing the services to be rendered and the amount to be paid under the funds' contracts with those under other investment advisory contracts entered into with [Fidelity Management & Research Company] and its affiliates and other investment advisers, such as contracts with other registered investment companies or other types of clients; considers such other matters and information as may be necessary and appropriate to evaluate investment advisory agreements of the funds; and makes recommendations to the Board concerning the approval or renewal of investment advisory agreements. Each committee will consult with the other committees of the Board of Trustees, and in particular with the Audit Committee and the applicable Fund Oversight Committees, in carrying out its responsibilities. Each committee's responsibilities are guided by Sections 15(c) and 36(b) of the [Investment Company Act of 1940].

Fidelity Prospectus, *supra* note 214.

217. Mercer Bullard, *Rouge on a Corpse Won't Bring Mutual Fund Directors Back to Life*, JURIST ONLINE, Mar. 15, 2004, http://jurist.law.pitt.edu/forum/bullard1.php ("Neither the SEC nor the fund industry has set forth standards regarding the minimum steps that fund directors must take to fulfill their fiduciary duties to shareholders.").

218. In *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, the court approved, and thus gave the fund sponsors the green light to accept, an annual pre-tax profit margin of over 77%. 663 F. Supp. 962, 979 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987). That pretax profit margin was no aberration; it was up from margins of 59.1% and 66.8% achieved the two previous years. *Id.* at 978-79.

benchmark standards. A knowledgeable observer in the United States Senate decried the fund industry as "the world's largest skimming operation,"[219] even though it operates in the most highly regulated money-management industry in the securities business and has a specially crafted federal "fiduciary duty" standard. There has got to be a better way to evaluate mutual fund fees. And, as will be shown, one does exist.

*A. The Free Market Offers a Valuable, Needed Pricing Guide*

When it comes to enforcing standards of fiduciary behavior, the focus must be on honest accountability and fair dealing. While *Gartenberg* acknowledged that the standard for testing the reasonableness of a fiduciary's compensation in a self-dealing transaction is an arm's-length price,[220] the issue is from *which* marketplace the comparable market prices are to be extracted. The proof should come from free market transactions, not from the conflict-ridden, contaminated fund market. As it is, *Gartenberg* allows funds to defend their fees by referencing fees paid by other similarly conflicted funds and sends plaintiffs on a fruitless and frustrating quest for an empirical holy grail while simultaneously disallowing or down-playing the best evidence of fairness: true fair market prices, as negotiated by unconflicted boards.

Fair market value is defined as the cash price an item would sell for between a willing buyer and willing seller assuming they both have knowledge of the relevant facts and they have *no compulsion* to buy or sell.[221] Because the fund market features prices drawn from negotiations where one party (the fund) is under compulsion to buy from only one supplier (the adviser), mutual fund fees negotiated between captive funds and their adviser, whether considered

---

219. *Trading Practices Hearing*, *supra* note 48, at 3 (opening statement of Sen. Peter G. Fitzgerald). According to Senator Fitzgerald, the fund industry represents a multi-trillion dollar "trough from which fund managers, brokers and other insiders are steadily siphoning off an excessive slice of the Nation's household, college and retirement savings." *Id.*

220. Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 927-28 (2d Cir. 1982). Indeed, the lower court correctly observed that "[t]he market price—freely available and competitively set—serves as a standard to test the fairness of the investment advisory fee under the facts shown in this record." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038, 1067 (S.D.N.Y. 1981).

221. *See* Newark Morning Ledger Co. v. United States, 507 U.S. 546, 570 (1993) (approving lower court's application of fair market value test as being "the price at which the asset would change hands between a hypothetical willing buyer and willing seller, neither being under any compulsion to buy or sell, both parties having reasonable knowledge of relevant facts"); *see also* Treas. Reg. § 20.2031-1(b) (as amended in 1965) (defining, for purposes of estate valuation, fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts").

