## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JILL E. SOUTHWORTH, as | ) | |
| TRUSTEE of the JILL | ) | |
| SOUTHWORTH REVOCABLE | ) | |
| TRUST, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:10-cv-00878-RMB-KW |
| v. | ) | |
| | ) | |
| HARTFORD INVESTMENT | ) | |
| FINANCIAL SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>

Of Counsel:

Harvey J. Wolkoff
Robert A. Skinner
Janna J. Hansen
Allison M. Boscarine
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts  02199-3600

John M. Seaman (#3868)
A. Thompson Bayliss (#4379)
Eric D. Selden (#4911)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
seaman@abramsbayliss.com
bayliss@abramsbayliss.com
selden@abramsbayliss.com

*Attorneys for Defendant Hartford*
*Investment Financial Services, LLC*

Dated:  January 3, 2011

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ................................................. 1

SUMMARY OF ARGUMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................ 4

    1.    Mutual Funds and the Investment Company Act of 1940 ..................................... 4

    2.    The Hartford Funds' Investment Management Agreement and Sub-Advisory Agreements ......................................................................................... 5

        a.    Investment Management Agreement .................................................. 5

        b.    The Sub-Advisory Agreements with Wellington and HIMCO ................. 7

    3.    Distribution Plans and Fees ..................................................................... 8

    4.    Expense Limitation Agreement ................................................................. 9

ARGUMENT ............................................................................................... 9

I.      THE COMPLAINT MISCONSTRUES JONES v. HARRIS ASSOCIATES AND FAILS TO ASSERT PLAINTIFF'S CLAIM UNDER THE CORRECT STANDARD OF LIABILITY ............................................................................................. 10

II.    COUNT I FAILS TO STATE A CLAIM FOR EXCESSIVE INVESTMENT MANAGEMENT FEES UNDER § 36(b) ......................................................... 11

    A.    General Industry Criticism Cannot Form the Basis For A Claim Against HIFSCO ................................................................................. 12

    B.    The Complaint's Comparisons of the Investment Management Fees to Other Types of Fees Do Not Establish a Plausible Claim For Excessive Fees ...................................................................................... 13

        1.    Differences Between Mutual Fund Investment Management Fees and Institutional Account Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding Comparability Of Services ........................... 13

        2.    Differences Between Mutual Fund Investment Management Fees and Sub-Advisory Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding The Services Provided Under the Respective Agreements ................................................................................. 16

    C.    Plaintiff's Remaining Conclusory Allegations on "Information and Belief" Cannot Form the Basis For Liability Under § 36(b) ........................... 19

III.   COUNT II FAILS TO STATE A CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICE FEES UNDER § 36(b) OF THE ICA ............................................... 24

    A.    The Complaint Does Not Allege A Claim for Excessive Distribution and Service Fees under § 36(b), But Merely Criticizes Rule 12b-1 Generally ........................................................................................ 25

    B.    There is no Private Right of Action to Assert a Violation of § 12(b) of the ICA or Rule 12b-1 ........................................................................ 29

CONCLUSION ........................................................................................................................ 30

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                          <u>PAGE(S)</u>

*Alexander v. Sandoval* .................................................................................29, 30
    532 U.S. 275 (2001)

*Amron v. Morgan Stanley Inv. Advisers, Inc.* .......................................12, 18, 21, 23, 28
    464 F.3d 338 (2d Cir. 2006)

*Ashcroft v. Iqbal*.......................................................................................... Passim
    129 S. Ct. 1937 (2009)

*Bell Atlantic Corp. v. Twombly*..............................................................................1, 9, 12
    550 U.S. 544 (2007)

*Burks v. Lasker*.......................................................................................................4, 5
    441 U.S. 471 (1979)

*Curran v. Principal Mgmt. Corp* ...........................................................14, 18-19, 22
    2010 U.S. Dist. LEXIS 83730 (S.D. Iowa June 8, 2010)

*Fowler v. UPMC Shadyside*...........................................................................9, 14, 27
    578 F.3d 203 (3d Cir. 2009)

*In re Franklin Mut. Funds Fee Litig.*.........................................................18, 21, 23, 28
    478 F. Supp. 2d 677 (D.N.J. 2007)

*Gallus v. American Express Financial Corp.* ...................................................... Passim
    Civ. No. 04-4498 (D. Minn. Slip Op. Dec. 9, 2010)

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*.......................................................2, 11
    694 F.2d 923 (2d Cir. 1982)

*In re Goldman Sachs Mut. Funds Fee Litig.*.................................................................21
    No. 04-2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)

*Green v. Fund Asset Mgmt., L.P.*................................................................................23
    286 F.3d 682, (3d Cir. 2002)

*Hoffman v. UBS-AG*................................................................................................27
    591 F. Supp. 2d 539

*I.N.G. Principal Protection Funds Deriv. Litig* ...........................................................27
    369 F. Supp. 2d 163 (D. Mass. 2005)

## TABLE OF AUTHORITIES (cont'd)

*Jones v. Harris Assocs. L.P.* ................................................................................. Passim
    130 S. Ct. 1418 (2010)

*Krantz v. Prudential Inv. Fund Mgmt. LLC* ...................................................12, 20, 26
    305 F.3d 140 (3d Cir. 2002)

*Krinsk v. Fund Asset Mgmt.* ...............................................................................27
    715 F. Supp. 472 (S.D.N.Y. 1988)

*Krinsk v. Fund Asset Mgmt.* ...............................................................................21
    875 F.2d 404 (2d Cir. 1989)

*Migdal v. Rowe Price-Fleming Int'l, Inc.* ..............................................................10
    248 F.3d 321 (4th Cir. 2001)

*Mintz v. Baron* ............................................................................................18, 26
    No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009)

*Olmsted v. Pruco Life Ins. Co.* ...........................................................................29
    283 F.3d 429 (2d Cir. 2002)

*Phillips v. County of Allegheny* ...........................................................................9
    515 F.3d 224 (3d Cir. 2008)

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.* ........................................................5
    184 F.3d 280 (3d Cir. 1999)

*In re Salomon Smith Barney Mut. Fund Fees Litig.* ..................................................21
    528 F. Supp. 2d 338

*In re Scudder Mut. Funds Fee Litig.* .....................................................................27
    No. 04 Civ.1921(DAB), 2007 WL 2325862 (S.D.N.Y., Aug. 14, 2007)

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.* ......................................................23
    663 F. Supp. 962 (S.D.N.Y. 1987)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ..........................................................5
    551 U.S. 308 (2007)

*Three Rivers Ctr. for Indep. Living, Inc. v. Housing Auth. of Pittsburgh* ......................30
    382 F.3d 412 (3d Cir. 2004)

*Yameen v. Eaton Vance Distribs., Inc.* ..................................................................27
    394 F. Supp. 2d 350 (D. Mass. 2005)

**TABLE OF AUTHORITIES (cont'd)**

*Yampolsky v. Morgan Stanley Inv. Advisers, Inc.,*......................................................................19
   No. 03 Civ. 5710, 2004 WL 1065533 (S.D.N.Y. May 12, 2004)

S<small>TATUTES</small>

15 U.S.C. §§ 80a ...................................................................................................................4, 5

O<small>THER</small> A<small>UTHORITIES</small>

John C. Coates IV & R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and
Implications for Policy*....................................................................................................................24

## NATURE AND STAGE OF THE PROCEEDINGS

On October 14, 2010, plaintiff Jill E. Southworth, as Trustee of the Jill Southworth

Revocable Trust, brought this action purportedly on behalf of the Hartford Capital Appreciation

Fund, the Harford Dividend & Growth Fund, the Hartford Income Fund, the Hartford Midcap

Fund, the Hartford Short Duration Fund, and the Hartford Total Return Bond Fund (collectively,

"the Funds" or "the Hartford Funds"), against the Funds' investment manager, defendant

Hartford Investment Financial Services, LLC ("HIFSCO"), alleging that fees paid by the Funds

to HIFSCO violated § 36(b) of the Investment Company Act of 1940 (the "ICA").  HIFSCO

moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), because it fails to state a

claim that satisfies the pleading requirements in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## SUMMARY OF ARGUMENT

The Complaint should be dismissed because, rather than state facts to meet the

requirements of *Iqbal*, it relies almost exclusively on conclusory statements, rehashed policy

arguments, and an abundance of sheer speculation alleged on "information and belief."  Indeed,

much of the Complaint simply recounts commentators' general criticisms of the mutual fund

industry's fee structures.  When this irrelevant commentary is set aside, the actual "*facts*" alleged

about the Hartford Funds are too conclusory and sparse to satisfy the pleading requirements

under *Iqbal* and *Twombly*.

