## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **JILL E. SOUTHWORTH, as TRUSTEE** ) | |
| **of the JILL SOUTHWORTH** ) | |
| **REVOCABLE TRUST, et al.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case Number 1:10-cv-00878-RMB-KW** |
| ) | |
| **HARTFORD INVESTMENT** ) | |
| **FINANCIAL SERVICES, LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

OF COUNSEL:

**JOHNSON, POPE, BOKOR,**
**RUPPEL & BURNS, LLP**
403 E Madison Street, Suite 400
Tampa, FL 33602
(813) 225-2500

**KELLER ROHRBACK, LLP**
1201 Third Ave., Ste. 3200
Seattle, WA 98101-3052
(206) 623-1900

**RICHARDSON, PATRICK,**
174 E. Bay St.
Charleston, SC 29401
(843) 727-6500

**THE NYGAARD LAW FIRM**
11050 Roe Avenue, Suite 212
Leawood, KS 66211
(913) 469-5544

Carmella P. Keener (Del. Bar No. 2810)
**ROSENTHAL, MONHAIT & GODDESS, P.A.**
919 N. Market Street
Suite 1401, Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com

*Counsel for Plaintiff Jill E. Southworth*

**TABLE OF CONTENTS**

I.     NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.    SUMMARY OF ARGUMENT ....................................................................................... 1

III.   STATEMENT OF FACTS .............................................................................................. 3

       A.     General Background on Mutual Funds and the Investment
              Company Act ....................................................................................................... 3

       B.     Defendant's Breach of Fiduciary Duty with Respect to
              Compensation Received from the Funds ............................................................. 3

              1.     Investment Management Fees ................................................................... 4

              2.     Rule 12b-1 Distribution Fees ................................................................... 7

IV.    ARGUMENT ................................................................................................................... 8

       A.     The Appropriate Focus of a Motion to Dismiss Remains Whether a
              Plaintiff Has *Pleaded* a Claim, Not *Proven* a Claim. ........................................... 8

       B.     Plaintiff's Allegations Are More Than Sufficient to State Claims
              Under Section 36(b) of the ICA. ...................................................................... 11

              1.     The Nature and Quality of Services ....................................................... 14

              2.     The Independence and Conscientiousness of the Directors .................... 16

              3.     Comparative Fee Structures ................................................................... 19

              4.     Economies of Scale ............................................................................... 22

              5.     The Profitability of the Fund to the Adviser-Manager ........................... 24

       C.     Defendant's Motion Relies on Inapposite Case Law. .......................................... 26

       D.     Count II Adequately States a Separate Claim Under Section 36(b)
              for Excessive 12b-1 Distribution Fees. .............................................................. 27

       E.     Eight Other Courts Have Held that Complaints with Similar
              Supporting Information as Plaintiff's Complaint Defeat a Rule
              12(b)(6) Motion. ............................................................................................... 29

V.     CONCLUSION ............................................................................................................. 30

i

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Amron v. Morgan Stanley Investment Advisors Inc.*,
   464 F.3d 338 (2d Cir. 2006).........................................................................................26, 27

*Arista Records LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010)...........................................................................................10, 16

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009).................................................................................................2, 8, 9

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................passim

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ..........................................................................................passim

*Burks v. Lasker*,
   441 U.S. 471 (1979)..............................................................................................................19

*Curran v. Principal Mgmt. Corp., LLC.*,
   No. 4:09-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010)......................................passim

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984)................................................................................................................3

*Dumond v. Mass. Fin. Servs. Co.*,
   No. 04-11458, 2006 WL 149038 (D. Mass. Jan. 19, 2006).............................................2, 29

*Erickson v. Pardus*,
   551 U.S. 89 (2007).............................................................................................................9, 19

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009)...........................................................................................passim

*Gallus v. American Express Financial Corp.*,
   370 F. Supp. 2d 862 (D. Minn. 2005) ("*Gallus I*")....................................................2, 28, 29

*Gallus v. American Express Financial Corp.*,
   No. 04-4498, 2010 WL 5137419 (D. Minn. Dec. 10, 2010) ................................................12

*Gallus v. Ameriprise Financial, Inc.*,
   561 F.3d 816 (8th Cir. 2009) ("*Gallus II*") ..................................................................passim

*Gartenberg v. Merrill Lynch Asset Mgmt.*,
   694 F.2d 923 (2nd Cir. 1982).......................................................................................11, 19

*Hunt v. Invesco Funds Group, Inc.*,
No. 04-02555, 2006 WL 1581846 (S.D. Tex. June 5, 2006).......................................2, 11, 29

*In re American Mutual Funds Fee Litig.*,
No. 04-5593, 2009 WL 5215755 (C.D.Cal. Dec. 28, 2009)................................................. 19

*In re Federated Mut. Funds Excessive Fee Litig.*,
No. 04-352, 2009 WL 5821045 (W.D. Pa. Sept. 30. 2009)...........................................passim

*In re Goldman Sachs Mut. Funds Fee Litig.*,
No. 04-2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ................................................... 12

*Jones v. Harris Associates L.P.*,
130 S. Ct. 1418 (2010)..................................................................................................passim

*Jones v. Harris Assocs. L.P.*,
No. 04-8305, 2005 WL 831301 (N.D. Ill. Apr. 7, 2005) ("*Jones I*") ........................2, 21, 29

*Krantz (Sheldon) v. Prudential Investments Fund Mgmt. LLC*,
305 F.3d 140 (3d Cir. 2002) ("*Prudential*") ...................................................................26, 27

*Krantz (Richard) v. Fidelity Mgmt. & Research Co.*
98 F. Supp. 2d 150 (D. Mass. 2000) ("*Fidelity*") ..........................................................12, 25

*Meyer v. Oppenheimer Mgmt. Corp.*,
764 F.2d 76 (2d Cir. 1985)................................................................................................ 28

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
248 F.3d 321 (4th Cir. 2001) ........................................................................................23, 27

*Pepper v. Litton*,
308 U.S. 295 (1939).......................................................................................................... 13

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008)................................................................................................ 9

*Revell v. Port Authority*,
598 F.3d 128 (3d Cir. 2010)................................................................................................ 9

*Sins v. Janus Capital Mgmt., LLC*,
No. 04-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006) ...........................................2, 29

*Strigliabotti v. Franklin Res. Inc.*,
No. 04-00883, 2005 WL 645529 (N.D. Cal. Mar. 7, 2005) .............................................2, 29

*Strougo v. BEA Assocs.*,
No. 98-3725, 2000 WL 45714 (S.D.N.Y. Jan. 19, 2000) .................................................... 12

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ...................................................................................................... 9

*Wicks v. Putnam Inv. Mgmt., LLC*,
  No. 04-10988, 2005 WL 705360 (D. Mass. Mar. 28, 2005) ................................................ 12

**Statutes**

15 U.S.C. § 80a ............................................................................................................................. 1

**Rules**

FED. R. CIV. P. 8 ................................................................................................ 8, 9, 17, 25, 28

FED. R. CIV. P. 9 ...................................................................................................................... 18

FED. R. CIV. P. 12 ............................................................................................................ passim

**Regulations**

17 C.F.R. § 270.12b-1 ............................................................................................................ 8, 21

## I. NATURE AND STAGE OF PROCEEDINGS

Defendant has moved to dismiss the Complaint filed by Plaintiff Jill E. Southworth, as Trustee of the Jill Southworth Revocable Trust ("Plaintiff"), on behalf of and for the benefit of the Hartford Capital Appreciation Fund; the Hartford Dividend & Growth Fund; the Hartford Income Fund; the Hartford Midcap Fund; the Hartford Short Duration Fund; and the Hartford Total Return Bond Fund (collectively, "the Funds"). Plaintiff alleges that Hartford Investment Financial Services, LLC ("Defendant" or "Hartford") breached its fiduciary duty under section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-l et seq. (the "ICA"), with respect to the receipt of investment management and Rule 12b-1 distribution fees.