*MUTUAL FUND ADVISORY FEES*

individually or collectively, cannot reflect fair market value and should not be used to judge whether a particular fee is fair.[222]

### B. Comparisons Can and Should Be Made

Other available comparators are superior. After all, mutual funds are not the only institutional investors holding portfolios of securities needing professional management; almost all institutional investors have that need. Pension funds, endowment funds, trusts, separate accounts, and even mutual funds that hire sub-advisers, are all able to purchase investment advisory services in arm's-length transactions in the free market. Those separate institutional contracts are findable and easy to evaluate. They present an array of comparables eligible for use in evaluating pricing in the fund market when conflicted advisers deal with their captive funds.

These actual arm's-length transactions can and should be used as reliable benchmarks when judging the unfairness of prices set by a fund adviser for portfolio management services rendered to a captive fund. The validity of this data is especially obvious since many mutual fund sponsors or their affiliates simultaneously sell *their own* advisory services on the free market to other entities—such as pension plans, college endowment funds, separate accounts, or through sub-advisory contracts. Indeed, as shown in Part III, nineteen advisers hired by Vanguard simultaneously maintain their own captive mutual funds. In such cases, the advisory function provided to the institutional entities and the captive fund is equivalent, since portfolio management is approximately the same whether the shares in the portfolio belong to a pension fund, a mutual fund, a college endowment fund, or some other large institutional investor.[223]   More accurately and objectively than expert

222. Lawyers representing fund advisers in 36(b) litigation insist the *only* admissible pricing evidence usable at trial is that drawn from similar mutual funds. *See, e.g.*, American Century's Motion in Limine to Preclude Evidence Relating to Sub-Advised and Institutional Accounts and Suggestions in Support, Baker v. Am. Century Inv. Mgmt., Inc., No. 04-4039-CV-C-ODS (W.D. Mo. June 22, 2006), 2006 WL 2320405. In that filing American Century argued successfully for preclusion of evidence establishing pricing outside the fund business, citing and relying on *Gartenberg* and its progeny, *In re AllianceBernstein Mutual Fund Excessive Fee Litigation*, No. 4 Civ. 4885(SWK), 2006 WL 1520222, at *2 (S.D.N.Y. May 31, 2006); *Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Krinsk v. Fund Asset Management, Inc.*, 715 F. Supp. 472, 486 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Bromson v. Lehman Management Co.*, No. 84 Civ. 7795, 1986 WL 165 (S.D.N.Y. Mar. 13, 1986).

223. Recall that the fund managers' lobbying group and advocate, the ICI, agrees that mutual funds and other institutional investors are in fact comparable. *See supra* text accompanying notes 108-12.

testimony ever could, the institutional contracts, negotiated in the free market, prove what the adviser *actually* demands by way of price and profit when it sells portfolio management services in an arm's-length transaction.

Portfolio services are especially susceptible to comparison because they tend to be bundled with few if any other services in fund industry advisory contracts.[224] When the data is pristine, it is easy to show on an apples-to-apples basis whether an advisory fee is grossly excessive. Even if the adviser's charge for portfolio management services is bundled with some other minor administrative expenses, fund advisory fees can still be compared with fees charged for like services in the free market. Fact finders have no trouble adjusting prices when necessary.[225] As previously noted, nobody insists that the comparables' attributes be absolutely identical to the item being valued, just that it be reasonably similar, with appropriate adjustments to make the comparison useful.

In sum, courts must permit plaintiffs to introduce evidence of free market comparables.[226] Relegating plaintiff shareholders to comparing a given fund's no-bid pricing schedules to other similar funds' no-bid pricing schedules will never yield any fee relief for shareholders, as history has shown. An evidentiary standard based on evaluating tainted fees based on comparisons with other similarly tainted fees is no credible evidentiary standard at all.