The Complaint asserts that two categories of fees paid to HIFSCO – the investment

management fee (Count I) and the distribution and service fee (Count II) – were excessive, in

breach of HIFSCO's "fiduciary duty with respect to the receipt of compensation" set forth in

§ 36(b).  The U.S. Supreme Court has held that to allege a claim under § 36(b), a plaintiff must

meet the significant hurdle of alleging sufficient facts to demonstrate that the fee is "so

{A&B-00164214-}

1

disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *See Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1426 (2010) (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982)).  The Complaint must be dismissed because it fails to allege facts about HIFSCO that state a plausible claim for excessive fees under § 36(b).

Count I, regarding investment management fees, fails to state a claim because it relies mainly on comparisons to other types of fees without pleading facts that make the comparisons relevant.  Plaintiff first alleges that the investment management fees paid by the Funds to HIFSCO are greater than the investment management fees paid to HIFSCO by non-mutual fund (or "institutional") clients for "virtually identical" services.  Compl. ¶ 87.  But differences between mutual fund fees and institutional account fees are only actionable if sufficient facts are pled showing that comparable *services* are provided to the different clients.  The Supreme Court addressed this question specifically in *Jones,* admonishing that "courts must be wary of inapt comparisons" because "there may be significant differences between the services provided by an investment adviser to a mutual fund and those it provides to a pension fund."  130 S. Ct. at 1428-29.  The Complaint utterly fails to allege facts supporting comparability of services.  *See* Compl. ¶ 86.  The mere fact that HIFSCO's different clients pay different fees – without any factual basis for comparability of the services provided for those fees – cannot support a claim that the Funds' fees are excessive, especially to the degree required under *Jones*.

Plaintiff next alleges that the investment management fees paid by the Funds to HIFSCO are greater than the fees paid by HIFSCO to the Funds' sub-advisers, even though plaintiff conclusorily asserts that HIFSCO delegated "virtually all" of its investment management duties to the sub-advisers.   Here again, plaintiff alleges no *facts* supporting this theory.  The

Investment Management Agreement ("IMA") attached to the Complaint states clearly that HIFSCO provides both investment management services and administrative services to the Funds.  The Complaint simply assumes that the entirety of the investment management services are delegated to the sub-adviser, and then waves away the administrative services altogether – because "*on information and belief*, the administrative type services included are a very small percentage of the expenses incurred under the agreement . . . ."  Compl. ¶ 18 (emphasis added).  With no factual allegations in support, the Complaint thus concludes that "HIFSCO has delegated virtually all of its duties to subcontractors at a fraction of HIFSCO's fee."  Compl. ¶ 19.  The Court is not required to accept such *ipse dixit* conclusions as true facts for purposes of a motion to dismiss, nor should it.  Count I fails as a matter of law to plead a plausible claim that the investment management fees are excessive.

With respect to Count II, regarding the distribution and service fees (commonly known as "12b-1 fees"), the allegations fail to state a claim for two separate reasons.  First, the Complaint does not allege any facts demonstrating that the 12b-1 fees were excessive in light of the services provided.  Indeed, it does not even attempt to allege that the fees were "disproportionately large," as required by *Jones*.  In addition, plaintiff alleges nothing about the quantity or quality of the distribution and servicing provided in exchange for the fee, and whether the size of the fee bears a reasonable relationship to those services.  Instead, the Complaint simply recounts  commentary criticizing Rule 12b-1 fees and parrots this criticism to conclude that the Hartford Funds' shareholders "enjoyed no benefits" from the 12b-1 fees.  Compl. ¶ 75.  But this policy debate has no place in a lawsuit, and does not form a plausible factual basis for an excessive fee claim under *Jones*.  *See* Argument Point III.A, *infra*.

Second, the assertion in Count II that the 12b-1 fees should not have been approved at all

fails as a matter of law because plaintiff has no private right of action to bring such a claim.

Direct shareholder actions under the ICA are limited to § 36(b) claims for excessiveness, and

plaintiffs may not shoehorn alleged violations of other parts of the statute into a § 36(b) claim.

*See* Argument Point III.B, *infra*.

At bottom, the Complaint is grounded on general industry criticism and the plaintiff's

hope that it can prove there was something wrong with the Hartford Fund fees.  But such a hope,

supported only by conclusory assertions about the nature of the services provided by HIFSCO

and its sub-advisers in exchange for those fees, does not allege a plausible basis for relief under

the recent Supreme Court precedent.  Indeed, if this Complaint can pass muster, the same

pleading could be asserted against literally any fund complex.

## STATEMENT OF FACTS

**1.    Mutual Funds and the Investment Company Act of 1940**

The ICA creates a regulatory structure for mutual fund governance designed to safeguard

the interests of fund shareholders.  Section 15(a) of the ICA requires that fund investment

advisers serve pursuant to written management contracts approved by a majority of the fund's

shareholders, which must  be approved annually by the fund's board of directors or a majority of

shareholders.  *See* 15 U.S.C. §§ 80a-15(a), 80a-2(a)(12).  Section 15(c) requires fund directors to

request and evaluate such information from the adviser as may be reasonably necessary to

evaluate the terms of the proposed contract.  *See* 15 U.S.C. § 80a-15(c).  Section 15(c) further

requires that approval of the management contract by the fund directors be accomplished by a

majority of disinterested directors, who represent the "cornerstone" of the ICA's efforts to check

conflicts of interest.  *See Jones*, 130 S. Ct. at 1423; *see also Burks v. Lasker*, 441 U.S. 471, 484-

85 (1979) ("In short, the structure and purpose of the ICA indicate that Congress entrusted to the

independent directors of investment companies, exercising the authority granted to them by state

law, the primary responsibility for looking after the interests of the funds' shareholders.").

Section 10(a) of the ICA provides that at least 40% of the fund's board of directors must not be "interested persons" of the fund, as defined by § 2(a)(19). 15 U.S.C. § 80a-2(a)(19). On the Hartford Funds' board, seven of the nine directors (or 77%) are independent (*i.e.*, not "interested persons" of the Funds). *See* Ex. 1[1] (Combined Statement of Additional Information for the Hartford Mutual Funds as Amended and Restated on May 28, 2010 ("SAI") at 33-37).[2]

## 2.   **The Hartford Funds' Investment Management Agreement and Sub-Advisory Agreements**

### a.   *Investment Management Agreement*

The Funds and HIFSCO annually enter into an IMA whereby HIFSCO agrees to provide investment management and administrative services to the Funds. Among its duties as investment manager, HIFSCO supervises the Funds' investment portfolios and provides overall management of all aspects of the Funds' business affairs. *See* Compl. Ex. 1 at 21[3]; Ex. 1 (SAI at 85-86). When a Fund is sub-advised, certain of HIFSCO's duties are delegated to the sub-adviser, but HIFSCO retains the responsibility to scrutinize the investment program of the Funds. *See* Compl. Ex. 1 at 21.

In addition to investment advisory services, HIFSCO has sole responsibility for coordinating the work of the Funds' custodian, transfer agent, accountants, and legal counsel.

---

[1] Unless otherwise specified, all exhibit numbers in this memorandum refer to Exhibits to the Declaration of Robert A. Skinner dated January 3, 2011, filed herewith.