## II. SUMMARY OF ARGUMENT

Defendant's motion to dismiss should be denied because it seeks to hold Plaintiff to a heightened fact-pleading standard when only notice pleading is required. Contrary to Supreme Court and Third Circuit case law, Defendant seeks to draw inferences *against* Plaintiff and require particularity in pleading where the Federal Rules of Civil Procedure require none. Defendant also would have this Court resolve questions of fact that are improper for a Rule 12(b)(6) motion. In short, Defendant asks this Court to require Plaintiff to have *proven* her claim already. But that is not what the Rules require: they only require that she have *pled* her claim.

Further, Defendant fails to disclose that in at least eight other cases alleging similar violations of the ICA, every one of the eight courts denied very similar motions to dismiss.[1] *See Curran v. Principal Mgmt. Corp., LLC.*, No. 4:09-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010), *vacated in part on other grounds*, 2011 WL 223872 (S.D. Iowa, Jan. 24, 2011)

---

[1] Defense counsel Ropes & Gray are counsel for the defendants in the *Jones* and *Gallus* cases.

("Curran");[2] *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-352, 2009 WL 5821045 (W.D. Pa. Sept. 30. 2009) ("*Federated*"); *Sins v. Janus Capital Mgmt., LLC*, No. 04-01647, 2006 WL 3746130 (D. Colo. Dec. 15, 2006); *Hunt v. Invesco Funds Group, Inc*., No. 04-02555, 2006 WL 1581846, *2-5 (S.D. Tex. June 5, 2006); *Dumond v. Mass. Fin. Servs. Co.*, No. 04-11458, 2006 WL 149038, *1-3 (D. Mass. Jan. 19, 2006); *Jones v. Harris Assocs. L.P.*, No. 04-8305, 2005 WL 831301 (N.D. Ill. Apr. 7, 2005) ("*Jones I*"); *Strigliabotti v. Franklin Res. Inc.*, No. 04-00883, 2005 WL 645529, *3-4 (N.D. Cal. Mar. 7, 2005); *Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862 (D. Minn. 2005) ("*Gallus I*"). Both the *Curran* and *Federated* cases were decided after *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ("*Iqbal*"), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Curran* also was decided after the Supreme Court's decision in *Jones v. Harris Associates L.P.*, 559 U.S. ___, 130 S. Ct. 1418 (2010), a section 36(b) case.

Plaintiff's 130-paragraph Complaint adequately puts Defendant on notice that it has breached its fiduciary duties with respect to the receipt of compensation by charging excessive fees, failing to share significant economies of scale with the Funds' shareholders, and accepting excessive and inappropriate compensation under unlawful distribution plans. Even based on the limited information publicly available to her, Plaintiff makes a host of specific allegations that Defendant breached the fiduciary duties it owed under the ICA. A careful analysis of Plaintiff's Complaint will demonstrate that she far exceeds the notice pleading standard applicable by "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Accordingly, Defendant's motion to dismiss should be denied.

---

[2] The *Curran* court partially vacated its earlier order on the ground of statutory standing, which is not pertinent to the issues facing this Court.

### III.   STATEMENT OF FACTS

**A.      General Background on Mutual Funds and the Investment Company Act**

A mutual fund is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984) (citation omitted). For this reason, the relationship between a mutual fund and its investment adviser is "'fraught with potential conflicts of interest.'" *Id.* (citation omitted). Mindful of these potential conflicts, Congress enacted the Investment Company Act of 1940 to regulate and curb "abuse inherent in the structure of [the mutual fund industry]," *Jones*, 130 S. Ct. at 1422 (quoting *Daily Income*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates.

Despite the passage of the ICA, investment advisers continued to exploit their close relationship with the mutual funds they created by charging excessive fees for the investment management services they provided. Recognizing that "the forces of arms-length bargaining [over compensation] do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy," S. Rep. No. 91-184, at 5 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897, 4901, Congress amended the ICA to further strengthen protections for shareholders. In adding section 36(b) to the ICA, Congress intended for private shareholders to protect the interest of their fellow investors by acting as an "independent check[] on excessive [adviser] fees." *Daily Income*, 464 U.S. at 541.

**B.      Defendant's Breach of Fiduciary Duty with Respect to Compensation Received from the Funds**

Even though limited public information about the workings of Defendant and the Funds is available, Plaintiff has alleged the following in her Complaint:

### 1.    Investment Management Fees

The Funds are governed by a Board of Directors that oversees over 90 mutual funds in the Fund Complex. (Compl. ¶ 22.) The Funds were organized by Defendant and, in turn, contract with Defendant and its affiliates for all of the services they need. (*Id.* ¶ 15; *see also id.* Exs. 1-2, 4-9, 11-12.) Under the terms of the Investment Management Agreement, Defendant provides two categories of services: investment management services and administrative services. (*Id.* ¶ 18.)

Rather than directly providing investment management services, Defendant subcontracts out those services at a fraction of the fees it collects from the Funds. (*Id.* ¶¶ 41-48, 108.) While Defendant has some initial involvement with setting the overall strategies and selecting sub-advisers for the Funds, after this initial involvement, Defendant provides minimal services to the Funds, instead delegating the provision of all substantive investment advisory services to the Funds' sub-advisers. (*Id.* ¶ 44.) In other words, it is the sub-advisers to the Funds who, according to the Investment Subadvisory Agreements, "will make all determinations with respect to the investment of the assets for the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same." (*Id.* ¶¶ 43, 45-46.)

Despite the fact that the sub-advisers provided the bulk of the investment advisory services to the Funds, in 2009, Defendant retained approximately 62% to 75% of the investment advisory fees. (*Id.* ¶¶ 108-110.) In actual dollar terms, for fiscal year 2009 alone, Defendant collected nearly $140 million in investment management fees from the Hartford Funds but paid the sub-advisers a mere fraction of that fee—approximately $44 million. (*Id.* ¶¶ 47-48, 108.) Therefore, Defendant paid itself more than twice what it paid the sub-advisers, retaining over $90 million of the fees charged to the Funds for providing few, if any, additional services. (*Id.*) For one of the sub-advisers (Hartford Investment Management Company), the Funds' disclosures

4

claim that it charges fees "at cost," yet *Defendant charged those Funds fees nearly three to three and one-half times the purported cost* in exchange for providing few, if any, additional services. (*Id.* ¶¶ 48, 112.) Plaintiff's Complaint includes a comparison of the fee schedules paid by each of the Funds to Defendant with the fee schedules charged by each of the Fund's sub-advisers (*id.* ¶ 47), as well as the actual dollar difference in the amounts paid to Defendant by each Fund versus the amount paid by Defendant to each Fund's sub-adviser. (*Id.* ¶ 108.)

Under the Investment Management Agreement, Defendant also claims to provide certain administrative services. Such services, however, comprise a very small percentage—likely less than three basis points, or 3/100ths of one percent—of the expenses incurred under the Investment Management Agreement. (*Id.* ¶ 18.) For while transfer agency services typically make up the largest component of administrative costs, those services are paid for *separately* from the investment management agreement and are provided to the Funds under a *separate* contract with Hartford Administrative Services Company. (*Id.*) Thus, even accounting for the administrative services that might be provided under the Investment Management Agreement, the fees Defendant receives under the Investment Management Agreement are simply not based on the services it actually renders or the actual cost of providing those services. (*Id.* ¶ 40.)

Plaintiff also alleges that other investment advisers who offer services to funds similar to the Hartford funds charge substantially less than Defendant ($17 million to $71 million less per year) and provides specific examples supporting her allegation. (*Id.* ¶¶ 80-83.) In addition, Plaintiff's Complaint points out that Defendant provides substantially similar, if not identical, services to the institutional accounts it manages. (*Id.* ¶ 86.) While there may be additional services provided to the Funds that are not provided to non-mutual fund clients, the Funds pay separate fees for those services under separate agreements. (*Id.*) Plaintiff provides several

examples of how the Funds pay significantly higher investment management fees than institutional clients. (*See id.* ¶¶ 90-92.) As just one example, despite providing similar services in 2009, *Defendant charged three of its fixed income funds* (*i.e.*, the Hartford Short Duration, Income and Total Return Funds) *as much as four and a half to five and a half times more* in basis points than it charged its institutional clients to provide investment management services to fixed income accounts. (*Id.* ¶ 92.)