### C. Courts Must Recognize Comparables' Power

Admitting evidence of free market comparables is a necessary but insufficient step. Courts must also recognize and harness the probative value of this evidence. Two recent cases have brought this point home. In these cases, courts have properly considered institutional pricing data but erred in the *manner* of consideration. In the first case, *Jones v. Harris Associates, L.P.*,[227] the court properly admitted into evidence proof that the adviser's institutional clients were charged fees that were less than half those charged

---

224. This is not always the case, though it should be. Because it is not uniformly the case, fund sponsor advocates like Coates and Hubbard are prone to contend that fund advisory fees are not subject to scrutiny because of data problems. *See supra* notes 86-87 and accompanying text.

225. *See supra* note 113 and accompanying text.

226. Without use of such comparators, section 36(b) plaintiffs are doomed. This was driven home recently when plaintiffs' counsel dropped a section 36(b) case on the eve of trial following the district court's ruling on a motion in limine to exclude institutional pricing evidence at trial. *See* Order Granting Defendants' Motion in Limine, *Baker*, No. 04-4039-CV-C-ODS.

227. Jones v. Harris Assocs. L.P., No. 1:04-cv-08305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007).

*MUTUAL FUND ADVISORY FEES*

the captive funds,[228] but the court failed to grasp the evidence's importance.[229] In granting summary judgment for defendants, the court held that advisory fee pricing embraced a range of prices, with the far lower fees charged institutional clients simply on the low end of a spectrum, which was also populated by the tainted fees charged conflicted funds. Because the subject funds' fees fell within the spectrum, the fund's high fees were held proper as a matter of law.

Similarly, in a recent case involving the Ameriprise fund family,[230] the plaintiffs introduced evidence showing the adviser charged advisory fees to its captive mutual funds that were more than double what the fees that would have been charged had the adviser used the fee schedules it employed when selling portfolio management services in the free market.[231] Taking its lead from *Jones*, the court in the *Ameriprise* case held the adviser's far lower institutional advisory fee prices merely established the low end of a range of prices to be considered; the pricing array was, of course, dominated by tainted prices set by conflicted bargaining.

If the superficial *Jones* and *Ameriprise* mode of analysis stands, fund investors will never win a case challenging advisory fees under section 36(b). Institutional fees charged in the free market will always be lower than fees for like work charged in the fund market, but they fade into irrelevance once the

---

228. For example, evidence in the record established that had the adviser charged Oakmark Fund according to its institutional fee schedule, the advisory fee would have dropped from 88 bps to under 36 bps, saving Oakmark Fund shareholders more than $33 million annually. *See* Expert Report of Edward S. O'Neal at 18, *Jones*, No. 1:04-cv-08305 (on file with the authors). For Oakmark Equity & Income Fund, the rate drop would have been from 73 bps to under 26 bps, and annual savings would have been over $37 million. *Id.* at 19. Thus, for these two funds alone, the difference between institutional pricing in the free market and conflicted pricing in the fund market amounted to $70 million in extra compensation for the adviser annually. In each case, the funds were paying more than double what the adviser was selling similar services for in the free market.

229. The court in *Jones* not only failed to focus on the importance of the pricing disparity, it also ignored a shocking fact supported with record evidence: It was more expensive for the adviser in Oakmark to service its institutional accounts than its mutual funds. In other words, the adviser in Oakmark was charging its mutual funds more than twice as much for advisory services even though those services were cheaper to deliver to the funds than to the institutional accounts. *See* Plaintiffs' Response to Defendant's Statement of Undisputed Facts and Plaintiff's Statement of Additional Facts ¶ 4, *Jones*, No. 1:04-cv-08305 (on file with the authors). From the data studied, it appears the adviser in Oakmark was charging its mutual funds more than twice as much for advisory services even though those services were cheaper to deliver to the funds than to the institutional accounts.