[2] Courts addressing Rule 12(b)(6) motions examine sources in addition to the complaint, such as "documents incorporated in to the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *see also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (holding that a court may consider "document[s] integral to or explicitly relied upon in the complaint" without converting a motion to dismiss to a motion for summary judgment).

[3] Page numbers of the Complaint Exhibits refer to page numbers electronically stamped at the top of the document.

Compl. Ex. 1 at 21.  HIFSCO also provides the Funds with personnel who serve as officers of the Funds, and compensates them for performing administrative functions.  *Id.*  HIFSCO also must provide adequate office space and related services necessary to effectively operate the Funds.  *Id.*

For its services, HIFSCO receives a fee from each Fund, calculated as a percentage of that Fund's net assets at the end of the preceding month.  *See* Ex. 1 (SAI at 87).  The fees are set forth in the IMA between HIFSCO and the Funds.  The fee structures feature "breakpoints" – that is, the marginal percentage fee declines as the net assets of the Fund increase.  *See id.* at 87-91.

The IMA is reviewed and approved annually by the Board of Directors of the Funds. This process consists of multiple meetings with HIFSCO representatives, independent legal counsel, an independent financial services consulting firm, and, Lipper Inc.  *See* Ex. 2 (Midcap Fund Annual Report dated October 31, 2009, at 30).  As described in the Funds' Annual Reports, a meeting of the Board of Directors was held on August 4-5, 2009, called in part for the purpose of voting on the renewal of the IMA.  *See, e.g.*, Ex. 2 (MidCap Annual Report at 30).  In the months preceding the August meeting, the Board undertook a robust process that involved multiple rounds of information requests to the investment managers and to independent consultants and counsel about each of the Funds.  *Id.*

In recent years, the annual contract renewal process has resulted in reductions to the Funds' fee schedules.  For example, in 2008, HIFSCO agreed to implement breakpoints to reduce management fees by 2.5 basis points (or .025%)[4] on assets over $5 billion and an additional .25 basis points on assets over $10 billion for three of the Funds at issue, and agreed to

---

[4] A basis point is equal to one one-hundredth of one percent.

permanently reduce its management fee by 5 basis points at all breakpoints in a fourth Fund.  *See* Compl. Ex. 1 at 28-32; Ex. 3 (Certified Shareholders Report dated October 31, 2008 at 440-41). This was preceded the year before by a permanent reduction of management fees by 5 basis points in two of the Funds.  *See* Ex. 4 (Certified Shareholders Report for all Hartford Funds dated October 31, 2007 at 402).

> **b.**     ***The Sub-Advisory Agreements with Wellington and HIMCO***

The IMA states that HIFSCO may engage one or more sub-advisers for the Funds. HIFSCO contracted with Wellington Management Company LLP ("Wellington") and Hartford Investment Financial Services Company ("HIMCO") (collectively, the "sub-advisers") to act as sub-advisers to the Funds.  Compl. Exs. 11, 12.  The sub-advisory arrangements are disclosed in the Funds' prospectuses, *see, e.g.*, Ex. 5 (Midcap Prospectus dated March 1, 2010, at 17-18), and the corresponding fees are disclosed in the Funds' Statements of Additional Information.  *See* Ex. 1 (SAI at 85, 91-93).

As sub-advisers, Wellington and HIMCO evaluate and implement an investment program appropriate for each Portfolio, although HIFSCO retains responsibility for supervising the sub-advisers, conducting continuing due diligence of the sub-advisers, and recommending their termination and replacement.  Ex. 1 (SAI at 85-87).  The sub-advisory agreements require the sub-advisers to consult with HIFSCO about portfolio management issues when appropriate, and HIFSCO must review all investment performance reports prepared by the sub-advisers before the reports are provided to the Board of Directors for review.  *Id.*

The sub-advisory agreements are reviewed and approved annually by the Funds' Board of Directors.  *See* Ex. 2 (Midcap Annual Report at 30).  For example, when HIFSCO recommended that the investment sub-advisory fee to Wellington be increased in 2009, the Board agreed to the higher sub-advisory fee only so long as HIFSCO, and not the Fund, paid for

the increase.  Ex. 2 (MidCap Annual Report at 32).

### 3.    <u>Distribution Plans and Fees</u>

Pursuant to Rule 12b-1 of the ICA, the Funds adopted distribution plans that authorize

the payment of  "12b-1 fees."  *See* Ex. 1 (SAI at 126-33).[5]  In adopting the distribution plans, the

Funds' Board of Directors determined that there was a reasonable likelihood that the Distribution

Plans would benefit the Funds' current and future shareholders.  *Id.* at 132.  Some of these

potential benefits include the ability to fulfill current shareholder servicing needs, the potential to

increase assets and possibly benefit from economies of scale, the potential to avoid a decrease in

assets and portfolio liquidations through redemption activity, the ability to sell shares of the

Funds through adviser and broker distribution channels, and the ability to provide investors with

an alternative to paying front end sales loads.  *Id.*  As required by the ICA, these plans were

adopted by a majority vote of the Board of Directors of the Fund, including at least a majority of

non-interested directors.  *Id.*

The plans authorize that these distribution activities be funded by a fee paid to HIFSCO,

which acts as the Funds' distributor under a separate underwriting agreement.  *See id.* at 126,

130-33; Compl. Ex. 7.  Each fee is based on a percentage of a Fund's net assets.  Currently,

although the distribution plans for Class A shares allow for the payment of a maximum of 35

basis points to the distributor, the Funds' Board of Directors currently authorize only 25 basis

points to be paid to HIFSCO for 12b-1 fees.  *See* Ex. 1 (SAI at 130-31).  Each quarter, HIFSCO

provides to the Funds' Board of Directors a written report of the amounts expended under the

---

[5] Specifically, the fee may be used for payment of commissions to brokers, dealers, and financial institutions who sell each Fund's shares; expenses related to the dissemination of prospectuses and statements of additional information; the costs of preparation and distribution of sales literature; and other expenses related to the provision of personal service to shareholders and the maintenance of shareholder accounts. Ex. 1 (SAI at 131).

distribution plans and the purposes for which the expenditures were made.  *Id.* at 131-32.

**4.     Expense Limitation Agreement**

In addition to the Investment Management and Underwriting Agreements, HIFSCO also entered into an Expense Limitation Agreement with the Funds in which it agreed to reimburse a Fund whenever its total operating expenses exceed a specified percentage of the Fund's average daily net assets.  *See* Compl. Ex. 2.  As a result of these expense caps, HIFSCO reimbursed each of the six Funds 0.73% on average for the fiscal year ending October 31, 2009.  *See* Ex. 1 (SAI at 93-94).

## ARGUMENT

Fed. R. Civ. P. 8(a) requires pleading factual allegations that are sufficient to state a claim for relief that is "plausible on its face."  *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555).  The Supreme Court's recent decisions have "shifted" pleading standards "from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive on a motion to dismiss:  'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949).  Thus, "a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  *Id.* at 211 (citing *Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)).  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Iqbal*, 129 S. Ct. at 1949.

I.     **THE COMPLAINT MISCONSTRUES *JONES V. HARRIS ASSOCIATES* AND FAILS TO ASSERT PLAINTIFF'S CLAIM UNDER THE CORRECT STANDARD OF LIABILITY**

The Supreme Court has made clear that the liability standard is that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 130 S. Ct. at 1426. This is a very high bar, one that plaintiff fails to reach.

The Complaint asserts that *Jones* authorized liability for a breach of § 36(b) based upon a showing *either* that the fee charged was not "the result of a fair process" or was "not reasonable." *See* Compl. ¶ 35. But the Supreme Court rejected this very argument, holding that a court must answer the ultimate question of whether the adviser's fee is excessive – not whether the fee or process is reasonable or fair. *See* 130 S. Ct. at 1426; *see also id.* at 1430 ("Section 36(b) is sharply focused on the question of whether the fees themselves were excessive." (quoting *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001))).