As Plaintiff states in her Complaint, the existence of economies of scale in the mutual fund industry has been confirmed by both the Securities and Exchange Commission and the Governmental Accounting Office ("GAO"). (*Id.* ¶ 97.) Here, as the Funds' assets under management have grown, the management and distribution fees paid to the Defendant have grown dramatically. (*Id.* ¶ 100.) Defendant has largely retained—and not shared with the Funds—the significant economies of scale in the management of the Funds. (*Id.*) For example, Defendant negotiated a breakpoint[3] schedule with its sub-adviser Wellington on at least two of the Funds pursuant to which breakpoints occurred at several points *before* the fund reached $500 million in assets under management. (*See id.* ¶¶ 47, 101.) Yet breakpoints in the fee schedules Defendant charges the Funds do not even *start* until the Funds have $500 million in assets under management. (*Id.*) As the cost of the minimal "oversight" function Defendant performs for the Funds should not increase as Fund assets increase, Defendant fails to meaningfully share with the Funds' shareholders the benefits of economies of scale realized either from the Wellington Sub-Advisory Agreement or by Defendant generally. (*Id.* ¶¶ 101-102.)

---

[3] When a mutual fund fee schedule includes "breakpoints," the fee, as measured in basis points, stays constant as assets under management increase until the assets reach a certain point or "breakpoint." When the assets reach that breakpoint, the fee decreases to a new rate—a rate that will be charged on all assets above the breakpoint. That new rate will stay constant until the assets under management increase to the next breakpoint, and the fee rate decreases again.

##### 2.     Rule 12b-1 Distribution Fees

Like the investment management fees, the Rule 12b-1 distribution fees the Funds pay constitute a breach of Defendant's fiduciary duty. These 12b-1 fees are supposed to compensate Defendant for marketing, selling, and distributing mutual fund shares to new shareholders under distribution plans. (*Id.* ¶ 49.) In turn, as the assets of the Funds grow and stabilize from the marketing and distribution activities, the Funds are supposed to benefit from economies of scale through a reduction in other fees such as investment management fees. (*Id.*) Yet the 12b-1 fees are not linked to any actual distribution activity by Defendant and, instead, are based purely on a percentage of the net assets of each of the Funds. (*Id.* ¶¶ 49, 53.) Therefore, any portion of the fees paid to Defendant that is derived solely from market increases in the net asset value of the Funds rather than any distribution activity (and the Funds' assets have grown over time (*id.* ¶¶ 73, 100)) constitute a breach of Defendant's duty to the Funds. (*Id.* ¶ 53.) The GAO has estimated that as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund. (*See id.* Ex. 17 at 9.)

Further, despite the dramatic growth in total assets held by the Funds, both the investment management and 12b-1 fees paid to Defendant have grown over time, indicating that the 12b-1 fees are not benefiting the Funds the way they are supposed to benefit them through the reduction of investment management fees. (*Id.* ¶ 73.) Rather, the 12b-1 fees are simply a mechanism for Defendant to extract additional compensation from the Funds (*id.* ¶ 52)— to the tune of almost $78 million for the fiscal year ending October 31, 2009 alone. (*Id.* ¶ 54.)

Each year, in order to approve the continuation of the Distribution Plan, the Funds' directors are supposed to review the 12b-1 Plan and conclude that "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, [ ] there is a reasonable likelihood that the [Distribution Plans] will benefit the company and its shareholders." 17 C.F.R.

§ 270.12b-l(e). However, because the benefits of the 12b-1 fees have served only Defendant, and not the Funds (Compl. ¶ 55), the 12b-1 Plans have not been adopted in accordance with these requirements. (*Id.* ¶ 73.)

## IV. ARGUMENT

A. **The Appropriate Focus of a Motion to Dismiss Remains Whether a Plaintiff Has *Pleaded* a Claim, Not *Proven* a Claim.**

FED. R. CIV. P. 8(a) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief" in a complaint. The Supreme Court affirmed this standard, holding "we do not require heightened fact pleading of specifics..." *Twombly*, 550 U.S. at 570. To meet this standard and defeat a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). While the plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a "sheer possibility," *id.*, it is not a "probability requirement." *Id.* Accordingly, a complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Federated*, 2009 WL 5821045, at *1 ("dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery").

In arguing for dismissal, Defendant effectively ignores several specific principles of pleading. First, all reasonable inferences must be drawn *in favor* of Plaintiff, not *against* her. The Third Circuit has reaffirmed this principle on several occasions post-*Iqbal*. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 91 (3d Cir. 2010); *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009) ("'[C]ourts accept all factual allegations as true, *construe the complaint in the light most favorable to the plaintiff*, and determine whether, *under any reasonable reading of the complaint*, the plaintiff may be entitled to relief.'" (emphasis added) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008))). The rule that reasonable inferences must be drawn in favor of, and not against, Plaintiff is simply a straightforward application of Supreme Court case law. Requiring Plaintiff to negate inferences that could be drawn against her "would invert the principle that the 'complaint is construed most favorably to the nonmoving party,' and would impose the sort of 'probability requirement' at the pleading stage which *Iqbal* and *Twombly* explicitly reject." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949-50) (internal citation omitted).

Second, the claims Plaintiff asserts are governed by Rule 8(a), not Rule 9(b). Hence, "[s]pecific facts are not necessary," *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), and Plaintiff "is not required, at this early pleading stage, to go into particulars." *Fowler*, 578 F.3d at 213; *see also Iqbal*, 129 S. Ct. at 1949 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations . . . ." (quotation marks and citation omitted)).

Next, the Third Circuit has stressed that at the motion-to-dismiss stage, the court should focus on the appropriate threshold question, which is whether a Plaintiff "*pleaded*" a claim and not whether a Plaintiff can "prove" a claim. *Fowler*, 578 F.3d at 213 (emphasis in original). As it has emphasized:

It is axiomatic that the standards for dismissing claims under FED. R. CIV. P. 12(b)(6) and granting judgment . . . are vastly different. . . . "In addition to the fact that a plaintiff presumably has had an opportunity to obtain admissions during discovery, a motion for summary judgment is reviewed under a much more stringent standard than a motion to dismiss for failure to state a claim."

. . . Even post-*Twombly,* it has been noted that a plaintiff is not required to establish the elements of a prima facie case but instead, need only put forth allegations that "raise a reasonable expectation that discovery will reveal evidence

9

> of the necessary element." . . . Under the Federal Rules of Civil Procedure, an
> evidentiary standard is not a proper measure of whether a complaint fails to state a
> claim.

*Id.* (citations omitted). Indeed, the Supreme Court held in *Twombly* that "asking for plausible

grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for

enough fact to raise a reasonable expectation that *discovery will reveal evidence* of [the conduct

complained of]." 550 U.S. at 556 (emphasis added).

Finally, Defendant repeats time and again that Plaintiff has made some of her allegations

on information and belief, as if that were some kind of strike against her. (*See* Def.'s Mot. 1, 3,

19, 22 & n.13.) But making allegations upon information and belief is entirely legitimate—and

those allegations, like any other allegation, must be accepted as true—"where the facts are

peculiarly within the possession and control of the defendant . . . or where the belief is based on

factual information that makes the inference of culpability plausible." *Arista Records LLC v.*

*Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citation omitted). Here, the allegations Plaintiff makes

upon information and belief concern facts that are peculiarly within the possession and control of

Defendant: *e.g.*, internal information about the Board's fee-approval process and the costs that

the advisers incur to operate these funds. (*See* Compl. Ex. 17 at 9.)

Along these lines, it is important to keep in mind that Congress intended that private

shareholders would play an important role in enforcing the fiduciary duties of investment

advisers. While made in the ERISA context, the Eighth Circuit's recent statements about the

12(b)(6) standard apply equally to claims brought by mutual fund shareholders against fund

complexes under the ICA:

> No matter how clever or diligent, [ICA] plaintiffs generally lack the inside
> information necessary to make out their claims in detail unless and until discovery
> commences. Thus, while a plaintiff must offer sufficient factual allegations to
> show that he or she is not merely engaged in a fishing expedition or strike suit, we
> must also take account of their limited access to crucial information. If plaintiffs

> cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by [the ICA] will suffer. These considerations counsel careful and holistic evaluation of an [ICA] complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief.