230. Gallus v. Ameriprise Fin., Inc., 497 F. Supp. 2d 974 (D. Minn. 2007).

231. Decl. of Edward S. O'Neal, Ph.D at 5, *Gallus*, 497 F. Supp. 2d 974 (No. 0:04-cv-04498-DWF-SRN).

court merely acknowledges them, with dispositive attention then turning to a pricing array of fund fees.[232]

Courts in section 36(b) cases must not only admit comparative price data into evidence; they also need to be carefully schooled on the probative value of free market pricing. Courts need to recognize that free market prices are more credible and hence ought to be far more illuminating than pricing examples taken from the conflicted fund market. Proof that a fund adviser treats a third-party outsider far more favorably than he treats the very party to whom he owes statutorily-provided fiduciary duties needs to be recognized for what it is: *prima facie evidence* of a breach of fiduciary duty. Consigning that powerful evidence to populate the low end of a range ships the damning proof of pricing unfairness off to oblivion. This outcome is particularly objectionable in cases where the issue being determined is whether fund pricing bears the hallmarks of an arm's-length bargain. In this context, evidence of actual arm's-length bargaining by the defendant or one of its affiliates is the best, most instructive evidence the finder of fact can study. In this light, a framework for processing crucial evidence extracted from the free market is presented in the following section.

*D. The* McDonnell Douglas *Framework Should be Used When Evaluating Pricing Discrepancies*

Courts called on to evaluate free market vs. fund market pricing discrepancies need to abandon the disjointed, hit-and-miss, scavenger-hunt approach epitomized by *Gartenberg* and embrace a new, cleaner, and far more realistic approach to analyzing section 36(b) claims. In *McDonnell Douglas Corp. v. Green*,[233] the Supreme Court laid out a framework useful for analyzing disparate treatment cases relying upon circumstantial evidence of discrimination.[234] These cases are pertinent. Employment discrimination claims, like fund advisory fee claims, are rooted in a charge that a litigant (there the employee; here the captive fund) is being treated in a way that is unfair and unjustifiable.

---

232. As shown by Figure 4 *supra*, fund advisory fees are subject to great dispersion. Because of this, many fund fee schedules can be presented as more moderate and fair than an array of others extant in the industry.

233. 411 U.S. 792 (1973).

234. *Id.* The *McDonnell Douglas* framework's distribution of the burden of proof and production was later refined by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). For a discussion of the *McDonnell Douglas* framework, see Leslie M. Kerns, Comment, Aka v. Washington Hospital Center: *Why the Debate over Pretext Ended with* Hicks, 60 OHIO ST. L.J. 1625, 1630-34 (1999).

*MUTUAL FUND ADVISORY FEES*

Under *McDonnell Douglas*, the plaintiff is required to make a prima facie case of unfair treatment—employment discrimination. In the fund advisory fee context, this prima facie showing of a breach of fiduciary duty that the transaction—here the fee charged—lacks the "earmarks of an arm's-length bargain" would be satisfied by a showing that the adviser or one of its affiliates charged the captive fund significantly more than either the particular adviser—or a comparable competitor—charged an institutional client to perform roughly equivalent work.[235]

Under the *McDonnell Douglas* framework, once a prima facie case of disparate treatment is made, the defendant must produce evidence to rebut the presumption of discrimination. At this point it becomes incumbent on the defendant to articulate a legitimate non-discriminatory reason explaining why the disparity exists. In the fund fee context, the adviser would need to produce evidence showing that the captive fund was fairly treated—a task it could accomplish by identifying and quantifying the service differences between picking portfolio securities for third-party institutional clients versus the captive mutual fund.[236] Once the defendant has presented evidence to explain the fee disparity, it remains for the plaintiff to show the pricing disparity evidences a breach of fiduciary duty. The plaintiff would do this by proving, by a preponderance of the evidence, that the differences in services the defendant identified do not adequately explain or justify the fee disparity. Here, the plaintiff's ultimate burden will be to show that the captive fund was charged substantially more than free market clients for like work.

Had the *McDonnell Douglas* framework been used in the *Jones* and *Ameriprise* cases, the plaintiffs in each case could have survived summary judgment and had the opportunity to prove their cases. In each case, the plaintiff presented evidence of gross pricing disparity tending to show that the prices paid by the captive funds were grossly unfair, and in neither case did the adviser rebut that evidence.