First, the *Jones* decision did not mandate a more searching review of the board process than contemplated by *Gartenberg*'s "so disproportionate" standard. Although *Jones* confirmed that a reviewing court should consider the expertise, diligence, and conscientiousness of the board as part of its review of all of the relevant circumstances,[6] *Jones* did not authorize "process" reviews *independent* from the "so disproportionate" inquiry that serves as the ultimate standard.[7]

---

[6] The *Gartenberg* court described a non-exclusive list of six "factors" that could be considered in determining whether a fee is so large that it bears no reasonable relationship to the services rendered: (i) the nature and quality of the services provided by the adviser to the shareholders; (ii) the profitability of the mutual fund to the adviser; (iii) fall-out benefits; (iv) economies of scale realized by the adviser; (v) comparative fee structures with similar funds; and (vi) the independence and conscientiousness of the independent trustees. *Gartenberg*, 694 F.2d at 928-31.

[7] In *Gallus v. American Express Financial Corp.*, Civ. No. 04-4498 (D. Minn. Slip Op. Dec. 9, 2010), the district court recently rejected the very mis-reading of *Jones* asserted by plaintiff here.

Second, the Court admonished that § 36(b) does *not* call for "judicial second-guessing of informed board decisions" or for courts to engage in a "reasonableness" review of the approved fees – indeed, Congress expressly rejected a reasonableness standard, as "courts are not well suited to make such precise calculations."  130 S. Ct. at 1430 ("[H]ow is a judge or jury to determine a 'fair price'?" (quotation omitted)); *see also Gartenberg*, 694 F.2d at 928 ("[T]he court is not authorized to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees" (citation omitted).).

Accordingly, as explained in Sections II and III, *infra*, the Complaint has directed its facts toward the wrong standard of liability and fails to allege facts to avoid dismissal under the high bar established by *Jones*.

## II.   COUNT I FAILS TO STATE A CLAIM FOR EXCESSIVE INVESTMENT MANAGEMENT FEES UNDER § 36(b)

Count I must be dismissed because the Complaint fails to assert facts specific to HIFSCO and the Hartford Funds that state a claim under § 36(b).  Most of plaintiff's allegations are addressed to the investment management industry as a whole and say nothing about the Hartford Funds or HIFSCO.  The few facts alleged that *do* pertain to HIFSCO fail to make out a claim because they are based on nothing more than conclusory assertions, often directly contradicted by the Fund documents attached to the Complaint.  In contrast to the paucity of the plaintiff's allegations, the documents attached to the Complaint and the public record reflect that the Hartford Funds' board has a significant number of independent directors (seven of nine, or 77%) whose reviews of the fee arrangements have recently resulted in *reductions* in advisory fees and the addition of more breakpoints to the fee schedules.  Plaintiff's sparse allegations are insufficient to make out a "plausible" basis for relief under the pleading requirements of *Iqbal* and *Twombly*.

## A.   General Industry Criticism Cannot Form the Basis For A Claim Against HIFSCO

The Complaint cannot assert a § 36(b) claim against HIFSCO by raising general complaints about the entire mutual fund industry.  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged," not purported facts about an entire industry.  *See Iqbal*, 129 S. Ct. at 1949 (emphasis added).

The Complaint attempts to make its case by citing law review articles and criticisms by a handful of academics, industry insiders, and regulators – whole pages pass without a single reference to the defendant in this case.  *See* Compl. ¶¶ 25-33, 50-51, 94-99 & *passim*.  This Circuit and others have noted the "strikingly similar" § 36(b) complaints filed in multiple courts over the past decade, which have relied on "speculation, inference and generalized observations about the securities industry."  *See, e.g.*, *Amron v. Morgan Stanley Inv. Advisers, Inc.*, 464 F.3d 338, 346 n.2, 343, 345 (2d Cir. 2006) (quoting *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002)).  Courts have regularly ignored these generic industry criticisms in determining whether a complaint's allegations pass muster under Rule 12(b)(6).  *See, e.g.*, *Krantz*, 305 F.3d at 143 ("This case is one of five virtually identical actions filed by Plaintiffs' counsel in district courts . . . .  All of the other courts . . . have rejected Plaintiff's arguments."); *Amron*, 464 F.3d at 342 ("Reviewing the factual allegations in the complaints, the pleadings rely heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders. . . . [C]onspicuously absent from either of the complaints are any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants.").  Similarly here, these allegations are entitled to no weight.

### B.   The Complaint's Comparisons of the Investment Management Fees to Other Types of Fees Do Not Establish a Plausible Claim For Excessive Fees

When the Complaint does allege facts about the Hartford Funds and HIFSCO, those facts are insufficient to establish a plausible claim for excessive fees under § 36(b).  The bulk of these allegations in support of Count I are comparisons of the Funds' investment management fees to other types of fees – namely, (i) investment management fees charged by HIFSCO to non-mutual fund or "institutional" accounts (*e.g.*, pension funds); and (ii) the fees paid by HIFSCO to the Funds' sub-advisers for taking on certain delegated responsibilities.  But these comparisons do not plausibly show HIFSCO's fees to be excessive, because they are not supported by factual allegations that make the comparisons relevant under the high *Jones* standard.

### 1.   Differences Between Mutual Fund Investment Management Fees and Institutional Account Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding Comparability Of Services

The *Jones* decision directly addressed fee comparisons and concluded that such comparisons should only be given weight if the services provided were comparable.  Plaintiff fails to establish a basis for comparing the funds listed in the Complaint because she simply *concludes* that the services provided to these funds are similar without providing specific facts to back up her conclusions.

In *Jones*, the Supreme Court specifically addressed the comparison between investment management fees charged to different types of clients in a § 36(b) claim:

> [C]ourts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require, *but courts must be wary of inapt comparisons*.  As the panel below noted, there may be significant differences between the services provided by an investment adviser to a mutual fund and those it provides to a pension fund which are attributable to the greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund assets, the more burdensome regulatory and legal obligations, and higher marketing costs.  If the services rendered are sufficiently different that a comparison is not probative, then courts *must* reject such a comparison.

*Jones*, 130 S. Ct. at 1428-29 (emphases added) (citation omitted).  While *Jones* involved the standard for summary judgment, its holding informs the principles for adequate pleading.  Under *Jones*, a plaintiff cannot simply list the respective fees of the challenged funds and selected institutional accounts and assert that any differences between the fees charged to the funds and institutional accounts must demonstrate excessiveness.  Instead, a plaintiff must plead facts that would *show* such comparisons to be apt.  *See Fowler*, 578 F.3d at 211.  And the Supreme Court has made clear that even a showing of a "large disparity" in fees "that cannot be explained by the different services" would not be actionable without "other evidence that the fee is outside the arm's-length range . . ."  *See Jones*, 130 S. Ct. at 1429 n.8.

The Complaint fails to compare the services provided to the Hartford Funds to the services provided to institutional accounts.  The Complaint simply provides *conclusions* – that "the services that Hartford provides to the institutional accounts are substantially similar, if not identical, to the investment management services Defendant provides to the Funds" – but no supporting facts are alleged.[8]  *See* Compl. ¶ 86; *see also* Compl. ¶ 87 (services "virtually identical") and ¶ 91 (services "the same").  Under recent precedents, such conclusory pleading is simply inadequate.  *See Iqbal*, 129 S. Ct. at 1949, 1950 ("[C]onclusory statements" are "not entitled to the assumption of truth.").