*Braden*, 588 F.3d at 598.  In addition, allegations that are directed at the funds advised by Defendant generally, while not contributing directly to fund-specific claims, can still "strengthen Plaintiffs' showing of a disproportionate relationship between the fees Defendant[ ] charged to the funds that they advised and the services Defendants provided to the funds." *Hunt*, 2006 WL 1581846, at *4.  In sum, "'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element . . . [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Federated*, 2009 WL 5821045, at *1.

**B.**     **Plaintiff's Allegations Are More Than Sufficient to State Claims Under Section 36(b) of the ICA.**

The Supreme Court's recent decision in *Jones* held that courts should use the "*Gartenberg* factors" as part of an analysis of ICA claims.  *See Jones*, 130 S. Ct. at 1426 (citing *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923 (2nd Cir. 1982)).  Those factors include: (1) the nature and quality of the services provided to the fund shareholders; (2) the independence and conscientiousness of the directors; (3) comparative fee structures; (4) economies of scale in operating the fund as it grows larger; (5) fall-out benefits, i.e., indirect profits to the adviser attributable in some way to the existence of the fund; and (6) the profitability of the fund to the adviser-manager.  *Id.* at 1425-26 & n.5.  While the allegations in Plaintiff's Complaint closely track these factors, a plaintiff need not make a conclusive showing as to each of the *Gartenberg* factors but, rather, can allege any combination of facts that plausibly support an inference that a particular fee is unlawful given all of the surrounding facts and circumstances.  *Curran*, 2010

WL 2889752, at *9.[4] A plaintiff must merely "allege facts that, if true, would support a claim that the fees at issue are excessive." *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *9 (citation omitted).

Defendant is simply wrong to argue that Plaintiff misconstrues *Jones* and asserts only a defective fee-approval process. (Def.'s Mot. 10-11.)[5] To the contrary, Plaintiff alleges that Defendant's fees, under the *Gartenberg* factors, are substantively excessive. (Compl. ¶¶ 40-48, 52-56, 80-83, 86-93, 100-03, 105-13.) Plaintiff certainly does allege that the fee-approval process was markedly inadequate—but her claim is that this defective process made the fees, *i.e.*, the *outcome* of that process, excessive. This is entirely consistent with *Jones*, which recognizes that a defective process will produce a substantively excessive fee. Indeed, the Supreme Court *defines* an excessive fee as one that "bears no reasonable relationship to the services rendered *and could not have been the product of arm's length bargaining*." *Jones*, 130 S.Ct. at 1426 (emphasis added). Precisely for this reason, *Jones* requires that "a court's evaluation of an investment adviser's fiduciary duty must take into account *both* procedure and substance," and

---

[4] *See also In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) (a motion to dismiss "do[es] not require us to assess whether all six factors have been met"); *Wicks v. Putnam Inv. Mgmt., LLC*, No. 04-10988, 2005 WL 705360, at *4 (D. Mass. Mar. 28, 2005) ("[a] plaintiff's failure to plead certain *Gartenberg* factors is not itself grounds for dismissal."); *Krantz (Richard) v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150 (D. Mass. 2000) ("*Fidelity*") (denying motion to dismiss Section 36(b) claim where plaintiff alleged facts concerning only four of the six *Gartenberg* factors); *Strougo v. BEA Assocs.*, No. 98-3725, 2000 WL 45714, at *6-7 (S.D.N.Y. Jan. 19, 2000) ("*Gartenberg* is a post-trial decision in which the evidence can be weighed against the six factor test. The pleading standards under the federal rules . . . do not contemplate pleadings sufficiently detailed to enable a court to make a determination on a 12(b)(6) motion as to whether the six *Gartenberg* factors were met.").

[5] Defendant cites *Gallus v. American Express Financial Corp.*, No. 04-4498, 2010 WL 5137419 (D. Minn. Dec. 10, 2010) in support of its position, but Defendant's argument is premised on the assertion that Plaintiff asserts a purely procedural ICA claim. As explained in the text, that premise is wrong. *Gallus* is being appealed once again to the Eighth Circuit, which already reversed the district court's first entry of summary judgment in favor of American Express.

12

that, when a board's process is defective, a court "must take a more rigorous look at the outcome" of that process—as this Court must do now. *Id.* at 1429-30 (emphasis added).[6]

The critical question here is whether Plaintiff's Complaint makes the allegations necessary to provide Defendant with notice of the claims against it. Defendant criticizes Plaintiff's Complaint (*see* Def.'s Mot. 14 n.8) for having some similarities to another set of lawsuits—*Curran*, *Gallus*, and *Jones*—but in all of those cases, the courts **denied** motions to dismiss. *See also infra* Section IV.D. Indeed, Judge Cercone in the post-*Twombly Federated* decision cited those similarities in the complaints as support for denying a motion to dismiss. *See Federated*, 2009 WL 5821045, at *8, and cases cited therein. An examination of Plaintiff's Complaint—which should be read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible," *Braden*, 588 F.3d at 594—demonstrates it alleges more than sufficient facts to put Defendant on notice of the substance of Plaintiff's claims.

---

[6] The Supreme Court held in *Jones* that a fee that is negotiated by a board *in full possession of all relevant information* may still be excessive if the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. 130 S.Ct. at 1429-30. However, the Supreme Court also specifically noted that, "*[i]n contrast*, , . where the board's process was deficient or the adviser withheld important information, the court must take a more rigorous look at the outcome. . . an adviser's compliance or noncompliance with its disclosure obligations is a factor that must be considered in calibrating the degree of deference that is due a board's decision to approve an adviser's fees." *Id.* at 1430. Ultimately, the "essence" of the test of fiduciary duty is "*whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.* If it does not, equity will set it aside." *Id.* at 1427 (*quoting Pepper v. Litton*, 308 U.S. 295, 306-307 (1939)) (emphasis in original). For purposes of Rule 12(b)(6) motion where information about the internal process of board is peculiarly within the control of Defendant, the fact that the fees Defendant charges the Funds are multiple times higher than what Defendant negotiates at arm's length with the Funds' sub-advisors who perform the core advisory services and institutional clients with similarly managed funds, *see* Sections IV.B.1 and IV.B.3, *infra*, should suffice to support the inference of a flawed process that requires increased scrutiny.

### 1.    The Nature and Quality of Services

The core and most costly service shareholders buy and pay for when they invest in the

Funds is investment advisory advice. Plaintiff has alleged that Defendant hires sub-advisers for

each of the Funds to provide those core investment advisory services. After some initial

involvement, Defendant delegates to sub-advisers the day-to-day investment management of the

Funds, including "evaluat[ing] and implement[ing] an investment program appropriate for each

Portfolio" as well as "mak[ing] all determinations with respect to the investment of the assets for

the Portfolios and the purchase or sale of portfolio securities." (Compl. ¶¶ 44-46 & Exs. 1, 11,

12.) While Plaintiff acknowledges that Defendant supposedly provides some additional

administrative services under the Investment Management Agreement (*id.* ¶ 18), Plaintiff

estimates that Defendant's cost to provide these additional services is around three basis points

(*id.*), which is *de minimis*. Defendant asserts that it provides some continuing "supervision" of

the sub-advisers by "coordinati[ng]" (but not itself actually *performing*) the functions of the

subcontractors, by hiring employees to keep the books, and by providing "adequate office

space." (Def.'s Mot. 17 (citing Compl. Ex. 1 at 21).) But the allegations in Plaintiff's Complaint

legitimately call into question whether, in fiscal year 2009 for example, these services could have

cost Defendant anywhere near the *over $90 million* it charged the shareholders over and above

what it paid the sub-advisers for investment advisory services for the Funds—a charge that was

also over two times what it paid its sub-advisers for performing the core investment management

advisory services. (*Id.* at 109.)[7]

---

[7] The additional amount paid by each fund is listed in paragraph 108 of the Complaint. On a fund-by-fund basis, the Funds at issue in this case were charged anywhere from $610,000 to almost $58 million over the cost of the sub-adviser.