---

235. "The essence of the [fiduciary] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 528 F. Supp. 1038, 1047 (S.D.N.Y. 1981) (citing Pepper v. Litton, 308 U.S. 295, 306-07 (1939)) (alteration in original), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

236. In *Burdine*, 450 U.S. at 250, the Court made clear the defendant shouldered only a burden of production, not a burden of proof, once the plaintiff had made a prima facie case. *See id.* at 254 ("The burden that shifts to the defendant . . . is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.").

*OKLAHOMA LAW REVIEW* [Vol. 61:83

### E. Free Market Comparables Are Potent Negotiating Tools Directors Should Consider

Free market pricing analogies, and the *McDonnell Douglas* analytical framework, offer great promise, not just as decision-making guides, but as tools a fund board may usefully employ in negotiating advisory fee contracts. In 2004, the SEC adopted rule and form amendments requiring that fund boards that take institutional fee comparisons into account in evaluating advisory contracts disclosures in proxy solicitations seeking approval of fund fee contracts—"the comparisons that were relied on and how they assisted the board in concluding that the contract should be approved."[237] The SEC said it adopted the disclosure requirement because it "believe[d] that information concerning whether and, if so, how the board relies on comparisons is important in understanding the board's decision."[238] This is a very powerful comment, for it evidences the SEC's belief that boards' decision to weigh or not weigh comparative pricing of advisory services is itself a material fact[239] investors ought to know in evaluating the board's actions.[240]

The SEC's decision to require disclosure about fund boards' processing of comparative cost information expressly recognized that the protocol used for evaluating advisory contracts had become detached from reality and outdated. Citing Freeman-Brown, the Commission explained:

237. Disclosure Regarding Approval of Investment Advisory Contracts by Directors of Investment Companies, Securities Act Release No. 8433, Exchange Act Release No. 49,909, Investment Company Act Release No. 26,486, 69 Fed. Reg. 39,798, 39,802 (June 30, 2004).

238. *Id.*

239. In the context of the securities laws, a fact is material if there is "a substantial likelihood that a reasonable shareholder would consider it important." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

240. The SEC's decision to revise and update disclosures concerning fund boards' consideration of advisory contracts shows just how far courts' rulings in fund advisory fee cases have strayed from reality. Some courts have taken the position that, under *Gartenberg* and its misguided progeny, comparative fees may not even be mentioned in court in a section 36(b) case. *See, e.g.*, Order Granting Defendants' Motion in Limine, Baker v. Am. Century Inv. Mgmt., Inc., No. 04-4039-CV-C-ODS (W.D. Mo. July 17, 2006) (finding that "Plaintiffs will be precluded from presenting any evidence relating to Defendants' management of non-mutual fund accounts, as such evidence is irrelevant to Plaintiffs' claims involving mutual fund fees under Section 36(b) of the Investment Company Act"); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990) (suggesting evidence of "comparative fee structures" in section 36(b) cases should be limited exclusively to fees charged by other mutual funds), *aff'd*, 928 F.2d 590 (2d Cir. 1991). Yet the SEC considers comparative fee matters, such as fees charged by fund advisers to their pension plan clients, to be "important" in understanding how the fee approval decision was reached.

> Recently, concerns have been raised regarding the adequacy of
> review of advisory contracts and management fees by fund boards.
> In particular, the level of fees charged by investment advisers to
> mutual fund clients, especially in comparison to those charged by
> the same advisers to pension plans and other institutional clients,
> has become the subject of debate.[241]

Directors must thus disclose the comparables they consider. When
considering comparables, directors' duty of care should require that they
consider true free market transactions where fees were negotiated at arm's-
length. Directors who consider fees determined only by tainted boards, are on
the road to breaching their fiduciary duties by failing to fight for the best
prices available for their funds' shareholders. In one case pertinent to the fund
industry, the Delaware Supreme Court admonished independent directors to
bargain hard in order to insure that the best possible bargain is struck on their
corporation's behalf:

> The power to say no is a significant power. It is the duty of the
> directors serving on [an independent] committee to approve only
> a transaction that is in the best interests of the public shareholders,
> to say no to any transaction that is not fair to those shareholders
> and is not the best transaction available.[242]

Getting "the best transaction available" requires using the best negotiating
ammunition available. When it comes to negotiating over fund portfolio
management fees, that means using free market comparables aggressively.