The Complaint attempts to plug this factual hole by asserting that the Hartford Funds contract for certain services with entities *other* than HIFSCO.  In a footnote, the Complaint

---

[8] A remarkably similar allegation (made "on information and belief") is found in the *Curran* complaint; a similar allegation is also made in the *Gallus* complaint in and the *Jones* complaint. The *Curran*, *Gallus*, and *Jones* plaintiffs are represented by some of the same counsel who appear for the plaintiff in the instant matter.  *See* Ex. 6 (*Curran v. Principal Mgmt. Corp.*, No. 09-cv-00433 (S.D. Iowa filed Jan. 15, 2010) Compl. ¶ 86 (hereinafter, "*Curran* Complaint")); Ex. 7 (*Gallus v. Am. Express Fin. Corp*, No. 04-8305 (D. Minn. filed Apr. 22, 2005) Compl. ¶ 53 (hereinafter, "*Gallus* Compl.")); Ex. 8 (*Jones v. Harris*, No. 04-8305 (N.D. Ill. filed June 10, 2005) Compl. ¶ 25 (hereinafter, "*Jones* Compl.")).

references the fact that fund accounting and transfer agency services provided to the Funds are performed pursuant to separate agreements. *See* Compl. ¶ 86 n.8 (referencing the agreements at Compl. Exs. 5 and 8). Plaintiff attempts to imply that *all* services necessary to operate the Funds – other than the types of services also provided to institutional accounts – are provided under separate agreements, thus establishing apples-to-apples comparability of the services provided under the Funds' IMA and the services provided to the institutional clients. But this logical leap has no basis in the facts alleged. Indeed, the Supreme Court itself in *Jones* pointed to potentially "significant differences between the services . . . which are attributable to the greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund assets, the more burdensome regulatory and legal obligations, and higher marketing costs." *Jones*, 130 S. Ct. at 1428-29. The Complaint provides no plausible basis to assume away all such differences based merely on the fact that fund accounting and transfer agency services are delegated to a third party. Moreover, the Funds' IMA (attached to the Complaint at Exhibit 1) delineates "administrative services" that HIFSCO provides to the Funds, and the Complaint alleges no basis to support plaintiff's apparent conclusion that those services are identical to what HIFSCO provides to institutional accounts.

With no factual basis to make the institutional fee comparison an apt one, the mere fact that institutional accounts pay lower fees (taking this fact to be true for purposes of this motion) does not provide a plausible basis for liability under the *Jones* "so disproportionately large" standard. Plaintiff should not be allowed, based on so thin a reed, to launch broad discovery and hope they find evidence to support their conclusory assertions.

**2.**      *Differences Between Mutual Fund Investment Management Fees and Sub-Advisory Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding The Services Provided Under the Respective Agreements*

The Complaint also attempts to allege that HIFSCO's investment management fees were excessive by comparing them to the fees paid to the Funds' sub-advisers. This comparison fails to state a claim, however, because the Complaint again relies only on *conclusions* and not facts, and because many of the conclusory statements in the Complaint are contradicted by documents attached to the Complaint as exhibits.

Under the IMA between HIFSCO and the Funds, HIFSCO provides both investment management services and administrative services to the Funds. *See* Compl. Ex. 1 at 21. The Complaint breezily concludes that "virtually all" of the *investment management* services are performed by the Funds' sub-advisers. *See* Compl. ¶ 47 ("Virtually all of the portfolio management and investment management services required by the mutual funds are performed by [the sub-advisers] and there is little, if any, work left to be done by HIFSCO."); *see also* Compl. ¶ 44 ("HIFSCO makes a one-time, initial determination regarding investment objectives and selects sub-advisers.").

As for the *administrative* services provided by HIFSCO under the IMA, the Complaint asserts only "on information and belief" that "the administrative type services included are a very small percentage of the expenses incurred under the agreement . . . ." *See* Compl. ¶ 18. The Complaint contains no specific factual allegations about the nature and quality of the investment management and administrative services provided to the Funds by HIFSCO, as opposed to the sub-advisers. Instead, the Complaint merely assumes that "HIFSCO has delegated virtually all of its duties to subcontractors at a fraction of HIFSCO's fee." *See* Compl. ¶ 19. These conclusions are not enough to meet the pleading standards mandated by the Supreme Court and

this Circuit.

Moreover, the Complaint's conclusory assertions are contradicted by Fund documents attached as exhibits to the Complaint.  Although the Court must make all reasonable inferences in favor of the plaintiff when deciding a motion to dismiss, inferences *cannot be reasonable* when they are at war with the documents in plaintiff's own pleading.  As detailed in the IMA (Exhibit 1 to the Complaint), HIFSCO provides extensive administrative and investment management services that are not provided by the sub-advisers.  HIFSCO has sole responsibility for coordinating the service providers for the Funds, provides personnel that serve in various capacities as employees of the Funds, compensates these personnel for performing various administrative functions (such as those outlined in the Statement of Facts) and provides space and services to operate the Funds.  *See* Statement of Facts at 2.a.; Compl. Ex. 1 at 21.  As for investment management services, HIFSCO has overall responsibility for the investment program of the Funds, which includes reviewing investment portfolios and securities, monitoring performance, and providing the extensive data and information required by the Board.  *See id*. And, as the Exhibits to the Complaint and the public record reflect, the Board of Directors has recently acted to reduce management fees in four of the six funds at issue and has allowed defendant HIFSCO to increase the sub-advisory fee of Wellington only so long as HIFSCO, and not the Fund, paid for the increase.  *See* Statement of Facts at 2.a., 2.b.

Case law on § 36(b) confirms that a Complaint must contain specific factual allegations about the services provided by an investment manager.  *See Krantz*, 305 F.3d at 143 (dismissing action where plaintiff "failed to allege any facts indicating that the fees received were disproportionate to the services rendered"); *Amron*, 464 F.3d at 342, 343 ("[C]onspicuously absent from either of the complaints are any factual allegations as to the *actual* fee negotiations

or management and distribution services rendered by *these* defendants."); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (holding that the complaint at issue "does not address *the actual services* rendered to [the relevant] Funds") (emphasis added); *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140, at *3 (S.D.N.Y. Mar. 20, 2009) ("[T]he gravamen of the Amended Complaint is the allegation that no marketing services and no 'new' administrative services were provided after the funds were partially closed.  The allegations are conclusory and bereft of sufficient factual support to render plausible any contention premised on the first *Gartenberg* factor – the nature and quality of the services provided – particularly in light of public SEC filings reflecting substantial net additional investments in the funds during the periods in question.").[9]

    The same reasoning applies here:  the Complaint's bare-bones conclusion that the sub-advisers are providing essentially all investment management services for only a fraction of the fee is not based upon sufficient factual allegations to make out a plausible claim.

---

[9] In a recent ruling post-dating the Supreme Court's decision in *Jones*, the Southern District of Iowa denied an adviser's motion to dismiss § 36(b) claims in a case involving sub-advised funds. *See Curran v. Principal Mgmt. Corp., LLC*, 2010 U.S. Dist. LEXIS 83730 (S.D. Iowa June 8, 2010).  *Curran*, however, presented many unique facts that are absent in this case.  The *Curran* court pointed first and foremost to the fact that the funds at issue were "funds of funds" whereby the funds in which the shareholders invested held shares in numerous other funds. *Id*. at *22.  As a result, the funds allegedly paid "four layers of fees" with the first layer to the adviser of the funds in which the shareholders directly invested, the second layer to the sub-adviser of those funds, the third layer to the adviser of each underlying fund and the fourth layer to the sub-adviser of each underlying fund. *Id*. at *31-32.  The Hartford Funds do not have such a multi-layer fee structure, which resulted in allegedly extreme fees for overlapping and repetitive services in *Curran*.

**C.    Plaintiff's Remaining Conclusory Allegations on "Information and Belief" Cannot Form the Basis For Liability Under § 36(b)**

The remaining allegations in support of Count I consist of plaintiff invoking the so-called "*Gartenberg* factors" and making "information and belief" allegations about them.  Many of these allegations have been made *verbatim* in other § 36(b) complaints, and are far too conclusory to reach the high bar posed by *Jones*.  *See Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, No. 03 Civ. 5710, 2004 WL 1065533, *1-2 (S.D.N.Y. May 12, 2004) (dismissing § 36(b) claims where plaintiffs "crafted their complaints" to track the *Gartenberg* factors).  As shown below, plaintiff's allegations are textbook examples of *Iqbal*'s caution that "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1949.