14

Further, in setting what it would pay the sub-advisers for their services to at least two of the Funds (Hartford Dividend & Growth and Hartford Midcap), Defendant negotiated a fee schedule with the Funds' sub-advisers that contains breakpoints at much lower levels than Defendant offered to those Funds. (*See* Compl. ¶ 47.) These two examples based on publicly available information are indicative of Defendant's *modus operandi* regarding the provision of services to the Funds' shareholders — negotiate for the lowest fee possible with the sub-advisers who provide the core investment advisory services but do not meaningfully share those savings with the Fund's shareholders and hide behind a few administrative services that result in, at most, a *de minimis* cost while charging shareholders tens of millions of additional dollars in fees.

These facts (which must be taken as true for purposes of Defendant's motion) provide ample support for the proposition that "the services provided have not been of a quality or quantity that would justify the fee arrangement." *Federated*, 2009 WL 5821045, at *8. In *Curran*, which was both a post-*Twombly* and post-*Jones* Section 36(b) case, the plaintiffs made a similar allegation that the defendant adviser collected substantially higher fees than the sub-advisers of the subject funds, even though the defendants provided little, if any, additional advisory services themselves. 2010 WL 2889752, at *8. The district court in *Curran* found the plaintiffs' allegations sufficient to defeat a Rule 12(b)(6) motion. Defendant weakly attempts to distinguish *Curran* because it involved a fund of funds with multi-layer fees. However, the essence of the *Curran* case is exactly the same as the instant case. As here, the *Curran* plaintiffs alleged that Principal (the defendant adviser), *inter alia*, hired a sub-adviser to provide the core investment management services but charged the plaintiffs many times over the fee charged by the sub-advisor when Principal provided few additional advisory services, *id.* at *8-9, and charged its institutional clients lower fees for similar services. *Id.* As did the *Curran* court, this

Court similarly should find Plaintiff's claim sufficient to defeat Defendant's misplaced challenge.

### 2.    The Independence and Conscientiousness of the Directors

Defendant wrongly asserts that Plaintiff's Complaint contains no factual allegations about the independence and conscientiousness of the directors in evaluating adviser compensation. (Def.'s Mot. 19.)  Plaintiff has alleged, *inter alia*, that the Board of Directors of the Funds oversees over 90 mutual funds in the Fund Complex (Compl. ¶ 22), and does not hold separate meetings to approve the fees for each mutual fund.  (*Id.* ¶ 66.)  The aggregated analysis the Board likely conducts can mask or overlook Defendant's higher profitability attributable to larger funds and prevent the Board from carefully reviewing the fairness of investment management fees for individual funds.  (*Id.* ¶ 67.)  Plaintiff further alleges that the Board could not have adopted the Funds' 12b-1 Plans in accordance with federal law since—despite the dramatic growth in total assets held by the Funds—both the management and 12b-1 fees received by Defendant have grown over time, depriving the Funds of the benefit of economies of scale. (*Id.* ¶ 73.)  In addition, Plaintiff alleges, upon information and belief, that Defendant does not provide the directors with sufficient information to fulfill their obligations, a factor demonstrating that the fee-setting process lacked good faith and integrity, in violation of ICA § 36(b).  (*Id.* ¶ 68.)  These information-and-belief allegations must be accepted as true, since the facts they concern "are peculiarly within the possession and control of the defendant." *Arista Records*, 604 F.3d at 120 (internal citation omitted).  Specific information about the fee-setting process is indeed peculiarly within the possession and control of Defendant.  Nonetheless, Plaintiff supports her belief about the faulty fee-setting process with an SEC Cease-and-Desist proceeding which charged that Hartford had failed to disclose to the Board its use of Fund assets

to pay for shelf space arrangements with broker-dealers—an omission that provides evidence of Defendant's willingness to withhold pertinent information from the Board. (Compl. ¶ 69.)

Defendant claims that "the documents attached to the Complaint and the public record" reflect a sufficiently rigorous Board review process. (Def.'s Mot. 20.) But the generally self-serving statements made in public disclosures which were carefully drafted by Defendant's and/or the Board's attorneys to cover factors they know must be considered hardly constitute a rigorous process. Nor is Plaintiff required to *negate* inferences that might support Defendant's claims. *See Braden*, 588 F.3d at 596 ("Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct."). In any event, Plaintiff's allegations regarding the diligence of the Board are similar to those in other complaints that have defeated motions to dismiss in which other defendants made these exact same arguments. (*Compare* Compl. ¶¶ 62, 65-70 *with* Def.'s Mot. 19-20, Ex. 6 (Curran Compl. ¶¶ 94, 97, 98, 111); Ex. 7 (Gallus Compl. ¶¶ 17, 66); and Ex. 8 (Jones Compl. ¶ 49)).

In *Curran*, the defendants also asked the court to review additional information that they submitted with their motion to dismiss, asserting that the plaintiffs' allegations about the board's process were implausible or inaccurate in light of the additional information. 2010 WL 2889752, at *9. In particular, in challenging the plaintiffs' allegations that the board of directors was not independent and lacked conscientiousness when reviewing the fees paid by the funds, the *Curran* defendants asked the court to "review 'publicly disclosed detailed explanations of the steps taken in setting fees' and 'credit the presumption that these directors are doing their jobs with respect to overseeing the fees paid by the SAM funds.'" *Id.* In declining the defendants' request, the *Curran* court rebuked the defendants for

> ask[ing] the Court to engage in a factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion, where the Court must take Plaintiffs' factual

> allegations as true and make all reasonable inferences in favor of Plaintiffs. Indeed, Defendants' arguments here, raising what appear to be fact-intensive inquiries, suggests that resolution of the § 36(b) claim . . . is unlikely even at the summary judgment stage of litigation.

*Id.*

Defendant also asserts that the "Complaint does not identify any relevant information that the Board should have considered but did not" (Def.'s Mot. 20), but this assertion is simply wrong. (*See, e.g.*, Compl. ¶ 67.) Even if Defendant were right, though, it would be asking this Court to apply a heightened pleading standard. Plaintiff need not allege with particularity exactly what information the Board overlooked or was not given. *Cf.* FED. R. CIV. P. 9(b). Plaintiff plausibly alleges that the Board could not have engaged in a proper fee-approval process given the grossly excessive outcome of that process. *See Braden*, 588 F.3d at 595-96 (holding that plaintiffs need not "directly address[]" the fiduciary decision-making process in order to state a claim).

There is good reason why Plaintiff need not make specific allegations about the Board's fee-approval process: Plaintiff lacks any access to facts about that process. Thus, for example, it was only in discovery that the plaintiffs in *Gallus v. Ameriprise Financial, Inc.*, 561 F.3d 816 (8th Cir. 2009) ("*Gallus II*"), *vacated*, 130 S. Ct. 2340 (2010), learned that despite the normal recitations in publicly filed documents regarding the factors considered by the board, there were questions concerning the veracity and accuracy of the materials provided to the board. *Id.* at 824. Likewise, in *In re American Mutual Funds Fee Litigation*, No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), only after discovery were plaintiffs able to develop evidence that, despite outward appearances,

> the Unaffiliated Directors' [sic] did not diligently inquire into some issues of importance and failed to recognize the consequences of some of the information presented to them . . . the Unaffiliated Directors accepted, with virtually no comment, statements made regarding compensation paid to CRMC and AFD

> employees either in the aggregate or in specific. Likewise, the directors regularly approved a 25 basis point 12b-1 fee, regardless of the assets under management, on the assumption that the increase in asset size was proportional to the increase in investors. However, the directors apparently failed to consider that the increase in assets under management resulted in significant part from appreciation of existing accounts and not the addition of new investors. Moreover, no evidence was presented that the fee was decreased as the assets under management substantially decreased between the middle of 2007 and the end of 2008. These failures are significant given the Unaffiliated Directors' important role as "independent watchdogs" with primary responsibility for protecting shareholder interests. [] Without exacting scrutiny by these directors, the possibility exists that issues of significant importance will not receive the attention they deserve, ultimately harming investors.