In our experience, independent directors of mutual funds are ignorant about
the value of comparative pricing and do not use it when negotiating over fund
fees. In some cases, the directors simply are kept in the dark about the data's
availability. In other cases, the pricing data is furnished, but the directors are
advised, falsely, that using data extracted from free market transactions yields
worthless "apples-to-oranges" comparisons. When asked why the comparison
is "apples-to-oranges," directors are prone to be told that it just is.[243] Directors
who accept or offer these flimsy explanations are guilty of failing to marshal

---

241. Disclosure Regarding Approval of Investment Advisory Contracts by Directors of
Investment Companies, Securities Act Release No. 8433, Exchange Act Release No. 49,909,
Investment Company Act Release No. 26,486, 69 Fed. Reg. 39,798, 39,802 (June 30, 2004).

242. Kahn v. Lynch Commc'ns Sys., Inc., 638 A.2d 1110, 1119 (Del. 1994) (alteration in
original) (quoting *In re* First Boston, Inc. S'holders Litig., Civ. A. No. 10338, 1990 WL 78836,
at *7 (Del. Ch. June 7, 1990)).

243. This conclusion is based on confidential depositions the authors have read.

helpful facts[244] usable in negotiating advisory fees with their funds' advisers. When fund directors fail to wield the power they have to gather important data and make informed decisions, fund directors breach their duty of care owed to the funds they serve.

By the same token, advisers who hide or misrepresent comparative data are breaching their fiduciary duties. Those who simply supply comparative prices without more have furnished a necessary, but insufficient service. Full adherence to their fiduciary obligations requires that, if the comparative data supplied to directors is not self-evidently apples-to-apples, advisers must also supply information about the cost of each alleged service difference between the comparable contract and the specific fund's advisory contract so apples can be compared to apples post-adjustments.

Fund directors' discharge of their fiduciary duties demands they request, receive, and carefully review information about advisory services being sold by their funds' adviser to institutional clients. Data presented earlier in Table 3[245] and also in Freeman-Brown[246] show that fund managers sometimes sell their services on the open market and then grossly overcharge their own captive funds for those same services. Directors need to determine whether this is going on and, if it is, they need to consult with legal counsel about the practice's fiduciary-duty ramifications. Fund directors need a good answer to this question: Why should the adviser sell its services as an independent contractor in the free market at a price that is far lower than the same services are being sold to mutual funds to whom the adviser owed clear-cut fiduciary obligations? In Freeman-Brown, we coined the "most favored nation" concept for fund fee pricing. This concept demands that mutual funds should pay a price for investment advice that is no higher than that charged by the fund's adviser when it provides advice to third-party customers (such as pension funds, endowment funds, and others, like Vanguard) who bargained at arm's-length. Directors should impose the "most favored nation" concept within their funds. Advisers, who would argue that providing advisory services to institutional accounts entail service differences that explain pricing differentials, need to identify and quantify each separate point of difference. The advisers' fiduciary duties require no less.[247]

---

244. The data is available as demonstrated by Eliot Spitzer's testimony cited earlier. *See supra* notes 93-94 and accompanying text.

245. *See supra* Table 3.

246. *See* Freeman & Brown, *supra* note 9, at 635-36.