**Diligence of Directors.**  The Complaint contains no factual allegations about the independence, expertise, care, and conscientiousness of the directors in evaluating adviser compensation.  The Complaint alleges "on information and belief" that the directors of the Hartford Funds do not consider each fund separately but consider all the funds together.  *See* Compl. ¶¶ 62, 65, 66, 67.  The Complaint also alleges that the directors were "dominated" and "unduly influenced"  because "on information and belief" HIFSCO "does not provide the directors with sufficient information to fulfill their obligations"[10] and, "on information and belief," the directors "rarely, if ever, question any information or recommendations provided by Defendant."[11]  *See* Compl. ¶¶ 68, 69, 70.  Such "naked assertions" contain no factual content to

---

[10] Similar allegations appear in other § 36(b) cases as well.  *Compare* Compl. ¶¶ 68, 69 *with* Ex. 6 (Curran Compl. ¶¶ 94, 97, 98); Ex. 7 (*Gallus* Compl. ¶¶ 17, 66); Ex. 8 (*Jones* Compl. ¶ 49).

[11] An identical "information and belief" allegation was also made in *Jones*, *Gallus*, and *Curran*. *See* Ex. 8 (*Jones* Compl. ¶ 49(d)); Ex. 7 (*Gallus* Compl. ¶ 66); Ex. 6 (*Curran* Compl. ¶ 111).

permit an inference other than a mere possibility of misconduct.  *Iqbal*, 129 S. Ct. at 1949-50.

The Complaint does not identify any relevant information that the Board should have considered

but did not.  Rather, the documents attached to the Complaint and the public record reflect a

Board review process sufficiently rigorous (by a Board composed overwhelmingly of

independent Board members) to result in fee reductions and the addition of more breakpoints to

the fee structures.

     Courts have rejected similar efforts to base § 36(b) claims on an alleged lack of director

independence, which fail to overcome the express presumption in the ICA that independent

directors are disinterested.  *See Amron*, 464 F.3d at 344 ("[A] plaintiff's burden to overcome this

presumption is a heavy one.") (internal quotation marks omitted); *Krantz*, 305 F.3d at 143-44

(holding that service on multiple boards did not render directors "interested" under the ICA);

*Migdal*, 248 F.3d at 330 ("The fact that directors of the funds might be busy does not suggest

that they were in any way 'interested' as defined by the ICA.  Likewise, plaintiff's assertions that

the directors were dependent on the investment advisers for information shed no light on the

question of whether the directors are disinterested." (internal citation omitted)).  And, as

reiterated in  *Jones*, § 36(b) does *not* call for "judicial second-guessing of informed board

decisions" or for courts to engage in a "reasonableness" review of the approved fees – indeed,

Congress expressly rejected a reasonableness standard, as "courts are not well suited to make

such precise calculations."  130 S. Ct. at 1430.

     **<u>Economies of Scale</u>.**  The Complaint devotes many paragraphs to third parties' views of

economies of scale in mutual fund management and general examples of how economies of scale

*might* work.  *See* Compl. ¶¶ 94-99.  A few paragraphs then discuss the Hartford Funds:  the

Complaint asserts that since HIFSCO and its sub-adviser, Wellington, have different breakpoints

in their fee agreements, economies of scale are not "meaningfully" shared with the fund

shareholders.  *See* Compl. ¶ 101.  These conclusory allegations are insufficient because they say

nothing about the *costs* per investor.  *See Hoffman*, 591 F. Supp. 2d at 540 ("In order to meet

their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs

at issue and whether the costs per investor increased or decreased as the assets under

management grew.  Without such information, there is no way to determine whether any

economy of scale even existed that could have been passed on to investors . . . .") (internal

citations omitted).[12]

Also, plaintiff's allegations ignore the documents attached to her Complaint, which show

that every Fund contains "breakpoints" that decrease the fee rate as the Funds grow in size.  *See*

Statement of Facts at 2.a.; Compl. Ex. 1.  Courts in this Circuit and others have dismissed cases

relying on general allegations that defendant investment managers refused to pass along

economies of scale.  *See, e.g.*, *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687

(dismissing complaint based on inadequate allegations including general allegations that any

economies of scale achieved by marketing of the funds to new investors were not passed on);

*Amron*, 464 F.3d at 345 (dismissing complaint based on, *inter alia*, conclusory allegations

regarding economies of scale); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-2567, 2006

WL 126772, *9 (S.D.N.Y. Jan. 17, 2006) ("Mere assertions that fees increased with the size of

---

[12] *See also Krinsk v. Fund Asset Mgmt.*, 875 F.2d 404, 411 (2d Cir. 1989) ("[P]laintiff bore the
burden of proving that the per unit cost of performing Fund transactions decreased as the number
of transactions increased."); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d
at 338-39 ("Economies of scale allegations are insufficient where there are no allegations of the
costs."); *see also Hoffman*, 591 F. Supp. 2d at 540 ("Moreover, Plaintiffs' claims concerning the
differential in breakpoints between sub-advisors and investment advisors is irrelevant to the issue
of economies of scale.  As Plaintiffs' complaint acknowledges, investment advisers and sub-
advisers perform distinct services.  The differences in services and compensation packages alone
justify the different breakpoint arrangements." (internal citation omitted)).

the Funds are not enough to establish that the benefits from economies of scale were not passed

on to investors.").

**Costs and Profitability of Providing Investment Management Services.**  The

Complaint attempts to make allegations in regard to the Hartford Funds' costs and profitability in

managing the Funds – again, relying primarily on "information and belief" and industry-wide

generalizations.  The Complaint focuses on the dollar amounts of the investment management

fees but alleges nothing of substance on HIFSCO's *costs*, which essentially equates revenue with

profits.

On the cost side, the Complaint states only that HIFSCO's incremental costs of providing

management services "are *believed* to be nominal."[13]  *See* Compl. ¶ 105.  The Complaint then re-

asserts its allegations that the sub-adviser provides all (or "virtually all") of the relevant services.

*See* Compl. ¶¶ 110, 111, 112, 113.  These allegations are based on nothing more than

"information and belief," general industry criticism, and conclusory assertions.  None of these

allegations addresses, as they must, the *actual costs* to or *specific services* provided by

HIFSCO.[14]

Such sparse allegations cannot support a claim for excessive fees.  For instance, the

District of New Jersey dismissed a § 36(b) claim involving allegations that certain of the funds at

---

[13] The Complaint's allegations that "on information and belief, Defendant's reporting of its revenue and costs is intended to, and does, obfuscate Defendant's true profitability" and that "on information and belief, Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations" are identical to "information and belief" allegations by these same plaintiffs' counsel against the defendants in several other cases.  *See, e.g.*, Ex. 8 (*Jones* Compl. ¶ 28); Ex. 7 (*Gallus* Compl. ¶ 45); Ex. 6 (*Curran* Compl. ¶ 88).

[14]  Not surprisingly, the Complaint's allegations do not address the telling facts that HIFSCO's rates were *lowered* in recent years, additional breakpoints were added to the advisory fee schedules, and total expense caps reduced overall fees.  *See* Statement of Facts at 2.a.; Compl. Ex. 1.

issue "had some of the highest fees in the industry," which increased over time and had no

breakpoints.  The court recognized that since the complaint did not adequately address "the

actual services rendered to those Funds," it must be dismissed.  *In re Franklin Mut. Funds Fee*

*Litig.*, 478 F. Supp. 2d at 686-87; *see also Amron*, 464 F.3d at 344-45 ("[Plaintiffs'] assertions

regarding the size of 12b-1 and advisory fees, moreover, are irrelevant to a showing of

profitability without some allegation of the corresponding costs incurred in operating the funds.

Instead, the Complaints merely pray for discovery on these points.").