2009 WL 5215755, at *55 (citing *Burks v. Lasker*, 441 U.S. 471 (1979)). Based on the limited

information publicly available to Plaintiff, she has alleged more than sufficient facts to meet this

factor for the purposes of a Rule 12(b)(6) motion.

### 3.    Comparative Fee Structures

The Supreme Court admonished that "courts should not rely too heavily on comparisons

with fees charged to mutual funds by other advisers. These comparisons are problematic

because these fees . . . may not be the product of negotiations conducted at arm's length." *Jones*,

130 S. Ct. at 1429 (citing *Gartenberg*, 694 F.2d at 929, for the proposition that competition

between fund advisers is "virtually non-existent").

Plaintiff's Complaint offers three comparisons to illustrate the unjust nature of

Defendant's fees. First, as discussed above in Section IV.B.1 (nature and quality of services),

Defendant paid itself over two times what it paid its sub-advisers despite the fact the sub-

advisers perform the bulk of the core investment management advisory services. Defendant

protests that the "Complaint contains no specific factual allegations" about the services that

Defendant itself provides (Def.'s Mot. 16) even though Plaintiff alleged that Defendant only

provides minimal oversight to the Funds. (Compl. ¶ 44.) In any case, Defendant misses the

point. *Specific* allegations are not necessary, *see Erickson*, 551 U.S. at 93; *Fowler*, 578 F.3d at

19

213, as it would be perverse to require Plaintiff to make specific allegations at a stage when she lacks access to specific information.

Second, Plaintiff also provides a comparison to the fees that the Fund's sub-advisers charge other similar mutual funds outside of the Hartford Complex with specific examples for three of the subject funds showing that Defendant charges the Funds anywhere from $17 million to $71 million more per year for investment advisory services. (Compl. ¶¶ 80-83.) Defendant asserts that Vanguard is not an appropriate comparator simply because it is a low-cost mutual fund provider. (Def.'s Mot. 23.) Yet like Vanguard, Defendant claims that its affiliate provides sub-advisory services to three of the Funds at cost. (*See* Compl. ¶ 47.) Further, while the Vanguard funds may be low-cost, they are not non-profit. The Vanguard fees provide, at a minimum, another way to analyze the cost of providing investment advisory services to similar funds, the economies of scale realized by Defendant, and a baseline against which to evaluate the fees Defendant charges to the Funds for similar services. In any event, Plaintiff does not rely solely on this comparison. The Vanguard example is merely one of three methods in Plaintiff's Complaint demonstrating the excessiveness of Defendant's fees.

Third, Plaintiff explains that Defendant or its affiliated entities also provide investment management services to third-party institutional clients which are substantially similar, if not identical, to the investment management services Defendant provides to the Funds. (Compl. ¶¶ 84, 86.) And yet, the Funds pay four and a half to five and a half times more in basis points than these institutional clients. (*Id.* ¶¶ 90-92.) Defendant suggests (but does not actually claim) that there could be differences between the services it provides to the Funds and the services it provides to its institutional clients that potentially may justify this discrepancy (*see* Def.'s Mot. 15 (citing *Jones*, 130 S. Ct. at 1428-29))—but as Plaintiff points out in her Complaint, the Funds

pay for a number of these services under agreements *separate from and in addition to* the

Investment Management Agreement. (Compl. ¶ 86.) For example, the Rule 12b-1 fees are

intended to cover marketing costs, *see* 17 C.F.R. § 270.12b-1, and transfer agency services

similarly are provided pursuant to *separate* contracts and are paid for with *separate* fees. Even if

it is assumed, *arguendo*, that there are some differences in services between the two types of

accounts, the Complaint raises sufficient questions as to whether the fees Defendant charges to

the Funds that are four and a half to five and a half times higher than what it charges its

institutional clients are justified or justifiable. Although vacated, the Eighth Circuit aptly

observed that "[t]he purpose of an inquiry into the fees paid by institutional [and] non-fiduciary

clients is to determine what the investment advice is worth." *Gallus II,* 561 F.3d at 824.

The defendants in *Jones I* made the exact same argument as Defendant does here: they

simply asserted that the services other clients received at significantly lower rates were not

identical. 2005 WL 831301, at *2. But as the court observed:

> We are in no position based on the allegations of the complaint to determine what
> services Plaintiffs received from Harris or how much they can fairly be worth. It
> is not inconceivable that the fees charged, given the exponential increase and
> different treatment of other clients alleged, were so disproportionate to the value
> of the services rendered that a violation of § 36(b) would lie. That is enough to
> withstand a 12(b)(6) challenge.

*Id.* Further, the district court in *Jones I* held that the defendant's argument was a "defensive

response[]" that did "not challenge[] the legal viability of the Plaintiffs' core contention. *Id.* In

other words, at this stage of the case, plaintiff needs not rebut negative inferences in order to

state an affirmative claim. *See Braden*, 588 F.3d at 596.

According to Defendant, Plaintiff is required to allege further facts proving the aptness of

the institutional fee comparison—an impossible feat without discovery. The Supreme Court's

decision in *Jones*, which Defendant repeatedly cites in an effort to advocate for this impossible

hurdle, was, as Defendant admits, a decision on a motion for summary judgment. And as previously discussed, "[i]t is axiomatic that the standards for dismissing claims under FED. R. CIV. P. 12(b)(6) and granting judgment . . . are vastly different," *Fowler*, 578 F.3d at 213, since, at the motion to dismiss stage, defendants generally control most of the information, and plaintiffs do not have access to critical discovery that will aid them in establishing further proof of their claims. It was, for example, only *after* discovery that the plaintiffs in *Gallus II* developed evidence that an institutional account was a "patterned portfolio" to the fund at issue in the case, that the two accounts had identical investment objectives and very similar stock holdings, and the portfolio manager (who was the same for both accounts) made the same decision to buy or sell stock shares for both accounts. *Gallus II*, 561 F.3d at 819. The lack of discovery is precisely why a plaintiff need only put forth allegations that "raise a reasonable expectation that discovery will reveal evidence of the necessary element" at this early stage of a case. *Fowler*, 578 F.3d at 213. Defendant's position is contrary to the case law approving many similar section 36(b) complaints and should be rejected.

      **4.**     **Economies of Scale**

Section 36(b) was enacted "in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services. Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from those economies of scale." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 326-27 (4th Cir. 2001).

Plaintiff's Complaint points out that as the Funds' assets under management have grown, the management and distribution fees paid to Defendant also have grown dramatically. (Compl. ¶ 100.) But Defendant has not shared the economies of scale it has gained from that growth as fees for the Funds' shareholders have not decreased dramatically.

A comparison with the sub-advisers' fee schedules helps to demonstrate Defendant's failure to share economies of scale. Plaintiff included specific information about the breakpoints for each Fund to illustrate this point (*id.* ¶ 47), and then, using the sub-adviser Wellington (which is also a sub-adviser to Vanguard), further illustrated the disparity between Defendant's and the sub-adviser's fee schedules (*see id.* ¶ 101). For example, when Defendant negotiated the breakpoint schedule with Wellington, the sub-adviser for the Hartford Dividend & Growth Fund, Defendant negotiated a schedule under which Wellington granted fee reductions beginning after the Fund reached $50 million in assets under management and dropped to just 15 basis points on any amount over $500 million. In contrast, Defendant offers Plaintiff and the shareholders of the Hartford Dividend & Growth Fund their *first* breakpoint only after assets under management reach $500 million (*id.* ¶ 47), and Defendant's fee does not drop below 60 basis points until there are more than $5 billion in assets under management. (*Id.*) This disparity is particularly egregious as the cost of the "oversight" function Defendant performs for the Funds should not increase as Fund assets increase, resulting in enormous economies-of-scale benefits that Defendant retains for itself but should share with the Funds and their shareholders. (*Id.* at ¶ 102.)