247. *See* RESTATEMENT (SECOND) OF AGENCY § 381 (1958).
     Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and

The advisers' fiduciary duty problems are exacerbated when strategies, policies, and processes developed by the adviser when working on behalf of the fund are then taken by the adviser and sold for discount prices to third-parties, with the adviser reaping the financial benefits. Directors who turn a blind eye to these asset diversion/corporate opportunity problems are asking to be sued. Full disclosure of accurate data paves the way for competent, honest evaluation of mutual fund portfolio management pricing.

### *Conclusion*

Over the past several years, there has been much discussion of whether fees for mutual fund portfolio advisory services are too high. In 2001, Freeman-Brown showed these fees were bloated by comparing mutual fund fees to fees charged pension funds for the same services. That comparison, which clearly touched a nerve within the fund industry, showed fund shareholders would save billions annually if fund portfolio management fees approximated those charged by managers of public pension funds' equity portfolios. In Part III, we revisit that inquiry and ultimately reach the same conclusion, this time by evaluating new data drawn from actual mutual fund advisory fee contracts entered into by the Vanguard Group and comparing that data to the fees the same fund advisers charge their own captive funds. This new data is powerful and robust, and it only confirms what has long been clear: Fee gouging is pervasive within the fund industry.

In 1970, Congress enacted Section 36(b) because it recognized the mutual fund industry's conflicted governance structure could stifle competition and lead to excessive fees flowing to fund sponsors and their affiliates. Section 36(b) exists because Congress wanted to reduce the burden on plaintiffs, as compared to the state court waste test. Yet, 36(b)—the weapon Congress specifically gave investors to fight excessive fees in the mutual fund industry —is singularly ineffective. Section 36(b), as systematically gutted by the courts—principally the Second Circuit's ruling in *Gartenberg*—requires the evaluation of data that is largely meaningless to investors. The required data is virtually impossible to find and, once found, is subject to bitter disputes between the parties and their experts. Furthermore, and even less logically, *Gartenberg* and its progeny permit funds to defend their excessive fees by reference to the bloated fees of their similarly-tainted compatriots while suppressing or paying lip service to evidence showing similar services cost far less in the free market. When it comes to evaluating fiduciaries' behavior, it

---

which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.

*Id.*

is absurd to find federal courts in 36(b) cases barring free market data or downplaying its relevance. After all, the SEC now demands mutual fund prospectuses disclose whether comparative data drawn from the free market was relied on by the fund's board in approving the advisory contract and, if so, what the comparisons were and how they assisted the board in the approval process. Data deemed relevant and material in the board room deserves equal treatment in the court room.

Courts need to understand that in advisory fee cases, where the absence of arm's-length bargaining is the central issue, the focus belongs on free market comparators where arm's-length bargaining actually occurs and fair market values are honestly established. The focus needs to shift away from prices set by conflicted dealings in the captive fund market. In interpreting section 36(b), courts should replace *Gartenberg*'s misguided grab-bag of factors with the Supreme Court's specially-crafted test to determine when unfairly disparate treatment is compensable: the *McDonnell Douglas* test. In applying *McDonnell Douglas* in the mutual fund context, a plaintiff should be able to make out a prima facie case of a breach of fiduciary duty by showing that the fiduciary-adviser charged the captive fund significantly higher prices than the adviser (or an affiliate or similarly-situated adviser) charged institutional clients in the free market for similar work. Simply put, when major pricing discrepancies exist between free market and fund market pricing, these differences are prima facie proof that the fees charged the captive fund lack the "earmarks of an arm's-length bargain" and that fiduciary duties are being breached.

Just as courts must focus on free market comparators, so too must directors. Directors should not turn their eyes away from proof of gross pricing discrepancies for similar services. The fund's independent directors sit as watchdogs, tasked with policing the adviser's discharge of fiduciary duties. The time has come to demand that fund advisers give fund shareholders "most favored nation" treatment on advisory fees. Fund directors, along with federal district court judges, need to learn that, in advisory fee cases, the focus belongs on fair market comparators, not conflicted dealings in the fund market. Embracing this simple, fair, and easily understood and applied concept would dramatically benefit fund shareholders, saving billions of dollars annually.