 **Comparison to Vanguard Fees.**  Plaintiff's assertion that "[s]hareholders of [certain]

Vanguard Funds pay significantly lower investment management fees" than the Hartford Funds,

Compl. ¶ 82, is irrelevant.  First, this comparison falls outside the relevant time period because

the only Vanguard fees alleged are from 2004 – well outside the applicable one-year period

preceding the filing of the Complaint, the only year for which plaintiff may seek damages.  *See*

Compl. ¶ 82 n.7; *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682, 685 (3d Cir. 2002) ("[U]nder

§ 36(b) . . . damages are not recoverable for any period prior to one year before the action was

instituted.").  Second, the Vanguard comparison also fails because there is no factual basis

alleged as to why Vanguard's fees are an appropriate comparator.  Vanguard is a not-for-profit

entity that markets itself primarily as a low-cost mutual fund provider.  The mere existence of a

lower-cost product does not, without more, plausibly support an inference that the Hartford

Funds are being charged excessive fees.  *See Amron*, 464 F.3d at 345 ("That a mutual fund has

an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low,

raises little suspicion under this [*Gartenberg*] factor."); *Schuyt v. Rowe Price Prime Reserve*

*Fund, Inc.*, 663 F. Supp. 962, 980 n.53 (S.D.N.Y. 1987) (in comparing funds involving similar

investment management services, "the appropriate analysis is a comparison at equivalent size levels," among other factors).[15]

* * *

Taken as a whole, the allegations in the Complaint do not add up to a plausible claim that HIFSCO charged excessive investment management fees under § 36(b). The Complaint's general assertions about purported industry-wide practices do not advance plaintiff's claim. The allegations that are specific to HIFSCO are an assembly of speculation and conclusion that could be alleged against any fund family (with minimal tweaks as to the particular fee arrangements at issue) – and, in fact, many of these same allegations have been pled in other cases against other fund groups. The Complaint's allegations fall short of the high bar of showing a disproportionate fee that "could not" have been the product of arm's length bargaining, particularly given the majority of disinterested directors who have reduced investment management fees in recent years. HIFSCO respectfully submits that the Complaint does not state a plausible claim of excessive advisory fees under *Iqbal*, *Twombly*, and *Jones,* and that Count I must be dismissed.

## III.   COUNT II FAILS TO STATE A CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICE FEES UNDER § 36(b) OF THE ICA

Plaintiff's 12b-1 allegations – most of which are lifted word-for-word from other complaints – do not include the most basic factors of an excessive fee claim under *Jones*.[16]

---

[15] *See also* John C. Coates IV & R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy*, 33 J. Corp. L. 151, 196-97 (2007) (cited in Compl. Ex. 10 at 85 n.11 & *passim*) ("Vanguard's and other funds' business models are based on being low-cost alternatives, while still other funds provide a larger set of services to investors, at higher prices. That is, expense ratios will vary depending on the type of services provided and selected by investors.").

Although the Complaint offers general criticisms of Rule 12b-1 as bad policy, the Complaint alleges virtually nothing that is specific to the Hartford Funds' distribution and service fees, other than the bald conclusion that the Funds' shareholders received "no benefits" from the fees. Count II is also governed by the "so disproportionately large" standard set forth in *Jones* and *Gartenberg*, and plaintiff's allegations fall far short of stating a plausible case for liability under that high bar. Instead of alleging *excessive* 12b-1 fees under this standard, plaintiff argues that *any* such fee was improper because the requirements of Rule 12b-1 were not met when the fees and distribution plan were approved by the independent directors. But plaintiff has no direct private right of action to assert such a claim under Rule 12b-1, and Count II must therefore be dismissed.

### A.  The Complaint Does Not Allege A Claim for Excessive Distribution and Service Fees under § 36(b), But Merely Criticizes Rule 12b-1 Generally

The Complaint fails to allege sufficient facts to avoid dismissal of the 12b-1 claim. The Complaint makes no allegations of the quantity or quality of distribution and servicing – despite the fact that no claim can be made that fees are excessive in relation to the services provided when there are no allegations about those services.[17] Instead, plaintiff claims that 12b-1 fees do not benefit shareholders, based on some general industry criticism. Such bare-bones pleading cannot support a claim for excessive 12b-1 fees under the high bar of Jones.

Here, plaintiff pleads essentially no facts about the relevant circumstances of HIFSCO's

---

[16] The Complaint's 12b-1 allegations are strikingly similar to the allegations made in the *Curran* complaint and the *Gallus* complaint. *Compare* Compl. ¶¶ 49-56, 72-77 *with* Ex. 6 (*Curran* Compl. ¶¶ 52-59, 101-04); Ex. 7 (*Gallus* Compl. ¶¶ 19-27).

[17] As discussed above, the Supreme Court has held that: "To face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Jones*, 130 S. Ct. at 1426. This standard applies equally to plaintiff's claims concerning distribution and service fees.

12b-1 fees.  In the Complaint's introduction, plaintiff foreshadows a list of three reasons why the

12b-1 fees purportedly breached HIFSCO's fiduciary duties:  (1) "the fact that the 12b-1 fees

have produced few, if any, benefits (in the form of economies-of-scale benefits, or otherwise) for

the Hartford Funds . . ."; (2) "the nature and quality of the services provided in exchange for the

12b-1 fees"; and (3) "Defendant's failure to provide the Hartford Funds' Board of Directors with

all information reasonably necessary to evaluate the . . . 12b-1 fees."  *See* Compl. ¶ 8.  But the

body of the Complaint does not back up these conclusions with any supporting substance.

Plaintiff does not even mention "the nature" or "quality" of distribution and shareholder

services after the introductory statement.  This alone is dispositive:  without pleading any facts

about the applicable services, plaintiff cannot make out a case that the 12b-1 fees "bear[] no

reasonable relationship to the services rendered."  *Jones*, 130 S. Ct. at 1426.  *See Krantz*, 305

F.3d at 143 (plaintiff "failed to allege any facts indicating that the fees received were

disproportionate to the services rendered"); *Amron*, 464 F.3d at 342 ("[C]onspicuously absent

from either of the complaints are any factual allegations as to the *actual* fee negotiations or

management and distribution services rendered by *these* defendants."); *Mintz*, 2009 WL 735140,

at *3  ("The allegations are conclusory and bereft of sufficient factual support to render plausible

any contention premised on the first *Gartenberg* factor – the nature and quality of the services

provided . . .").  Having alleged nothing about the quantity or quality of the distribution and

servicing provided in exchange for the 12b-1 fee or whether the size of the fee bears a reasonable

relationship to those services, plaintiff has failed to state a claim.

The bulk of the 12b-1 allegations in the Complaint are conclusions about the purported

lack of benefits to shareholders from 12b-1 fees without any specific allegations about the

services provided by HIFSCO or any attempt to compare those services to the fees charged.  *See*

Compl. ¶ 53 ("fail[] to benefit the Plaintiff and other shareholders"); *id*. ¶ 55 ("entirely a waste of

Fund assets"); *id*. at ¶ 75 ("Plaintiff and the other shareholders of the Hartford Funds have

enjoyed no benefits from the Distribution Plans . . . ."). Plaintiff simply repeats critical industry

commentary that 12b-1 fees are bad policy, and that fund shareholders receive "no benefit" from

such fees. *See* Compl. ¶¶ 50-52; *id*. at ¶ 74 (alleging that a "financial economist at the S.E.C.

confirms that . . . .12b-1 fees are 'not an efficient use of shareholder assets'"). But these sorts of

"threadbare recitals . . . supported by mere conclusory statements" cannot survive a motion to

dismiss, under the guidance of *Iqbal* and *Twombly*. *See Fowler*, 578 F.3d at 210 (quoting *Iqbal*,

129 S. Ct. at 1949). Plaintiff has not alleged any facts *specific to HIFSCO* to support her

conclusory statements.

Courts have dismissed complaints premised on assertions that shareholders receive "no

benefits" from 12b-1 fees, rather than fact-based allegations that the fees themselves were

excessive. *See, e.g.*, *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 356 (D. Mass.

2005) (dismissing 12b-1 fee claim premised on allegations that distribution fees paid after the

fund was closed to new investors were excessive because "there was no reasonable likelihood

that the Fund's payment of the fees would benefit its shareholders"); *Hoffman v. UBS-AG*, 591 F.