Defendant relies heavily on the mere existence of breakpoints (Def.'s Mot. 21), but their mere existence in the Funds' fee schedules does not mean that economies of scale are *adequately* passed on to shareholders of the Funds. Nor does it mean that a fund ever gets so large that the shareholders can *actually* avail themselves of the fee breakpoints. Further, a full picture emerges only when one examines the breakpoints offered to the Funds in comparison with the breakpoints Defendant negotiated with its sub-advisers at arm's length. Translating the difference into dollar terms, Defendant retained $90 million in compensation for investment advisory services while paying its sub-advisers less than half that amount for performing the core investment

management services—namely, evaluating and implementing an investment program appropriate for each portfolio and investing the assets of the portfolios by buying and selling securities. (*See* Compl. ¶ 45.) In addition, Plaintiff alleges that administrative services—aside from transfer agency costs, which are provided under a fee that is paid for *separately* from the investment advisory costs—do not account for more than three basis points, or 3/100ths of a percent, of the average mutual fund's advisory fee. (*Id.* ¶ 18.) Combine all of these allegations, and Plaintiff surely has "give[n] the defendant fair notice" that it has not adequately shared economies of scale with the Funds and has breached its fiduciary duty. *Twombly*, 550 U.S. at 555 (quotation marks and citation omitted).

Despite the existence of these allegations in the Complaint, Defendant demands more. In fact, Defendant argues that a plaintiff should be required to include information about "the *costs per investor*" in a complaint. (Def.'s Mot. 21.) Given Defendant's counsel's experience in section 36(b) cases, it is astounding that they take this position. Defense counsel knows full well that this type of information can be determined only by reviewing and analyzing accounting information, *i.e.*, inside information that is not publicly available. As noted by the GAO, "comprehensive data on the total costs incurred by mutual fund advisers are not publicly available. . . . [M]utual funds disclose . . . only those operating costs that have been deducted from the assets of the fund, but not the costs that the advisers incur to operate these funds." (Compl. Ex. 17 at 9.) *See also Braden*, 588 F.3d at 598. The publicly available information and other allegations in Plaintiff's Complaint, however, are more than sufficient to state a claim under ICA section 36(b).

### 5. The Profitability of the Fund to the Adviser-Manager

Plaintiff's Complaint demonstrates how Defendant retains approximately 62% to 75% of the investment advisory fees obtained from the Funds (Compl. ¶ 108), even though the bulk of

24

the investment advisory services are provided by sub-advisers to the Funds. In 2009, Defendants received nearly $140 million in investment advisory compensation while the sub-advisers received a fraction of that amount, or approximately $44 million. (*Id.* ¶ 47-48.)

Similar to its criticism of Plaintiff's allegations about economies of scale, Defendant asserts a plaintiff must show, at the outset of a case and prior to any discovery, "the *actual cost* to or *specific services* provided by [Defendant]." (Def.'s Mot. 22.) This is precisely the sort of particularity that is not required under FED. R. CIV. P. 8(a). *See Fowler*, 578 F.3d at 213. Moreover, as Defendant surely knows, such information is typically considered highly proprietary by fund complexes and, as a result, is not available absent discovery. (Compl. Ex. 17 at 9.) It is therefore impossible for Plaintiff to know *now* how much profit Hartford makes from the Funds or how it allocates its costs among the funds in the Fund Complex or between the Funds and Defendant's other lines of business. Where "specific financial information is not available prior to discovery," courts have refused to dismiss Section 36(b) claims based upon the lack of information regarding this factor. *See Fidelity*, 98 F. Supp. 2d at 159; *see also Braden*, 588 F.3d at 598. Accordingly, Defendant's argument that more facts are required at this stage should be rejected.

In sum, the *Gartenberg* approach "insists that all relevant circumstances be taken into account." *Jones*, 130 S. Ct. at 1427. Here, Plaintiff has laid out in her Complaint, *inter alia*, that Defendant charges tens of millions of dollars in additional advisory fees over and above what its sub-advisers (who provide the bulk of investment advice) charge even though Defendant provides few, if any, additional advisory services, Defendant charges advisory fees four to five times greater than it charges to institutional clients for substantially similar services, Defendant does not provide the Funds' directors with sufficient information to fulfill their obligations, and

Defendant's fees do not reflect the benefits derived from economies of scale. These facts, taken

together to comprise "the surrounding facts and circumstances," all "plausibly support an

inference that [Defendant's fees] . . . [were] disproportionately large to the services rendered in

exchange for that fee." *Curran*, 2010 WL 2889752, at \*9.

## C.     Defendant's Motion Relies on Inapposite Case Law.

Defendant, citing *Amron v. Morgan Stanley Investment Advisors Inc.*, 464 F.3d 338 (2d

Cir. 2006) and *Krantz (Sheldon) v. Prudential Investments Fund Management LLC*, 305 F.3d

140 (3d Cir. 2002) ("*Prudential*"), attempts to mislead the Court into believing that Plaintiff's

Complaint is "'strikingly similar [to other] § 36(b) complaints filed in multiple courts over the

past decade, which have relied on 'speculation, inference and generalized observations about the

securities industry.'" (Def.'s Mot. 12 (listing *Amron* as an example).)  The *Amron* and

*Prudential* complaints were part of five "virtually identical actions," *Prudential*, 305 F.3d at 143,

in which the plaintiffs based their claims on the "poor performance" of mutual funds. *Amron*,

464 F.3d at 340.  With the exception of facts about the funds' "poor performance," these

complaints hardly made any factual allegations at all. *See Amron*, 464 F.3d at 344-45.[8]  In

particular, they lacked the specific and extensive fee comparisons that Plaintiff's Complaint

includes. *See id.*  Further, rather than alleging facts that would allow a court to draw an

inference that the fee-approval process itself was flawed (as Plaintiff does in this case), the

*Amron* and *Prudential* complaints leveled legally inadequate accusations against the directors'

independence. *See id.* at 345.  The complaints were rejected because—as another court

remarked in ruling on these complaints—they contained only conclusory allegations amounting

---

[8] A copy of the Complaint in *Amron v. Morgan Stanley Investment Advisors Inc.,* No. 03-cv-05896 (S.D.N.Y. filed Aug. 6, 2003), as published at 2003 WL 25659496, is attached hereto at Exhibit 1.

to nothing more than "the mere recitation of boilerplate statutory language." *Migdal*, 248 F.3d at 328. That is a far cry from Plaintiff's Complaint.

Furthermore, Plaintiff relies on eight district court orders denying very similar motions to dismiss, *all* of which were decided after the Third Circuit's decision in *Prudential*, and several of which were decided after the Second Circuit's decision in *Amron*. None of the district courts concluded that *Amron* or *Prudential* were at all applicable to the complaints before them.

## D.   Count II Adequately States a Separate Claim Under Section 36(b) for Excessive 12b-1 Distribution Fees.

Count II of Plaintiff's Complaint asserts that Defendant breached its fiduciary duty by receiving additional compensation in the form of distribution fees that contributed to economies of scale that benefited only Defendant because Defendant failed to adequately pass along any of those benefits to Plaintiff or the Funds. Defendant asserts that Count II should be dismissed for failure to state a claim for largely the same reasons it argues with respect to Count I.

As set forth in the Statement of Facts, *see supra* Section III.B, Plaintiff included in her Complaint facts specific to the Rule 12b-1 fees. Even so, Plaintiff's Complaint should be read as a whole. The reasons why Plaintiff sufficiently alleges a breach of duty with respect to the receipt of compensation for investment advisory services apply with equal force to the 12b-1 fees. As Plaintiff explains, Defendant's distribution fees are excessive because they were yet another mechanism by which Defendant obtained additional advisory compensation. (Compl. ¶ 53.) In *Meyer v. Oppenheimer Management Corp.*, 764 F.2d 76, 83 (2d Cir. 1985) the court held that "[a] claim that payments made under Rule 12b-1 are excessive when combined with advisory fees, where both payments are made to 'affiliated persons' of an investment adviser, is cognizable under section 36(b)." Defendant repeats that Plaintiff should have to assert specific facts regarding the *actual costs* of managing the funds (Def.'s Mot. 28), but as previously

27

discussed, this type of information is neither required by Rule 8(a) nor publicly available. To require plaintiffs to state a claim pleading facts which "tend systematically to be in the sole possession of defendants" would cause the remedial scheme of statutes such as the ICA to fail. *Braden*, 588 F.3d at 598.