Applying most favored nation treatment to mutual fund advisory fee payments has been classified by *Forbes* magazine writer Neil Weinberg as the fund industry's "worst nightmare."[248]   Weinberg's "worst nightmare"

---

248. Neil Weinberg, *Mutual Funds' Worst Nightmare*, FORBES.COM, Dec. 16, 2003, http://www.forbes.com/2003/12/16/cz_nw_1216mutualfunds.html. Weinberg quoted one industry

description demonstrates that, when it comes to portfolio management services, knowledgeable Wall Street insiders themselves recognize that the gross disparity between free market prices and fund market prices is an accepted fact of life.[249]

That mutual fund sponsors' "worst nightmare" involves treating fund shareholders scrupulously fairly when pricing vital services shows how far the fund industry has strayed from sensible fiduciary standards. Section 36(b)'s promise has been squandered. Abandoning the confusing, vague, and unfair *Gartenberg* grab-bag and focusing directly on relevant free market pricing data will bring honesty and thoughtful analysis to fund advisory fee pricing decisions in the nation's boardrooms and courtrooms.

---

observer who had this reaction to the idea: "It's a brilliant idea to bring most favored nation clauses to the mutual fund arena . . . ." *Id.* (quoting Edward Siedle, Investigator, Benchmark Financial Services).

249. In the same vein, when Freeman-Brown was first discussed in *The Wall Street Journal*, it was in a story with a title suggesting that proof of price gouging in mutual fund fees was old news. *See* Lauricella, *supra* note 75, at C1 (the headline stated: "This Is News?: Fund Fees Are Too High, Study Says").

APPENDIX A

| Fund | Yr. Entered Program | Average Assets 2004 ($ mm) |
|---|---|---|
| Explorer | 1975 | 7,536 |
| Morgan Growth | 1975 | 4,174 |
| US Growth | 1975 | 5,698 |
| Windsor I | 1975 | 18,189 |
| Wellesley Income | 1975 | 9,906 |
| Wellington | 1975 | 29,940 |
| Intl Growth Fund | 1981 | 7,280 |
| International Value | 1983 | 1,864 |
| Primecap | 1984 | 21,336 |
| Windsor II | 1985 | 27,668 |
| Equity Income | 1988 | 3,042 |
| Growth & Income | 1993 | 6,278 |
| Capital Opportunity | 1995 | 6,747 |
| Global Equity Income | 1995 | 814 |
| Select Value | 1996 | 1,595 |
| US Value | 2000 | 631 |
| Growth Equity | 2001 | 745 |
| Capital Value | 2002 | 351 |
| MidCap Growth | 2002 | 345 |
| Int'l Explorer | 2002 | 999 |
| Dividend Growth | 2002 | 892 |

APPENDIX B

| *Vanguard Fund* | *External Manager* |
|---|---|
| Explorer | Wellington, Granahan, Chartwell, Grantham, |
| Morgan Growth | Wellington, Franklin Portfolio Assoc. |
| US Growth | Alliance, W. Blair |
| Windsor I | Wellington, Stanford C. Bernstein |
| Wellesley | Wellington |
| Wellington | Wellington |
| Int'l Growth Fund | Schroder, BG Overseas |
| Int'l Value | Hansberger, Sanford C. Bernstein |
| Primecap | Primecap |
| Windsor II | Barrow, Equinox, Hotchkis, Tukman |
| Equity Income | John Levin, Wellington |
| Growth & Income | Franklin Portfolio Assoc. |
| Capital Opportunity | Marathon, Arcadian |
| Global Equity Income | Marathon, Arcadian |
| Selected Value | Barrow |
| US Value | Grantham |
| Growth Equity | Turner |
| Capital Value | Wellington |
| Mid Cap Growth | Provident |
| Int'l Explorer | Schroder |
| Dividend Growth | M & G, Wellington |