Supp. 2d at 539 ("Plaintiff's allegations regarding 12b-1 fees . . . refer to the propriety of the

fees, not to the amount charged. This form of pleading is insufficient to the extent that Section

36(b) permits actions where fees are disproportionately large, not where fees are merely applied

improperly.") (internal quotation marks omitted).[18]

---

[18] *See also In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ.1921(DAB), 2007 WL 2325862, *4,
14-15 (S.D.N.Y. Aug. 14, 2007) ("Here, the plaintiffs do not allege any facts that would
demonstrate that the compensation paid to the defendants was disproportionate to the services
rendered. Instead, [the plaintiff's Section 36(b) claim] states only that the defendants improperly
charged certain distribution fees."); *ING Principal Protection Funds Deriv. Litig.*, 369 F. Supp.

The Complaint's allegations as to economies of scale also fail to provide any further substance.  Plaintiff asserts that the "management fee and the total 12b-1 fees received by Defendant have grown over time" – an *aggregate* increase due to the growth of the Funds' assets under management, not an increase in the percentage fees applied.  Plaintiff then insists that this growth in fees "depriv[es] the Funds of the benefits of the[] economies of scale" achieved by the growth of the Funds.  Compl. ¶ 73.  Again, these allegations are no more than conclusion.  The Complaint asserts no facts regarding the actual *costs* of managing the Funds (on a per-investor basis or otherwise) and whether those costs decreased as the assets under management grew.  *See Hoffman*, 591 F. Supp. 2d at 540 ("In order to meet their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew.  Without such information, there is no way to determine whether any economy of scale even existed that could have been passed on to investors . . .") (internal citations omitted); *see also Amron*, 464 F.3d at 345 ("The Complaints again point to the size of the 12b-1 and advisory fees, but make no allegations regarding the costs of performing fund transactions or the relationship between such costs and the number of transactions performed.").  If plaintiffs were allowed to state a § 36(b) claim "based upon such paltry allegations,"  "then any fund that grew over time while not simultaneously lowering its fees would be subject to suit under the ICA.  This cannot be

---

2d 163, 166 (D. Mass. 2005) (dismissing complaint where plaintiffs failed to allege the "fundamental claim" that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided").  *Cf. Krinsk v. Fund Asset Mgmt.*, 715 F. Supp. 472, 501 (S.D.N.Y. 1988), *aff'd* 875 F.2d 404 (2d Cir. 1989) ("Plaintiff . . . asserts that use of 12b-1 payments to encourage better shareholder service and to maintain Fund size violates Rule 12b-1.  The Court disagrees.").

allowed." *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687.[19]

HIFSCO respectfully requests that this Court dismiss Count II in its entirety.

## B.   There is no Private Right of Action to Assert a Violation of § 12(b) of the ICA or Rule 12b-1

Plaintiff asserts that the approval of the Funds' 12b-1 fees was "in violation of both Rule 12b-1 and ICA §§ 12 and 36(b)."  Compl. ¶ 75.  In addition to the Complaint's failure to adequately allege excessive fees under § 36(b), Count II  also fails because there is no private right of action for plaintiff to assert a violation of Rule 12b-1 or Section 12(b) of the ICA.

The only express private right of action in the ICA is provided in § 36(b), which states that "a security holder" of a registered investment company may bring an action to enforce its terms.  *See, e.g.*, *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 433 (2d Cir. 2002).  In contrast, section 12(b) of the ICA and Rule 12b-1 contain no provisions allowing a shareholder to bring a claim for alleged violations.

Nor is there an implied private right of action under § 12(b) or Rule 12b-1.  Since the Supreme Court provided a renewed framework for analyzing rights of action created by statute in *Alexander v. Sandoval*, 532 U.S. 275 (2001), courts have consistently declined to find implied private rights of action under the ICA – and no court has found an implied private right of action

---

[19] HIFSCO respectfully submits that a recent district court decision refusing to dismiss a 12b-1 fee claim under § 36(b) misapplied the *Jones/Gartenberg* standard.  In *Curran*, 2010 U.S. Dist. LEXIS 83730, the court pointed to the allegation that "the distribution fees . . .  are excessive under § 36(b) because the shareholders of the Subject Funds pay for marketing, selling, and distributing the Subject Funds, yet the monetary benefits derived from attracting new shareholders largely accrue to Defendants, not the existing shareholders," *id*. at *40.  These assertions are little more than the conclusory and policy-oriented statements made by plaintiff here, as discussed above.  These general allegations about the services provided by a distributor ("marketing, selling, and distributing the Subject Funds") and the results of those services ("the monetary benefits derived from attracting new shareholders largely accrue to Defendants") do no more than "permit the court to infer . . . the mere possibility of misconduct," they do not "show . . . that the pleader is entitled to relief."  *See Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).  Pleadings after *Twombly* and *Iqbal* require more.

under § 12(b) or under Rule 12b-1.  *See, e.g.*, *Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862, 868 (D. Minn. 2005) ("The Court finds it telling that no federal court has found an implied right of action under section 12(b).").  Nor could such a private right of action be implied.  As the Third Circuit has noted, "even when Congress creates rights or obligations . . . it does not necessarily follow that private parties can enforce them or obtain a direct remedy through the judicial process. . . . Some statutes create rights in individuals that are only enforceable by agencies." *Three Rivers Ctr. for Indep. Living, Inc. v. Housing Auth. of Pittsburgh*, 382 F.3d 412, 420 (3d Cir. 2004).  There is no language in the ICA that would imply that Congress intended to allow private enforcement of § 12(b) or Rule 12b-1.  Section 12(b) and Rule 12b-1 focus on limiting the types of actions an investment company can take, and as the Supreme Court has ruled: "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (internal quotation marks omitted).  As per the Supreme Court's directive in *Sandoval*, the private cause of action analysis starts and ends with an interpretation of unambiguous statutory text and structure and there is, accordingly, no private right of action under § 12(b) or under Rule 12b-1.

## **CONCLUSION**

For all of the foregoing reasons, HIFSCO respectfully requests that the Court enter an order dismissing the Complaint with prejudice for failure to state a claim.

Respectfully submitted,

Of Counsel:                          */s/ John M. Seaman*
                                     John M. Seaman (#3868)
Harvey J. Wolkoff                    A. Thompson Bayliss (#4379)
Robert A. Skinner                    Eric D. Selden (#4911)
Janna J. Hansen                      ABRAMS & BAYLISS LLP
Allison M. Boscarine                 20 Montchanin Road, Suite 200
ROPES & GRAY LLP                     Wilmington, Delaware  19807
Prudential Tower                     (302) 778-1000
800 Boylston Street                  seaman@abramsbayliss.com
Boston, Massachusetts  02199-3600    bayliss@abramsbayliss.com
                                     selden@abramsbayliss.com

                                     *Attorneys for Defendant Hartford Investment*
Dated:  January 3, 2011              *Financial Services, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of January, 2011, I electronically filed the foregoing *Entry of Appearance* with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that on January 3, 2011, I caused to be served true and correct copies of the foregoing document on the following counsel as indicted below:

**Via Hand Delivery**

Carmella P. Keener
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, Delaware 19899-1070

**Via U. S. Mail, Postage Prepaid**

Guy M. Burns
Jonathan S. Coleman
Aleksas A. Barauskas
JOHNSON, POPE, BOKOR,
   RUPPEL & BURNS LLP
403 E. Madison Street, Suite 400
Tampa, Florida  33602

**Via U. S. Mail, Postage Prepaid**

Michael D. Woerner
Tana Lin
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052

**Via U. S. Mail, Postage Prepaid**

Michael Brickman
James C. Bradley
Nina H. Fields
RICHARDSON, PATRICK, WESTBROOK,
   & BRICKMAN, LLC
174 E. Bay street
Charleston, South Carolina 29401

**Via U. S. Mail, Postage Prepaid**

Diana A. Nygaard
THE NYGAARD LAW FIRM
11050 Roe Avenue, Suite 212
Leawood, Kansas 66211

*/s/ John M. Seaman*
John M. Seaman (#3868)