Further, as Defendant correctly notes, the allegations about the 12b-1 fees are similar to the claims raised in *Gallus I* and *Curran*. (Def.'s Mot. 25 n.16.) Yet, both the courts in *Gallus I* and *Curran* found those very similar allegations sufficient to defeat defendants' motion to dismiss. *See Gallus I*, 370 F. Supp. 2d at 867-868 (plaintiffs' assertions that the distribution fees paid by the funds' shareholders were excessive, that the only purpose of these fees was to generate additional advisory fee for defendant, that plaintiffs had paid $113 million in distribution fees but received no benefits from the payment of the fees, and that the fees have only served to benefit the defendants was sufficient to survive a motion to dismiss); *Curran*, 2010 WL 2889752, at *11 ("Plaintiffs have met their burden by alleging that fees collected by PFD for its distribution services surpassed the value of those services, and that the manner in which those fees were assessed did not correspond to the type of services performed but, rather, resemble fees collected for advisory services.").[9] (*Compare* Compl. ¶¶ 49-56, 72-77, *with* Def.'s Mot. 24-25, Ex. 6 (*Curran* Compl. ¶¶ 52-59, 101-04); Ex. 7 (*Gallus* Compl. ¶¶ 19-27).) This Court likewise should find that Plaintiff's allegations sufficiently state a claim.

Finally, Defendant argues that Plaintiff has no private right of action to challenge 12b-1 fees under ICA section 36(b), but this argument misses the point entirely. The question here is not whether Plaintiff has a private right of action under section 36(b). She clearly does, and

---

[9] Defendant, in disagreeing with the *Principal* decision, merely states that "pleadings after *Twombly* and *Iqbal* require more." (Def.'s Mot. 29 n.19.) Yet, *Principal* was a post-*Twombly* and *Iqbal* decision, and the *Principal* court was well aware of both of those decisions.

Defendant concedes as much. The question, rather, is the *substance* of that private right of action. As Plaintiff has pointed out, the case law extends that substance to Rule 12b-1 fees, which may be challenged under section 36(b). *See Meyer*, 764 F.2d at 83.

**E.   Eight Other Courts Have Held that Complaints with Similar Supporting Information as Plaintiff's Complaint Defeat a Rule 12(b)(6) Motion.**

As previously noted, eight other courts have held that complaints with allegations similar to the ones in this case withstand a Rule 12(b)(6) motion. *Curran*, 2010 WL 2889752, at *9; *Federated*, 2009 WL 5821045, at *8; *Sins v. Janus Capital Mgmt., LLC*, 2006 WL 3746130, at *10-12; *Hunt v. Invesco Funds Group, Inc.*, 2006 WL 1581846, at *2-5; *Dumond v. Mass. Fin. Servs. Co.*, 2006 WL 149038, at *8-11; *Jones v. Harris Assocs. L.P.*, 2005 WL 831301, at *2; *Strigliabotti v. Franklin Resources, Inc.*, 2005 WL 645529, *11-12; *Gallus I*, 370 F. Supp. 2d at 867. As there are several overlapping similarities between Plaintiff's Complaint and those in these eight other cases, Plaintiff will only discuss the two decisions that have been decided post-*Iqbal* and *Twombly* to illustrate that the facts the courts found sufficient in those cases also are present in the Plaintiff's Complaint:

In the *Curran* complaint (which also was a post-*Jones* decision), the plaintiffs alleged that Principal "charges more than the subadvisors, who allegedly provide the bulk of investment advice, that the charges do not reflect the benefits derived from economies of scale, and that other institutional clients pay less for the same services, all support a reasonable inference that PMC collected excessive fees for its investment advising services of the Subject Funds." 2010 WL 2889752, at *9. The *Curran* court found that these facts were sufficient to "plausibly support an inference that [Principal's fees], given all of the surrounding facts and circumstances, [was] disproportionately large to the services rendered in exchange for that fee." *Id.* Plaintiff's

29

Complaint contains facts specific to each of the points raised in *Curran*. (*See* Compl. ¶¶ 42-48,

84-93, 100-103.)

> In the *Federated* case, the court found that the plaintiffs' complaint alleged that:

> the process leading to the fees charged to the Kaufmann Fund did not disclose
> meaningful and specific information needed to assess the relationship of the fees
> being charged to the services being provided. They have alleged that the fees
> charged are excessive under any relevant comparison. They have alleged that the
> services provided have not been of a quality or quantity that would justify the fee
> arrangement. They have alleged that the defendants have completely failed to pass
> along any economies of scale gained by the fund's growth over recent years
> through merger and otherwise and instead have consumed these saving for their
> own benefit or the benefit of other funds managed within the same complex of
> funds.

2009 WL 5821045, at *8. Similar allegations can be found in Plaintiff's Complaint. (*See*

Compl. ¶¶ 48, 63, 67-71, 79-93, 100-103, 110-114.) The Federated court noted:

> [a] number of courts have upheld complaints founded on similar allegations
> ...[C]ontrary to defendants' efforts to characterize the allegations of the CAC as
> formulaic recitations of legal principles, assertions that lack meaning without
> proper context, or naked assertions incapable of further factual enhancement,
> plaintiffs' allegations are grounded in sufficient fact or are derived from concrete
> factual matter. Standing unrebutted through expert testimony or otherwise, they
> are enough to 'nudge' the section 36(b) claim 'across the line from conceivable to
> plausible,' which is all that is required.

*Id.* As Plaintiff's Complaint contains essentially all the facts detailed not only in *Curran* and

*Federated* but in all eight of these other complaints, the Court should reject Defendant's motion

to dismiss, as did all eight other courts that have considered like motions from other defendants.

## V.  CONCLUSION

Reading Plaintiff's allegations as a whole, Plaintiff has demonstrated that the factual

allegations in her Complaint are far "more than labels and conclusion, and a formulaic recitation

of the elements of a cause of action..." *Twombly*, 550 U.S. at 555. Accordingly, Plaintiff

respectfully requests that the Court deny Defendant's motion to dismiss.

Dated: February 2, 2011

Respectfully submitted,

OF COUNSEL:

Guy M. Burns
Jonathan S. Coleman
Aleksas A. Barauskas
**JOHNSON, POPE, BOKOR,**
**RUPPEL & BURNS, LLP**
403 E Madison Street, Suite 400
Tampa, FL 33602
(813) 225-2500
guyb@jpfirm.com
jonathanc@jpfirm.com
aleksasb@jpfirm.com

Michael D. Woerner, Esq.
Tana Lin, Esq.
**KELLER ROHRBACK, LLP**
1201 Third Ave., Ste. 3200
Seattle, WA 98101-3052
(206) 623-1900
mwoerner@KellerRohrback.com
tlin@KellerRohrback.com

Michael Brickman, Esq.
James C. Bradley, Esq.
Nina H. Fields, Esq.
**RICHARDSON, PATRICK,**
**WESTBROOK & BRICKMAN, LLC**
174 E. Bay St.
Charleston, SC 29401
(843) 727-6500
mbrickman@rpwb.com
jbradley@rpwb.com
nfields@rpwb.com

Diane A. Nygaard, Esq.
**THE NYGAARD LAW FIRM**
11050 Roe Avenue, Suite 212
Leawood, KS 66211
(913) 469-5544
diane@nygaardlaw.com

/s/ *Carmella P. Keener*
Carmella P. Keener (Del. Bar No. 2810)
**ROSENTHAL, MONHAIT & GODDESS, P.A.**
919 N. Market Street
Suite 1401, Citizens Bank Center
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
ckeener@rmgglaw.com

*Attorneys for Plaintiff Jill E. Southworth*

31